```
NNH-FA19-5046828-S              :  SUPERIOR COURT


THEODORA F. ANTAR              :  JUDICIAL DISTRICT
                               :  OF NEW HAVEN


v.                             :  AT NEW HAVEN, CONNECTICUT


MATTHEW J. LODICE              :  JUNE 28, 2022
```

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JANE K. GROSSMAN, JUDGE


A P P E A R A N C E S :



Representing the Plaintiff:

    MS. THEODORA ANTAR - Ordering Party
    Self-Represented Party
    856 Shagbark Drive
    Orange, Connecticut 06477


Representing the Defendant:

    MR. MATTHEW J. LODICE
    Self-Represented Party
    23 Lyman Street
    New Britain, Connecticut 06053




                Recorded By:
                Mary Labasi
                Amanda Taylor

                Transcribed By:
                Mary Labasi
                Court Recording Monitor
                235 Church Street
                New Haven, Connecticut 06510

1      THE COURT:  Good morning.  All right.  Antar and

2   Lodice.  All right.

3      What's your name for the record, ma'am?

4      MS. ANTAR:  Theodora Antar.

5      THE COURT:  And, sir?

6      MR. LODICE:  Matthew Lodice.

7      THE COURT:  All right.  So Ms. Antar and Mr.

8   Lodice, you two have appeared in front of me before.

9      MR. LODICE:  Mm-hmm.

10      THE COURT:  And I would say that the last time

11   that you were here, your performance in front of my

12   courtroom was kind of disastrous.  You were yelling

13   at each other.  You were yelling at me.  You were

14   interrupting each other.  You were interrupting me.

15      Now you will notice that you are the only people

16   in my courtroom today.  Because you were so

17   disruptive the last time you -- that you were here,

18   that you are all that I've scheduled for the next few

19   hours.  But I will tell you right now, that if you do

20   not follow the orders of the Court, your hearing will

21   be terminated, and I will reschedule it, and we will

22   try again on another day when perhaps you two are

23   able to follow the rules of court.

24      Under no circumstances, will you be permitted to

25   talk out of turn, or talk over each other, or talk

26   disrespectfully to each other or to me or to anybody

27   else in the courtroom.  So I can't stress this

1    enough.  I will not waste time and I will not waste

2    the Court's time and the court staff time on

3    litigants who cannot follow the rules.

4         So do you understand that, ma'am?

5         MS. ANTAR:  Yes.

6         THE COURT:  And do you understand that, sir?

7         MR. LODICE:  Yes, your Honor.

8         THE COURT:  Do not be surprised if you can't

9    follow these rules, and I get off this bench and you

10   get another court date in the mail.  Do you

11   understand?

12        MS. ANTAR:  Yes.

13        MR. LODICE:  Yes, your Honor.

14        THE COURT:  Okay.  Now we're going to take a

15   moment to discuss what motions we're hearing today

16   and what motions we're not hearing today.  Are you

17   both ready to do that?

18        MR. LODICE:  Yes.

19        THE COURT:  This overall is a visitation

20   petition.  It was filed by you, ma'am.  And it went

21   to judgment back in 2019.  So there are requests by

22   both of you to change that judgment.  In order to

23   change that judgment, you have to -- I have to make

24   certain findings.  So just because you're here and

25   asking for changes, does not mean that changes are

26   automatically happening.

27        The law requires for most of the changes you're

1    requesting that I make a finding that something

2    justifies the change.  So I want you to understand

3    that just because you're here, doesn't mean you're

4    leaving with what you want.  The law is very specific

5    about what I have to find.

6         Now, what I have on the calendar for today is

7    motion 136 and motion 148, as well as -- no, I'm

8    sorry.  Yeah, we are gonna do those.  That's -- let's

9    see.  Well, one of those is a magistrate motion.

10        So really what we have on the calendar for today

11   is your request for emergency custody, ma'am, which

12   was denied but set down for a hearing.  So that's

13   number 162.  And I think that the same claims you've

14   made in that motion are reflected in motion 165,

15   which is ma'am, your request for modification of

16   custody.  And I think that's probably it.  Let's just

17   take one more look here.  165.  163.

18        So I believe all those motions are filed by you,

19   ma'am.  I don't see any of those motions filed by

20   you, sir.

21        MR. LODICE:  I also filed for a contempt motion

22   and a motion of change of custody.

23        THE COURT:  When did you file those?

24        MR. LODICE:  I want to say March.

25        THE COURT:  Okay.  Let me go --

26        MR. LODICE:  March, second week.

27        THE COURT:  -- let me go back.  I didn't go back

1        that far.  All right.

2              So I do see motion 142 which looks like your

3        motion to modify custody.  It looks to me like there

4        was an order entered on your motion for contempt by

5        Judge Price Boreland.  Let's see.

6              So it looks to me, sir, like the motions that

7        you filed in March were resolved by the agreement

8        that you entered in April which is agreement number

9        153.  So some changes --

10             MR. LODICE:  For the contempt.

11             THE COURT:  Well, the modification.  Perhaps not

12        the contempt.  Let's see.

13             MR. LODICE:  For the modification of custody?

14             THE COURT:  Well, yes.

15             MR. LODICE:  Okay.  That's not what I was

16        understanding of.

17             THE COURT:  Well, you were here on that date.

18        You entered into some orders changing custody.

19        Though, the mother has some requests for custody.  So

20        you can certainly be heard on her request.

21             MR. LODICE:  Okay.

22             THE COURT:  It doesn't really matter what motion

23        I enter them on.

24             MR. LODICE:  Okay.

25             THE COURT:  And then there was a motion for

26        contempt, 157 -- no, that's mom's.  I'm not sure

27        which one you're referring to.  You think it was

1      filed in March?

2          MR. LODICE:  I believe they were all the same

3      day.

4          THE COURT:  Okay.  Let me look.  March of this

5      year?

6          MR. LODICE:  Yes.  I believe it was the --

7          THE COURT:  Okay.

8          MR. LODICE:  -- the 17th, I believe was the day.

9          THE COURT:  Okay.  I don't see that.  Do you

10     have a copy of the motion you want to show me.

11         MR. LODICE:  I don't have a copy with me.  But

12     that's all right.  As long as the custody one's

13     there, I don't -- I'm not worried about contempt.

14         THE COURT:  Well, I --

15         MR. LODICE:  We can discuss custody.

16         THE COURT:  -- I think we should try to address

17     all the issues regarding the children -- the child

18     today.  The issues regarding finances are being heard

19     in the magistrate court.  And I think you might have

20     a date tomorrow about that.

21         MR. LODICE:  Tomorrow?

22         THE COURT:  I believe.

23         MR. LODICE:  Because I checked the website and

24     there wasn't anything listed for tomorrow.

25         THE COURT:  Maybe July 11th.

26         MR. LODICE:  Yeah.  That I saw on the website.

27         THE COURT:  Okay.  So we can try and address all

1      the issues regarding your requests to change custody.

2      I just want to be clear -- or -- and the access

3      schedule.  -- I want to be clear that the last access

4      schedule is essentially the one that was entered in

5      April and that was the agreement that you entered

6      into.  So is that what you're both trying to change,

7      the -- the April 2022 agreement?

8          MR. LODICE:  We set a temporary agreement just

9      to get through to this court date.

10         THE COURT:  All right.  Is that your

11     understanding, ma'am?

12         MS. ANTAR:  No, your Honor.  I just wanted to

13     please clarify.  So the contempt that he filed which

14     was --

15         THE COURT:  All right.  Answer my question.  Are

16     you trying to change the agreement that you entered

17     into in April?

18         MS. ANTAR:  No.  Absolutely not.

19         THE COURT:  You want to keep that the same?

20         MS. ANTAR:  Yes.  And I just wanted to see if

21     number 142, which is the one that he was referring

22     to, I was never served with that and I don't -- I've

23     never even seen the motion.  I was not served with

24     that nor the contempt which was the motion that he

25     filed.  And I have the number as well.

26         The one that he did was in March.  It was number

27     142 on March 10th, 2022, post judgment motion for

1    modification.  I was never served with that.  And

2    then the other one that he filed was also the

3    contempt, which was number 140, which was resolved

4    with the order of 4/12/22 with Judge Price-Boreland.

5        So that contempt was already resolved and the

6    142, I'm asking to be removed since I was never

7    served, I was never given proper service at all.

8        THE COURT:  Well, I'll hear you both out about

9    your general complaints about following the rules and

10   following the court orders.  And we'll see -- we'll

11   see what happens in terms of the motions.

12       If -- if Judge Price-Boreland took a temporary

13   agreement, then you both have the right to ask,

14   number one, for that to be changed; or number two,

15   for those motions to be heard.

16       It's not clear to me if it was temporary or not

17   but I can listen to her transcript and indicate --

18   and that should tell us what -- what she intended.

19       Yes.

20       MS. ANTAR:  I also wanted to say it was not

21   temporary.  It was never said to be temporary.  And I

22   just wanted to also ask because when we were last in

23   court on June 1st, the Judge stated that motion --

24   motion number 148 or -- hold on.  I'm sorry.

25       THE COURT:  It's 148.

26       MS. ANTAR:  152 which is motion for order of

27   discovery he stated would be heard today.  And that's

1    why we rescheduled the date to July 11th for that

2    modification of child support because it's -- it's

3    very dependent on that result of the motion for

4    financial discovery.  So the Judge on 6/1, at first

5    they said on 6/1 we would hear that.  But then on

6    6/1, the Judge stated we would hear that in front of

7    family court today.

8         THE COURT:  Well, I'll -- I'm happy to try and

9    resolve your discovery disputes; that's not a

10   problem.  I'd like you to have a productive hearing

11   in July.  So you can tell me what it is that you're

12   asking for.

13        So I'll hear you out about your request to

14   change custody.  I'm not so -- if there's issues

15   regarding violations of the existing Court orders,

16   I'll hear you about that.  And we'll talk about the

17   discovery issues.  And then I'm gonna issue some

18   orders.  And then I think we're gonna be done.  So

19   let's get started.  Yes.

20        MS. ANTAR:  There's also several other motions

21   that you didn't mention that I filed for contempt

22   which --

23        THE COURT:  Well, that's true.  But they were

24   filed recently and they're not before me today.

25        MS. ANTAR:  Okay.  'Cause I tried to see if I

26   could get a motion for continuance 'cause I wanted to

27   see about getting an attorney for this because

1    everything has become so complicated.  And I was

2    seeing if maybe we could possibly -- since everything

3    is, you know, going to be heard at the same time and

4    it's a lot, I was seeing if we could continue that

5    but just only decide on the financial discovery today

6    so it doesn't interfere with the 7/11 date.

7        THE COURT:  All right.  Well, the reason I

8    denied your request for continuance is because it

9    indicated that you -- I didn't -- it didn't have Mr.

10   Lodice's consent.  And since it was filed so late, I

11   couldn't cancel the court date on such short notice.

12       So have you two talked about that?

13       MR. LODICE:  I don't want to continue it, your

14   Honor.  The only reason she wants to continue it is

15   'cause she's hoping that I'll be arrested because I'm

16   behind in my child support and I won't make the next

17   court date.  This is what her goals are 'cause -- of

18   the custody agreement.  I feel like the custody

19   should be heard today.  And we need to solve this

20   issue of the custody and the visitation so we can get

21   that on paper so moving forward we at least have

22   something in place where Angelina's protected and

23   things are being done the right way.

24       THE COURT:  Well, I am a little concerned,

25   ma'am, that these motions have been pending for such

26   a long time.  I don't really want to continue them

27   any longer.  Who -- who is it -- have you talked to a

1    lawyer?

2         MS. ANTAR:  I have.  And I'm trying to get

3    enough money to come up with one.  I'm -- I never

4    said I wanted him to go to jail.  He was incarcerated

5    on 6/1 for -- and a purge was set for -- for the

6    child support and he since has not made a single

7    payment.  Judge Price-Boreland ordered on 4/12 for to

8    make the payments; he hasn't.  He only made the

9    payment to get himself out of prison.

10         And he's lying about his income which is why the

11    financial discovery is crucial in getting the

12    transcripts, police reports, other things that I'm

13    also waiting for which I mentioned in my motion for

14    continuance.

15         And also, I have spoken to an attorney, but they

16    want at least 6 to $7,000 as a retainer and I'm

17    trying to get the money together, trying to see if

18    family can help me and -- that's why I asked for the

19    date of August 9th to be able to come back to -- to

20    try my best to get counsel.  And to get all the other

21    things I'm waiting for, transcripts, which all are

22    extremely relevant to the custody and, you know, as

23    far as the contempt as well.

24         THE COURT:  All right.  So listen, in terms of

25    your request for continuance, if there's no

26    agreement, I'm not gonna continue it.  I set time

27    aside to do it today.  The motions have been pending

1    for a couple of months.  Everybody's has notice that

2    this was going on.  You two filed a motions as far

3    back as March.  Now I'm almost in July.  So I think

4    really, we have to get some of these things done

5    today.

6        MS. ANTAR:  Do I have the right to get an

7    attorney in this case because I feel that I need one.

8        THE COURT:  Well, if you felt like you needed

9    one, you'd have one standing next to you now.  I set

10   these hearing dates a while ago.  I'm not gonna

11   continue it the day of because you want counsel.  You

12   had the ability to get counsel up until now.  So do

13   you have a right to have an attorney, certainly.  But

14   you don't have a right to have the case continued

15   indefinitely until you get one.

16       MS. ANTAR:  I was saying at least, you know, by

17   -- by the first week of August I thought maybe I'd be

18   able to get counsel or even see if I could get some

19   help at a discounted rate.  I haven't been able to

20   afford it.  I've been trying to pay all my bills

21   receiving zero dollars in child support this whole

22   time.  And I do want to try to address most of the

23   issues today.

24       THE COURT:  Well, we're going to do that.  So

25   you two can have a seat.

26       All right.  So let's start here.  Ma'am, you --

27   you filed an emergency motion for custody back in

1    March.  The emergency portion, the -- the -- the part

2    where you file it and send it to -- give it to a

3    Judge that day, that was denied.  You have the right

4    to a hearing to continue that request for emergency

5    orders. If you want to be heard on it, you can.

6        So is that something you're pursuing that today,

7    the notion that the child is in immediate physical

8    danger or at risk of physical injury from the father.

9    Is that something that you're continuing today?

10        MS. ANTAR:  I'm sorry.  Which number on the --

11    of the motion are you referring to on this one?

12        THE COURT:  It's number -- it's number 145.

13        MS. ANTAR:  So we had a hearing by -- with that

14    one -- with you on March 8th and you denied it.  And

15    that was thrown out.  So we're already passed that.

16        THE COURT:  Okay.  We're gonna go through all

17    the motions.  Then you filed a motion for

18    modification at the same time indicating that you

19    didn't think the father was following the agreement

20    and you wanted to change -- let's see -- you wanted

21    to change -- you wanted to remove the father's

22    visitation.  Is that something that you're pursuing;

23    that's 146?

24        MS. ANTAR:  146 was resolved at the 4/12 hearing

25    with Price -- with Judge Price-Boreland.

26        THE COURT:  Well, I think the father's

27    indicating those orders were temporary.

1      MS. ANTAR:  No.  They were not temporary.  And

2   it was never said to be temporary ever.  The Judge

3   stated if he did not comply for me to file motions

4   for contempt, which I did.

5      THE COURT:  Okay.  So 146 is not being pursued;

6   you think it was resolved.

7      And you filed 148, which is also a motion to

8   modify.  I think that's what's been heard in

9   magistrate court because that's about the finances.

10      MR. LODICE:  That was 148, your Honor?

11      THE COURT:  Yep.  So that's being heard by the

12   magistrate court.  And that's the -- that's the

13   motion on which you were requesting discovery.  Is

14   that right?

15      MS. ANTAR:  I was under the impression that 148

16   might have been the motion to transfer or --

17      THE COURT:  No, it's not.

18      MS. ANTAR:  I wasn't sure what that one was.

19      THE COURT:  No.  The motion -- motion 148 is a

20   motion for modification asking to change the child

21   support --

22      MS. ANTAR:  Okay.

23      THE COURT:  -- indicating that the father's

24   making more money and a request for you to remove the

25   father's visitation.  So I think the removal of

26   father's visitation was addressed in my orders

27   regarding the emergency motion.  But I don't know if

1    you're still pursuing the change in the child

2    support.  Is that correct?

3         MS. ANTAR:  Yes.  And that's what's being heard

4    on July 11th.

5         THE COURT:  Okay.  I think that's true.  And

6    that's the motion that you want discovery on?

7         MS. ANTAR:  Correct.

8         THE COURT:  Okay.  So that's -- motion 148 still

9    has some things we need to address.  And let's see.

10   The motion to transfer is 151, it was denied by Judge

11   Price-Boreland on April 12th.  So that's resolved.

12        And your request for discovery, ma'am, is number

13   152.  So we'll take that up.  And you've got a motion

14   for contempt regarding first refusal.

15        Is that something you're pursing?

16        MS. ANTAR:  Yes.  Can you please state the

17   number of it?

18        THE COURT:  It's number 157.

19        MS. ANTAR:  Okay.  Yes.

20        THE COURT:  And phone calls.

21        Okay.  And there's another request to modify.

22   I'm not sure that's -- let's see.  That's, I think

23   it's 157.6; perhaps it's the same motion.  And in

24   that you're asking for sole custody.

25        Is that motion something you're still pursuing?

26        MS. ANTAR:  Yes.

27        THE COURT:  Okay.  There's another motion for

```
1    contempt regarding child support.  That was -- that

2    was just filed in May.  I'm not sure that we're gonna

3    hear that today.  I think those more recent motions

4    have -- will have to be assigned some dates in the

5    future.  All right.  Hold on.

6         You also filed a motion to dismiss in May.  Oh,

7    that's a motion to dismiss -- it's a motion to

8    dismiss your contempt motion.  So maybe we will take

9    that up.

10        All right.  Well, let's start with -- I think

11   those are the motions we're able to hear today.  So

12   let's start with you, ma'am.

13        Why don't you swear the plaintiff in please.

14        THE CLERK:  If you could please stand and raise

15   your right hand.

16        MR. LODICE:  Both of us?

17        THE COURT:  Yeah, you can swear them both in

18   actually.

19        THE CLERK:  Yeah.  Both of you can raise your

20   hand.  Thank you.

21        Do you solemnly swear or solemnly and sincerely

22   affirm, as the case may be, that the evidence you

23   shall give concerning this case shall be the truth,

24   the whole truth, and nothing but the truth so help

25   you God or upon penalty of perjury?

26        MS. ANTAR:  Yes, I do.

27        MR. LODICE:  Yes.
```

1        THE CLERK:  Ma'am, starting with you, if you

2    could state your name and address for the record.

3        MS. ANTAR:  Theodora Antar, 856 Shagbark Drive,

4    Orange, Connecticut 06477.

5        THE CLERK:  Thank you.  And, sir?

6        MR. LODICE:  Matthew Lodice, 23 Lyman Street,

7    apartment number 2, New Britain, Connecticut.

8        THE CLERK:  Thank you.  You guys can have a

9    seat.

10        THE COURT:  All right.  So ma'am, why don't you

11    start by telling me what it is that you want the

12    custody orders to be, and why -- what has changed

13    that makes you think the custody orders should be

14    different.

15        MS. ANTAR:  So are we -- I'm just wondering, are

16    we going to be doing it, like, by each motion or?

17        THE COURT:  Nope.  I want you to tell me overall

18    what it is that you think should be different about

19    the existing custody and access orders and why.  And

20    you also have to tell me if you think that Judge

21    Price-Boreland's orders were -- were not -- that

22    agreement that you entered into, if you think it

23    wasn't temporary, then you got to tell me what's

24    happened since April that would justify a change

25    today.  'Cause that agreement was filed in April.

26        MS. ANTAR:  Okay.  First of all, I feel that I

27    should have sole custody of Angelina.  I feel that in

1    addition to that, his visitation schedule can stay

2    the same with the exception of I'm requesting that

3    she be returned to me on Sundays rather than going --

4    getting -- having him bring her directly to daycare

5    or directly to my mother's on Mondays like it

6    currently says.  And as far as the visitation and

7    custody as a summary, that's pretty much it.

8        THE COURT:  All right.  And why do you think you

9    should have sole custody?

10        MS. ANTAR:  I have sole custody of my other

11    daughter.  I've had primary residency of Angelina

12    since birth.  I do absolutely everything for her;

13    schedule doctor's appointments, I take care of all of

14    her needs.  She has a very close bond with me.  I've

15    had a stable home for her for the last three years of

16    her life.

17        Matthew, on the other hand, he has moved around

18    a lot.  He has constant different women in and out of

19    his life with their family -- making a family and

20    having them be around my children.  In addition, he

21    has substance abuse issues with alcohol and

22    recreational drugs including marijuana and Psilocybin

23    which he stated multiple times on phone calls to me

24    and emails and text messages that he does regularly

25    as well as marijuana and alcohol.

26        He also has not followed the custody agreement

27    at all.  From -- as you can see the very first

1    contempt that I filed after the 4/12 hearing was on

2    4/18.  He didn't follow a single thing that the Judge

3    asked him to do.  He has disparaged the Court over

4    and over again.

5        He has caused a lot of emotional damage to our

6    daughter who I've now in the process of trying to get

7    her in therapy.  I've had her on a waitlist for over

8    six months.  I've spent hours calling different

9    places trying to get her in treatment because she's

10   had -- showing signs of anxiety, showing signs of

11   separation anxiety and just acting out and things

12   like that.  And, you know, I have a lot of evidence

13   and I'd like to have a chance to be able to go over

14   everything in detail before I say anything else but,

15   you know.

16       THE COURT:  All right.  Well, your testimony is

17   evidence.  And I'm, like, you have to show me -- tell

18   me what you want me to know now.

19       MS. ANTAR:  Okay.

20       THE COURT:  So that's why I'm asking you.

21       MS. ANTAR:  Okay.

22       THE COURT:  What -- what has happened since

23   April that would require a change?

24       MS. ANTAR:  So since April, he has violated the

25   agreement several times.

26       (Whereupon there was a pause in the

27   proceedings.)

1          THE COURT:  All right.  In what way has he

2     violated the agreement since April?

3          MS. ANTAR:  Okay.  One of the biggest ways that

4     he's violated the agreement is regarding our Court

5     order which speaks about religious decisions for the

6     child.  And the order which was entered in the court

7     June 18th, 2021, number 128.

8          I just need to grab that.  (Indiscernible.)

9          THE COURT:  I have it in the file.

10          MS. ANTAR:  Okay.

11          THE COURT:  You don't need to give me a copy.

12          MR. LODICE:  Your Honor I have that on my phone.

13     Is it okay if I pull it up on my phone while we go

14     through it?

15          THE COURT:  Yes.

16          MR. LODICE:  Thank you.

17          THE COURT:  You can do that.

18          (Whereupon there was a pause in the

19     proceedings.)

20          MS. ANTAR:  Okay.  So on number 4 of our

21     agreement, page 1 number 4, it states both parents

22     are responsible for taking the child to all of her

23     religious, educational, sporting, extracurricular and

24     social activities including but not limited to Sunday

25     school, dance, swimming, and birthday parties in

26     which the child is involved that occur during their

27     parenting time.  In addition, on page 2, number 9, it

1   states the mother shall make all religious decisions

2   for the child.

3        So on several occasions since April, I have

4   asked him on multiple, multiple occasions to bring

5   her to religious obligations that occurred during his

6   visitation time which usually happens on a Saturday

7   or a Sunday since April.  And I've told him in our My

8   Family Wizard parenting app, which -- may I have

9   permission to have the app out?

10        THE COURT:  All right.  Well, just -- I don't

11   want you reading from something I can't --

12        MS. ANTAR:  Okay.

13        THE COURT:  -- take into evidence.  So --

14        MS. ANTAR:  Okay.

15        THE COURT:  -- why don't you tell me what the

16   events were.  When they happened and --

17        MS. ANTAR:  Okay.

18        THE COURT:  -- what it is that you're unhappy

19   about since April.

20        MS. ANTAR:  So for example on May 11th, I told

21   him that she had a religious obligation that was

22   going to be on that following Sunday at 10 o'clock

23   a.m. at the Greek church in Orange which she has been

24   a member at since she --

25        THE COURT:  What -- what was the obligation.

26        MS. ANTAR:  It was a church religious service.

27   It was a church service.  And our religion is

1      extremely important to me.  I've met with my priest
2      recently and --
3           THE COURT:  All right.  Hold -- stop.  Stop.
4      Stop.  You have to tell me why the child had to go,
5      like, why did the child --
6           MS. ANTAR:  For church.  She had to attend
7      church.  It was scheduled from -- the service was --
8      the service was scheduled from the time that I
9      stated, which was from 10 to 12.
10          THE COURT:  Why did the child need to be at that
11     service?  Was there something going on, like, special
12     for the child, or the children, or what?
13          MS. ANTAR:  Yes.  They have Sunday school.  And
14     she -- and she also has to attend the weekly service;
15     it's part of our religion.
16          THE COURT:  All right.  So --
17          MS. ANTAR:  So --
18          THE COURT:  -- so the child has to be there
19     every Saturday and Sunday?
20          MS. ANTAR:  Every Sunday.  Every Sunday for --
21     for the service.  And she'll be starting Sunday
22     school this year.  So --
23          THE COURT:  All right.
24          MS. ANTAR:  -- she needs to be there every
25     Sunday.
26          THE COURT:  So when does Sunday school start?
27          MS. ANTAR:  Well, typically they go around --

1    THE COURT:  No.  When -- you said it's going to

2    start.

3        MS. ANTAR:  I don't know the exact date.  I

4    would have to check.  But it's going to be starting

5    in the fall around the time when school starts.

6        THE COURT:  Okay.  So if Sunday school's

7    starting this fall, why did the child have to be in

8    church on May 11th.

9        MS. ANTAR:  Because there was a church service

10   and she needed to attend and --

11       THE COURT:  That's what I'm trying to get you to

12   tell me.  Why did the child need to attend that

13   particular church service?

14       MS. ANTAR:  Because attending weekly Sunday

15   services is a part of our religion.  And it's our --

16   it's one of our religious obligations as Greek

17   Orthodox Christians.  And it's extremely important to

18   me and my faith.  My mother is willing to be a

19   witness, my sister, my priest as well at the very

20   significant importance of being in church every

21   Sunday, especially as a family.

22       THE COURT:  All right.  Does the child have to

23   go, I mean, can't you meet this obligation by a

24   different day of the week service?

25       MS. ANTAR:  There is no other day of the week.

26   In our faith, we go on Sundays.  And Sundays are

27   supposed to be the holy day for us.  So since this is

1    extremely important to me and he has expressed

2    multiple times that he is an atheist, doesn't believe

3    in God, he ridicules my religion, something that I'm

4    extremely passionate about.  And I want my children

5    to be raised with the same faith that I've been

6    raised with.  That we've been going to that same

7    church since I was a baby.

8        THE COURT:  So is it your expectation that the

9    father take the child to -- to that service every

10   Sunday when the child is with him?

11       MS. ANTAR:  Yes.  And when what I'm asking is

12   that maybe he, since he's been refusing to do that

13   consistently every single time no matter if it's at

14   that weekly Sunday service which is going to be soon

15   and Sunday school, or a very special holiday service

16   that sometimes might be on a Saturday.  It doesn't

17   matter what it is, he says no and refuses even though

18   it's Court ordered for him to do that.  So I'm asking

19   now to change -- to modify his visitation so that he

20   brings her to church on Sunday and then that's where

21   he -- that's his drop off point.  Instead of dropping

22   her off to daycare or my mother on Monday, she can

23   come home Sunday and -- and, you know, I have another

24   child who comes home -- she goes with her father on

25   Friday and comes home Sunday as well.  So I think

26   that having both of my children on the same schedule

27   would be easier for everybody.  And then it

1       eliminates him having to have to go bring her

2       somewhere on Monday when Monday's are hectic.

3              THE COURT:  So you want --

4              MS. ANTAR:  And she's able to attend the

5       religious --

6              THE COURT:  -- you want him to have -- him to

7       never have the child Sunday morning.  He -- the child

8       always goes to church Sunday morning?

9              MS. ANTAR:  And then he can drop her off.  So he

10      has her from Friday until Sunday.  And right now he

11      just -- the only difference is he brings her home

12      Monday morning.

13             THE COURT:  Okay.  So this May 11th date was a

14      regular Sunday service?

15             MS. ANTAR:  I believe so.

16             THE COURT:  Okay.  So what other -- you were

17      telling me ways in which you think he has not

18      followed the Court orders since April.  Was there

19      anything else?

20             MS. ANTAR:  Yes.  So there, you know, in

21      addition there was a religious service that he said

22      that he was going to bring -- it was around our

23      Easter and he said he was going to be bringing her.

24      He confirmed it.  And then he texted my mother at six

25      in the morning of the day of stating, I can't bring

26      her.  If you want her to go to church, you can come

27      pick her up.  Even though it states in the agreement

1      that if there is a religious event or anything

2      birthday, social, whatever it is during his parenting

3      time or my parenting time, we are supposed to bring

4      her to it, not the other parent.  And that's why we

5      agreed on that when we sat down last year and came up

6      with this agreement which he hasn't been following.

7           THE COURT:  All right.  When was the date of the

8      event that you just described to me?  Around Easter?

9           MS. ANTAR:  Around -- around -- I would say that

10     it was around that -- that time.  I don't know off

11     the top of my head.

12          THE COURT:  Okay.  All right.  And is there --

13     was there -- were there any other occasions in which

14     you think the agreement was violated since April that

15     would justify sole custody?

16          MS. ANTAR:  Yes.  So on April 21st, I also told

17     him about the religious event.  I wrote a note in My

18     Family Wizard, titled it Sunday's event.  I asked him

19     to confirm.  He stated, yes.  And again, he didn't

20     show up.  He didn't bring her after confirming.

21          THE COURT:  Okay.  Is there any other reason why

22     you're requesting sole custody?

23          MS. ANTAR:  Yes.  The substance abuse issues.

24     He is a very heavy drinker.  And he leaves my child

25     with people that I don't know.  On our agreement,

26     number one, I believe, of our agreement states that

27     he is supposed to give me the right of first refusal.

1       Since that agreement has been in place, it's been a
2       little over a year, he has never once asked me for --
3       if I wanted the right of first refusal.
4           And during those instances, he has left his --
5       left the child with his son who is on medication for
6       mental health issues that he actually was forced to
7       comply with 'cause he was withholding the medication
8       and his ex-wife had to get an emergency ex parte
9       order because he threatened the doctor to stop giving
10      the child the meds.  He leaves him with her -- with a
11      child who's maybe fourteen years old.
12          He's left her -- he's left her with his ex-wife
13      and her boyfriend.  And my child stated that she was
14      left on -- sleeping on a couch and I wasn't given the
15      right of first refusal.  He's left her with other
16      people including his girlfriend that he lives with
17      that I've never met.  He's left her with several
18      people that I have no knowledge of and when I ask him
19      where she is, he says, it's none of your business.  I
20      can leave her with whoever you [sic] want and doesn't
21      give me the right of first refusal.
22          THE COURT:  All right.  And how do you know that
23      these things occurred?
24          MS. ANTAR:  My child told me.  And there was
25      multiple times when he stated and admitted to me that
26      his son watched the child and that he left her with
27      his son who is a minor and, like I said, he has ADHD

1   and he is unable to handle a young child who, at the

2   time, was two years old.

3       My daughter also told me and every time that my

4   daughter says things and I question Matthew about it,

5   he -- he accuses my child of lying.  My child does

6   not lie.  She's extremely smart for her age being

7   three years old.  She speaks and she tells you the

8   truth about everything.  And if it's something that

9   she says that he doesn't want me to know about, he

10  accuses her of lying.  And that's not right.  He's

11  gaslights my child.  And he uses her as a pawn

12  against me.

13      THE COURT:  So I don't understand what you mean

14  by that, that he uses the child against you.

15      MS. ANTAR:  So he tries to do things related to

16  the child to hurt me.  Whether it is -- there's been

17  instances where he said he was going to take her and

18  then he was upset because maybe I was dating somebody

19  or something like that.  And he then refused to take

20  the child after already agreeing and committing.

21      So we've gone through so much just to even get

22  to the agreement that we had last year.  And, you

23  know, you will also see that we have had several

24  pending motions before that June 2021 agreement was

25  made because he was harassing me trying to get me to

26  be with him.  And I didn't want to.  And then we

27  finally come up with this agreement and he said -- he

1    kept stating that he was going to take me back to

2    court and lower my child support to try to hurt me.

3    He kept saying that if I didn't do what he wanted, he

4    would take me to court and state that he has no

5    income --

6        THE COURT:  All right.  Are you talking about

7    something before your agreement or after?  Because I

8    -- you -- you have an -- you have a -- I have to

9    consider things since April.  So I can't go back to

10   the beginning.

11       MS. ANTAR:  Well this is since -- since June.

12   So this is, like, since the last agreement besides

13   April was made.

14       THE COURT:  All right.  Well, you're asking me

15   to change the April agreement.  Right?

16       MS. ANTAR:  I'm just asking to change so that

17   the visitation schedule will be that he brings her to

18   church every Sunday.  And if for some reason the

19   church is closed, then -- which would rarely happen,

20   but if it was, to bring her to my home instead which

21   is in the same town.

22       And for sole custody because I believe that he

23   is not stable.  He was incarcerated for not paying

24   child support.  Almost missed his visitation.  He

25   withholds income.  I ask him all the time, can we get

26   the child set up in classes for -- for soccer, for

27   anything, he says, no.  I'm sorry.  I can't.

1          But he has money for his apartment.  He has

2     money for an extravagant garden.  He has money for

3     going out all the time with his friends and his

4     girlfriend.  And every time I'm calling to say good

5     night to the child, he's at a party.  He's, you know,

6     his social life is his priority.  And he does the

7     child a great disservice by refusing to pay for

8     anything that she needs.

9          He hasn't given -- he has violated the child

10    support orders since April 12th.  Judge Boreland

11    stated in there and made it clear, start paying the

12    child support every Friday no later than 6 p.m.  He

13    hasn't paid a single dollar besides the purge to get

14    himself out of prison.  And he stated in court that

15    he doesn't think it hurts our child in any for him to

16    owe thousands of dollars.

17         THE COURT:  All right.  So you have told me some

18    reasons why you think you want sole custody.  And

19    you've told me some reasons why you want to change

20    the parenting plan.  Was there anything else based --

21    that you wanted me to know about the sole custody or

22    the parenting plan?

23         MS. ANTAR:  Yes.  So this is related to the

24    contempt that I filed on May 25th.  Again, that the

25    Judge ordered that I make all the religious decisions

26    and that the defendant must bring the child to all

27    the religious events regardless of what they are.

1       And I notified him in Our Family Wizard app on 5/16

2       that the child had a religious obligation scheduled

3       on 5/22 from 10 to 12.  The defendant viewed the

4       message in the app.  I also sent a reminder to him

5       about him it on 5/21 as well as put it in the

6       calendar in the app, he did not bring her to the

7       scheduled religious event.

8            THE COURT:  What was the event?

9            MS. ANTAR:  This was church.  This was our --

10           THE COURT:  So --

11           MS. ANTAR:  -- our weekly Sunday service.

12           THE COURT:  All right.  So is it your

13      expectation that if he doesn't bring the child to

14      Sunday service that he's violating this order?

15           MS. ANTAR:  Yes.  Because it's part of her

16      religion and it's extremely important.  It's the one

17      thing in the week that -- that she needs to attend.

18      And it's a two-hour thing.  But that's why I said I

19      don't expect him to sit through a service or drive

20      there and have to pick her up and wait around.  It

21      would be so much easier if she just stays there,

22      attends the service with the rest of me and my

23      family, my other child, her sister, her grandmother,

24      her Godmother.  All these people who -- who are part

25      of this.

26           THE COURT:  All right.  So ma'am, I'm not sure

27      that the agreement that you signed indicates that the

1      father has to bring the child to church every Sunday.

2      Your -- what your agreement says is that you would

3      honor events, but not every Sunday service.   That's

4      not what this says.

5           MS. ANTAR:  So it says that I make religious

6      decisions for the child.  So if I'm saying that the

7      child is --

8           THE COURT:  All right.  So that -- that means

9      that you can decide what -- what -- what religion to

10     raise the child in.  But I don't think it means that

11     every single week you get to decide that the child

12     has to go to service and the father has to bring her.

13     I'm not sure that that -- that this says that.

14          MS. ANTAR:  I'm -- I disagree.  It says I make

15     all religious decisions for the child.  And the Court

16     -- I feel that the Court is not able to determine how

17     we practice our religion.  Our religion is practiced

18     in a specific way.  And like I said, I'd -- I'd like

19     to be able to bring in my priest.  I'd like to bring

20     in my mother who's also the Godmother of the child,

21     my sister who has a heavy influence on her as well.

22     To state --

23          THE COURT:  All right.  They're -- listen to me.

24      -- they're separate things.  So I'm not saying that

25     that's not how you practice the Greek Orthodox

26     church.  I'm sure you're an expert in that compared

27     to me.  But I'm looking at your agreement.  And your

1    agreement doesn't say that the father has to bring

2    the child to church every Sunday.  I don't think the

3    father would have had any notice that that was what

4    we was agreeing.  So if -- if you want to tell me

5    about other, like, if there was a holiday or Sunday

6    school.  That's why I was asking you.  Like, when

7    does Sunday school start.  I think your agreement

8    does cover Sunday school.

9         But if -- if you're saying that he violated the

10   agreement by failing to bring the child to church

11   every Sunday when you asked him to, I think that may

12   not be an accurate interpretation of the agreement

13   you two signed.

14        MS. ANTAR:  It was my interpretation when I

15   wrote the agreement, that that's what that meant;

16   given the fact that my religion is one of the most

17   important things in my life.

18        THE COURT:  I -- I --

19        MS. ANTAR:  And my children's life.  So --

20        THE COURT:  -- I understand your position.  But

21   I have to interpret the agreement based on what it

22   says, and I'm not sure it says that.

23        So why don't you tell me about some -- if there

24   are any other -- like, are there holidays that you

25   think he missed.  Or was there Sunday school that you

26   think he missed, or something like that.  If all of

27   these are about just -- just Sunday service, I'm not

1       sure that that will meet the standard.

2           MS. ANTAR:  Just because it says in there, it

3       says -- but not --

4           THE COURT:  Listen to me.  Listen to me.  Stop

5       arguing with me.  I know you don't like what I just

6       told you, but that's my interpretation of this

7       agreement.

8           So tell me if there were things that were not

9       just Sunday service that you asked him to bring the

10      child to that he missed.

11          MS. ANTAR:  There are several other things.

12      However, in that agreement it states it's not limited

13      to --

14          THE COURT:  Okay.

15          MS. ANTAR:  -- the things that are in the

16      parentheses.  It states including but not limited to.

17          THE COURT:  I read it, ma'am.  So why don't you

18      tell me about the other things.

19          MS. ANTAR:  So you can -- in our religion we

20      consider that the -- the divine liturgy is a weekly

21      celebration.  It's like a holiday to us in our

22      religion.

23          THE COURT:  Okay.  Listen to me.

24          MS. ANTAR:  We go by religious calendar so.

25          THE COURT:  I want you to stop telling me about

26      Sundays and tell me if there's anything else that --

27      like, a special event or school, or anything else

1    besides the regular Sunday service that you think you
2    told him about that he didn't bring the child to.
3        MS. ANTAR:  Yes.  There are.  However, this is
4    why I'm asking for an attorney 'cause I feel that I'm
5    not given my legal right to -- to approve the
6    agreement that I made.
7        THE COURT:  Let's -- let's move on from that and
8    why don't you me about some of these other things.
9        MS. ANTAR:  So she ordered Matthew that he had
10   to get the Our Family Wizard app by April 15th of
11   2022.  Matthew refused to do so.  I emailed him
12   asking him throughout that week to get it.  He stated
13   that he believed that the app cost over $300.  I then
14   looked online and saw that it was nowhere near $300.
15   It was actually close to $7 a month.
16       He said that he was not going to get that app
17   despite on April 12th, Judge Price-Boreland
18   specifically said it would have to be that app and
19   specifically said he had to pay for it and register
20   us both by that date of April 15th.  He did not do
21   so.  He continued to email me.  He stated to me that
22   he was only gonna do it if I -- if I downloaded a
23   free app which had -- had glitches.  I read reviews
24   of it.  It stated that it had ways where you could go
25   in and post things as the other parent.  And there's
26   a reason why Judge Price-Boreland chose the --
27       THE COURT:  All right.

1        MS. ANTAR:  -- Family Wizard one.

2        THE COURT:  Hold on.  I don't see anything about

3    Our Family Wizard in the order -- in the agreement of

4    April 12th.

5        THE CLERK:  It's 153 --

6        THE COURT:  153.

7        THE CLERK:  -- point one, your Honor.

8        THE COURT:  Oh, never mind.  The Clerk found it.

9    Thank you, Madam Clerk.  All right.  Okay.

10       So does he have it now?  Are you --

11       MS. ANTAR:  He only --

12       THE COURT:  -- are you saying he got it late?

13       MS. ANTAR:  It's not that he got it late.  He

14   continued to refuse to get it and he said to me -- he

15   kept emailing me ten to twelve times a day stating to

16   me that he was not going to get and the only way that

17   he would do a parenting app was if I did the free one

18   that he was insisting that we did called AppClose.

19       THE COURT:  Yeah.

20       MS. ANTAR:  I told him I only use my email for

21   business.  I don't want to get harassed with multiple

22   emails nonstop every day from him, please follow the

23   Court orders stating that you have to get this app,

24   do what the Judge said.  He refused.  He continued to

25   refuse.  He kept calling me on my phone and he kept

26   emailing me.

27       So I had to go to the Orange Police Department.

1          And this was on -- may I look at my calendar?

2              THE COURT:  Yeah.

3              MS. ANTAR:  So this was on Tuesday April 19th,

4          2022, exactly one week after Judge Price-Boreland

5          ordered him to -- to do it.

6              THE COURT:  You --

7              MS. ANTAR:  And his deadline was the 15th.

8              THE COURT:  -- you went to the police

9          department?

10             MS. ANTAR:  I went to the police department

11         'cause he wouldn't stop emailing me and calling me.

12         I stated to the police that I -- that I showed them

13         the Court order.  I said to them, I want them to tell

14         him not to contact me again unless it's in the

15         parenting app only and please stop emailing me.  The

16         police had to call him and tell him that.  He tried

17         to say to the police that the app $300 and he wasn't

18         gonna do it.

19             THE COURT:  All right.  Hold on.

20             MS. ANTAR:  Okay.

21             THE COURT:  Where you there?

22             MS. ANTAR:  I was.

23             THE COURT:  For his conversation with the

24         police?

25             MS. ANTAR:  Yes, I was.  The police officer told

26         me.

27             THE COURT:  All right.  So -- all right.  -- so

1       that's not the same thing.  The police officer told

2       you what he said?

3              MS. ANTAR:  Yes.

4              THE COURT:  Okay.  So back up.  Is he using Our

5       Family Wizard now?

6              MS. ANTAR:  He is, only after the officer told

7       that him if he didn't, he would be arrested for

8       harassing me and contacted me -- he said if he --

9              THE COURT:  All right.

10             MS. ANTAR:  contacted --

11             THE COURT:  Stop.

12             MS. ANTAR:  -- me again --

13             THE COURT:  Stop.

14             MS. ANTAR:  Okay.

15             THE COURT:  So when did he start using it?

16             MS. ANTAR:  The first day that he actually did

17      download it and use it was -- I believe it was April

18      21st.

19             THE COURT:  Okay.  Okay.  Are -- so I think you

20      were telling me other reasons why you wanted sole

21      custody and other reasons why you think that he

22      violated the April order.  Anything else?

23             MS. ANTAR:  Yeah.  So -- so, you know, in the --

24      in the state of Connecticut with their criteria that

25      they use to determine sole custody and what's in the

26      best interest of the child on their table two, number

27      three, it discusses the character of the parent by

1     reason of willful disobedience of Court orders.  So

2     it's showing a pattern of him disobeying the Court

3     order by not downloading the app unless he was forced

4     to by the police; shows that unless he's going to

5     jail or unless he's forced or -- or given the

6     ultimatum of being arrested, he will not follow a

7     Court order.

8         The other thing that he was ordered to do was to

9     have a joint birthday celebration for our daughter

10    which was supposed to be scheduled to take place on

11    May 21st, 2022.  And we -- after I finally was able

12    to initiate contact with him in the family wizard

13    app, we discussed it.  I -- I discussed it with him

14    in great detail.  I told him that I want -- we back

15    and forth for a while.  And then eventually when I

16    kept telling him I wanted to go to one place.  He was

17    saying he wanted to go to a different place.

18    Eventually I wake up the next day and he sent me a

19    Zelle for $300 with no note or explanation.  So I

20    messaged him in the app asking what is this money

21    for.  I'm assuming you want me to just book it

22    wherever I want since now you're just sending the

23    money.  And he said to me, yes, book it wherever you

24    want, I sent you the money.  You said you wanted to

25    do it at this location.  So I did.  I sent him

26    screenshots of the booking.  I sent him screenshots

27    of everything in My Family Wizard showing what

1     included with the price.

2          On the April 12th hearing, the Judge ordered us

3     to split the cost of the celebration.  And so when he

4     gave me the $300, I then assumed that our joint

5     budget for the party was gonna be $600.  I believed

6     that he -- like he said in the app that he was giving

7     me the ability to just decide what I wanted to do

8     with the planning part and take over that.

9          So he then stated to me that he understood that

10    it was going to be at Urban Air on May 21st from 12

11    to 2.  He said to me that he was going to be bringing

12    seven children with him 'cause I asked him how many

13    kids.  And he said he had seven children.  I asked

14    him how many adults.  He said it didn't matter for

15    the adults.  We discussed the different details.

16         He said to me that, you know, I asked him for

17    more money, 'cause I said that we were going to have

18    -- I wanted to get her a custom cake which we had

19    done for her in the past.  And he said, no, I don't

20    want to spend more money on the cake.  I said to him

21    I wanted to order some nice invitations to send to

22    people.  He didn't want to spend any more money.  I

23    told him that the -- I told him that the party

24    included a large, like, one or two large pizzas and

25    waters for ten kids.  And I said to him, if we have

26    more than ten children that show up to the party,

27    then it's going to be $20 or something per kid. And

1    he said to me, okay, it's fine, you know, if we need

2    more -- if we need to order more food on the day of,

3    we can do it then.  We'll handle it then.  All of

4    this was discussed in the parenting app.

5        So then a couple weeks later, he decided -- a

6    couple weeks later he then messaged me again in the

7    parenting app asking me, oh, when is the party

8    happening.  And after we had already extensively said

9    the details, I didn't answer him because I'm in the

10   middle of working and I'm busy.  I don't have time to

11   sit there -- like, he'll ask me all the time, well

12   what does --

13       THE COURT:  All right.

14       MS. ANTAR:  -- the agreement say?

15       THE COURT:  Listen to me.

16       MS. ANTAR:  Yes.

17       THE COURT:  You are focused.  You are telling me

18   ways in which you think he violated the part about

19   the birthday celebration.

20       MS. ANTAR:  Yes.

21       THE COURT:  So in what way do you think he

22   violated that order about celebrating together and

23   sharing the cost?

24       MS. ANTAR:  So after I had already sent him the

25   booking information and we both acknowledged and

26   discussed in the app that it was going to be at that

27   location, that date, and that time.  And he told me

1          to use whatever money that was left to buy the rest

2          of the stuff and say he's not paying any more.

3                At that point, you know, I just, like, sent out

4          invitations to the people I was gonna invite and I

5          figured he would invite his own people.  And I knew

6          he said he was bringing seven kids with him, so I

7          counted the seven kids in -- in the total.

8                So then the party was scheduled to be on a

9          Saturday which was our daughter's birthday.  On that

10         -- which is May 21st.  -- on that Thursday which was

11         May 19th, the -- my daughter was in daycare and I

12         asked him -- I asked the defendant if he wanted to

13         have the right of first refusal, to get her for a

14         couple of hours so that I could work.  And I said, if

15         not, I would get a babysitter and send him a bill for

16         the babysitter.  He stated that he was going to pick

17         her up.  And I asked him originally if he could get

18         the child at 5:30, watch her for a while and bring

19         her back around 8 or 9.  He stated that he was gonna

20         get her.  So then when I said to him, okay, please

21         bring her home for 9 -- 9 p.m. -- or 8 p.m., he

22         stated no, I'm just gonna keep her overnight.

23                THE COURT:  All right.

24                MS. ANTAR:  So --

25                THE COURT:  What does this have to do with

26         paying for the birthday party.

27                MS. ANTAR:  Okay.  I'm trying to get there.  I'm

1          trying to explain it.

2               THE COURT:  Okay.  Get there now.

3               MS. ANTAR:  Okay.  So he kept her overnight.

4          The next day I called.  And I asked him please make

5          sure that when you bring her to school the next day

6          that you're gonna have cupcakes for the class.  I

7          said to him, what about her birthday outfit.

8               THE COURT:  Listen.

9               MS. ANTAR:  He said she's not gonna be with

10         you --

11              THE COURT:  Listen.  Listen to me.

12              MS. ANTAR:  Yes.

13              THE COURT:  You are complaining that he violated

14         the order by not -- that says that they share the

15         cost -- you share the cost of the birthday party.  So

16         don't tell me about cupcakes for class because that's

17         not part of the order.  Tell me about violating the

18         order that says you're supposed to share costs for

19         the birthday.

20              MS. ANTAR:  I'm not saying that he violated the

21         part about the cost.  That's the only part he didn't

22         violated.

23              THE COURT:  Okay.

24              MS. ANTAR:  He paid the $300.

25              THE COURT:  Okay.

26              MS. ANTAR:  But what did violate was refuse to

27         bring her to the party.  And I had to -- I tried to

1    come to the Court on that Friday because he told me

2    in the app on Friday, I'm not bringing her to the

3    party.  I'm gonna have my own party.  He says I

4    booked my own celebration with her for me and my

5    family.  You're not allowed to come.  I'm not going

6    to let you see her.  Don't show up at my house or

7    I'll have her arrested.  If you try to come retrieve

8    the child or come anywhere near my house, I'll have

9    you arrested and she's -- we're gonna be away from

10   the -- the home all day.

11        THE COURT:  Was that -- was that on the date the

12   Judge discussed, on the 21st or was that a different

13   day?

14        MS. ANTAR:  I'm sorry.

15        THE COURT:  So you have an order that says a

16   birthday party on May 21st.

17        MS. ANTAR:  Correct.

18        THE COURT:  Did this happen on May 21st?

19        MS. ANTAR:  This happened on May 20th.  And so

20   on May 20th, he told me --

21        THE COURT:  All right.  So he had a party on May

22   20th.

23        MS. ANTAR:  No. The party was supposed to be --

24   our joint party was supposed to be May 21st.  On May

25   20th, I messaged him in the app asking him about her

26   outfit for the party.  At this point, he stated to me

27   that he was not going to be having a joint party with

```
1            me.
2                 THE COURT:  On the 21st.
3                 MS. ANTAR:  On the 21st.  He said he was gonna
4            have his own celebration on the 21st.  And he said if
5            I tried to do any of that stuff to come get the baby
6            or try to be part of her day at all, that he was
7            going to have me arrested.  And -- so this was on the
8            20th.  So I'm over here getting very upset because
9            our agreement says that birthday are to be shared
10           equally.  And in our agreement from June of 2021
11           states that it could either be split -- the day split
12           in half or with a joint celebration.  And that's why
13           when I went to court on the 12th, I made sure that we
14           adjust that -- that part because I wanted to make
15           sure for that coming birthday that we had it agreed.
16                THE COURT:  So what happened on the 21st?
17                MS. ANTAR:  So -- so -- yeah, well on -- well on
18           the 20th, I had -- I came to the court, I tried to
19           file that emergency ex parte order which was denied.
20           And I tried to get the Judge to, you know, allow the
21           child to come back into my custody and order that he
22           had to bring her.  That was denied.  And that was one
23           of the things that was supposed to get pushed -- it
24           was originally scheduled to go to June 22nd and then
25           it got pushed to today because I filed a continuance.
26                THE COURT:  All right.
27                MS. ANTAR:  So on the 21st --
```

```
1              THE COURT:  What --
2              MS. ANTAR:  On the 20th -- I feel this is
3      important.  -- on the 20th, that evening --
4              THE COURT:  I know what -- I know you feel all
5      this is important.  But I need to hear what I think
6      is important.  So tell me what happened on the 21st.
7              MS. ANTAR:  Well after I -- after I went to the
8      police on the 20th and had the police make contact
9      with him, only after the police again made contact
10     with him, they went to his house, he refused to open
11     the door.
12             THE COURT:  All right.
13             MS. ANTAR:  The police --
14             THE COURT:  Listen to me.
15             MS. ANTAR:  Yes.
16             THE COURT:  Were you there.
17             MS. ANTAR:  This is what the officer told me.
18             THE COURT:  Okay.  So --
19             MS. ANTAR:  And that's --
20             THE COURT:  -- I --
21             MS. ANTAR:  -- why I want to get the --
22             THE COURT:  Stop.  Stop.
23             MS. ANTAR:  -- police report which isn't ready
24     yet.
25             THE COURT:  -- I want you to tell me what you
26     experienced.  Because I can't really rely on what
27     other people told you they experienced.  So just tell
```

```
 1          me what you experienced.  Okay.  Don't tell me what
 2          other people said.  Don't tell me what other people
 3          told you he said.  Just tell me what your experience
 4          was.
 5              MS. ANTAR:  Well, after going to the police
 6          station, I tried to have them -- they said that they
 7          were gonna go to his home and try to visit him.
 8          After him refusing to cooperate, I -- they stated to
 9          me that I should -- if he doesn't bring her to the
10          party, to call and they would do a warrant for his
11          arrest.
12              THE COURT:  Okay.
13              MS. ANTAR:  So on Monday --
14              THE COURT:  And what happened --
15              MS. ANTAR:  -- on Saturday in the morning, I
16          messaged him again in the app saying again I'm
17          reminding you about the party on Saturday.  And he
18          says again, I'm sorry.  I'm not bringing her today.
19          This is Saturday.  He says, I'm not -- I don't care.
20          I'm not bringing her.  And it's too bad.  Maybe next
21          time you'll -- you'll think about it.  And -- and
22          just telling me no.  So I called the police again.
23          And after he had told the ones the night before I
24          don't --
25              THE COURT:  Okay.  Listen.  Tell me what you
26          experienced and not what the police said and not what
27          he said to the police.
```

1          MS. ANTAR:  So the police told me that they were

2     going to go to his house again and try to talk to him

3     and give him another ultimatum of either bringing the

4     child to the party or they were gonna issue a warrant

5     for his arrest.  And then he -- the police called me

6     after that stating that they talked to him and

7     convinced him to bring the child to the Prospect

8     Police Department, drop her off to me, let me take

9     her a couple hours before the party.  And then --

10          THE COURT:  All right.  So tell me --

11          MS. ANTAR:  -- he was gonna meet me there.

12          THE COURT:  -- what happened on the 21st.

13          MS. ANTAR:  I had to go to the Prospect Police

14     Department at 10 a.m. to get my child after having to

15     call the police two days in a row because he was

16     refusing, unless being threatened with a warrant.

17          THE COURT:  So you pick up your child and went

18     to the party?

19          MS. ANTAR:  I picked up my child.  I went to go

20     pick up the cake, some more balloons.  I then went to

21     the party.  He showed up at the party -- the party

22     was from 12 to 2.  -- he showed up at that party at 1

23     o'clock, almost an hour late.  I, you know, hosted

24     the party mostly myself.  I put all the decorations

25     up.  We didn't have many people there.

26          Also, one of the other things he's violating in

27     the agreement is that it states that he's supposed to

```
 1        -- it said, like, you know, that all the
 2        communication is gonna be in the My Family Wizard app
 3        and it also says that, like, if -- in -- during our
 4        -- the exception to that is that we can have the 7
 5        o'clock phone call to say good night to the child.
 6        And it says during that 7 o'clock phone call, the
 7        parties will not have disparaging conversations with
 8        each other or something along those lines.  And he
 9        has, every single time, said disparaging things to
10        me, insulting things to me.
11            During the party he was insulting me in front of
12        my whole family.  He was talking bad -- I recorded
13        the whole thing.  He was -- he was, the entire time
14        making negative mean comments to me in front of the
15        child, in front of both my children actually, and my
16        -- my whole family.
17            THE COURT:  And what is it that he says that you
18        are putting in that category?
19            MS. ANTAR:  So he's telling me I'm a psychopath.
20        He's saying to me I'm a loser.  Every name in the
21        book.  He's telling -- he's saying I was -- I was
22        holding and our daughter and she was having a tantrum
23        and didn't want to sit down and, like, flinging
24        herself around and I'm -- I'm holding her, like,
25        trying to, like, calm her down and he starts laughing
26        in front of everyone.  And says, oh, that's why --
27        she's doing that 'cause she even know you.  Doesn't
```

1      know me?  I'm -- I've been the closest person to this

2      child out of everyone in this whole world since her

3      birth and he sees her on the weekend.

4           You know, he was -- he was saying all these

5      insults.  He was mocking me about a pregnancy loss

6      that I suffered in December in front of my mother.

7      He just continued to just say all these things.  I

8      asked -- he kept trying to talk to me and I was

9      recording him saying please only communicate with me

10     in the parenting app and he was laughing, laughing at

11     me in my face about it just thinking it's a joke.

12          And he stated multiple times that he can't get

13     in trouble or get arrested for violating a Court

14     order.  And after being in incarcerated in -- on June

15     1st for violating a Court order, he thinks that

16     everything with the family court is a joke.  He

17     stated multiple times that nothing will happen to him

18     if he violates the Court order.  That the Judge can't

19     do anything, the Court can't do anything.  He knows

20     he can do what he wants.  He stated, I know how these

21     things go.  And he just has a very disrespectful

22     attitude towards the Court, towards me, towards the

23     Judge, everything.

24          And, you know, I feel that he is -- is a

25     dangerous person.  He also was convicted of leaving

26     both of his children alone --

27          THE COURT:  All right.  Hold on.

```
1            MS. ANTAR:  -- and --
2            THE COURT:  I -- I am only concerned with what's
3       happened since your Court orders entered.
4            MS. ANTAR:  Okay.
5            THE COURT:  All right.  So are we done?  Or is
6       there more?
7            MS. ANTAR:  No, there's more.
8            THE COURT:  Okay.  Why don't you -- I want a
9       little highlight about what it all is because it
10      takes you a long time to explain things to me.  So
11      what else, like, why don't you hit the highlights for
12      me.  What else is there?
13           MS. ANTAR:  Okay.
14           THE COURT:  Before you get into the details,
15      just tell me what the things are.
16           MS. ANTAR:  Okay.  I just need one second
17      please.
18           The other thing is that it stated in the
19      agreement that the father was supposed to bring the
20      child on Mondays to daycare by 9 o'clock.
21           THE COURT:  Okay.
22           MS. ANTAR:  He has not done that.  He has
23      actually been bringing her any time that he wants.
24      Out of the six Mondays where he was supposed to bring
25      her since then, he's only brought her by 9 o'clock
26      two of them.  The other four, he didn't.
27           Yesterday, he had --
```

1      THE COURT:  Well, what -- what do you mean by he
2   didn't?
3      MS. ANTAR:  So --
4      THE COURT:  Like, what time -- what time --
5      MS. ANTAR:  -- I have -- so --
6      THE COURT:  -- did he arrive instead?
7      MS. ANTAR:  Yes.  Give me one second.
8      So the first day that he was Court ordered to
9   bring her to daycare was May 2nd.  On that weekend, I
10   asked him in the parenting app, I said, these are the
11   things that our child needs for the first day, please
12   make sure that you're sending her with all these
13   items.  He viewed my message; didn't say anything.
14      I spoke to the child on Sunday May 1st at our 7
15   o'clock phone call.  The child sounded fine.  She was
16   happy.  She sounded in great spirits.  She was
17   talking about how she was excited to go to school the
18   next day.  It was gonna be her first day of school.
19      THE COURT:  Listen to me.
20      MS. ANTAR:  Yes.
21      THE COURT:  You told me he brings the child
22   late.  What time did he bring the child?
23      MS. ANTAR:  That day he did not bring her.
24      THE COURT:  Okay.
25      MS. ANTAR:  He didn't bring her at all actually.
26   And I messaged him in the app.  I said -- I said to
27   him that morning about it.  He says, oh, she's sick.

1    I said what do you mean she's sick, if she doesn't

2    have a fever and it's -- and it's something little,

3    she can still go to school, that's their policy.  He

4    says, oh, no she's extremely sick.  She slept for the

5    twenty-two out of the twenty-four hours yesterday

6    even though I spoke to her and she sounded fine.

7         THE COURT:  All right.

8         MS. ANTAR:  I said to her -- him, if she's that

9    sick --

10        THE COURT:  So you don't -- stop.  -- you don't

11   think the child was sick?

12        MS. ANTAR:  I don't.  And I said to him if she

13   was really that sick, please schedule a sick visit

14   appointment with her pediatrician and they take same

15   day sick visits because our -- also our agreement

16   states that we're -- both of us make medical

17   decisions together.  And I said to him, please have

18   -- if she's --

19        THE COURT:  All right.

20        MS. ANTAR:  -- if she's too sick to go to

21   school, please have her being [sic] seen by a

22   pediatrician because that's concerning.  He refused.

23   He said he was not gonna bring her to the

24   pediatrician.  He said that -- that he was gonna

25   allow her to -- that he was not gonna bring her to

26   daycare and he refused -- and he kept her that whole

27   day of May 2nd.  And the next day, he brought her to

1          daycare on May 3rd, which was a Tuesday.

2                THE COURT:  All right.

3                MS. ANTAR:  So that was the first time.

4                And the second time was on June the 13th, he

5          brought her at 9:36.  And the school has a policy

6          that they have to be there by 9 o'clock.  Actually,

7          I'm sorry.  On May 9th, he brought her at 9:05.

8          Their policy is 9 o'clock.  If you're not there by 9,

9          you get turned away.  They have a five-minute grace

10         period they stated that they'll, if you're there by

11         9:05, but --

12               THE COURT:  Has the child not been able to

13         attend this program because he's bringing her late?

14               MS. ANTAR:  So no.  She -- but he brought her

15         again on 6/13 at 9:36 and that was over a half hour

16         past the grace period.

17               THE COURT:  All right.

18               MS. ANTAR:  And then yesterday, which was Monday

19         again, my other child was -- was supposed to be there

20         as well. So I got there at 8:58.  I said to the

21         directors is Angelina, the baby here.  She said, no,

22         she's not here yet.  She said they didn't get any --

23         usually their policy also is that they have to -- the

24         parent is supposed to --

25               THE COURT:  Has -- has your child suffered in

26         any negative way because the father is bringing the

27         child late?

1         MS. ANTAR:  She did by missing the first day and

2     him withholding her from going to the doctor if she

3     was allegedly sick.  By him making her late -- and

4     yesterday, he brought her at 9:55 a.m.  And it says

5     no later than 9 on the agreement.

6         So actually, I was there.  I tried messaging him

7     in the parenting app.  He refused to open any of the

8     messages.  He wouldn't read it.  I -- I didn't know

9     where she was.  The school said they hadn't heard

10    from him.  The school -- it was 9:45.  Then I called

11    the police.  I said the school hasn't heard from him.

12    He's not responding in the parenting app.  The

13    child's supposed to be here by 9, it's almost 10,

14    she's nowhere to be found.  The strict cut off time

15    is 9:05.

16        So only then did he say to the police officer,

17    Oh, I'm coming to bring her.  And he brought her

18    there after that.  And I took the child.  And, you

19    know --

20        THE COURT:  What do you mean, you took the

21    child?

22        MS. ANTAR:  I took the child home 'cause I was

23    actually coming there to pick her up and that's why I

24    was saying where is she, she's not here. She's

25    supposed to be here by 9.

26        THE COURT:  So -- but you didn't plan on keeping

27    the child in daycare that day?

1          MS. ANTAR:  No.

2          THE COURT:  So why didn't you just tell him that

3     and then he wouldn't have to worry about what time he

4     got her there?

5          MS. ANTAR:  Because anytime I try to do anything

6     that bends the agreement in any way, he says no, I

7     want to stick to the agreement a hundred percent.

8     There's no flexibility.  Which is another thing that

9     I wanted to ask to --

10          THE COURT:  Hold on.  So you wanted him to drop

11     the child off at daycare so you could just pick the

12     child up?

13          MS. ANTAR:  Yes.

14          THE COURT:  Okay.

15          MS. ANTAR:  And also I now decided to pull both

16     of the children out of that program because there was

17     some misconduct on the end of the director who's --

18          THE COURT:  Don't you have to do that with him?

19          MS. ANTAR:  No, I don't.  And so now --

20          THE COURT:  What do you mean you don't?

21          MS. ANTAR:  It's my childcare arrangement.  So

22     what I do during my time for childcare is for my

23     ability to work and go to school, not for him.  So if

24     I need a babysitter or daycare, I don't need to have

25     his permission for any of that.

26          THE COURT:  Okay.

27          MS. ANTAR:  If it's educational --

1          THE COURT:  Didn't you --

2          MS. ANTAR:  -- that's different.

3          THE COURT:  Weren't you changing daycare

4      providers the last time I talked to you?

5          MS. ANTAR:  Well, what happened is Matthew is

6      against the flu vaccine. And so when it was time --

7          THE COURT:  Okay.  Listen -- listen to me.  I

8      want you to answer my -- the questions --

9          MS. ANTAR:  Yes.

10         THE COURT:  -- that I'm asking you.

11         MS. ANTAR:  Yes.

12         THE COURT:  So I feel like the last time you

13     were in front of me and we had a hearing, I'm trying

14     to find when it was, I think -- was it in April?

15         MS. ANTAR:  Yes.

16         THE COURT:  That you were changing to this

17     daycare provider.  Right?

18         MS. ANTAR:  Correct.

19         THE COURT:  So your child was in one daycare

20     provider before April, and then one after, and now

21     you're changing again.

22         MS. ANTAR:  Before April, she was with our

23     private babysitter.

24         THE COURT:  Okay.

25         MS. ANTAR:  And prior to that, she was in a home

26     daycare which we had to take her out of because the

27     State mandates the flu vaccine and Matthew was

1    against it.  By the time that we were going to just
2    give it to her, the pediatrician stated that they
3    didn't have any flu vaccines.  So we had no choice
4    but to, by the State law, take her out unless she got
5    the vaccine.  And they said they weren't gonna have a
6    vaccine until March because they were -- they said
7    they were backlogged.
8          THE COURT:  All right.
9          MS. ANTAR:  So that's why she's --
10         THE COURT:  So what's --
11         MS. ANTAR:  -- with our sitter.  And then I
12   wanted to get her in a program which she was in this
13   on in Thomason but -- also I live in Orange so it's
14   almost forty minutes away.  So I said, let's try it
15   out.  A lot of the ones near me were full at that
16   time.
17         THE COURT:  Hold on.
18         MS. ANTAR:  Yes.
19         THE COURT:  So who's watching the children or
20   you now?
21         MS. ANTAR:  So now we've enrolled her in a
22   facility that's in Bethany.  And it is a new place.
23   We took a tour of it.  It was recommended to me by a
24   mom's group.
25         THE COURT:  Did you tell the dad?
26         MS. ANTAR:  I did.  I told him I would give him
27   all the details.  He asked -- I told him that she's

1          no longer gonna be at the other place.  I messaged

2          him yesterday in the app.  He said where is she going

3          to be.  I said I will provide you with all of the

4          details of the new place.  I said, please keep in

5          mind that upcoming Monday is a holiday, which is July

6          4th, so the place is closed.  And I wanted to just

7          double check my agreement because I know that we have

8          something in there about July 4th.  So I just wanted

9          to make sure with him that we were -- that we were on

10         the same page.  So the -- the following Monday will

11         be the first one where he will have bring her on

12         Monday to school.  But the thing is that --

13              THE COURT:  All right.  Hold -- hold on.

14              MS. ANTAR:  Yes.

15              THE COURT:  You have an agreement that says he

16         has to drop the child off at daycare.

17              MS. ANTAR:  Yes.

18              THE COURT:  But you've moved the daycare.

19              MS. ANTAR:  Yes.

20              THE COURT:  Okay.  So where do you live?  In

21         Orange?

22              MS. ANTAR:  Orange.

23              THE COURT:  And where do you live?

24              MR. LODICE:  New Britain.

25              THE COURT:  And the daycare's in Bethany?

26              MS. ANTAR:  Correct.

27              THE COURT:  So does this still make sense for

1           you two to have the child dropped off in Bethany if

2           you live in Orange and he lives in New Britain?

3                 MR. LODICE:  Not at all.

4                 MS. ANTAR:  Well that's why I was saying that if

5           he drops her off at church on Sundays, she's able to

6           be part of that important part of our family and our

7           religion of being at the Sunday service for --

8                 THE COURT:  All right.  I --

9                 MS. ANTAR:  It hurts us that she --

10                THE COURT:  Listen.

11                MS. ANTAR:  Yeah.

12                THE COURT:  -- I understand that's what you're

13          asking for.  But you have a Court order that says

14          school.

15                MS. ANTAR:  Okay.  So -- but I'm just saying,

16          maybe it's easier for him to not --

17                THE COURT:  All right.

18                MS. ANTAR:  -- have to drive to Bethany.

19                THE COURT:  Let me ask you a question.  If he --

20          let's say he agreed that the child could be dropped

21          off Sunday morning.  What -- instead -- so he won't

22          have the child Sunday morning to Monday morning.

23          What day should he have the child instead of Sunday?

24          Like, are you talking about cutting down his

25          parenting time or making that time up somewhere else?

26                MS. ANTAR:  I was saying to cut it down.  But if

27          he really wanted to try to make up for it, then maybe

1    we could consider that.  But I was just saying to cut

2    it down.  Because to me, the only difference, is

3    really, like her sleeping and waking up in the

4    morning and getting dropped off.

5         THE COURT:  It's a whole day of Sunday with him.

6    It's a whole week day -- weekend day.  It's half the

7    weekend.

8         MS. ANTAR:  Well, she spends the majority of the

9    time with me as it is so I --

10        THE COURT:  Well, no, that -- but that's -- that

11   is -- that's something that you're requiring the

12   child do.  You think the child requires -- is

13   supposed to be dropped off.  But that's not what your

14   agreement says.  Your agreement says the weekend

15   would be with the father.

16        MS. ANTAR:  Right.  And -- and that's why I put

17   in the thing about religious things.  Because if he's

18   refusing every religious thing including Holy

19   Saturday which was -- is one of the holiest days of

20   the year before Easter, he didn't bring her to that

21   either.  He said he was gonna bring her and he

22   didn't.  So it's like -- it's not just the -- it's

23   not just the, you know, it's not just the -- the

24   special occurrences.

25        Like, for example, I -- I was awarded with a

26   scholarship.  and they had a special -- a special

27   service and ceremony afterwards for that because I'm

1    going to be going to law school.  And I asked him to

2    have my child to be there so she can see me and my

3    other child was there, and he refused.  So it's --

4    it's -- and it's, like, it's not just religious

5    events, it could be anything.  Birthdays, whatever it

6    is.

7        And also another thing that I have in my other

8    agreement with my other child's father which I would

9    like to have in this one as well, states that -- it

10   gives the ability where if I wanted to have her on a

11   weekend, I should be able to give him two weeks'

12   notice or forty-eight hours' notice, or whatever it

13   is, to be able to ask for that.  Because the way it

14   is now, I'm not ever able to have my child on a

15   weekend.  And I have to hope that he's gonna follow

16   through and -- and take her to these events that

17   occur during her visitation hours because he refuses

18   to.  And -- so it's like, if I want to plan something

19   on a weekend now with my child, I can't.  Whereas --

20       THE COURT:  But -- but isn't the agreement that

21   you entered into?

22       MS. ANTAR:  It is.  But I wanted to modify it to

23   -- that's why I'm back in court now trying to modify

24   it a year later to make these changes and close these

25   loopholes.  Because I think it's reasonable that I

26   should be able to have -- if, you know, at least, you

27   know, sometimes, like for example in my other

1    agreement, it states that each parent's allowed to

2    have a certain number of nonconsecutive vacation days

3    with the child per year.  So if you wanted to take a

4    vacation, why should it only be limited to this five

5    day period.

6        THE COURT:  But -- but did you give him notice

7    that that's something you'd be asking for today?

8        If you have to -- when you -- when you --

9        MS. ANTAR:  When I filed the motion.

10       THE COURT:  All right.  But when you make

11   requests to modify custody, you have to kind of tell

12   each other what you're asking for.  So you can't --

13   like, I can't let him come in and say well, I want to

14   change it to say she never goes to church.  Right?

15   Like, you -- you have to give each other notice about

16   these things.

17       So I have notice that you wanted to change the

18   pickup and drop off times and that you wanted to

19   change to sole custody.  But I don't think I have

20   notice you were trying to change the summer plans.

21       Did you talk about this together?

22       MS. ANTAR:  It's not about summer plans.  It's

23   the fact that I want to be able to make it so if --

24   just like if he wanted to take her during the week,

25   it should be -- if the other parent wants to have

26   additional time, they should be able to ask and,

27   like, if I have her the majority of the time but I

1       never can have her on the weekend, ever.  And there's

2       something -- a special occasion or something that I

3       want her to be with me on a weekend, if I give him

4       two weeks' notice or -- or seventy-two hours' notice,

5       that's reasonable to say okay and then -- and then he

6       can make it up with a weekday dinner where he takes

7       her -- like, I'm just speaking off what it says on my

8       other agreement with my other child because I feel

9       like that's an important thing that closes a loophole

10      which eliminates me from ever being able to maybe do

11      a playdate with another friend who has children

12      that's her age and things that might occur on the

13      weekend.

14           THE COURT:  All right.

15           MS. ANTAR:  I'm not -- I'm not --

16           THE COURT:  Let me ask you -- let me ask you a

17      couple of questions.  What do you do for work?

18           MS. ANTAR:  I have a publishing company.

19           THE COURT:  All right.  And so do -- are you

20      self-employed?

21           MS. ANTAR:  Yes.

22           THE COURT:  So do you have regular work hours?

23           MS. ANTAR:  No.

24           THE COURT:  So you have flexibility during the

25      week?

26           MS. ANTAR:  Yes.

27           THE COURT:  Okay.  What do you do for work?

```
1              MR. LODICE:  I'm a contractor.

2              THE COURT:  And what kind of contractor?

3              MR. LODICE:  Home improvement.

4              THE COURT:  So are you also self-employed?

5              MR. LODICE:  Yes.

6              THE COURT:  So either one of you could have the

7         child, like arrange your work so that you would have

8         the child during the week or on the weekends, either

9         one?

10              MR. LODICE:  I work typically 7 to 5 every day

11         during the week.

12              THE COURT:  What's that?

13              MR. LODICE:  I work 7 to 5 every day during the

14         week.

15              THE COURT:  But you're self-employed.

16              MR. LODICE:  But I am self-employed.

17              THE COURT:  All right.  And what about you?

18              MS. ANTAR:  So I'm -- I just wanted to say

19         that --

20              THE COURT:  I'm not -- I'm asking you about your

21         schedule.

22              MS. ANTAR:  My schedule is always changing.  And

23         I'm about to be starting law school in August which

24         is going to be at night.  So I'm gonna need

25         additional childcare in the evenings.  And, you know,

26         I'm in the process of looking for babysitters to have

27         as on call to be able to facilitate that.  Because
```

1    I'm gonna be working during the day and going to

2    school at night.  So I'm not gonna be able to work as

3    much because I'm -- I'm going back to school.

4         THE COURT:  All right.  So couldn't it work out

5    that you change your parenting schedule so that the

6    children are with you different times because you

7    both will have flexibility in your schedule.  Does it

8    have to be weekends?  Do you have to have the child

9    on the weekends?

10        MR. LODICE:  Well, I also have two other

11   children that I take the same time, Friday to Sunday

12   -- or Friday to Monday.  This is why we worked it out

13   on those days so this way all our -- all my children

14   are together.

15        THE COURT:  All right.

16        MR. LODICE:  And I get to see them all

17   simultaneously.

18        THE COURT:  All right.  So ma'am, why don't you

19   wrap up what it is that you want to tell me because

20   we have the two-hour hearing and I've been listening

21   to you for an hour.  So wrap up what you want to tell

22   me about your requests.  And then I'm gonna hear from

23   dad.

24        MS. ANTAR:  I just wanted to know if it would be

25   okay if can put more money in the meter outside

26   because it's gonna expire in fifteen minutes and I

27   don't want to have to get a ticket.

1          THE COURT:  Okay.  Well, if you'd like to take a

2    break, we can do that.  Why don't you wrap up with

3    whatever else you want me to -- want me to know.

4    Like, you know, five minutes or so and then we'll

5    take a break.  And then when we get back, I'll hear

6    from him.

7          MS. ANTAR:  I have a lot -- it's gonna take more

8    than five minutes for me to wrap up.

9          THE COURT:  Well, give it a try.

10          MS. ANTAR:  Okay.  So I just wanted to say that

11    he has no -- he has no Court ordered custody

12    arrangement or visitation arrangement with his other

13    children.  He can see them anytime he that wants.  He

14    only started taking them on the weekend after we made

15    an agreement last June to have him have Angelina

16    every weekend.

17          And since he has no set schedule with his other

18    children and I do have a set schedule with my other

19    daughter, which is from Friday at 6 to Sunday at 6

20    but he brings her to church every week and he follows

21    the part that says about religious obligations, since

22    Matthew is not following that, I don't feel

23    comfortable with him having her on Sundays anymore

24    because that's a important part of our faith.  So

25    that's why I no longer like him having her on

26    Sundays.  If he was going to bring her to the church

27    and then take her back, I would feel so much better

1    about it.  But he won't do that.  If I told him he

2    has -- she has soccer, he says, no I'm not bringing

3    her, you can schedule it during your parenting time.

4         So he's saying he wants to have these visitation

5    days but he doesn't comply with our agreement.  And

6    so, you know, for example it says about Fourth of

7    July here.  On even years, the Fourth of July will be

8    spent with -- with him.  So that means that he's

9    gonna have her on Monday for Fourth of July.  But it

10   doesn't -- there's loopholes where it doesn't then

11   say how she's gonna come back to me.  So now she's

12   gonna be with him on Monday.  The daycare closed.

13   It's a holiday where she's set with him, the next

14   day's Tuesday, there's nothing in there that says

15   where the child's gonna get returned.  So --

16        THE COURT:  What would be -- that's why you two

17   have Our Family Wizard.  There's gonna be a million

18   things like this raising a child that -- that won't

19   be specified.  So do you have a request for what

20   happens July 6th -- or the 5th?

21        MS. ANTAR:  Well I'm -- I was requesting

22   regarding for My Family Wizard that he be required to

23   view and respond to the messages within twenty-four

24   hours.  Because he purposefully ignores my messages.

25   And I -- I can see when he opens them.  If he sees

26   the word religion, he won't open the message.  If he

27   sees the word contempt, he won't open the message.

```
1          He -- he only picks and choose and then he reads it
2          and then he doesn't respond.
3                  THE COURT:  Okay.  So --
4                  MS. ANTAR:  So in my -- in my other order it
5          says that the parties have to respond within a
6          certain amount of time.
7                  THE COURT:  Okay.  And what -- do you want -- do
8          you want to tell me what you want to have happen at
9          -- and the holidays?
10                 MS. ANTAR:  So I think that he should bring her
11         to daycare.  I mean, that would be --
12                 THE COURT:  All right.  But the daycare's in
13         Bethany now.  Right?
14                 MS. ANTAR:  Yes.  And before this, he was
15         bringing her to my mother's in Woodbridge for almost
16         seven months straight until she started the school in
17         Thomason, which again, is forty-five minutes from my
18         home.  I can't -- with the price of gas, it costs me
19         over a hundred dollars to fill my gas tank.  I can't
20         manage it anymore.  So I need to do what I -- what's
21         reasonable for me for childcare.  And in addition to
22         the fact that he's not paying any child support like
23         he was ordered to do.  And I'm -- I'm paying for
24         everything for the child by myself with no help from
25         him whatsoever.  I haven't received a penny since
26         December 2021, not one penny.
27                 THE COURT:  All right.  Do you want to tell me
```

1    what you think should -- oh, you said daycare.  But

2    it's the new daycare?

3        MS. ANTAR:  Well for this -- I don't want to say

4    something that's gonna be for every single holiday

5    because it all depends on what day of the week it is

6    and -- and each thing is -- is specific.  But as far

7    as this coming July 5th, which is a Tuesday, you

8    know, I would appreciate it if he would bring her

9    like, as it would say for Monday, either to daycare

10   or if the daycare's closed to my mothers.  So maybe

11   if we just put something in there saying that like,

12   if -- if the -- if Monday's -- if the holiday falls

13   on a Monday were the father has the child, then he

14   shall drop her off instead on Tuesday.

15       THE COURT:  Okay.  All right.

16       MS. ANTAR:  Because I don't think there's too

17   many Monday holidays that he'll have her.  But it

18   kind of gives it -- what if it's Christmas or

19   something; then this way it explains what to do for

20   the next day.

21       THE COURT:  Okay.  Why don't you go put money in

22   your meter.

23       MS. ANTAR:  Well, I do have a couple more things

24   I wanted to say before --

25       THE COURT:  Okay.

26       MS. ANTAR:  So as far as the -- the nightly

27   phone calls as well.  In addition to him making

1       really mean, nasty comments to me, he's -- every time

2       -- it says he's not supposed to have disparaging

3       remarks towards me, and the parties will not speak to

4       each other, and will just only hand the phone to the

5       child.  I recorded and I told him in our family app

6       that all calls I have with him to call my child are

7       recorded to be able to have as evidence in court.

8       And during every single call since that date of April

9       12th, he has screamed at me, called me names.  He

10      said things -- bad things about me in front of the

11      child.  He will refuse to let me speak to her.  He'll

12      hit the -- the tone dial buttons over and over so I

13      can't hear anything.  He'll stand there and I'll --

14      I'll answer the phone and I'll -- and I'll say hello,

15      and he'll stand there and he'll, like, yell from the

16      other side of the room, oh, Angelina, come over here

17      to answer the phone.  He won't, like, walk over to

18      her and hand her the phone.  He's clearly in a

19      different room and he's -- what's is really upsetting

20      to me is that he constantly is saying these

21      disparaging remarks towards me.  And I have not said

22      one single word to him at all outside of the

23      parenting app.

24          THE COURT:  Why don't you tell me what it is

25      that he says that you're describing as disparaging?

26          MS. ANTAR:  He says, oh, you're fucking stupid.

27       He says, you're, you know, you're a loser.  You're

1        such a child.  Nobody likes you.  This is why nobody

2        loves you.  You know, he'll, like, he'll -- I have

3        them all recorded and  --

4            THE COURT:  All right.  So you're recording his

5        phone calls with the child?

6            MS. ANTAR:  Yes.  Because he says disparaging

7        comments and screams at me.  He saying all these rude

8        comments to me in front of the child.  And not only

9        that, but he refuses to let me speak to her.  And on

10       several occasions, like on this past Sunday, I tried

11       to call.  I called one time.  He wouldn't give her

12       the phone.  He also insists on him holding the phone

13       and he will talk.  Like, I'll say to him -- every

14       time I try to speak to the child, he interrupts, and

15       he will respond.  If I'm asking the child a question,

16       you know, oh, what did you eat?  Oh, well we ate

17       this.  We ate that.  Like, he'll respond.  And I'm

18       not -- I get, like, frustrated because I'm not trying

19       to speak to him.  I don't want to speak to him.  I

20       want to speak to the child.  And then he will refuse

21       to let me talk to her.

22           So on this past Sunday, for example, he refused

23       to let me speak to her and I had to -- I called -- I

24       called multiple times.  Finally, he answered, and I

25       heard him yell from across the room saying, oh, come

26       over here Angelina, to answer the phone.  And then

27       he, you know, it sounded like he was going to put her

```
1         on the phone and then it sounded like she, like, hung
2         up.  And then I tried calling back eleven times.  I
3         left voice mails each time I called.  I recorded
4         myself leaving a voice mail to document the time and
5         everything.  And he did not answer.  He refused to
6         answer.  He only answered the one time and he -- he
7         just let her run away, and he didn't even have enough
8         decency to answer me in the app or anything, or to
9         try to, like, just let me say good night to the
10        child.
11             And, you know, he'll -- he'll talk about me with
12        his fourteen-year-old son.  And he'll make insults
13        saying she's --
14             THE COURT:  All right.  How -- how do you know
15        that?
16             MS. ANTAR:  Because I hear them talking.  I -- I
17        -- he has it on speaker every time when the phone
18        call.  It's on speaker.  And you can hear his son and
19        him talking on the speaker when I'm trying to just
20        say good night to my daughter.
21             THE COURT:  Okay.
22             MS. ANTAR:  So I don't want -- I want it to be
23        so -- so all of our --
24             THE COURT:  So what is it that you're asking me
25        to order about the phone calls?
26             MS. ANTAR:  I'm sorry?
27             THE COURT:  What do you want -- are you asking
```

1       me to change the orders about the phone calls?

2           MS. ANTAR:  Well, the other thing about the

3       phone calls is that when he calls, she'll start

4       crying and she'll have a meltdown crying, screaming,

5       saying I don't want to talk to you, I don't want to

6       talk to you.  And, like, so I feel that this is,

7       like, upsetting to the child and it's causing her

8       more anxiety and stuff.  And he will -- he's, I feel

9       is, like, trying to manipulate the child and trying

10      to say don't talk to her, don't talk to her.

11          So, you know, I feel like, you know, I do want

12      to be able to have the ability to call my daughter to

13      say good night.  But I do wish that you would make it

14      so all communication between the parties is limited

15      to the parenting app.  No communication through the

16      parties during any phone contact.  Because every time

17      he uses it as a -- as a means to say these nasty,

18      mean comments in front of multiple children.  And,

19      you know, I've had conversations where I called my

20      daughter and my seven-year-old is next to me and he's

21      over here calling me names and it's being recorded.

22      And so it's, like, I don't -- I don't feel

23      comfortable with that.  I don't want him to be able

24      to speak to me at all unless it's in the parenting

25      app.

26          THE COURT:  Okay.

27          MS. ANTAR:  And I want him to have to read it

1      within twenty-four hours and respond.

2           THE COURT:  Okay.  I got it.

3           MS. ANTAR:  And same vice versa.

4           THE COURT:  Okay.  All right. Do you want to put

5      some money in the meter.

6           MS. ANTAR:  I just wanted to just wrap up really

7      quick.

8           THE COURT:  Okay.

9           MS. ANTAR:  Because I don't want to lose an

10     opportunity to say what I have to say.

11          THE COURT:  It's not a choice.  I mean, you

12     know, if you -- why don't you go put money in the

13     meter.  We'll come back in fifteen minutes.  And then

14     you can finish up.

15          MS. ANTAR:  Well, what about the financial

16     discovery?

17          THE COURT:  All right.  Well that's a separate

18     issue.  I asked you -- we're gonna get to that last.

19     All right.

20          We're in recess, ladies and gentlemen.

21          THE MARSHAL:  All rise.  The Court's in recess

22     for fifteen minutes.

23          (Whereupon the Court recessed.)

24          (Whereupon the intervening, unrelated matters

25     were not included.)

26          THE COURT:  So the folks on the earlier case can

27     come back up, Anatar [sic] and Lodice.  Come on up.

1          (Whereupon there was a pause in the

2      proceedings.)

3          THE COURT:  So resuming after a very long break

4      Antar and Lodice.  I'm gonna hear from Mr. Lodice for

5      -- for a little while.

6          Mr. Lodice, you've been sworn in.

7          MR. LODICE:  Yes, your Honor.

8          THE COURT:  So why -- I have a couple of

9      questions for you --

10         MR. LODICE:  Of course.

11         THE COURT:  -- about some of the things that Ms.

12     Antar said.

13         MR. LODICE:  Okay.

14         THE COURT:  But why don't you -- why don't you

15     start by telling me if you want any changes to the

16     current parenting plan.  And if so, what they are.

17         MR. LODICE:  Yes.  I would -- I'd actually like

18     to take over as primary residency for Angelina.  And

19     then I would also like to, obviously readdress our

20     orders that are in place 'cause it would not match

21     the primary residency.

22         THE COURT:  All right.  And why do you want

23     primary residency?

24         MR. LODICE:  I just feel like -- that everything

25     that Theodora has done for our daughter -- or to me

26     -- or to our daughter, I should say, is nothing but

27     hurting her.  And you want me to start going through

1    everything?

2         THE COURT:  Well, look.  I don't have a -- I

3    don't think I have motion before me from you to

4    change residency.

5         MR. LODICE:  Yeah.  I don't understand how that

6    you don't considering I filed it and everything.

7         THE COURT:  All right.  Well when -- let me just

8    -- there's a lot of motions.  Let me make sure I'm

9    right about that.

10        MR. LODICE:  I -- well, earlier you guys said

11   that it was not served.

12        THE COURT:  That could be.  When did you file it

13   though so --

14        MR. LODICE:  That was March 17th, I believe was

15   the day, your Honor.

16        THE COURT:  March 17th.  All right.  So I do see

17   a motion to modify.  Although, I think that might be

18   the mother's.  I see something back on March 10th.

19        MR. LODICE:  That might be the day.

20        THE COURT:  Yeah.

21        MR. LODICE:  I know it was that week 'cause it

22   was the week that --

23        THE COURT:  Okay.

24        MR. LODICE:  -- we were here in court.

25        THE COURT:  All right.  And how did you provide

26   notice to the mother of that motion?

27        MR. LODICE:  I gave it to a whatchamacallit; a

1    marshal.

2         THE COURT:  The marshal.  Okay.  And did you get

3    anything back from that marshal?

4         MR. LODICE:  I do not recall.  It was a while

5    ago.  I don't think so.

6         THE COURT:  I don't see your return of service

7    in the file for that.

8         Though, would you take a look 'cause there's a

9    lot of motions in there.  All right.

10        So let's put that aside for a moment.

11        MR. LODICE:  Okay.

12        THE COURT:  Why don't you tell me about some of

13   the requests that the mother is making about changing

14   the access schedule and the Sundays and --

15        MR. LODICE:  Yeah.  I don't --

16        THE COURT:  -- stuff like that.

17        MR. LODICE:  -- I don't want to lose -- I only

18   have two days off a week and I get to see my children

19   on those days.  I would definitely don't want to lose

20   that Sunday with my daughter, especially considering

21   I have my other children that day.

22        THE COURT:  Are they with you every other

23   weekend or --

24        MR. LODICE:  No, every week.

25        THE COURT:  -- every weekend?  Every weekend.

26   All right.  So what about the -- the issue that the

27   child's never with the mother on the weekends.  I

1      mean, that's kind of a -- that's kind of a concern.

2           MR. LODICE:  I would be open to that.  But the

3      only thing is, I just want to have -- I feel like

4      there should be a limit on that because she's the

5      kind of person who will take advantage of any

6      loophole there is in our agreement, like she's been

7      doing all along.  And so I want to make sure that if

8      she does that, it's not gonna be, okay every single

9      week she's like hey I want Angelina this week, hey I

10     want Angelina this week.

11          THE COURT:  Well, I agree we should probably be

12     a fixed weekend.  Like, the last weekend of every

13     month or the first weekend of every month or

14     something like that.  I agree you two need a

15     schedule.  So is that something that you would

16     consider?  I'm asking you.  You two --

17          MR. LODICE:  You're asking me.

18          THE COURT:  I'm asking you.

19          MR. LODICE:  Oh, I'm sorry.  I mean, yes, I

20     would be open to that.

21          THE COURT:  All right.  And when would you want

22     it if -- if -- if -- let's say that Angelina was with

23     her mother, you know, well the second weekend of

24     every month, what -- when would you want to see

25     Angelina that week?

26          MR. LODICE:  To make up for it, you're saying?

27          THE COURT:  Yeah.

1        MR. LODICE:  Whatever days would work best.

2        THE COURT:  Well, I'm --

3        MR. LODICE:  If we're saying the weekend, what

4    would the weekend entail?  You're talking about

5    Saturday or Sunday?  You're talking about just

6    Sunday?

7        THE COURT:  I think the child would stay with

8    the mother that weekend.  So --

9        MR. LODICE:  Oh, so stay with the mother all

10    weekend.

11        THE COURT:  Yeah. The whole weekend.

12        MR. LODICE:  So I wouldn't see her all week.

13        THE COURT:  So she could, you know, have -- have

14    -- have once a month --

15        MR. LODICE:  So then I would drop off on Monday

16    and I wouldn't get to see her again 'til --

17        THE COURT:  It would be --

18        MR. LODICE:  -- probably the following --

19        THE COURT:  It would be two weeks.

20        MR. LODICE:  -- Monday then.

21        THE COURT:  Right.  So that's what I'm saying.

22    Like, if you were gonna have the child not -- during

23    those weeks but not on a weekend --

24        MR. LODICE:  That's almost similar to our old

25    schedule, which was like the two, two, three plan.

26        THE COURT:  Okay.  Well, I -- I --

27        MR. LODICE:  I mean, if we do that, yeah, that'd

1       be fine.  But then, like, maybe it would be the next

2       weekend I would have her, whatever if I'm losing,

3       what, two three days, so it would be that Wednesday,

4       Thursday, Friday, Saturday, Sunday.

5              THE COURT:  Oh, okay.  I see.

6              MR. LODICE:  You know what I mean.

7              THE COURT:  Yes.

8              MR. LODICE:  So this way the following weekend,

9       so this way it's kind of like a, I guess a week on,

10      week off type thing almost.

11             THE COURT:  Okay.

12             MR. LODICE:  But with a five day thing on it.

13             THE COURT:  So you would want the -- the

14      weekdays before your weekend.

15             MR. LODICE:  Yeah.

16             THE COURT:  That would make sense to you.  Okay.

17             MR. LODICE:  Yes.  The only challenging thing

18      with that now, is she removed her from daycare as of

19      Monday because she didn't like that the daycare

20      teacher wouldn't make me bring in extra things for

21      her.  So now we don't have a daycare for our

22      daughter.  This is the first I'm hearing of the one

23      from Bethany.  I had no idea about that until she

24      brought it up today in court.

25             THE COURT:  Well, I think if the child --

26             MR. LODICE:  This is --

27             THE COURT:  -- was with you during those

1          weekdays --

2               MR. LODICE:  Yep.

3               THE COURT:  -- considering how far away you

4          live --

5               MR. LODICE:  Yep.

6               THE COURT:  -- from the daycare she's using,

7          that you would be responsible for your own -- you

8          make whatever arrangements you think are right.

9          'Cause it'll only be once a month also.  Remember,

10         it'd be like two days once a month.  So I don't know

11         you might take those days off, you might -- the child

12         might be with your grandmother, your mother,

13         whatever.  All right.  I --

14              MR. LODICE:  Yeah.  It's just hard for me to

15         take days off 'cause I owe a lot of child support I'm

16         trying to catch up on and it's just hard for me --

17         'cause without me working, I don't make money.

18              THE COURT:  All right.

19              MR. LODICE:  You know, I have to stay --

20              THE COURT:  If I were going to order that, I

21         would say you -- you would make your own daycare

22         arrangements.

23              MR. LODICE:  Okay.

24              THE COURT:  That you wouldn't be -- you wouldn't

25         be obligated to use the daycare back in Bethany.

26         Because I think the commute's too far for the child

27         to do those days.

```
 1          MR. LODICE:  Yeah.  Well, I mean, either way we
 2     have to figure out a daycare situation 'cause our
 3     drop off is always at the daycare now.  So, like,
 4     that's the way we made our last schedule.  So now I
 5     don't know what the drop off is.
 6          THE COURT:  Well, what would you --
 7          MR. LODICE:  We have a set --
 8          THE COURT:  -- want it to be?
 9          MR. LODICE:  We did a backup where it was her
10     mother's house.  Somewhere in the middle would be
11     ideal.  Like, I don't want to have to go -- and this
12     is my big issue about bringing her to church on
13     Sunday.  'Cause I brought her to every special event
14     that she said I wasn't bringing her.  Like, the Greek
15     Easter, the Passover, the name day, all those special
16     events, I made sure I brought her to church on time.
17          She's never there at church.  It's always just
18     her mother there.  She doesn't go to church.  She
19     says she does.  She doesn't.  I can have her mother
20     verify that if you need me to.
21          THE COURT:  There's no interrupting.
22          MR. LODICE:  And, like, that's the --
23          THE COURT:  All right.  But we're gonna get --
24          MR. LODICE:  -- big thing is.
25          THE COURT:  -- we're gonna get --
26          MR. LODICE:  It's an hour away.
27          THE COURT:  Listen.
```

1          MR. LODICE:  Gas is --

2          THE COURT:  -- we're gonna get back to that.

3          MR. LODICE:  Okay.

4          THE COURT:  But let me just -- for my sake, one

5     thing at a time.

6          MR. LODICE:  Of course.

7          THE COURT:  If the child was with you those

8     couple -- like, so let's say the child's with the

9     mother every second weekend in the month.

10          MR. LODICE:  Okay.

11          THE COURT:  And that weekend of the month, then

12     the following week, you'd have the child, you'd pick

13     the child up Wednesday, she'd stay with you through

14     Monday.

15          MR. LODICE:  Okay.

16          THE COURT:  All right.  You're gonna make your

17     own daycare arrangements?

18          MR. LODICE:  Yeah.  I can do that.

19          THE COURT:  You can do that.

20          MR. LODICE:  I'll figure that out.

21          THE COURT:  Okay.  Now the next question is if

22     we're not doing pick up and drop off at daycare,

23     where would you want it to be?  Somewhere in the

24     middle?

25          MR. LODICE:  Somewhere in the middle would be

26     ideal.

27          THE COURT:  Okay.  But we're talking about early

```
1            in the morning.
2                   MR. LODICE:  Yes.
3                   THE COURT:  All right.
4                   MR. LODICE:  So I have to -- on Monday I have to
5            drop my other children off at their school.
6                   THE COURT:  Mondays.
7                   MR. LODICE:  So their school is the -- the last
8            one gets dropped off at 8:10 his bus comes.  So I
9            leave Southington at 8:10.
10                  THE COURT:  Okay.  So you could meet her with --
11                  MR. LODICE:  Waterbury -- our old meeting place
12           was the best, is Naugatuck 'cause was right in
13           between everybody.  It was in between my -- my -- my
14           ex-wife, my mother, her parents, her house.  Like,
15           that Naugatuck spot is right in the middle of all
16           that.
17                  THE COURT:  I don't remember where that was.
18                  MR. LODICE:  It was the -- the Cumberland Farms
19           in Naugatuck.  When we picked -- I picked the
20           Cumberland Farms because it has a lot of cameras in
21           case there's any issues.
22                  THE COURT:  Okay.  There's probably a million
23           Cumberland Farms in Naugatuck so which one?
24                  MR. LODICE:  There -- it's the main -- the one
25           on -- I'm trying to remember the name of the street.
26           It was on -- it should be on our original order.  I
27           don't have a copy with me in --
```

```
 1              THE COURT:  All right.

 2              MR. LODICE:  -- my phone but I --

 3              THE COURT:  I'll -- I'll find it.  I'll find it.

 4              MR. LODICE:  Okay.

 5              THE COURT:  So that's your suggestion.

 6              MR. LODICE:  That would be my suggestion.

 7              THE COURT:  The old order.  Okay.

 8         Now, she's saying that there are Sunday events

 9    that -- church events that you didn't get the child

10    to --

11              MR. LODICE:  Yes.

12              THE COURT:  -- in May -- in the last two months.

13     Do you want to comment on those?

14              MR. LODICE:  There was no events.  The only

15    things I didn't bring her to was the church every

16    week.  And -- because I can't afford to drive -- on

17    my days off with my children, I can't drive all the

18    way from my house all the way to Orange, bring her

19    there, sit there for two hours, you know, twiddling

20    my thumbs, and then drive all the way back; lose four

21    hours of that morning.

22              THE COURT:  Okay.

23              MR. LODICE:  My car -- my car is struggling

24    right now.  I'm having a lot of car problems which

25    I'm hoping to get resolved in the next couple weeks.

26    But it's gonna cost more than I can afford right now.

27    So long distance, like, it took me an hour and a half
```

1          to get here today because I keep having to pull over,

2          shut my car off.

3                THE COURT:  Okay.  What about Our Family Wizard?

4                MR. LODICE:  I'm sorry.  What about what?

5                THE COURT:  The Our -- the wizard -- Our Family

6          Wizard.

7                MR. LODICE:  Yeah, so --

8                THE COURT:  Tell me about that.

9                MR. LODICE:  -- when -- so when that happened, I

10         downloaded it three days later.  I didn't download at

11         first because when we first discussed it in court,

12         the Judge said, you know, there's two ones you can

13         use.  You can use AppClose or you can use Our Family

14         Wizard.  And she was telling me, the Court, that the

15         Our Family Wizard was only $99.  So I said fine, you

16         know what, we can do that one.  When I looked it up,

17         and it ended up costing me $340 because I had to pay

18         for myself and her.  So it was $340 for just a year.

19         So every year now I have to come up with $340 for the

20         app.  So while I was asking her -- I wasn't refusing

21         to --

22                THE COURT:  Why were you paying her share?

23                MR. LODICE:  'Cause she won't pay it.  She'll

24         just say no.

25                THE COURT:  I think you were each supposed to

26         pay your own share.  Okay.  All right.  We'll get

27         back to that.

1          MR. LODICE:  And then I asked her that whole

2     week -- the -- those first three days I was like, can

3     we please just use an app that's free.  I really

4     can't afford to shell out $340 right now, especially

5     since I had to bring -- give her money for the party

6     also.  Which I also want to touch on that too.

7          THE COURT:  We're gonna get back to that.

8          MR. LODICE:  Okay.  And then she kept saying,

9     well stop harassing me, stop calling me.  And that's

10    when the police called.  And I was, like, fine.  So I

11    borrowed the money from somebody and paid for the app

12    for both of us.  And then I sent her the email and

13    then three days later, she finally responded and

14    signed up.

15         THE COURT:  And when was that?

16         MR. LODICE:  I believe -- I want to say, it was

17    like the 18th -- 4/18.  I can probably verify it on

18    the app or my email.

19         THE COURT:  All right.  Tell me about the

20    birthday party.

21         MR. LODICE:  Okay.  So the birthday party.  We

22    were talking about the birthday party.  She sent me

23    some screenshots where she was looking at the

24    birthday party, nothing was finalized.  She was

25    saying here's what's available, blah, blah, blah.

26    And it was $400 for the birthday.  So I said, okay.

27    I'll send you -- I'll send you 300.  I was like, and

1          that allows, you know, 600 total.  That allows 200

2          extra to get cake, decorations, whatever other little

3          things you want to get for the party besides the 400

4          for the actual party.  All right.

5               So during that time, she's like, well I want

6          more money.  You need to send me 400.  And I was

7          like, well I can't afford that right now.  You know,

8          I feel like 300 is a fair amount.  That gives you 400

9          for the party, 'cause that's what she was showing me

10         the bill was.  It was, like, $401.  And then I was,

11         like, that gives almost 200 more dollars where you

12         can get all the other stuff.

13              And then -- so she spent the whole month of May

14         telling me the party was cancelled.  I actually have

15         copies of emails or from the app if you'd like to see

16         them.  I made copies for her and copies for you.

17              THE COURT:  Okay.  So --

18              MR. LODICE:  Of her -- of her saying I cancelled

19         it.

20              THE COURT:  All right.  Don't -- don't read to

21         me from those yet.

22              MR. LODICE:  Okay.

23              THE COURT:  Let's just -- what -- so --

24              MR. LODICE:  She -- she told me to --

25              THE COURT:  -- these are --

26              MR. LODICE:  -- a whole month the party was

27         cancelled.

```
 1              THE COURT:  Hold on.  Those are emails from her
 2        to you?
 3              MR. LODICE:  These are from the app.
 4              THE COURT:  Okay.
 5              MR. LODICE:  Communications from the app.
 6              THE COURT:  All right.  So you want me to look
 7        at them?
 8              MR. LODICE:  I do.
 9              THE COURT:  You got to give mom copies.  And
10        then I'll look at them.
11              MR. LODICE:  I do.  I have a copy for both of
12        you.
13              THE COURT:  Okay.  All right.  So ma'am, are
14        those what he says they are?  Are they communications
15        between the two of you over Our Family Wizard?
16              MS. ANTAR:  They are partial communications that
17        don't have the complete -- they don't have the
18        full --
19              THE COURT:  Okay.
20              MS. ANTAR:  -- transaction.
21              THE COURT:  So -- but they are what he says they
22        are?
23              MS. ANTAR:  They are partial communications.
24              THE COURT:  All right.  So those can be entered
25        as a full exhibit then.  It'll be -- let's see
26        here --
27              THE CLERK:  Defendant's A.
```

1        THE COURT:  All right.  Defendant's A.  Thank

2    you.  All right.  Let me take a look at these.

3        All right.  There's a lot of messages here.

4    Which page is --

5        MR. LODICE:  The -- they're all -- they're

6    different, Judge.  So if you look at the first one,

7    on page 1.

8        THE COURT:  Yeah.

9        MR. LODICE:  The first paragraph is her saying I

10   cancelled it.

11       THE COURT:  Wait.  Oh, I see.

12       MR. LODICE:  And that was May 3rd.

13       And on the second page.

14       THE COURT:  Yeah.

15       MR. LODICE:  If you look towards the bottom.  On

16   April 30th, she says again, the party is off.

17       THE COURT:  Okay.

18       MR. LODICE:  Again, on May 2nd, she said I will

19   do my own party since you aren't paying more for this

20   one.  That was May 2nd.

21       THE COURT:  Okay.  Okay.

22       MR. LODICE:  And then the other one is her

23   saying, I'm not doing it with you because you're

24   being rude and dispectful [sic].  I don't need to be

25   around you.  Please leave me alone and stop harassing

26   me.  And I was like -- and I was explaining to her

27   that, you know, the party cost this much, I sent you

1    and extra 200.  And this is her still just denying

2    it.  Saying that we weren't having the party

3    together.

4         And throughout the month, I kept asking what day

5    is the party; what time is the party; are we doing a

6    party together; we're supposed to do a party

7    together.  And she just wouldn't respond to those

8    messages until the day before I got a mail -- now

9    this is after I already planned my own party with my

10   own family and everybody because I have to have a

11   party for my daughter.  I'm not gonna not have one

12   because she's not gonna have one.  So then I planned

13   my own party.

14        So the day before she decides to tell me make

15   sure Angelina's in her dress for tomorrow.  And I'm

16   like, for -- for what?  For her party.  And I'm like,

17   well, I never did that.  So nobody in my family got

18   any invitations or anything for this party.  No one

19   in my family was at the party except for my brother

20   who she called the morning of the party to tell him

21   that she was having a party for Angelina.

22        THE COURT:  All right.  Are there more

23   communications between the two of you after May 3rd

24   about the party?

25        MR. LODICE:  There is me asking about it.  And

26   then not until the day before.  I don't have any

27   printed.  I can have them -- I can get them printed

1 for you if you'd like to see them.

2   THE COURT:  Okay.  All right.

3   MR. LODICE:  I mean, everything she does, it

4 just hurts Angelina.  So like, when we were talking

5 about the phone calls before.  That's a big issue

6 with us.  So Angelina is three.  So when we call,

7 when she calls for her to talk to her on my phone and

8 I call to talk to her on her phone, she's always just

9 like, I don't want to talk to her.  Or she'll say the

10 same thing, I don't want to talk to him.  Right.  And

11 then if you give her the phone, she'll just hang up.

12   So what happened is when I call Theo, or I call

13 Angelina on Theo's phone, she'll give Angelina the

14 phone and Angelina just hangs it up 'cause she hits

15 the button -- she hits the button.  So when she calls

16 me, I'll actually hold the phone so Angelina can't

17 hang it up.  And I encourage Angelina to talk to her.

18 I would love to hear the recordings she has of these

19 calls 'cause you would see the difference between

20 when I call her and she calls me that I encourage

21 Angelina to talk to her.  I try so hard.  I make her

22 talk to her.  I chase her around.  And she's like,

23 no, no, no, I don't want to talk to her, I don't want

24 to talk to her.

25   Not only that, I have to call at 7 on the dot

26 according to Theo.  If I call one minute later, she

27 won't answer.  And I even have emails from that same

1      app of her saying that, you know, she's sleeping, she

2      walks up at 5, call time is at 7 p.m., not 7:05, not

3      7:12.  Next time be prompt at 7 p.m. sharp like the

4      Court order says if you want to say good night.

5            Like, this is what I have to deal with telling

6      me that I -- I can't call before, I can't call a

7      minute after.  It has to be exactly at 7 o'clock.  So

8      if I don't get to my phone at 7 on the dot, I don't

9      get to talk to her that day.

10           THE COURT:  Okay.

11           MR. LODICE:  She can call anytime, anytime

12     around that time.  She's called at quarter of.  She's

13     called at quarter, twenty after and I'll always

14     answer for her because I want Angelina to be able to

15     talk to her.  'Cause I know that's what's best for

16     her.

17           THE COURT:  Okay.  She indicated that the child

18     support has not been paid.  Is that accurate?

19           MR. LODICE:  That is accurate.  I am behind on

20     child support.  My bank accounts are empty.  One's

21     negative.  The other one has, like, $12 in it.  I'm

22     struggling right now.

23           THE COURT:  Are you --

24           MR. LODICE:  I'm having trouble getting by.

25           THE COURT:  -- are you working?

26           MR. LODICE:  I am working.

27           THE COURT:  What do you do for work?

1          MR. LODICE:  I'm a contractor, self-employed.

2          THE COURT:  Oh, that's right.

3          MR. LODICE:  I'd be happy to show all my bank

4     records.  Like, when it comes to that discovery, I

5     have no problems bringing them all up 'cause you will

6     see I'm not making the income that she's claiming I'm

7     making.  And, like, she says that she's struggling to

8     pay child support, she went on vacation last week out

9     of the country.  How does somebody struggling, you

10    know, getting by, be able to go on vacation?

11         THE COURT:  Well, what is going on with your

12    child support.  Is none of it getting paid?  Is some

13    of it getting paid?

14         MR. LODICE:  Well, I just paid 2100 of it the

15    other -- the last -- or was that, two weeks ago

16    'cause I had to because I was getting incarcerated.

17    So now I'm down to, like, zero dollars.

18         And now I'm trying to -- I'm trying to make a

19    payment this week.  And obviously every other

20    subsequent week I'm trying my best.  It's just hard.

21    I got a lot of bills.  And gas is through the roof.

22    And, like, gas and groceries alone cost me, you know,

23    five, six hundred a week.  Like, I still have to feed

24    my children three days a week.  Like, even though,

25    yeah, okay she has primary residency of Angelina, I

26    still have her three days a week.  I still have to

27    give her dinner three nights a week, breakfast three

1          days a week.  You know, that matters.  She only has

2          her one more day than I have her.

3               I've been paying the daycare on time every time.

4           And I also have a letter --

5               THE COURT:  All right.  Hold on.

6               MR. LODICE:  -- from the daycare.

7               THE COURT:  What's -- what's the daycare order?

8               MR. LODICE:  I don't understand the question.

9               THE COURT:  What are you required to pay?

10              MR. LODICE:  I believe fifty/fifty we agreed on.

11              THE COURT:  All right.  Okay.  See when we

12         agreed to all our agreements, we didn't do it

13         through, like, you guys -- when I say you guys, the

14         Court deciding what we pay.  We kinda came to our own

15         agreement.  I was making more money back then.  I had

16         a different -- a different job.  So I agreed to pay

17         half the daycare.  I agreed to the 120 a week.  Like,

18         all that I need to reassess now because a lot of

19         circumstances have changed in our lives.

20              THE COURT:  Okay.  Well, if you two were both

21         using the same daycare and both responsible for the

22         payments, then -- then ma'am, I don't think you can

23         choose the daycare without his input.  Like, I didn't

24         realize that you were supposed to each pay -- you're

25         -- you're sharing the work-related daycare costs?

26              MS. ANTAR:  Your Honor, may I speak please?

27              THE COURT:  Okay.  No, you -- I don't -- I'm not

1  interrupting him to get your side of the story.  I

2  want to understand does he pay -- is he supposed to

3  pay half the daycare?

4   MS. ANTAR:  He's Court ordered to pay 50 percent

5  of the daycare costs.

6   THE COURT:  Your work-related childcare costs.

7   MS. ANTAR:  For any work-related or any

8  childcare costs for my child.  Yes.

9   THE COURT:  Okay.  But -- so then you two do

10  have to kind of cooperate on which provider you're

11  using.  Because it can't be --

12   MR. LODICE:  I agree.

13   THE COURT:  -- like, a crazy expensive person

14  that you'd each have to pay half for.

15   I thought you were each paying your own work-

16  related daycare costs.

17   MR. LODICE:  No. And what's -- what's --

18   THE COURT:  All right.  So -- so who do you use

19  for work-related daycare?

20   MR. LODICE:  Well, what's -- that's -- I have

21  the advantage of taking Angelina on my time off.

22   THE COURT:  Okay.  So if we -- if we change

23  that, then we have to change her daycare --

24   MR. LODICE:  Then I'm gonna have to find my own

25  daycare on those days.

26   THE COURT:  Well then -- then we're gonna have

27  to make different rules for the daycare.

1    MR. LODICE:  Okay.

2    THE COURT:  All right.  So if I enter orders

3    that keep the child with the father during your work

4    weeks, then we'd have to make some competent

5    arrangements related to the daycare.  Okay.

6    MR. LODICE:  Can we make it where we just pay

7    our own work-related daycare?  Like, isn't that what

8    child support partially's like supposed to cover?

9    THE COURT:  No.  Child support has three parts.

10   It's got child support which you pay to each other;

11   it's got work-related daycare costs; and it's got

12   medical costs.  But I misunderstood your situation.

13   That was my mistake.

14   MR. LODICE:  So she has a schedule that she

15   makes herself.  Like, she can schedule appointments

16   whenever.

17   THE COURT:  So -- so do you.

18   MR. LODICE:  So I have to pay for a full week of

19   daycare when she's --

20   THE COURT:  So do you.  You're both self-

21   employed.

22   MR. LODICE:  Yeah. But I'm a contractor where I

23   can only work, like, 9 to 5 type hours for people's

24   houses.  I can't choose to go someone's house and

25   work at 9 o'clock at night.  She can go sign -- she

26   can do her work anywhere from her house.

27   THE COURT:  You can't -- you can't do your work

1       early in the morning and on the weekends?

2            MR. LODICE:  I can do it early in the morning.

3       Yes.

4            THE COURT:  You can't do your work on the

5       weekends?

6            MR. LODICE:  Well then I'll have to lose time

7       with my other children.

8            THE COURT:  Okay.  All right.  What else -- you

9       -- we have a few more minutes before I have the

10      lunch --

11           MR. LODICE:  Okay.

12           THE COURT:  -- we'll have to take the lunch

13      break.  So what else did you want to tell me.

14           MR. LODICE:  She's saying I moved around a lot.

15      I didn't.  I literally was at my mother's house until

16      I got my own place.  And those are the only places

17      I've lived.

18           She's saying I'm having different women around

19      my daughter all the time.  I don't have any woman

20      around my daughter except for the one I've been

21      currently seeing for a while now.

22           She says I use drugs, I don't use drugs at all.

23       She's just trying to, like, throw things to, like,

24      soil my name.

25           She says I'm creating emotional damage for my

26      daughter, which is the opposite 'cause she's creating

27      emotional damage.  That's why I was applying for the

1    custody 'cause she had been refusing to take her.  It

2    was weeks on end where she didn't even see Angelina.

3    And the reason I -- I did say that Angelina doesn't

4    know her, 'cause Angelina doesn't.  When Angelina's

5    with her, she spends most of the time with her

6    mother, not with Theo.

7         And like, like, finally since our last court

8    date in April, she has been following the agreement

9    and taking her.  But prior to that, it would be weeks

10   on end she would just refuse to take her.  And I have

11   plenty of emails and stuff that prove all that.

12        Like -- and right, like, right now, even when we

13   left court -- your -- our last court date with you

14   and we went outside, she followed me to my car even

15   though we had just -- or it might have been before

16   then.  We had just decided of the -- the new pickup

17   time and where it's gonna be and she followed me to

18   my car.  And then stood in front of my car, refused

19   to move until the cops came.  She ended up getting

20   arrested for filing a false report and disorderly

21   conduct.  And now there's a restraining order against

22   her protecting me from being harassed.  All because I

23   wouldn't go pick up my daughter early because I

24   couldn't because I had an appointment to go to.

25        THE COURT:  You have a protective order against

26   her?

27        MR. LODICE:  Against her.

100 of 170

1          THE COURT:  Which court did that go to?

2          MR. LODICE:  To here.

3          THE COURT:  You went across the street?

4          MR. LODICE:  To, yeah, the one over there.

5          THE COURT:  Okay.

6          MR. LODICE:  Like, everything has been

7     harassment.  She's emailed everyone in my family.

8     Every -- I can't even post pictures with friends

9     because she'll email them.  She'll send them

10     pornographic pictures.  She my own mother

11     pornographic video she found of me from years ago.

12     My own mother she sends them.  Like, pornographic

13     pictures that I've sent to her that we sent in

14     private to each other, she would send to my family,

15     my friends.  I have, like, twenty-five different

16     people who are willing to come in and testify on her

17     harassing them.  She's unstable.  She's not showing

18     that she can be a good mom for Angelina.

19          And another thing on our agreement is, we set it

20     up where on Fridays, she can bring her to my mother's

21     house.  And when we were setting up the agreement, I

22     was like, okay don't bring her past, you know,

23     earlier than 9 o'clock.  So do it, like, anytime

24     after 9 -- 9 a.m.  Now for her to, like, attach me

25     now what she's been doing, she brought her last week

26     at, like 9 o'clock at night.  Like, she's -- she's

27     telling me that our daughter goes to bed a 7 when I'm

1    calling, I can't call later than that, but then she's

2    bringing her to my mother's at 9 o'clock at night.

3    She's just doing everything she could to try to just

4    make things difficult for us.  And it's only hurting

5    Angelina.  It's not hurting me.  It's hurting our

6    daughter.

7        And our daughter's telling me all the time, like

8    I don't want to go back to mommy's.  I'm like, you

9    have to.  I'm like, I don't know what to tell you.

10       THE COURT:  Okay.  We're gonna -- we are gonna

11   break until 2:15 for the lunch recess.

12       MR. LODICE:  Okay.

13       THE COURT:  And then I will -- we'll come back

14   at 2:15 and we'll finish up with you.  And then I'll

15   have some questions for you.  And I -- and then we'll

16   see where we're at.

17       MR. LODICE:  Okay.

18       THE COURT:  So I'll see everybody at 2:15.  I

19   think they can probably leave you -- their stuff.

20   Right?

21       Yeah.  So you can leave your things on the table

22   'cause the courtroom will be locked.

23       MR. LODICE:  Okay.

24       THE COURT:  Yes, ma'am.

25       MS. ANTAR:  Your Honor, I'm asking if due to all

26   these false allegations he just stated and the fact

27   that I wasn't allowed to -- I feel I'm being treated

1    unfairly.  I wasn't allowed to give any of my

2    evidence, but you willingly took his evidence.  And I

3    asked for an attorney when this first began, and I

4    was denied that right.  I would like an attorney

5    please.

6        I don't feel that I'm being treated fairly.  I'm

7    feeling that this -- this is unfair bias towards him

8    on your end.  And I feel like I'm being treated

9    unfairly by this Court.  And -- and it's an unfair

10   biased.  I'd like an attorney.  I have over -- I have

11   over ninety exhibits that I prepared for today's

12   court date.

13       THE COURT:  Ms. Antar, number one, I've already

14   addressed your request for an attorney.

15       Number two, you didn't offer me any exhibits.

16   So I didn't -- it's not that I didn't take them, you

17   didn't offer them.  So if there's something that you

18   want me to look at, then we'll do exactly the same

19   thing that I did with the things that he wanted to

20   look at.  But he said I want you to look at this.

21   You never said that to me.  I didn't know you had

22   exhibits.

23       MS. ANTAR:  I was -- I was interrupted --

24       THE COURT:  Stop.

25       MS. ANTAR:  -- multiple times by you.

26       THE COURT:  Yes, ma'am.  You were interrupted

27   because you never stop talking.  The only way that I

1     could get you to listen to me is to interrupt you.  I
2     don't normally interrupt litigants.  But this the
3     experience that I had with you the last time you were
4     here and this is the experience I've had with you
5     here today.  I do listen to you.  But you go off in
6     different directions.  You don't stay on the subject.
7     And when I'm asking you questions, you don't answer
8     them.  So as a result, you get interrupted by me a
9     lot because I've got to get certain information out
10    of you and you're not volunteering it.  So yeah,
11    you're getting interrupted, and I know that's
12    frustrating for you.  But I've got to get certain
13    information from you.  And you're telling me a whole
14    bunch of stuff that doesn't matter for the motions
15    that you have on before me.
16         So when he is done, and I have some questions
17    for you, if there are things you want me to take a
18    look at, we will go through the same exercise.  What
19    are they, are they admissible, we will do the same
20    thing with the things you want me to look at.  But
21    we'll have to do that after the lunch recess.
22         As for the attorney request, I have already
23    addressed that.  I will see everybody at 2:15.
24         MS. ANTAR:  I just want to confirm.  Am I being
25    denied the right to an attorney?
26         THE COURT:  Ma'am, I don't -- we don't appoint
27    attorneys in family court.

1          MS. ANTAR:  If I want an attorney, am I not --

2     do I not have the legal right to hire an attorney to

3     represent me in this case.

4          THE COURT:  Ma'am, you can hire whoever you

5     want.  But you can't have your case continued because

6     you want a lawyer because the case has been scheduled

7     for many months.

8          MS. ANTAR:  But why are we hearing his motion

9     that he never served me on.  I was never served with

10    that motion.  No return --

11         THE COURT:  I will see everyone at 2:15.  Thank

12    you.  We're in recess.

13         THE MARSHAL:  All rise.  Court stands in recess

14    'til 2:15.

15         (Whereupon the Court recessed.)

16         THE MARSHAL:  Court is now back in session.

17    Good afternoon, your Honor.

18         THE COURT:  Good afternoon, ladies and

19    gentlemen.  Please have a seat.

20         The parties are present on the Antar and Lodice

21    matter.  We're back from lunch.  And when we broke,

22    we were in the direct testimony of Mr. Lodice.

23         So, sir was there more you wanted to tell me.  I

24    think when we broke you were -- you were talking

25    about the pickup and drop off time sometimes being at

26    your mother's and sometimes being late.  That's the

27    last thing I had.

1        MR. LODICE:  Yeah.  So I -- well one of the

2   things that I would like to adjust if we do get to

3   the point of adjusting our arrangement and the pickup

4   and drop offs is a better window of time for the

5   Friday drop off if she gonna be dropping off to my

6   mother especially since I have to pick her up from my

7   mother's and I can't go there at 9 o'clock at night

8   to go pick her up.  I mean, you know, that's awfully

9   late.

10       THE COURT:  What -- what time is now?

11       MR. LODICE:  It's any time after 9 a.m.  We

12   didn't --

13       THE COURT:  Oh, okay.

14       MR. LODICE:  Because I just didn't want her

15   bringing her at 7 in the morning so my mother could

16   at least get ready for the morning.

17       THE COURT:  So what time would you like it to

18   be?

19       MR. LODICE:  Anytime between 9 and 11.

20       THE COURT:  9 a.m. and 11 a.m.

21       MR. LODICE:  9 and 11 a.m. --

22       THE COURT:  Okay.

23       MR. LODICE:  -- would be good.

24       THE COURT:  Okay.  All right.  So --

25       MR. LODICE:  I kind of lost track of what we

26   were --

27       THE COURT:  Well, I'm looking at my --

1       MR. LODICE:  -- what we discussed.

2       THE COURT:  -- I'm looking at my notes and then

3   I'll -- if there's -- I think you told me things that

4   you wanted to change.  You gave me some options if I

5   granted the mother's request about Sundays or in part

6   or in full.

7       MR. LODICE:  I also wanted to bring up that

8   there's a Greek Orthodox Church near my house that if

9   she wanted her to go to mass, I can bring her to that

10  Greek Orthodox -- can't talk.  -- Greek Orthodox

11  Church right near my house.

12      THE COURT:  Is that a religion that you

13  participate in?

14      MR. LODICE:  No, that's her same religion.

15      THE COURT:  Okay.

16      MR. LODICE:  It's just the one closer to me.  So

17  this way I wouldn't have to drive an hour to her and

18  then an hour back.  It's in walking distance of my

19  house.

20      I also wanted to hand in this paper.  This is a

21  certified letter from the director of the daycare

22  'cause Theo did mention that I was bringing her late

23  all the time.  But I have a letter here saying that

24  the 9 a.m. cut off was -- was the cut off time and

25  that I was only late one time and it was due to car

26  trouble which I did call.  And also that I've been

27  nothing but respectful, and caring, and engaging with

1    my daughter and that all my bill was paid on time and

2    always.  I have that letter I'd like to --

3         THE COURT:  All right.  Is that -- is that

4    something that you've seen, Ms. Antar?

5         MS. ANTAR:  No.

6         THE COURT:  All right.  Do you want to look at

7    that?

8         MS. ANTAR:  Yes.

9         I'm gonna object to this because there's

10   information here which is not factual, and I have

11   evidence to prove otherwise.

12        THE COURT:  So you disagree with the contents of

13   the letter?

14        MS. ANTAR:  Yes.  And I don't think this is even

15   -- this isn't even a real email.  So I don't -- I

16   don't think that this is authentic.  I don't believe

17   that this is even true.

18        MR. LODICE:  I can pull the email thread up on

19   my phone.

20        MS. ANTAR:  And I actually -- the people at the

21   daycare sent me my own communications which I'd like

22   the Court to see.

23        THE COURT:  Okay.  Well, we'll take that

24   communication that he offered.  And you can offer

25   yours when -- when we're hearing from you again.  And

26   we'll see where we're at.  That can be marked as a

27   full exhibit.  Okay.

1       So I want to be mindful of the time.  Is there

2    anything else that you wanted me to hear --

3       MR. LODICE:  I mean --

4       THE COURT:  -- about, sir?

5       MR. LODICE:  -- I can go through piece by piece,

6    email after email different things of like, just

7    showing her inconsistency with picking up our

8    daughter.  I mean, I have at least five or six

9    different times of text messages and proof that she

10   was just refusing to take our daughter when it was

11   her time.  So then I would keep our daughter all

12   week.

13       THE COURT:  What's the window of time you're

14   talking about?

15       MR. LODICE:  All the way from last year up until

16   -- pretty much up until the last time we were in

17   court when she realized that it was getting serious

18   and then she started following the agreement.

19       THE COURT:  Okay.  So the -- the motions I have

20   before me for the most part, are about what's

21   happened since the last time you were here.

22       MR. LODICE:  Okay.

23       THE COURT:  So you can hang on to those.  They

24   may be -- they may be relevant for the overarching

25   request to change custody.  But it might not be

26   relevant for the present motions.

27       MR. LODICE:  Okay.  And another thing I wanted

1    to bring up is the daycare.  I mean, we are [sic]

2    already been through three daycares.  She got her

3    kicked out of two daycares and then she removed her

4    from the last one.  I just feel like the

5    inconsistency with that, finding a way to -- I don't

6    know what the word is.  -- like, I guess navigate,

7    finding at daycare that works that she won't cause

8    problems at, that Angelina won't get removed from, or

9    that she won't take her out of every time --

10        THE COURT:  Well --

11        MR. LODICE:  -- that a little hiccup happens.

12   So --

13        THE COURT:  Why do you think the child's been

14   moved from daycare?

15        MR. LODICE:  So the first daycare when Theo and

16   I originally split, I ended up seeing one of the

17   daycare teachers.  And Theo went in there and made a

18   big scene because they wouldn't fire the daycare

19   worker because it's not against their policy.  So

20   they're like, well we can't fire 'em, she's not doing

21   anything wrong.  So she started swearing and yelling

22   in front of the kids.  And so they were like, all

23   right, well your daughter can't come here anymore.

24        And then after that she actually filed a report

25   of abuse and neglect on the daycare director and the

26   daycare teacher that I was seeing because she just

27   wasn't happy with the results she was getting.

1     On the second daycare, which was the private

2     home daycare, Theo says that -- that the -- she was

3     removed because of -- that it was a vaccine issue but

4     that wasn't the issue.  The actual issue was that

5     Theo kept showing up late and not on time past the

6     time that she's allowed.  And then so the -- the

7     teacher had to drop her.  She also didn't tell me

8     that she dropped her.  And I didn't find out about it

9     until five weeks later after sending her five weeks

10    of daycare money for that daycare.

11          And then --

12          THE COURT:  So do you --

13          MR. LODICE:  -- this daycare, the teacher told

14    me that the reason Theo pulled our children -- my

15    daughter and also her -- her own daughter out is

16    because on Tuesday they do what's called, like, water

17    play.  And then Theo's like, well you need to tell

18    the dad to bring the water clothes.  But she's like,

19    well Tuesday's your day so can you just bring the

20    water clothes.  She's like, no, you need to tell or

21    I'm taking my kids out.  And so she ended up taking

22    our kids out -- my daughter and her daughter out of

23    that.  And that was the last daycare.

24          It's just -- everything she does is just like a

25    malicious attach at me and it just ends up hurting

26    Angelina and I don't know how to stop it.

27          I mean, I get the -- she's filed for three

1    restraining orders on me; two you guys dismissed.

2    One, she didn't show up for court for.  She's called

3    the cops on me.  I mean, I have I think twenty-five

4    different police reports from four different police

5    stations of her calling the cops just trying to get

6    me in trouble, throw something at me.  She'll just do

7    anything she could when things are not working out

8    her way.  And it's just -- I just want to do what's

9    best for our daughter.  And I just feel like she

10   doesn't want that.  She wants everything to be from a

11   retaliatory nature.  And I don't.  That's -- that's

12   really all I got, I guess.

13        Everything else is just, you know, facts and

14   evidence of all these things that she's been doing.

15   That's, you know, forty, fifty emails and text

16   messages that I'm not gonna bore you with.  But I

17   mean, if you need to see them, I can show you them

18   but.

19        THE COURT:  Okay.  Well, do you both want me --

20   are there certain things that you both want me to

21   look at?  Like, you both want me to look at the

22   Family Wizard messages?

23        MR. LODICE:  I mean, I can show you -- a lot of

24   the messages are before when we started the wizard

25   app.  But I guess you said it's everything since

26   April.  So I guess none of that really matters.  So I

27   guess everything that's prior to April doesn't matter

1      so.

2           THE COURT:  Well not -- not for today's hearing.

3      I will tell you that -- I'll tell you both that I

4      heard enough between the two of you that I'm very

5      concerned that the -- the long-term custody orders

6      for your -- custody and access orders for your child

7      are not working.  I'm very concerned about that.

8      That the level of conflict that you two have is not

9      good for your child; that the number of -- like, the

10     time she goes back and forth, it seems stressful.

11     The number of different daycares she's been in is not

12     ideal.  I don't think the schedule is, like there's a

13     lot of things here that are just not good for you --

14     either one of you -- for both of you or your child.

15          So I am going to make some temporary orders

16     today.  But the -- I think the final orders regarding

17     custody, you know, you both have requests to change

18     custody and change the access schedule.  I'm probably

19     going to have you speak with family relations about

20     that when we're done here at 3:30 and have them

21     screen you for appropriate services.

22          I told them that I think it might be appropriate

23     for a full custody evaluation so that they really

24     look into everything you're both saying.  They really

25     look into all the complaints you're both making, both

26     of your backgrounds and histories, what's been going

27     on with the daycares, what's going on with the

1        doctors and the police, and DCF and really give some

2        recommendation to the Judge who makes the custody

3        decisions.  I am very concerned that this is, like,

4        too high conflict and that we need to make some

5        orders that will -- are definitive and will last.

6            So when we are done here today, I may issue

7        temporary orders.  The final orders will be pending

8        the outcome of family relations, what they think,

9        what services they think would -- your family would

10       be appropriate for and then when those services are

11       done.  So we may do temporary orders today.  But that

12       -- I'm sorry.  That's a long way of saying a lot of

13       the materials you both brought with you today might

14       be better suited for that process or that hearing or

15       both.  That's -- that's what I'm trying to say.

16           MR. LODICE:  Okay.  I understand.

17           THE COURT:  All right.  So I'm gonna be back

18       with you in a minute, ma'am.  I want to make sure I'm

19       done with him.  And then we'll return to you and then

20       we'll finish up.

21           Is there anything else, sir, in the short term

22       that you wanted me to look at or hear about?

23           MR. LODICE:  I guess just I feel like, if we're

24       -- like you're saying, if we're gonna go over the

25       temporary orders, then we do need to figure out, you

26       know, very in detail about what each thing we're

27       doing means.  Like the pickup, time, place, drop off

1    window, the call that we do on 7 o'clock, maybe like

2    a fifteen, twenty-minute window that we can make that

3    call in.  Just, like, little details like that.

4    That's kind of in loopholes I feel like have been

5    kinda misused.  And I don't want to see them misused

6    anymore.

7         THE COURT:  All right.  Okay.  I think you had

8    explained all that to me.  All right.

9         So, ma'am, I will hear from you about -- not

10   everything all over again but, like, things that he

11   raised or things that -- if there's things that you

12   wanted me to look at, remembering that I'm gonna keep

13   them to the kinda window of the more recent events.

14        So what do you have in mind?

15        MS. ANTAR:  Okay.  I just want to start by

16   saying that the letter that I received from the Court

17   on April 20th stated that today's hearing was

18   supposed to be a mandatory resolution plan date with

19   family services in order to go over everything.  And

20   I just want to say that we never had the opportunity

21   to even speak to family relations today.  As soon as

22   I came in, we were thrown into the hearing without

23   any discussion from them.

24        Second of all, I just wanted to say that none of

25   the defendant's motions were -- set for being heard

26   today.  All the motions were for my motions for

27   contempt, my motion for modification of visitation

1      and custody, my motion for financial discovery, my

2      motion to dismiss his motion I never got served with.

3           So I don't feel comfortable with any of the

4      orders being changed.  I don't agree to that.  And I

5      would like -- I did speak to an attorney over the

6      course of the break and I must -- before anything

7      gets changed, I want to be able to hire counsel and

8      have adequate counsel take over.  I feel that it's

9      unfair that the defendant is -- is allowed to file a

10     motion without being served.  There's no service.  I

11     confirmed with the Court multiple times.  I was never

12     served.  The last time he served me with something

13     was in 2021.

14          THE COURT:  All right.  Ma'am, you filed motions

15     to modify custody.

16          MS. ANTAR:  Right.  I filed a motion --

17          THE COURT:  All right.  So -- so when you file a

18     motion to modify custody, both parties can be heard

19     on that motion.  So just because you filed a request

20     doesn't mean that he can't say, oh, yeah, I do want

21     things changed also.  You're both allowed to do that

22     on a motion to modify.

23          MS. ANTAR:  Okay.  So his motion number 142 that

24     I was never served with, is that gone now since that

25     was never served properly?

26          THE COURT:  Well, I'm not sure.  I'm gonna have

27     to take a little time to look at the file about that.

```
 1              But the issue of custody and access schedule is
 2         before the Court by virtue of your motions.  So even
 3         if you weren't served with his motion, it doesn't
 4         mean that I wouldn't be hearing motions today.
 5              MS. ANTAR:  Okay.  So I just--
 6              THE COURT:  It doesn't mean that I wouldn't be
 7         hearing those issues today.
 8              MS. ANTAR:  Okay.  -- so I just wanted to say
 9         that everything that Mr. Lodice just said was
10         completely false.  I just want to start with what he
11         said about the April 8th incident.  So that --
12              THE COURT:  What's -- remind me what happened on
13         April 8.
14              MS. ANTAR:  So on April 8th, we appeared in
15         court in front of you.  And that was the day that
16         you --
17              THE COURT:  Oh, the --
18              MS. ANTAR:  -- you kind --
19              THE COURT:  -- the car.  Yeah.
20              MS. ANTAR:  -- got mad at us and told us to
21         leave.  But during that hearing, that was supposed to
22         be for an emergency ex parte motion of custody which
23         he states that I refused my child.  I've never once
24         refused my child.  I was begging him for a very long
25         time --
26              THE COURT:  Okay.
27              MS. ANTAR:  -- to be able to --
```

1          THE COURT:  We are -- listen.

2          MS. ANTAR:  Yes.

3          THE COURT:  I want to hear April forward.  Okay.

4          MS. ANTAR:  Right.

5          THE COURT:  I didn't -- he said that, but it

6     doesn't matter.  Because --

7          MS. ANTAR:  Well, I'm just responding to --

8          THE COURT:  -- that's not before me.

9          MS. ANTAR:  -- what he said.

10          THE COURT:  I know.  But it's not necessary

11     because that's not before me.  We're dealing with

12     more recent events.

13          MS. ANTAR:  Okay.

14          THE COURT:  He -- he told me that you followed

15     the schedule since you set this new schedule.  So

16     that's fine.  That's the part --

17          MS. ANTAR:  He also --

18          THE COURT:  -- that matters.

19          MS. ANTAR:  -- he also stated that -- that in

20     court that day, we change the schedule and then I

21     followed him to his car and got arrested.  That's not

22     true.  On that day, nothing was changed in the

23     schedule.  You told us that we would have to wait

24     until April 12th, which was the following Tuesday in

25     order to discuss any of that.  I -- I said please,

26     can we please change this because it's saying that we

27     have to meet at Cumberland Farms in Naugatuck at 5:30

1          on Fridays.  This is causing problems.  If I

2          explained to him that he hadn't been for -- for six

3          to seven months prior to that April hearing of April

4          8th, from September to April, he was bringing the

5          child every Monday to my mother's in Woodbridge and

6          he was picking her up every Friday from my mother's

7          in Woodbridge. There was no conflict because we

8          didn't have to see each other during the pickup, drop

9          off.  There was no issues.

10              Then in March, he got mad.  He started saying

11         from now on, I'm sticking to the agreement by the

12         book.  We're --

13              THE COURT:  I -- I remember you telling me --

14              MS. ANTAR:  Right.

15              THE COURT:  -- all of this.

16              MS. ANTAR:  So after all that, on that day when

17         we left, I -- you said to us that you encouraged us

18         to work our -- resolve our issues and work together

19         for what's in the best interest of the child.  And

20         just like I said that day, that's all I wanted to do

21         is get along with him.  I don't want to continue to

22         fight with him.  I said to him, listen, I have an

23         appointment, I'm supposed to be meeting a customer at

24         5 o'clock in Oxford, the child is at Woodbridge at my

25         mother's which is about fifteen minutes from this

26         courthouse.  He lives in New Britain, forty-five

27         minutes away.  I said, it's -- it's almost 4 o'clock

1    now when we left the court that day.  I said, can you

2    please just go get the child from my mother's.  I

3    have to go to be in Oxford for this appointment.  He

4    says no, I'll see you at 5:30 in Naugatuck with the

5    child.  I said I'm not with the child.  It doesn't

6    make sense.  When we made that agreement, he says it

7    was because it was halfway between both of us.

8    That's not true.  The only reason we chose that was

9    because it was on my way to and from work.  And I

10   used to bring her with him [sic].

11        THE COURT:  Okay.

12        MS. ANTAR:  What he said about the daycare --

13        THE COURT:  Let me -- let me stop here.

14        MS. ANTAR:  Yes.

15        THE COURT:  Because I have questions about that.

16        MS. ANTAR:  Okay.

17        THE COURT:  Can -- if you both have flexible

18   work schedules, why can't you meet in the middle to

19   exchange your daughter?

20        MS. ANTAR:  Because I don't have a flexible work

21   schedule.  He owns a successful construction company.

22   And he's -- has full control over his schedule.

23        THE COURT:  I thought --

24        MS. ANTAR:  I don't.

25        THE COURT:  -- I thought -- I thought you worked

26   for yourself?

27        MS. ANTAR:  I do work for myself.  But I don't

1      have full control over my schedule.

2          THE COURT:  All right.  Explain to me the work

3      situation.

4          MS. ANTAR:  So I'm -- right now I have, like, a

5      publishing company and I sell newspaper ads and

6      things like that.  So sometimes when the paper comes

7      out, I have to drop off the papers that are extra.  I

8      have to make appointments with clients.  Things like

9      that.  It's also, you know, if I'm meeting with

10     somebody at a place at business, I have to go during

11     business hours.  I can't just do it on -- on, you

12     know --

13         THE COURT:  No.  What I'm asking is, like, do

14     you get your own clients or do you work for somebody

15     else as an independent contractor?  That's what I'm

16     trying to understand.

17         MS. ANTAR:  I get my own -- I get my own

18     clients.  So to a certain extent, I can control some

19     parts of it.

20         But what I'm saying is, our schedule from --

21     from February -- from the last time when Judge Price-

22     Boreland, on April 12th, ordered the change to change

23     -- all she mainly changed was the drop off point.

24     She got rid of that Naugatuck thing.  And the only

25     reason why I agreed to -- at first, I said, I'm

26     having her in a new daycare, which I would like to

27     start by saying about the daycare 'cause that was

1    something that you brought up saying that you were

2    concerned about.  But the way he's saying is simply

3    inaccurate.

4         The first daycare she was not kicked out of.  I

5    enrolled her in that daycare when she was two months

6    old and she was going there full-time.  It's the same

7    daycare that my seven-year-old attended for three

8    years.  So I felt comfortable with that daycare.  I

9    found out in 2020 -- in December of 2020 that he was

10   having a relationship with the eighteen-year-old

11   daycare teacher.

12        THE COURT:  You are -- you are, like, way too

13   far afield for me.

14        MS. ANTAR:  Okay.  But he said --

15        THE COURT:  I said April of 2022 and you're in

16   another year.

17        MS. ANTAR:  But you're saying why is she

18   changing so many daycares.  It's extremely important

19   that you understand this.  I did not -- she did not

20   get kicked out of the daycare.  I have printed emails

21   from the school.

22        When I emailed them and said to them that the

23   issue was that one, she was having a relation -- the

24   girl actually complained that he was sexually

25   harassing her.  And the school was aware of it.  They

26   said no communication between him and the teacher

27   unless it's through the HiMama app or through email

1    through the school directly.  The school -- I have

2    emails from the director, Dawn, stating that no

3    communication between the two; which the girl was 19,

4    he's almost 40.

5         He has a very bad sex addiction.  He has mental

6    health issues and substance abuse --

7         THE COURT:  Okay.  Stop.

8         MS. ANTAR:  Okay.

9         THE COURT:  Stop.  I asked you why you can't --

10   if you both are self-employed, why you can't meet in

11   the middle instead of meeting at daycare.  Answer

12   that question.  This is -- can't have anything to do

13   with his age or -- tell me that.  That's what I'm

14   asking you.

15        MS. ANTAR:  Because that's not what we agreed

16   to.  And also, I'm -- my schedule's gonna be --

17        THE COURT:  I understand that's not what you

18   agreed to.  I'm trying to figure out how to have less

19   conflict for your child.  So tell me why you can't

20   meet in the middle somewhere or why he can't drop the

21   child at your mom's, or you can't drop the child at

22   his mom's.  What's wrong with those arrangements.

23        MS. ANTAR:  Here's the thing.  He had no problem

24   dropping the child to and from my mother's for seven

25   whole months.

26        THE COURT:  Listen, I'm not asking you that.

27   I'm asking you about the current arrangements right

1      now.   Why can't that happen?

2           MS. ANTAR:  I think the current arrangements are

3      absolutely fine.  There's no reason to change it.

4      Since April 12th, there's been --

5           THE COURT:  Okay.

6           MS. ANTAR:  -- no issue.

7           THE COURT:  I understand that that's how you

8      feel.  I'm asking you why can't it be the other way

9      if your schedules are okay -- are flexible.  Why

10     can't he drop the child at your mom's?  Why can't you

11     drop the child at his mom's?  What's wrong with those

12     arrangements?

13          MS. ANTAR:  So our current arrangement states

14     the reason why I agreed to this too.  It states that

15     on Friday I can bring the child to his mother's house

16     any time after 8:30 a.m.  It doesn't say between 8:30

17     and 11, or you have to be by here [sic]; it says any

18     time after 8:30 a.m.  I originally, on April 12th,

19     asked for him to agree that he would just drop her on

20     -- drop her at daycare on Mondays no later than 9 and

21     pick her up from daycares on Friday by 5:30.  The

22     prior agreement said meeting at those times as well.

23     It said 8:30 on Mondays, 5:30 on --

24          THE COURT:  All right.

25          MS. ANTAR:  -- Friday.

26          THE COURT:  Are you not gonna answer my

27     question?

1        MS. ANTAR:  I'm just -- I'm just trying to

2    explain it.  I'm trying to explain myself.  So to

3    answer your question, you know --

4        THE COURT:  I understand you don't want to.  But

5    is there anything that prevents you from doing it.

6    All right.  Let's just make a distinction.

7        MS. ANTAR:  Prevents me from doing what?

8        THE COURT:  I understand you don't want to.  But

9    is there any reason why you can't exchange the child

10   at your mother's homes?

11       MS. ANTAR:  Well, currently what this is what we

12   are doing.  So I don't understand why you're asking

13   that question.

14       THE COURT:  Okay.  Well, no, he's dropping the

15   child off at daycare on Mondays.  Right?

16       MR. LODICE:  Which we don't have anymore.

17       MS. ANTAR:  Just on Monday.  We do have daycare.

18   I told him in the app.  The daycare is called Bunny

19   Village in Bethany.  She's registered.  She's going

20   to be going there regularly full-time.  So --

21       THE COURT:  All right.  So let me ask you this.

22   He has said that he'd like to make a window for when

23   you drop the child off at his mom's house so that his

24   mom has some predictability.  So he's proposed

25   sometime between 9 in the morning and 11 in the

26   morning.  Does that work for you?

27       MS. ANTAR:  It absolutely does not work for me.

1          And the only reason I agreed to bring to his mom's in

2      the first place was because there was no window.  The

3      -- originally I said I want her to get her from

4      daycare.  And he said he can't because --

5          THE COURT:  Okay.  What --

6          MS. ANTAR:  -- he might have to work past 5:30.

7          THE COURT:  -- what's wrong --

8          MS. ANTAR:  But he told -- he testified that he

9      gets out at 5 every week.

10         THE COURT:  So what would be an appropriate

11     window for you?

12         MS. ANTAR:  I would say maybe between 9 and 6.

13     And also to answer what he said --

14         THE COURT:  The whole workday?

15         MS. ANTAR:  Well, I just -- the thing is, if I

16     have to go all the way and drive forty minutes to

17     Waterbury to drop her off, that's a huge

18     inconvenience for me.

19         THE COURT:  Okay.

20         MS. ANTAR:  So --

21         THE COURT:  Let me just point out to you that

22     you want him to drop the child off at daycare exactly

23     at 9.  But you want an eight-hour window when you

24     drive the child in?

25         MS. ANTAR:  The only reason why I said exactly

26     at 9 was because that particular school had a policy

27     which stated that the children had to be there no

1     later than 9 and if they're not, they're denied

2     access for the day.

3           So when I was making that request in court, this

4     was before she started her first day there.  Then

5     when we started, they said okay five minutes is okay.

6     And then I found out that she made an arrangement

7     with him that he can bring her within thirty minutes

8     late.  So then when he didn't bring her until 10

9     o'clock yesterday and we had to call the police to

10    find out where he was 'cause he wasn't responding in

11    the app, it was concerning to me.

12          The new daycare actually stated that there is no

13    cut off time.  So they said you can -- you're not

14    limited to bring them by 9, you can bring them

15    anytime.  And on Friday's they close at 6.  So if he

16    was to go back to what it was before where he was

17    picking her up on Friday instead of me dropping her

18    off to his mother, I'm suggesting he can do drop off

19    and pickup at the daycare --

20          THE COURT:  All right.

21          MS. ANTAR:  -- then we don't have to see each

22    other.

23          THE COURT:  I'm not gonna make one side do all

24    the driving 'cause I don't think that's fair.  And I

25    think it's fair that his mother have a window when

26    she can expect you to be there.  So I'm asking you

27    what a reasonable window is for you.  Eight hours is

1          not really reasonable.

2                MS. ANTAR:  Well, he stated to me that she's

3          home all day.  She's retired.  And she has her other

4          grandson so that anytime is fine.  And he said

5          there's no pressure.  And so for me with the -- with

6          the sporadic way that sometimes -- sometimes I might

7          have appointments.  So let's say I don't have any

8          appointments on Friday, I don't want to have to rush

9          to go -- to go there.

10                THE COURT:  All right.

11                MS. ANTAR:  If she's gonna be home all day, I

12          think it's reasonable, you know, anything after 5, 6

13          o'clock I can understand is a little late.

14                And the reason why I was there at 9 o'clock was

15          because we didn't go out of the country like he

16          stated.  We actually went on a trip to Florida which

17          I paid for with -- after saving three years' worth of

18          credit card points.  And I had a flight which was

19          scheduled to land in Hartford at 6 p.m.  And I

20          scheduled that flight intentionally so that she could

21          get to his mother's house at a reasonable time.

22                However, this flight was delayed by almost three

23          hours in Orlando.  So I had no control over that.  We

24          were three hours delayed.  We didn't get back to

25          Hartford, until almost 8:30.  I rushed to get her as

26          early as I possibly could at that time because again,

27          I -- I would have liked to have kept her longer,

1      maybe Friday, Saturday.  However, because he's -- the

2      way that our agreement is now, there's no leeway.

3           I disagree with what he was saying -- what you

4      were saying before about making a set weekend every

5      week -- every month.  That's not what I'm asking for.

6      I'm just saying if there's a special occasion or

7      something that both of us should be able to give the

8      other person, like --

9           THE COURT:  Okay.

10          MS. ANTAR:  -- just if he wants to take time off

11     on the weekend.

12          THE COURT:  All right.

13          MS. ANTAR:  If he has a special thing to do, he

14     can say to me, hey I have an event.

15          THE COURT:  But you guys can do that now.

16          MS. ANTAR:  Right.

17          THE COURT:  You don't need a Court order.

18          MS. ANTAR:  But he won't agree with -- he won't

19     talk to me unless it's Court ordered.

20          THE COURT:  Listen.

21          MR. LODICE:  May I?

22          THE COURT:  I am not going to put you two in a

23     position when you leave my courtroom today where you

24     have to agree on more things because you haven't

25     agreed on anything in front of me the whole time

26     you're here.  So if your request to have the child

27     sometimes on the weekend is a totally reasonable one.

1      That's totally reasonable.  Every parent would want

2      some weekend time with their child.

3          But I think we have to fix the schedule.

4      Because there's no way that you guys are gonna work

5      it out.  You can't work anything out.  You couldn't

6      work the child's birthday party out.  So -- so that's

7      why I'm asking you these questions because I would

8      like to grant some of your requests.  But I'd like

9      your input.  So that's why I -- I'm asking you about

10     the window of time to drop off at grandma's which I

11     don't think you've answered, but okay.

12         MS. ANTAR:  Well, I can answer --

13         THE COURT:  And that's why I'm asking you about

14     weekends.  Because you should have some weekend time

15     with your child.  But you two need to fix the

16     schedule so that you're not negotiating.

17         MS. ANTAR:  Well --

18         THE COURT:  So do you want to -- do you want to

19     revisit the window of time at grandma's?  Otherwise,

20     I'm just gonna do what I think is right.

21         MS. ANTAR:  I do want to visit -- visit it.

22     Like I'm saying, you know, usually the latest I ever

23     brought her before that was 7 o'clock.  And that's

24     because I didn't have work that day and we were

25     playing all day outside.

26         THE COURT:  7 p.m.

27         MS. ANTAR:  7 p.m.  But he had a -- they were

1    all having a party when I got there.  They were

2    having a pool party.  So it wasn't like everyone was

3    sleeping or anything like that.  There was fifty cars

4    outside so.

5        THE COURT:  Listen.  I'm asking you about a

6    reasonable window one last time.  Then I'm just gonna

7    do what I think is fair.

8        MS. ANTAR:  I'm saying -- I'm saying I feel like

9    maybe, like, sometime in the afternoon would be

10   reasonable.  I think giving me only two hours is too

11   much pressure because I have a forty-minute drive.

12   So -- and it's a lot to get me and the child out the

13   door.  And I also have my other daughter who I can't

14   even leave until she goes to school or camp.  So if

15   you're saying I have to be there by a certain time

16   and I have to drop her in camp or school.

17       THE COURT:  Well, what -- that's what I'm asking

18   you, what time do you drop the other child off?

19       MS. ANTAR:  It depends.  She's in a couple

20   different camps this summer and then usually she goes

21   to school when it's during the year.  So right now,

22   she's gonna be in camps where it's, like, in Milford

23   and it's starting at 8:30.  So by the time I get from

24   Milford to Waterbury, if the cut of is 11, it's,

25   like, it's such -- it's cutting me close.  So I would

26   say, like, to make it, like, sometime in the

27   afternoon.  Like, I mean, I would say --

1          THE COURT:  You don't --

2          MS. ANTAR:  -- 3 o'clock maybe.  I think

3     that's --

4          THE COURT:  -- you don't -- you don't work on

5     Fridays?

6          MS. ANTAR:  Like I said, sometimes it all

7     depends.  If I -- if I have no customers and nothing

8     going on, it's been slow right now with the way

9     things are.  So I'm trying -- I try to work as much

10    as I possibly can.  But sometimes if I don't have a

11    set appointment, I might take my time in the morning

12    getting out the door.  So instead of leaving at 8,

13    I'll leave at 10, 11.

14         THE COURT:  All right.  So let's go back to the

15    weekend thing.  Do you have a request about the

16    weekends, which weekends you would want?  Do you want

17    to tell me about that?

18         MS. ANTAR:  I was requesting exactly what it

19    says here in my current agreement which I was hoping

20    to match the same language, which states that if the

21    mother has an activity with the child on the weekend,

22    she shall notify the father forty-eight hours in

23    advance and she shall be able to take the child to

24    said activity.  If desired by father, said time shall

25    be made up with a midweek dinner between father and

26    child from after school until 8, drop off at mother's

27    address.  And that last part I'm flexible about.

1          But I'm -- all I'm saying is, you know, let's

2     say I have a friend and wants to plan a playdate.

3     Like, I have a friend who texted me today and asking

4     me if I ever get the kids on -- on a Sunday.

5          So it's like, you know, if I said to him a week

6     in advance, hey you know what, on this Sunday I want

7     to take her to the beach, can I pick her up.

8          THE COURT:  But you --

9          MS. ANTAR:  I'm giving you a week advance.

10         THE COURT:  -- you guys can agree on that if you

11    want to.  But there's no way I'm gonna put you in a

12    position where you have to negotiate more because you

13    don't negotiate well.  You two are not -- you're not

14    good at that right now.  So I think -- that's what

15    I'm saying to you.  I'm not gonna do that because

16    it's too much back and forth between the two of you.

17         MS. ANTAR:  I also added here about, like, I

18    said both parents shall be entitled to two

19    nonconsecutive vacation weeks.  Parents shall each

20    other thirty days' notice, you know, and --

21         THE COURT:  All right.  Do you have a request

22    for this summer?

23         MS. ANTAR:  No.  Not for this summer.  But I'm

24    just saying, like, in general.  Because I was

25    thinking, you know, about maybe planning a trip next

26    year.  And I wanted to do it that -- for maybe more

27    than a week.  And it's not possible unless I can have

1      those extra days.

2           THE COURT:  All right.  Well that's true.  Do

3      you have a request for summer access?

4           MR. LODICE:  I have no specific request right

5      now.  I can't afford a vacation.

6           THE COURT:  Okay.  All right.  So I do want to

7      be mindful of the time because we are going to finish

8      up at 3:30.  I thought I'd only have you guys for two

9      hours and I think we're pushing four.

10          MR. LODICE:  Your Honor --

11          THE COURT:  So -- yes.

12          MR. LODICE:  -- may I may suggest maybe 8 to

13       12 --

14          THE COURT:  Eight --

15          MR. LODICE:  -- for the Friday drop off?  It

16      gives a four-hour window.  Plus it's still early

17      enough where my mother could take her in, get her

18      ready for a nap and put her ready for bed?

19          THE COURT:  All right.  Does 8 to 12 work for

20      you?

21          MS. ANTAR:  Right now it's after 8:30.  So 8 is

22      just a bit impossible.  I can't physically ever get

23      there at 8.

24          THE COURT:  It's a -- it's a window of time.

25          MS. ANTAR:  I would like the window to be

26      starting at 9 because that's reasonable for me.  I

27      can't start my day before 9.

```
1           THE COURT:  Okay.  Does that matter?

2           MR. LODICE:  Yeah.  9 to 12 is fine.

3           THE COURT:  Okay.

4           MS. ANTAR:  Well that's even shorter.

5           MR. LODICE:  It's the same thing.

6           MS. ANTAR:  Well that's even shorter.  Why don't

7      we do 9 to 2?

8           THE COURT:  Okay.  Stop.  You guys are not doing

9      this on my time.  I'll pick.  You -- he -- he -- he

10     -- he -- he suggested exactly what you asked me for

11     and you said no.  You asked me for noon and -- and he

12     said noon and you said no.

13          MS. ANTAR:  Well, he said 8.  He started at 8.

14     That's what I'm saying.  8 to 12 is four hours.

15          THE COURT:  But it's -- it's a window.

16          MS. ANTAR:  So why is it only three hours and

17     not four hours?

18          THE COURT:  Oh my goodness.  Okay.  Do you have

19     anything else you want to share with me?

20          MS. ANTAR:  Yes, I do.  So, you know, like I

21     said, I'm asking that you rule on my motion to

22     dismiss his motion number 142 'cause I was never

23     served.

24          Matthew stated on -- on that -- at the 4/12/22

25     hearing that the Judge said he had a choice between

26     using AppClose and My Family Wizard.  That's

27     absolutely false.  I just wanted to show this which
```

1        -- I wanted to give this as an evidence.

2            THE COURT:  All right.  Tell me what it is.

3            MS. ANTAR:  It's a Court order.

4            THE COURT:  All right.  Well, I have the Court

5        orders.  Which one is it?  What's the date of it?

6            MS. ANTAR:  It's order number 439610.  The date

7        is 4/12/22.

8            THE COURT:  Okay.  I've looked at that and it

9        says Our Family Wizard.

10           MS. ANTAR:  It says Our Family Wizard.  So I'm

11       just pointing out that he stated that it was -- she

12       gave us an option, she did not.

13           Also the question came up about paying for it.

14       It's stated here on the same order, defendant father

15       will pay the fees associated with the app.  And the

16       reason why is because during the hearing he stated

17       that he's willing to do anything it takes in order to

18       facilitate communication.  And he said he would pay

19       the full amount no matter what it is because he said

20       he was willing to go the extra mile to -- so we could

21       communicate with each other.

22           And since that day of 4/12, there have been no

23       issues with the drop off pickup since we changed the

24       location.  And the communication since he did

25       download the app, it's been going through with the

26       app.  The only issue I'm having is, like I said, him

27       intentionally ignoring the messages.  So I was asking

1        if it could be ordered that -- the same thing that it

2        says on my other agreement which --

3            (Whereupon were discussions held between the

4        clerk and the Court.)

5            MS. ANTAR:  So on the other one, it just says,

6        like, all communications shall be through the app.

7        Communications shall be responded to within forty

8        hours of receipt.  And since, you know, he -- he

9        clearly looks at the ones he wants to, I think that

10       that's concerning to me because how does he know what

11       is in the message.  What if it's important.  And it's

12       always regarding the child.  So I believe that it

13       should be returned on both ends within forty-eight

14       hours.  I think that's a reasonable request.

15           In addition, he stated that on -- about, like,

16       visitation, he said we changed our visitation

17       schedule and that I subsequently followed him and got

18       arrested, that's false.  When we appeared on the

19       hearing, I begged to change the visitation schedule

20       that day and was told it would have to be heard on

21       4/12.

22           THE COURT:  All right.

23           MS. ANTAR:  And that the 4/8 hearing was solely

24       for the --

25           THE COURT:  Can -- can I ask --

26           MS. ANTAR:  -- ex parte?

27           THE COURT:  -- can I ask you a question about

1          that?

2                    MS. ANTAR:  Yes.

3                    THE COURT:  Did you get arrested that day?

4                    MS. ANTAR:  Not that day.  And actually, the

5          only reason I got arrested was because he wrote a

6          statement against me which is full of lies.  And

7          actually, I never pled any -- I never pled guilty to

8          that.  The charges are being dismissed on July 27th.

9          I already completed all the requirements that the

10         Court told me to do.  And no charges are going to be

11         filed.  It's all getting dismissed because I should

12         have never been arrested in the first place.

13                    And he, on the other hand, has multiple

14         convictions on his record.

15                    THE COURT:  All right.  And was --

16                    MS. ANTAR:  Including reckless endangerment.

17                    THE COURT:  -- was there a protective order

18         between the two of you? Is there --

19                    MS. ANTAR:  There is.

20                    THE COURT:  -- a protective order?

21                    MS. ANTAR:  Yes, there is.

22                    THE COURT:  What are the terms of the protective

23         order?

24                    MS. ANTAR:  It's a limited.  It's the lowest it

25         can be.

26                    THE COURT:  Okay.

27                    MS. ANTAR:  And that's also being dropped on the

1      27th at -- as well as the charge is being dismissed.

2            THE COURT:  All right.  And --

3            MR. LODICE:  Your Honor, I have a copy of that

4      police report if you'd like to see it.

5            THE COURT:  Okay.  You can hang on to that.

6            How -- how will your schedule change in August?

7       Are you starting school in August?

8            MS. ANTAR:  Yes.

9            THE COURT:  Okay.  And how will your schedule

10     change?

11           MS. ANTAR:  I won't be getting my schedule until

12     July.  So I don't even know how much my schedule is

13     going to change.  And also, I'm not going to be able

14     to work as much because of that.  So I might have to

15     pick up another job or do what I have to do to work

16     around it.  So I'm waiting to get that schedule --

17           THE COURT:  Are you -- are you going to school

18     in person or online?

19           MS. ANTAR:  It's all in person.

20           THE COURT:  Okay.  And where are you gonna be

21     commuting to?

22           MS. ANTAR:  Hartford.

23           THE COURT:  All right.  But you're going to

24     continue to live where you are now in Orange?

25           MS. ANTAR:  Yes.

26           THE COURT:  Is --

27           MR. LODICE:  She's going to be going to

1        Hartford?

2              THE COURT:  That's what she said.

3              MR. LODICE:  That's, like, driving by where I

4        live.

5              THE COURT:  Yes.  I think that's probably true.

6              Okay.  So when you get your schedule, is this

7        access schedule going to need to change?

8              MS. ANTAR:  I don't think so because, you know,

9        I'm gonna be -- I'm gonna be taking classes at night.

10       The only thing that might change is my work schedule

11       if I have to -- to start doing something else or

12       change things with my work.

13             THE COURT:  Okay.

14             MS. ANTAR:  That's the only thing that would

15       change.

16             But as far as the access, I believe that it

17       shouldn't.  Because if he's bringing her to daycare

18       on Mondays and I'm bringing her to his mom's on

19       Fridays, there's really no -- that won't affect it.

20             THE COURT:  All right.  So you -- this is what I

21       was asking.  You expect to be taking classes in the

22       evening?

23             MS. ANTAR:  Yes.

24             THE COURT:  Okay.  So when do you expect those

25       classes would start and end?

26             MS. ANTAR:  I would say they would start

27       sometime around 6 -- 6 o'clock.  And end sometime

1    around 9:30, 10 o'clock.

2         THE COURT:  Okay.  So who's going to watch the

3    child while you are in class?

4         MS. ANTAR:  I'll have to have a babysitter

5    watching her.

6         THE COURT:  So the orders about daycare cover

7    work.  You understand they don't cover school?

8         MS. ANTAR:  I -- I was not aware of that, no.

9         THE COURT:  Okay.  So the child support

10   guidelines apply to work-related childcare.  They

11   don't apply to school-related childcare.  So that's

12   why I raise it.  Because I don't want you to think

13   that when you make your arrangements, that is going

14   to be something that you will have to pay yourself.

15   The child support guidelines don't include school-

16   related daycare.  So --

17        MS. ANTAR:  That's fine.  But I just wanted to

18   also clarify that there's been several instances

19   where I have paid babysitter for work-related things

20   after the hours of the daycare.  And I've told him

21   about it.  And he states that he's not going to pay

22   it because he says I -- I have to only work during

23   the hours of daycare and that's it.  And he tries to

24   tell me you can't work outside of those hours when,

25   like I said, it's not so cut and dry with him.  He's

26   -- and also, he said that he works 7 to 5 Monday

27   through Friday but he drops her off at the daycare by

1      9, 9:30, 10 o'clock.  So how is he working at 7 --

2              MR. LODICE:  Monday I don't.

3              THE COURT:  All right.  Please don't interrupt.

4              MS. ANTAR:  You know --

5              MR. LODICE:  Sorry, your Honor.

6              MS. ANTAR:  -- he said before it was Monday

7      through Friday.  And he also stated that he --

8              THE COURT:  What -- what about your work

9      schedule.  So are you working the entire time that

10     the child is in daycare?

11             MS. ANTAR:  Yes.

12             THE COURT:  But your schedule is flexible?

13             MS. ANTAR:  To a certain extent.  It's not

14     extremely flexible.  It's flexible to some extent

15     whereas if there's an emergency or something, I can

16     drop everything and go.  I don't need to ask my

17     employer for permission.  Or -- of if I need to take

18     a day off, a sick day, I can just do whatever I want.

19     But as far as making money and actually being able to

20     work and bring in income, I need to put in hours to

21     do that.

22             THE COURT:  Well what about Fridays?

23             MS. ANTAR:  So again, every day is

24     unpredictable.  It's very sporadic.  And so I try to,

25     you know, schedule things on my schedule, my calendar

26     and every week's different.  But I give myself,

27     usually, you know, between the hours that I'm usually

1      working are anytime between 9 a.m. to, you know, 7,

2      8, sometimes 9.  It all depends on the schedule.  So

3      it's not always, like, I'm working a set schedule,

4      set hours.

5           THE COURT:  Okay.  Let's -- you wanted -- you

6      told me that the Family Wizard emails that he gave me

7      about the birthday party were not complete.  Is there

8      something else that you wanted me to see about that?

9           MS. ANTAR:  Yes.  And I also just wanted to --

10           THE COURT:  All right.  Don't -- listen.  Don't

11      change --

12           MS. ANTAR:  Okay.

13           THE COURT:  -- the subject.  Okay.

14           MS. ANTAR:  Yes.  Okay.

15           THE COURT:  I got to stay on one thing at a

16      time.

17           MS. ANTAR:  All right.

18           THE COURT:  So stay with me on that.

19           MS. ANTAR:  I just --

20           THE COURT:  If there's emails you want me to

21      look at --

22           MS. ANTAR:  Yes.

23           THE COURT:  -- pull them out now.

24           MS. ANTAR:  Okay.

25           THE COURT:  And I'll -- and we'll -- and we'll

26      show them to him.  Just one thing at a time for me.

27      I can't bounce around like you can.  I'm gettin'

```
 1          lost.
 2                (Whereupon there was a pause in the
 3          proceedings.)
 4               MS. ANTAR:  So can I show additional things
 5          related to that?  Like, not just that specific one.
 6          'Cause I have a lot of stuff that I would like to
 7          show.
 8               THE COURT:  Okay.  I would like to start with
 9          those.
10               MS. ANTAR:  Okay.  Let me try to find that
11          specific one.  Give me one second.
12                (Whereupon there was a pause in the
13          proceedings.)
14               THE COURT:  Okay.  Any progress on those emails?
15               MS. ANTAR:  I'm sorry.  It's because I -- you're
16          asking for one specific one and I'd like to show what
17          I have.  I'd like to --
18               THE COURT:  All right.  Well, what -- tell me
19          what it is that you want to show me.
20               MS. ANTAR:  Okay.  So the first thing that I
21          would like to show is on here, this is a message from
22          Family Wizard between the two of us which is from
23          April 28th, 2022 at 9:36 a.m. when he actually sent
24          me a message asking me if I wanted to meet up with
25          him to have a coffee -- to have a coffee date and
26          discuss details of the party.
27               THE COURT:  Okay.  That's fine.  But that --
```

1    here's the issue.  You told me that you had to call

2    the police 'cause he refused to bring the child to a

3    birthday party.  And he gave me emails that said you

4    -- you told him he -- you cancelled the party.

5        MS. ANTAR:  And I have the other email as well.

6        THE COURT:  All right.  So that can be marked as

7    an exhibit, the email asking for him to meet with

8    you.  That's fine.

9        MS. ANTAR:  Okay.

10       THE COURT:  You don't have any objection to

11   that, do you?

12       MR. LODICE:  (Indiscernible.)

13       THE COURT:  So I guess what I'm concerned about

14   is that you told me he didn't bring the child and he

15   showed me something that said you cancelled the

16   party.  So help me understand what happened there.

17       MS. ANTAR:  Right.  So in the email that he said

18   -- it was incomplete.  I'm getting the one that is

19   the --

20       THE COURT:  Okay.  Well, what does the complete

21   one say?

22       MS. ANTAR:  So I can't show it on the app?

23       THE COURT:  You -- no, I can't -- I can't -- you

24   don't want me to keep your phone.  Whatever we take

25   into evidence, we have to keep.  So you don't want me

26   to keep your phone.  But if you don't remember, you

27   can tell me.

```
 1          MS. ANTAR:  I have it.  I -- before we left, I

 2     wanted to show it.  But then we had to come back

 3     and --

 4          THE COURT:  Well, did you have communication

 5     after that saying the --

 6          MS. ANTAR:  Yes.

 7          THE COURT:  -- party's back on?

 8          MS. ANTAR:  We had a communication after that

 9     and he said, I sent you the money, please continue to

10     plan it.  And he conveniently didn't include that

11     message in the one that he put in for evidence.

12          THE COURT:  And then after that, did you have

13     more communication with him about the party?

14          MS. ANTAR:  Yes.

15          (Whereupon there was a pause in the

16     proceedings.)

17          THE COURT:  All right.  What did those -- what

18     were those communications like?  Just tell me.

19          MS. ANTAR:  I just wish I would have the chance

20     to speak and show everything in -- in the order I

21     have it.

22          THE COURT:  All right.  Ma'am, I'm listening to

23     you.  And I'm asking you what happened.  He says you

24     cancelled the party.  What happened after you sent

25     the email saying the party was cancelled?

26          MS. ANTAR:  So when I had originally sent him

27     all those emails, I sent him the booking information.
```

```
1      I sent him screenshots of all the things.  I said --
2      it even said what was included.  It stated how many
3      pizzas, all the details.
4          THE COURT:  Tell me what happened after you sent
5      the cancellation.
6          MS. ANTAR:  After I sent him that, I asked him
7      if he would be able to give me more money.  He said
8      no.  So then I asked him -- he said -- I said, okay.
9      And then after that he said, please continue to plan
10     it, I sent you the money, you said it's a this place,
11     please continue to plan it.
12         THE COURT:  All right.
13         MS. ANTAR:  So he acknowledged that he knew that
14     it was gonna be at that place.  He stated that I
15     never responded after that, which is not true.
16         THE COURT:  So after you sent him the email
17     saying it's cancelled, did you ever say anything back
18     to him like, okay I will or yes, it's back on?
19         MS. ANTAR:  No.  Because I already sent him all
20     of the information.  I sent him all the booking stuff
21     and he said multiple times, I know it's at Urban Air,
22     I know it's between 10 and 12.  Then he's saying to
23     me, what date is the party when it says on the Court
24     order the date.  Like, so it's like, he always does
25     this where he doesn't read the Court order just like
26     he was -- he called the police two weeks ago, sent
27     threatening messages to my mother and to me saying he
```

1      was gonna have me arrested because I didn't bring the

2      child -- he said I didn't bring the child to his

3      mother's by 8.  But the agreement says any time after

4      8:30.  And so it's like --

5              THE COURT:  Okay.  Listen.

6              MS. ANTAR:  -- he doesn't read the Court order,

7      then --

8              THE COURT:  Please, please don't change the

9      subject.  'Cause I can't jump around like this with

10     you.

11             MS. ANTAR:  Okay.

12             THE COURT:  So listen to me.  You want me to

13     hold him in contempt for not following Court orders

14     about this child's birthday party.  And he showed me

15     emails saying the party was cancelled; that you said

16     the party was cancelled.  So I can't hold him in

17     contempt for not bringing the child to the party that

18     you told him was cancelled.  So if that's -- if you

19     have communications after that that said the party's

20     uncancelled, please come, you got to tell me.

21             MS. ANTAR:  Yes.  On Thursday and Friday.

22     And --

23             THE COURT:  Before the party?

24             MS. ANTAR:  Before the party.  -- and he was --

25             THE COURT:  So --

26             MS. ANTAR:  -- telling me no, I'm not bringing

27     her.  I tried to file an ex parte 'cause he was

1      telling me on the Friday, two days before the party,

2      no.

3            THE COURT:  But three weeks before that, you

4      told him it was cancelled.

5            MS. ANTAR:  And then --

6            THE COURT:  So there was no communication

7      between that and the two days before the party?

8            MS. ANTAR:  There was communication.  May I look

9      at my Family Wizard app?

10           THE COURT:  You -- you can look at it.  But I, I

11     mean, I can't keep your phone.

12           (Whereupon there was a pause in the

13     proceedings.)

14           MS. ANTAR:  So I have multiple communications up

15     here showing clearly that we discussed over weeks and

16     weeks and weeks the details of the party.

17           THE COURT:  Okay.  But what I want to know is

18     what happened after you told him it was cancelled?

19     Because that -- I think -- I read those messages.

20     And I think a reasonable person would read the three

21     times that you said the party is cancelled to believe

22     that you cancelled it.

23           MS. ANTAR:  So, like, on this message where he

24     said -- I said --

25           THE COURT:  All right.  Well, hold -- hold on.

26           MS. ANTAR:  Yeah.

27           THE COURT:  You got to tell me what that is.

1          MS. ANTAR:  It's from My Family Wizard.

2          THE COURT:  And what's the --

3          MS. ANTAR:  And I said --

4          THE COURT:  Hold on.

5          MS. ANTAR:  Yes.

6          THE COURT:  What's the date?

7          MS. ANTAR:  This date on here is April 30th.

8          THE COURT:  Okay.  So that's before you

9     cancelled it.

10         MS. ANTAR:  He stated multiple -- he showed

11    evidence of multiple different dates.  He showed in

12    evidence of me.

13         THE COURT:  Show -- show it to him.  Show it to

14    the --

15         MS. ANTAR:  Okay.

16         THE COURT:  -- father.  Hold on.  Don't read

17    from it, just show it to him.

18         Is that what she says it is.  Is it a Family

19    Wizard message between the two of you?

20         MR. LODICE:  Can I object to the relevance

21    considering it's before the time she cancelled?

22         THE COURT:  Okay.  Well, you can.  But I'm

23    probably gonna look at it anyway --

24         MR. LODICE:  That's fine.  Go ahead.

25         THE COURT:  -- because she wants me to.

26         I understand it's -- is -- is it what she says

27    it is though?

1          MR. LODICE:  It is what she says she is.  Yes.

2          THE COURT:  Okay.

3          MR. LODICE:  What she says it is.  Excuse me.

4          THE COURT:  All right.  So listen, it's

5     admitted, it'll be a full exhibit.  But if you want

6     me to hold him in contempt, I think you got to show

7     me how you told him that the party was back on after

8     you told him it was cancelled.

9          MS. ANTAR:  He showed multiple -- he showed

10    multiple different dates of me saying that if he --

11    we can't agree on this, that I was just gonna have my

12    own party.  And every single time, he said no, we

13    already book it, we already discussed this, we're

14    doing what we discussed.

15          Again, here's another one where he's --

16          THE COURT:  All right.  Is that --

17          MS. ANTAR:  -- states he's bringing seven

18    children.  It's from the same date, 4/30.

19          THE COURT:  Okay.  Do you have -- do you have

20    any communications after you --

21          MS. ANTAR:  I do.

22          THE COURT:  -- told him it was cancelled?  Okay.

23     That's what I want to see.

24          MS. ANTAR:  Right here.  I said, I said I'm

25    gonna have my own party.  And then here I said to

26    him, he said I sent you the money, set it up where

27    you want.  I said are you letting me make all the

1      decisions myself, is that --

2           THE COURT:  All right.  Listen.  Stop.  Don't --

3           MS. ANTAR:  Okay.

4           THE COURT:  -- read to me from that 'cause it's

5      not in evidence.

6           MS. ANTAR:  I'd like to show him.

7           THE COURT:  Is it before -- but that's still

8      before --

9           MS. ANTAR:  It's after one of the first times

10     that he referenced me saying that I was going to

11     cancel it.

12          THE COURT:  Okay.  That's fine.  If it is what

13     she says it is, I'll look at it.  Okay.

14          MR. LODICE:  No.  This is before she says it was

15     cancelled.

16          MS. ANTAR:  It says on right at the bottom.

17          MR. LODICE:  It's -- you're gonna administer it

18     anyway.

19          THE COURT:  I'll put them in order, folks.

20          MR. LODICE:  It's fine.

21          THE COURT:  I'll put them -- I will put them in

22     order.  So --

23          MR. LODICE:  (Indiscernible.)

24          THE COURT:  -- the plaintiff's exhibit is in

25     April.  The defendant's exhibits are in May.  Okay.

26          MS. ANTAR:  I also have six more pages that scan

27     over two weeks of us again discussing the details of

1          the party.

2               THE COURT:  Okay.  Is it before -- listen to me.

3               MS. ANTAR:  It's the same date of 4/30 where I

4          did say on that date that I was gonna cancel it.  And

5          then he said, no continue to book it on -- with these

6          details.  So that is after I said I was going to

7          cancel it, yes.

8               THE COURT:  Okay.  Take a look at those.

9               MR. LODICE:  Same.

10              THE COURT:  Those can be marked as a full

11         exhibit.

12              MS. ANTAR:  This is another one from May 2nd

13         where he's telling me to just spend $40 on the cake.

14              MR. LODICE:  I guess.  Yeah, that's fine.

15         (Indiscernible).

16              THE COURT:  Okay.  All right.  I'd like to go

17         back to this issue about the weekends because I want

18         to make sure before we stop at 3:30 that if you have

19         an opinion about splitting up the weekends, that you

20         share that with me.  I am definitely not going to

21         grant your request to make it, sort of, ad hoc.  I

22         don't think that's a good idea for you guys.  But I

23         do think it's reasonable that you get to spend some

24         weekend time for your -- with your child.  And that

25         the father see the child on different days of the

26         week when you have the child on the weekends.  So do

27         you want to weigh in on that?

1    MS. ANTAR:  I don't agree with that because I

2   can't commit to doing a monthly weekend with her.  I

3   have so much going on.  I have -- I'm a single

4   mother.  I have a whole house I take care of by

5   myself.  The juggling school, work.  The only time

6   that I can only ever get things done or pick up extra

7   hours or things like that is the weekend.  And so I

8   was simply requesting that we have that so that in

9   the event I wanted to do a vacation or plan something

10   special, I have that option.

11    THE COURT:  Okay.

12    MS. ANTAR:  But if he's not willing to agree to

13   that, then I'll have to speak to an attorney about

14   this.  I'm not agreeing to having a set weekend.

15   That doesn't work for my schedule.

16    THE COURT:  Okay.  Well --

17    MS. ANTAR:  I'd rather have no weekends, then --

18   then -- then give in to his demand.

19    THE COURT:  Okay.  Well, I actually think it was

20   the other way around, Ms. Antar.  That you asked me

21   for some weekend time.  And I imposed that on him.

22   And now I'm asking you which weekend time you want

23   and you're telling me you don't want to schedule any

24   weekend time.

25    MS. ANTAR:  I want to have the ability, like it

26   says in my other Court order.

27    THE COURT:  Okay.  But --

1          MS. ANTAR:  I want to have that same language in

2     this Court order.

3          THE COURT:  -- but you two can't do that.  So

4     I'm not willing to order that.

5          MS. ANTAR:  But we didn't have a chance to meet

6     in front of family relations and discuss it.

7          THE COURT:  All right.  So the way -- I just

8     want to be clear with you.  -- that the way the

9     system works, the way the court procedure works is

10    that you only meet family relations once on your

11    motions.  And after that, you come see the Judge.

12    And that is what happened here.  So there was no

13    expectation today that you would be seeing family

14    relations to negotiate because you were set for a

15    hearing today.

16         So we are going to finish up because I am very,

17    very far over the time that I thought we would be

18    spending together.  You folks, I am going to

19    issue some temporary orders on the existing motions.

20    I'm not going to enter final orders on the existing

21    motions because the final orders are pending the

22    outcome of your meeting and services with family

23    relations.

24         So you are going to leave my courtroom, go down

25    the hall, meet with family relations, and they're

26    going to talk with you and screen your family for

27    appropriate services on the motions to modify the

1          parentin -- the legal custody, the physical custody,

2          and the access schedule.

3               So final orders on those things will not be

4          issued until after family relations does their work.

5          And if you can't agree, after a hearing.  So

6          temporary orders will enter after today.  Final

7          orders are not going to enter until after family

8          relations is done with their work and after, if

9          anybody wants it, a full hearing on those motions.

10         Everybody understand that?

11              MR. LODICE:  Yes, your Honor.

12              THE COURT:  Procedurally, everybody understand

13         that?  Ma'am, do you --

14              MS. ANTAR:  I understand but I --

15              THE COURT:  -- understand what I'm saying?

16              MS. ANTAR:  -- thought that -- you said after

17         the break that I would have a chance to speak and

18         show my evidence.  And -- and I was only able to give

19         the one thing that you said related on that one

20         issue.  I have other things -- these were all my

21         motions for contempt.  I want to be able to be heard.

22         I feel like there's an extreme unfair bias toward

23         him.  I like feel I'm being treated unfairly.   He

24         was allowed to talk.  At several instances, he even

25         interrupted you and you didn't stop him.  I just want

26         to be able to show my evidence.  I have so much

27         evidence I've prepared for this.  And I'd like to be

1    able to speak my -- for a fair trial and say what I

2    have to say and show the evidence to go into the

3    court.  Because everything he said on the record was

4    false.  And I have evidence here to prove it all.

5         THE COURT:  Okay.  So, Ms. Antar, we started

6    this hearing with you testifying.  And I appreciate

7    that you got interrupted.  But I -- you got --

8    mostly got interrupted with my questions about what

9    you're trying to achieve here.  I listened to you for

10   almost two hours.  And even in the last half an hour,

11   which I devoted entirely to your rebuttal, I -- you

12   spent a lot of the time not answering my questions

13   and not showing me the documents that you said you

14   had.  So I feel like we have really vetted these

15   motions and I can't imagine what else there is to --

16   to raise here.

17        MS. ANTAR:  Your Honor, may I please show my

18   evidence here --

19        THE COURT:  All right.  So --

20        MS. ANTAR:  -- like he had the opportunity to.

21        THE COURT:  Ma'am, I've been listening to you

22   for hours.  And I do think that you have made clear

23   you position.  I think I understand your position.  I

24   don't agree with all the assumptions imbedded in your

25   request, but I think I understand your positions

26   pretty well.

27        MS. ANTAR:  There's many things I haven't said

1    though.  And I feel I'm not being given a fair day in

2    court.  I want to be heard.  I want to be able to

3    show the evidence I've prepared.

4         THE COURT:  Well --

5         MS. ANTAR:  He's making allegations against me

6    that are extremely serious and you're speaking about

7    entering in orders on our behalf without us agreeing

8    to it.  I'd like to show -- you said I'd have a

9    chance to respond to what he said.  May I at least do

10   that?

11        THE COURT:  Ma'am, I have another case that I've

12   pushed off until 3:30 so that I could talk to you

13   folks for the last ninety minutes, and we have done

14   that.  But I still -- I don't -- his allegations are

15   not -- the things that he -- he said a lot of things

16   that don't matter.  That -- that you both have said a

17   lot of things that don't matter.  You have a lot of

18   complaints against each other.  You don't have to

19   respond to everyone.

20        You have motions about the daycare.  You have

21   motions about the time change.  You have motions

22   about OFW.  You have motions about the birthday.  I

23   -- I think you have told me everything I need to know

24   about those things.

25        As for the access schedule and the changes, I'm

26   not -- any changes I make today are not going to be

27   permanent.  They're going to be temporary.  I'm not

```
 1        entering final orders on your request to change the

 2        custody -- the legal custody or the schedule.  That

 3        is not going to happen until after you talk to

 4        family.  So if you don't agree with what happen --

 5        you know, if you don't agree with what family

 6        relations recommends, then at some point you'll have

 7        another hearing, another opportunity to tell,

 8        probably this Judge what you think the access

 9        schedule and the custody orders should be.

10            But in terms of the motions for contempt, we've

11        been at this for hours.  And I think you have told me

12        everything relevant.

13            MS. ANTAR:  Your Honor, I also was told that the

14        motion for financial discovery was going to be heard.

15            THE COURT:  We haven't --

16            MS. ANTAR:  And I was also --

17            THE COURT:  You are right.  We have not gotten

18        to that.  So why don't you tell me what it is that

19        you want me to order him to produce for finances.

20            MS. ANTAR:  So --

21            THE COURT:  And then you are going to see family

22        relations.  Probably this lady waiting for you right

23        here.

24            FAMILY RELATIONS:  Yes, your Honor.

25            MS. ANTAR:  So in terms --

26            THE COURT:  All right.  A few more minutes.

27            MS. ANTAR:  -- in terms of the financial
```

1    discovery, which I filed on March 30th, I'm asking

2    for the last three years of tax returns, all personal

3    and business bank accounts, credit card statements,

4    Venmo records, Cash App records, Zelle records,

5    Robinhood statements, Webull statements, TD Bank

6    business checking account, People's Bank account,

7    Wells Fargo accounts, and any and all other financial

8    records including business records for Whole House

9    Remodeling, LLC.  I want to see all federal and state

10   income tax returns, IRS forms, W2, 1099 and K-1

11   within the last three years.  All paystubs,

12   statements for all accounts, statements showing

13   interest and --

14        THE COURT:  All right.  Stop.  Stop.  Stop.  Why

15   do you need three years?

16        MS. ANTAR:  Because it's my legal right.  And I

17   looked it up --

18        THE COURT:  Okay.  I don't -- what -- what makes

19   you think you have the right to go back three years

20   on a motion you just filed this year?

21        MS. ANTAR:  I didn't just file it this year.  I

22   filed the motion for modification of child support in

23   November.  And that's what this is regarding.  And

24   it's been continued several times.

25        And the reason why I feel it's important is

26   because we've been in court for the last three years

27   since 2019.  Mr. Lodice had lied several times about

1       his income.  He had stated in 2019 --

2              THE COURT:  Okay.

3              MS. ANTAR:  -- on the record --

4              THE COURT:  Stop.  Listen.  The way the law

5       works is that once your case goes to judgment --

6       well, let me put it this way.  If you file a motion

7       to modify something, the -- like the child support,

8       the furthest back that the Court can continue -- can

9       -- can look is from the last order.  So -- so you

10      have -- you have a motion before the Court today to

11      modify the child support -- or the magistrate court.

12      I can't go back many, many years even if I wanted to.

13      The law only says that I can go back to the last

14      child support order.  So anything beyond the last --

15      before the last child support order wouldn't be

16      relevant.  So that's why I'm asking you why you need

17      three years because --

18             MS. ANTAR:  Well, an attorney advised me that I

19      have my legal right to have the last three years of

20      all this financial information 'cause discovery was

21      never done.  So therefore, we never had an accurate

22      idea of what his income is.  And he stated to me that

23      he made excessive amounts of money in the stock

24      market in 2021.  He stated to me that now since

25      having Whole House Remodeling in April 2021 that he's

26      making extravagant --

27             THE COURT:  All right.  Ms. Antar --

1          MS. ANTAR:  -- amounts of money.

2          THE COURT:  -- did you hear anything I just said

3     to you?

4          MS. ANTAR:  I did.  So since -- so since June

5     2021 was the last time the child support was ordered.

6     Then -- does that mean --

7          THE COURT:  So you can --

8          MS. ANTAR:  -- that we can go back to then?

9          THE COURT:  If that's the last child support

10    order, then -- then you can request discovery back to

11    that date.  But it can't go back before that date

12    because nothing before that date would be relevant

13    'cause the Court wouldn't be allowed to consider it.

14         MS. ANTAR:  So then can we do it from June 18th,

15    2021 to present day because that's when the last

16    order agreement was entered in 2021.

17         THE COURT:  Well, it can go back to the last

18    child support order.  I need to take a look at when

19    that was.

20         And I just want to be clear that both of you

21    have to produce financial information to each other.

22    So it's not just one way.  When -- when a Court

23    orders child support, child support is -- encompasses

24    both of your incomes.  So you would both be required

25    to exchange financial information.

26         MS. ANTAR:  I was told by an attorney that only

27    if he files his own motion is that -- is that true.

1      That's why I'm asking for an attorney.  I'm asking

2      for another court date.  I did not have enough time

3      to go over any of this and I kept getting rushed.

4          And then you rushed us saying to go put money in

5      the meter and then we can back and jumped to him.

6      Now we're rushed again saying another person has a

7      hearing.  When we had a hearing on June 1st, they let

8      us stay until 5 o'clock and actually didn't stop us

9      from talking and let us say all the evidence and then

10     incarcerated him.

11         So I feel that, you know, based on the advice

12     I've gotten from an attorney that I've consulted

13     with, I believe that that -- I'm getting conflicting

14     information about what my rights are in this case.

15     And was told it doesn't matter if you're married or

16     not, you have the right in any child support case to

17     go back three years especially if there's a

18     discrepancy.

19         THE COURT:  Ms. Antar, stop.  Okay.  Listen.

20     Sometimes I do make mistakes, but I'm not usually

21     wrong about the law.  And I'm definitely not wrong

22     about the child support law.  So I'm sorry that you

23     got a different impression from a lawyer that you

24     consulted with.  But I don't think that your

25     impression is gonna rule the day here.

26         So let's focus on what it is that you would like

27     to have him produce and also what you are going to

1       produce.  Because child support is a function of both

2       of your incomes.  So when we -- if you get your

3       request and you ask somebody to revisit the child

4       support and recalculate the child support, we have to

5       use the right income numbers for both of you.  So we

6       couldn't take your old numbers from June which might

7       not be accurate and his new numbers from now.  We

8       have to have both of your new incomes, your current

9       incomes.  So you do both have to produce some

10      financial information.

11           MS. ANTAR:  Okay.  But when -- when I -- I just

12      want to clarify.  Because you said, like, from when

13      the child support order was -- was ordered, and the

14      one that the -- the order -- nothing changed in the

15      child support order from June.  That was just all

16      different things about custody and visitation so.

17           THE COURT:  Okay.  That may be --

18           MS. ANTAR:  So can you tell us what the date --

19           THE COURT:  I'm gonna take a look --

20           MS. ANTAR:  -- can you say what the date would

21      be.

22           THE COURT:  I need to look at your file which

23      has many, many, many entries.  So it will be in my

24      written order, but I don't have time to look at it

25      right now.  But it will be included in the orders

26      that I issue on your motion for discovery.

27           MS. ANTAR:  So -- so since the last time that

1    the order was placed about child support, it would

2    be, like, the last time that it originally put in.

3         THE COURT:  Yep.

4         MS. ANTAR:  Because if the other order says it's

5    staying the same as per this order, then that's not

6    changing it, just so I understand.

7         THE COURT:  Well, I don't -- the reason I can't

8    answer your question is 'cause I don't know the

9    answer to that question.  I need to look more

10   carefully at the orders that the other Judges issued.

11   It's not clear to me if they considered child support

12   or just declined to change it pending that next

13   hearing.  So I need to look at your file more

14   carefully.

15        There are almost two hundred entries in your

16   file so it's gonna take me a little while.

17        MS. ANTAR:  Okay.  The other question is the --

18   the whole reason we pushed off that modification for

19   July 11 was pending this.  So now since we don't have

20   an answer, are we able to get an additional

21   continuance in that so that we have time for the

22   discovery to go through?

23        THE COURT:  I don't know.  That's possible.

24   We'll see.

25        MS. ANTAR:  But that's something I would just

26   have to file another motion for request for

27   continuance?

1      THE COURT:  Well it has -- it also has to do

2   with the magistrate schedule.  So the child support

3   magistrate is -- is hearing -- so far has been

4   hearing your child support issues.  It may make sense

5   just to keep them all -- to just have you come once

6   and -- so I'm gonna talk to the Magistrate about

7   that.

8      All right.  So you would like his personal and

9   business records back to the most -- the relevant

10   time as far back as you can go.  Right?

11      MS. ANTAR:  I want everything listed here as

12   well.  Because he regularly uses Venmo, Cash App, and

13   he also keeps a lot of cash.  I have evidence here

14   that the daycare stated every payment he's made since

15   the first day was made in cash.  He regularly -- also

16   when we had the birthday party, he paid the girl in

17   cash as well.  So what he does is -- that's why he's

18   saying his accounts are negative because he -- he

19   cashes checks and he pays -- he keeps everything in

20   cash in order to try to lie about his income.  And he

21   -- I have a plethora of evidence of him telling me

22   that he has made more money than he has ever made in

23   his entire life since he's opened up his own company.

24      He testified on June 1st that --

25      THE COURT:  All right.  Stop.

26      MS. ANTAR:  Okay.

27      THE COURT:  We're talking about what it is that

1    you're asking for.  We're not -- we're not taking

2    evidence on your motion for modification.

3         MS. ANTAR:  I just want word for word all the

4    items stated here.

5         THE COURT:  Okay.  Well, I don't know what

6    you're looking at.  What are you looking at?

7         MS. ANTAR:  So --

8         THE COURT:  Is that your motion?

9         MS. ANTAR:  -- tax returns --

10        THE COURT:  Listen.

11        MS. ANTAR:  This is my motion.  Yes.

12        THE COURT:  Okay.  So the list is in your

13   motion?

14        MS. ANTAR:  On the motion for financial

15   discovery that was filed in the court on March 30th.

16        THE COURT:  Okay.  So I will take a look at that

17   motion.  And I will issue an order on that in writing

18   as well as all these other issues.

19        MR. LODICE:  Will that be sent to me?

20        THE COURT:  It will be sent to both of you --

21        MR. LODICE:  Thank you.

22        THE COURT:  -- at the addresses that you have on

23   file: Shagbark Drive and Lyman Street.  Okay.

24        All right, folks --

25        MS. ANTAR:  And --

26        THE COURT:  -- I think we're done.  Thank you.

27   I'll issue some orders in writing as soon as possible

1          including on your request for discovery.

2               We're gonna take the recess, ladies and

3          gentlemen, and then we'll take the next matter.

4               MS. ANTAR:  Your Honor, may I ask one question?

5               THE COURT:  No.  We're all done here.

6               THE MARSHAL:  All rise.  Court stands in recess.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
NNH-FA19-5046828-S           :   SUPERIOR COURT

THEODORA F. ANTAR            :   JUDICIAL DISTRICT
                             :   OF NEW HAVEN

v.                           :   AT NEW HAVEN, CONNECTICUT

MATTHEW J. LODICE            :   JUNE 28, 2022
```

C E R T I F I C A T I O N

     I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Judicial District, New Haven Connecticut, before the Honorable Jane K. Grossman, Judge, on the 28th of June, 2022.

     Dated this 8th day of August, 2022 in New Haven, Connecticut.

_____
Mary Labasi
Court Recording Monitor

```
NNH-FA19-5046828-S              :  SUPERIOR COURT

THEODORA F. ANTAR               :  JUDICIAL DISTRICT
                                :  OF NEW HAVEN

v.                              :  AT NEW HAVEN, CONNECTICUT

MATTHEW J. LODICE               :  JUNE 28, 2022
```

C E R T I F I C A T I O N

     I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Judicial District, New Haven Connecticut, before the Honorable Jane K. Grossman, Judge, on the 28th of June, 2022.

     Dated this 23rd day of June, 2023 in New Haven, Connecticut.

_____
Mary Labasi
Court Recording Monitor