NNH-FA19-5046828-S                  :   SUPERIOR COURT

THEODORA F. ANTAR                   :   JUDICIAL DISTRICT
                                        OF NEW HAVEN

v.                                  :   AT NEW HAVEN, CONNECTICUT

MATTHEW J. LODICE                   :   MARCH 27, 2023


*TRANSCRIPT OF PROCEEDINGS*


BEFORE THE HONORABLE JANE K. GROSSMAN, JUDGE


A P P E A R A N C E S :


Representing the Plaintiff:

        ATTORNEY DONALD CRETELLA
        Zingaro, Cretella & Rasile
        681 State Street
        New Haven, CT  06511


Representing the Defendant:

        Matthew J. Lodice, Self-Represented Party


                        Recorded & Transcribed By:

                        Janis Longobardi
                        Court Recording Monitor
                        235 Church Street
                        New Haven, CT  06510

```
1                    *    *    *    *

2            COURT MONITOR:  We're on the record.

3            THE COURT:  All right.  Good morning, ladies and

4       gentlemen.  We are conducting a hearing by video in

5       the Antar-- excuse me, Theodora Antar and Matthew

6       Lodice custody case, and we are here on a-- let's

7       see, post judgment motion-- emergency motion for a

8       custody, which was marginally granted, and we'll need

9       to discuss that motion today.

10           So let's have everyone identify themselves for

11      the record, starting with the plaintiff.  Plaintiff's

12      counsel, I should say.

13           ATTY. CRETELLA:  That's okay.  Good morning,

14      your Honor.  Don Cretella for Theodora Antar.

15           THE COURT:  And sir?

16           MR. LODICE:  Matthew Lodice.

17           THE COURT:  Okay.  Attorney Cretella, your

18      client is on the call, right?

19           ATTY. CRETELLA:  Correct.

20           THE COURT:  Okay.  And, Ms. Antar, you should

21      probably turn on your video.  There we go.  Okay.

22           All right, so my first question, Attorney

23      Cretella, is for you, and that is it looks to me like

24      we have a hearing next week, April 5th, and I think

25      Family Relations is in the middle of some work with--

26      with the couple.

27           ATTY. CRETELLA:  Okay.  That's true.
```

1          THE COURT:  Let's see.  So is this motion today

2     something that is going be consumed with what we're

3     doing on April 5th, should we try and do it all

4     together, or is this something discreet that you

5     think we can-- we can deal with today?

6          ATTY. CRETELLA:  I mean, globally yes, it-- it

7     can be discussed-- or it can be dealt with on the

8     5th.  But, you know, the an-- the-- the short answer

9     is yes, it can be dealt with on the 5th.  I don't

10    know if Ms. Antar wishes to defer to the 5th, but I

11    guess that would be up to the-- the Court.

12         THE COURT:  Well, I think the question really is

13    for the person who this effects, which is Mr. Lodice.

14    So --

15         ATTY. CRETELLA:  Right.

16         THE COURT:  Because there are some kind of, not

17    very impactful, but temporary orders that say that

18    while-- while the orders remain in effect, the child

19    won't be alone with the stepbrother, so that would

20    have to remain in place until the 5th.

21         So, Mr. Lodice, is that something that --

22         MR. LODICE:  No, I'd-- I'd like to address this

23    now please, your Honor.  I've been not able to see my

24    daughter.  She's been keeping my daughter from me.

25    In the last nine weeks-- In the last nine or 10 weeks

26    I've only seen my daughter once, and I have not been

27    able to talk to her, she's not letting me speak to

1   her, so I would rally like to address this right now.

2   THE COURT:  All right.  Attorney Cretella, the

3   temporary orders say that the cust-- child custody

4   and access remain the same, so that should not have

5   been happening the last couple weeks.  You're aware

6   of that?  Okay, then we'll --

7   ATTY. CRETELLA:  Yes.

8   THE COURT:  Fine, we will-- we will have the

9   hearing.  We'll do it today.

10  ATTY. CRETELLA:  The only thing, your Honor, I

11  would suggest is that that's not going to change

12  anything.  The orders are the orders, you're not

13  going to, you know, change the orders to make them

14  more beneficial to Mr. Lodice at this point.  The

15  only thing that now-- that we're here to address

16  today would be whether or not the child can be alone

17  with the son.

18  THE COURT:  Well I think Mr. Lodice is saying

19  that the orders aren't-- existing orders aren't being

20  followed.

21  ATTY. CRETELLA:  Oh, I understand that.  But --

22  THE COURT:  And I would like to-- I'd like to

23  understand why that is.

24  ATTY. CRETELLA:  Okay, we can-- You know, you

25  can do that, your Honor.  I mean, that's fine.  I

26  mean, but-- Listen, it's-- it's-- My name is not on

27  the front door of the courtroom.

1          THE COURT:  I understand your point that the
2      only thing that's down for a hearing today is whether
3      or not this restriction is lifted, but if the
4      restriction is the reason why your client's been
5      withholding access then we're going to tackle that.
6      I-- You know, --
7          ATTY. CRETELLA:  That's fine.
8          THE COURT:  -- I don't need to tell you or your
9      client, who I-- I believe has represented she is a
10      law student, that when court orders are in place we
11      expect them to be followed.
12          ATTY. CRETELLA:  Yes.
13          THE COURT:  So it is, of course, disturbing to
14      me that I would hear the court orders are not being
15      followed.  All right, so we'll --
16          ATTY. CRETELLA:  I-- I --
17          THE COURT:  Go ahead.
18          ATTY. CRETELLA:  That's fine.  My suggestion
19      would be, your Honor, maybe we just deal with that
20      issue.  You can-- You can talk to Ms. Antar, we can--
21      I can inquire about that issue, and-- Because-- I-- I
22      guess my point is if-- if-- other than what's before
23      the Court today, if want to go forward that
24      everything that Mr. Lodice wants to go forward on
25      we're actually going to have a full blown custody
26      hearing today.
27          THE COURT:  I-- I see your point.

1    ATTY. CRETELLA:  And --

2    THE COURT:  However, --

3    ATTY. CRETELLA:  And I'm not prepared for that,

4    first of all.

5    THE COURT:  What I have is-- down for today is

6    an Emergency Application for Custody indicating that

7    that-- by-- by another Judge who indicated that the

8    minor child wouldn't be left alone with the

9    stepbrother --

10    ATTY. CRETELLA:  Correct.

11    THE COURT:  -- at all, underlined twice, other

12    custody, access and visitation orders remain in

13    effect and are not disturbed by this order.  So --

14    ATTY. CRETELLA:  I agree.

15    THE COURT:  -- you can go forward.  Mr. Lodice

16    does not-- not want these orders to continue.  You

17    can go forward on your request for emergency custody,

18    whatever that entails, I don't know, --

19    ATTY. CRETELLA:  Okay.  That's fine.

20    THE COURT:  -- and then we'll-- I imagine in the

21    course of that I'll hear something about why the

22    current orders aren't being followed.

23    ATTY. CRETELLA:  Fair enough.

24    THE COURT:  All right.  How would you like to

25    proceed?

26    ATTY. CRETELLA:  I would like to inquire of Ms.

27    Antar.

1          THE COURT:  Okay.  Would you swear Ms. Antar in,

2     please.

3          ATTY. CRETELLA:  You're on mute, Ms. Antar.

4          COURT CLERK:  Please raise your right hand.

5               **(The witness complied.)**

6          COURT CLERK:  Do you solemnly swear, or solemnly

7     and sincerely affirm as the case may be, that the

8     evidence you shall give concerning this case shall be

9     the truth, the whole truth, and nothing but the

10    truth, so help you God or upon penalty of perjury?

11    If so, please say I do.

12         MS. ANTAR:  I do.

13         COURT CLERK:  Please state your  name and

14    address for the record.

15         MS. ANTAR:  Theodora Antar, 856 Shagbark Drive,

16    Orange, Connecticut, 06477.

17

18

19

20

21

22

23

24

25

26

27

1        **T H E O D O R A   A N T A R**, of

2    856 Shagbark Drive, Orange, Connecticut, 06477, having been

3    duly sworn by the Clerk, was examined on her oath and

4    testified as follows:

5                THE COURT:  All right.  Go ahead.

6                ATTY. CRETELLA:  Mau I-- May I?  All right.

7                THE COURT:  Yes.

8    **DIRECT EXAMINATION BY ATTY. CRETELLA:**

9        Q    Ms. An-- Ms. Antar, we're here today on a emergency

10   hearing; correct?

11       A    Yes.

12       Q    All right.  And you have a daughter?

13       A    Yes.

14       Q    What are her initials?

15       A    A.L.

16       Q    And how old is A.L.?

17       A    Three.

18       Q    And recently-- Well, let me withdraw that.  You-- You

19   have filed Motion for Emergency Hearing today; correct?

20       A    Yes.

21       Q    And you have reason believe that your daughter is in

22   physical and or emotional distress; correct, danger?

23       A    Yes.

24       Q    Can you tell the Court why that is?  As succinctly as

25   possible, please.

26       A    Due to the current-- Due to the two current criminal-

27   - active criminal investigations that are in place, I feel

1  my daughter is in danger that Matthew might try to take her

2  again like he did, and expose her to being in danger of

3  being sexually abused like she's  --

4      Q    Okay.

5      A    -- disclosed to me that she was.

6      Q    All right.  Well, let's-- let's-- let's get to--

7  let's get to the point in-- in terms of-- I'm not really

8  that interested, and I don't think the Court is interested

9  in proceedings or investigations, what we're here to figure

10 out is why you think your daughter is in danger.

11         What has happened to your daughter that you believe

12 she has been mistreated and/or would be-- continue to be

13 mistreated?

14     A    So, since February 1st my daughter disclosed to me

15 that she was being abused while in the care of Matthew, I

16 immediately reported it to DCF and the police.  Subsequently

17 we had investigations and I informed everybody from DCF and

18 the police that I would, for her own safety, be planning to

19 keep her with me throughout the remainder of those

20 investigations for her own safety, and I was told that

21 Matthew also agreed that it was in her best interest to

22 remain with me throughout the investigations.  And --

23     Q    All right.  So --

24         MR. LODICE:  Could I object?  Like, who told you

25         that?  Like, objection, hearsay.  She's saying

26         somebody said that I said something.

27         ATTY. CRETELLA:  It's not hearsay.

```
 1              THE COURT:  Well, --

 2              MR. LODICE:  She's-- It is.

 3              THE COURT:  Hold on.  I'm just trying to figure

 4         out like-- You will get a chance to ask her about

 5         these things.  Let me see what the context is first,

 6         okay.

 7              MR. LODICE:  Okay.

 8              THE COURT:  And you can take notes if you want,

 9         sir, you'll be able to ask questions.

10              MR. LODICE:  Thank you.  Thank you.

11   BY ATTY. CRETELLA:

12     Q   So, Ms. Antar,--

13              ATTY. CRETELLA:  You know, may-- And normally I

14         know it's not-- I shouldn't be doing it, but your

15         Honor, would it be okay if I led the witness maybe

16         just a little bit?  Give me a little latitude.

17              THE COURT:  That's fine.  I-- You know-- Because

18         there have been-- Attorney Cretella, because there

19         have been so many accusations leveled by your client

20         against this father and the other father that she has

21         cases with in this court, I'm going to need some

22         details.  You know, her vague assertions that the

23         child is abused is not going to do it, I mean I need

24         to understand what exactly she's talking about.  So,

25         yes, you can certainly ask her some leading

26         questions.

27              ATTY. CRETELLA:  Thank you.
```

**BY ATTY. CRETELLA:**

  Q   All right.  So, Ms.-- Ms. Antar, when did you first become aware that your daughter was being abused?

  A   In October of 2022.

  Q   Okay.  And what were the-- What did she tell you? How-- How did-- Withdrawn.  How-- How-- How did you become aware?

  A   My child told me.

  Q   What did she tell you?

  A   At that time she said that she was being tickled in her private area by her older brothers.

  Q   When you say older brothers who-- And, again, I think if they're a minor just for-- just on the safe side just give their-- their initials.

  A   D.L and S.L.

  Q   Okay.  And do you know old is D.L. and S.L. are?

  A   D.L. is 16, and S.L. is around 11.

  Q   Okay.  And under what circumstances was your daughter exposed to D.L. and, was it, S.L.-- S.L., D.L. and S.L.?

  A   Yes.  Matthew typically leaves the child with both of those alone, unsupervised during his parenting time.

  Q   So they're babysitting?

  A   Correct.

  Q   And when-- In October of `22 when your daughter told you this, what did you do?

  A   I spoke about it to my therapist who then told me to call DCF and said she would call DCF if I would not, so I

1  then reported it to DCF.

2    Q   All right.  And at some point-- excuse me, DCF opened

3  an investigation; is that correct?

4    A   Correct.  And a police investigation.

5    Q   Okay.  And subsequent to that, were there any more

6  allegations in 2022 from your daughter?

7    A   No, in 20-- 2022.

8    Q   Okay.  You didn't-- From October `22 `til December of

9  `22 there was no alleg-- no further allegations; correct?

10    A   Correct.

11    Q   And were there times that your daughter was alone

12  with these two young men?

13    A   Yes.  Al --

14    Q   Okay.

15    A   Almost every time that she was with Matthew.

16    Q   All right.  So then at some point there is-- there

17  are more allegations; correct?

18    A   Yes.

19    Q   And when are they?

20    A   They first began on February 1st, 2023.

21    Q   All right.  And what allegations were made

22  specifically?

23    A   So specifically on that date of February 1st my

24  daughter stated to me that-- she was making sexual motions

25  on top of a stuffed animal, and I asked her what are you

26  doing, and she stated I'm doing what Dom does to me,

27  referring to her 16 year old brother.  And I captured this

1    on video.

2       Q    When you say you captured it on video, you captured

3    her telling you on video, you didn't capture the actual--

4    her allegations on video which she was alleging; correct?

5       A    I captured her sexually humping the stuffed animal in

6    what appeared to be a sexual manner and I recorded me

7    speaking to her and our conversation, during which she

8    stated this is what he does to me, and then proceeded --

9       Q    Okay.

10      A    -- to demonstrate.

11              ATTY. CRETELLA:   Okay.  And then just for the

12         record, I think the person you're referring to is 16

13         years old so maybe we can-- his first name was

14         mentioned, maybe we could strike that.

15   **BY ATTY. CRETELLA:**

16      Q    All right, so in February.  Were there any

17   allegations after that?

18      A    Yes.

19      Q    What-- When-- When were they?

20      A    The next allegation after that happened on-- I'm

21   sorry, February 3rd.

22      Q    Okay.  And what were those allegations?

23      A    It was the same type of scenario where the child was

24   making sexual motions on top of a stuffed animal, and I

25   asked her what she was doing, and she had said-- she just

26   told me that she's doing what the minor brother does to her.

27      Q    You could refer to him by initials, it's easier.

1    A    D.L.

2    Q    All right.  So-- And were there any other allegations

3    between February and today?

4    A    Yes, there was several.  There was another-- The next

5    one was on February 10th.

6    Q    Okay.

7    A    The child came --

8    Q    What-- What-- Continue.  I'm sorry.

9    A    Yes.  On February 10th same scenario, I walked into

10   my living room, I find the child humping her toy, I said to

11   her what are you doing, the child state doing what D.L. does

12   to me while having her legs wide open in the air.  I said

13   show me, she stuff-- puts the stuffed animal under her

14   vagina, she starts humping and grinding it in a sexual

15   manner saying that's what D.L. does to me.  And I also

16   recorded all if these interactions --

17   Q    All right.

18   A    -- and the police --

19   Q    That's all right.  Just-- All right.  So when-- when

20   you have these conversations, do you inquire further of-- of

21   your daughter --

22   A    Yes.  As much --

23   Q    -- about specifics?

24   A    Yes.  As much as I can.

25   Q    All right.  Did she ever say, and I'm not saying

26   things happened, but just for example did he ever say that--

27   she ever said that D.L. removed any of her clothing, touched

1   her underneath her clothing, said anything while any things-

2   - any of these things were going on?

3       A    Yes.  Multiple times.

4       Q    Specifically.  Tell-- Tell me specifically.  I gave a

5   lot of examples, give me specifically what-- what went on.

6       A    Yes.

7                    **(Pause in the proceedings.)**

8       A    Sorry.  I just wanted to note that on-- you know, on

9   February 22nd she again was doing the behavior, and again

10  said the same thing, that she was doing what D.L. does to

11  her while humping the toy.

12      And then-- And then moving forward there was --

13                   **(Pause in the proceedings.)**

14              THE COURT:  Attorney Cretella, what's the

15          question that's pending here?

16              ATTY. CRETELLA:  Specifics about --

17              MS. ANTAR:  Yes.

18              ATTY. CRETELLA:  -- what went on.

19              THE COURT:  What-- What I'd like to know is what

20          happened with the DCF investigations, what happened

21          with the police investigations.

22              ATTY. CRETELLA:  Okay.  Let me inquire about

23          that.

24  **BY ATTY. CRETELLA:**

25      Q    So initially when you made the complaint in Decem--

26  in October, you had indicated DCF and the police department

27  opened investigations; correct?

1    A    Correct.

2    Q    And which police department was that in October?

3    A    The New Britain Police Department.

4    Q    All right.  And what was the result, if you know, of

5  the DCF investigation --

6    A    The DCF invest --

7    Q    -- at that time?

8    A    It was closed.

9    Q    Okay.  What about the police investigation in

10  October?

11           MR. LODICE:  Objection.  She's saying it's

12        closed, that doesn't state what was the result of the

13        investigation.  She just said it was closed, she

14        didn't say whether it was substantiated or

15        unsubstantiated.

16           ATTY. CRETELLA:  That wasn't my question.

17           MR. LODICE:  You said what was the results of

18        the DCF investigation.  That not the results, the

19        results were as unsubstantiated.

20           THE COURT:  If she knows --

21           MR. LODICE:  Okay.

22           THE COURT:  -- the outcome would be helpful.

23  **BY ATTY. CRETELLA:**

24    Q    Do you know?

25    A    So that investigation in October they determined that

26  there was no abuse or neglect at the time and the police

27  investigation was closed, but I was told that if any future

1    disclosures come up to immediately report it again.

2        Q    Okay.

3        A    And I do have more examples --

4        Q    Hang-- Hang on.

5        A    -- for you.

6        Q    Wait.  Wait.  Wait.  There's no-- That answered

7    question, okay.

8        A    Okay.

9        Q    So then you said after that there was no allegations-

10   - or no reports to you of anything the rest of 2022;

11   correct, from your daughter?

12       A    Yes.

13       Q    So then 2023, February, you get some-- your daughter

14   discloses more information; correct?

15       A    Yes.

16       Q    And then you contact DCF; correct?

17       A    Yes.

18       Q    And what-- And you contacted was it, again, the New

19   Britain Police Department?

20       A    DCF did.

21       Q    Okay.  So they're mandatory reporters as far as you

22   know?

23       A    Yes.

24       Q    All right.  So is there a current investigation going

25   on with DCF?

26       A    Yes.  There's two current investigations.

27       Q    With DCF?

1    A    Correct.

2    Q    And what about the New Britain Police Department?

3    A    There's two open criminal investigations.

4    Q    Okay.  And you have given-- You have cooperated with

5    DCF; correct?

6    A    Yes.  And the police.

7    Q    And the police.  And you-- you've actually gone down

8    tot eh New Britain Police Department to give statements;

9    correct?

10    A    Correct.

11        ATTY. CRETELLA:  So that's-- that's where we

12        stand with those, your Honor.

13        MS. ANTAR:  And I can also --

14        ATTY. CRETELLA:  No.

15        MS. ANTAR:  I'm sorry.

16        THE COURT:  Okay.  Attorney Cretella, is it true

17        that you want to ask about the-- the child's contact

18        with father in-- since these allegations.  I would

19        like to know what's going on.

20        ATTY. CRETELLA:  Okay.  So --

21        THE COURT:  You want me to ask?  I'll ask, --

22        ATTY. CRETELLA:  Yeah.  Ab --

23        THE COURT:  -- that's fine.

24        ATTY. CRETELLA:  Absolutely.  Feel free.

25        THE COURT:  All right.  So, ma'am, who is the

26        DCF worker you're working with on these cases?

27        MS. ANTAR:  To my knowledge it's Larae Plummer.

1            THE COURT:  And-- And who's the police officer?

2            MS. ANTAR:  The main detective is Detective Lisa

3       Steeves from the New Britain Police Department.

4            THE COURT:  And is it-- When is the last time

5       that your daughter saw her father?

6            MS. ANTAR:  The last time that she saw him was

7       on March 12th.

8            THE COURT:  He started this hearing by alleging

9       that you're not letting him see the child, is that

10      true?

11           MS. ANTAR:  That's correct.

12           THE COURT: All right.  You're aware that there's

13      court orders on your application that say that he

14      continues to see the child on a regular schedule?

15           MS. ANTAR:  Yes.

16           THE COURT:  Okay.  So you're not following those

17      court orders?

18           MS. ANTAR:  I can explain if you-- if you like.

19           ATTY. CRETELLA:  Just --

20           MS. ANTAR:  Okay.

21           THE COURT:  Have you talked to any-- Have you

22      talked to Family Relations about these new

23      allegations?

24           MS. ANTAR:  No.

25           THE COURT:  Okay.  I-- I'm going to have the

26      Family Relations Officer who is doing the custody

27      evaluation review the file and call these-- call the

```
1    police officers, call the DCF workers, because

2    obviously that's information that everyone would want

3    her to have to for next week.

4         Okay.  All right.  Any other witnesses, Attorney

5    Cretella.

6         ATTY. CRETELLA:  I think so, yes.  Anthony

7    Zuppardi.

8         THE COURT:  And who's that?

9         ATTY. CRETELLA:  He's a friend of Ms. Antar.

10   And I-- I would-- After he is sworn in I'll ask him

11   to give an offer of proof, basically, on what he

12   would testify to.

13        THE COURT:  That'd be helpful.

14        ATTY. CRETELLA:  All right.

15        THE COURT:  Okay.  If Mr. Zuppardi is here, he

16   can dial in or turn his camera on.

17        MR. ZUPPARDI:  Okay.

18        THE COURT:  All right.

19        MR. ZUPPARDI:  Can you hear me?

20        THE COURT:  Yep, we can hear you.  Would you

21   swear him in, please.

22        COURT CLERK:  Sir, please raise your right hand.

23             (The witness complied.)

24        COURT CLERK:  Do you solemnly swear, or solemnly

25   and sincerely affirm as the case may be, that the

26   evidence you shall give concerning this case shall be

27   the truth, the whole truth, and nothing but the
```

1       truth, so help you God or upon penalty of perjury?

2       If so, please say I do.

3            MR. ZUPPARDI:  I do.

4            COURT CLERK:  Please state your  name and

5       address for the record.

6            MR. ZUPPARDI:  Anthony Zuppardi, North Ridgeland

7       Road, Wallingford, Connecticut, 06492.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1          **A N T H O N Y   Z U P P A R D I**, of

2    North Ridgeland Road, Wallingford, Connecticut, having been

3    duly sworn by the clerk, was examined on his oath and

4    testified as follows:

5               ATTY. CRETELLA:  May I inquire?

6               THE COURT:  Yes.

7    <u>**DIRECT EXAMINATION BY ATTY. CRETELLA:**</u>

8       Q    So, Mr. Zuppardi, you-- you've been-- you've listened

9    to what was going so far her today; correct?

10      A    Yes.

11      Q    All right.  Do you have any direct knowledge of the

12   allegations made by Ms. Antar?

13      A    Well, I mean, I brought it up to her a while ago.

14   I'm a trained firefighter, EMT, EMR, I mean I've went

15   through child sex trafficking and-- and-- and many courses

16   on this, and I was watching the child over the summer, and I

17   said she exhibited may signs of-- of abuse.  And I said

18   that, you know, I'm a mandatory reporter, she needed to tell

19   her therapist or somebody about it, because I said I-- I

20   don't have any confirmation, I don't prod the child, it's

21   not what we do, we don't try to elicit information out of

22   them.

23      Q    Um-Hm.

24      A    I just asked her what are you doing, you know, and

25   she had told me that's what her brother did to her, and I

26   was like it --

27      Q    Okay.

1    A   -- it looked inappropriate, and I just let the child

2    talk.  And I reported it to Ms. Antar and I said, you know,

3    I said this is not healthy.  You know, I said --

4    Q   Yep.

5    A   -- I said --

6           MR. LODICE:  Objection, your Honor.  He-- The

7           witness is not an expert in child sex issues in any

8           way, shape, or form.

9           THE COURT:  That is --

10          MR. LODICE:  -- I don't understand how this

11          testimony is relevant.

12          THE COURT:  That objection is sustained.

13          Attorney Cretella, you can finish asking your

14          question.

15          ATTY. CRETELLA:  Yep.

16   **BY ATTY. CRETELLA:**

17   Q   So what-- what behavior by the child did you observe

18   that you thought you should report to Ms. Antar?

19   A   I witnessed --

20   Q   What caused you concern          ?

21   A   I witnessed the child with a teddy bear spreading its

22   legs and-- and humping the teddy bear in a sexual manner,

23   and I-- I said stop, stop, what are you doing.  She goes

24   it's okay, it's okay.  You know,-- She said a name, I don't

25   remember which name, it was like her brother, and I was like

26   who is that, and it's like my brother.  And I-- I didn't

27   really know, I didn't know her other part of the family, I

```
 1   didn't know the history, --
 2      Q   Okay.
 3      A   -- I --
 4      Q   All right.  Let me-- Let me back up a little bit.
 5   How do you know Ms. Antar?
 6      A   We've been friends since June --
 7      Q   Okay.
 8      A   -- of last year.
 9      Q   All right.  So you-- How many times have you observed
10   the child making-- doing things that you thought were
11   inappropriate?
12      A   A-- A few times.  Once at my house, once at her
13   house.
14      Q   Okay.
15      A   And then I've been around the child a lot, our-- our
16   children play together, I have a daughter-- I have a young
17   daughter, eight-year-old, and they all play.
18      Q   All right.  And you thought enough of these incidents
19   that you should bring it up to Ms. Antar; correct?
20      A   Just that I've been-- I mean, I've seen normal--
21   Yeah, I mean, I have a daughter --
22      Q   Let me-- Let me just-- Let me just --
23      A   Yeah.
24      Q   So you thought to bring it up to her; correct?
25      A   Yes.  It was alarming.
26      Q   As a-- As a father, not as a --
27      A   As a father.
```

```
1    Q    -- EMT or not as an expert in any way, --

2    A    Yep.

3    Q    -- just as a-- as a dad?

4    A     Yes.

5              ATTY. CRETELLA:  All right.  I have no more

6         questions.

7              THE COURT:  All right.  So when is the last time

8         saw the parties' child?

9              MR. ZUPPARDI:  I Facetime with then all the

10        time.  I'm around them-- Probably a couple weeks ago.

11        I've been travelling the first few weeks for work, so

12        I haven't been around that much.

13             THE COURT:  Okay.  Listen to my question, --

14             MR. ZUPPARDI:  Yeah.

15             THE COURT:  -- when is the last time you saw the

16        child in person?

17             MR. ZUPPARDI:  Three, four weeks maybe.

18             THE COURT:  All right.  And what's the nature of

19        your relationship with Ms. Antar?

20             MR. ZUPPARDI:  We're-- We're close personal

21        friends.

22             THE COURT:  Okay.  Well, are you in a romantic

23        relationship or not?

24             MR. ZUPPARDI:  We have been, yes.

25             THE COURT:  Are you now?

26             MR. ZUPPARDI:  No.

27             THE COURT:  All right.  When did that end?
```

```
1              MR. ZUPPARDI:  Around December.

2              THE COURT:  Okay.  All right.  I don't think we

3      have any more questions for this witness.

4              Sir, do you have any more questions for this

5      witness?

6              MR. LODICE:  No.  No.

7              THE COURT:  All right.  Can we let this person

8      go, Attorney Cretella?

9              ATTY. CRETELLA:  Of course.

10             THE COURT:  All right, sir, you're excused.

11             MR. ZUPPARDI:  Thank you.

12             THE COURT:  Thank you.  Okay.  Mr. Lodice, do

13     you have any questions you want me to ask, or you

14     want to ask Ms. An-- Antar about what she testified

15     to?

16             MR. LODICE:  Yes, I-- I would.

17             THE COURT:  All right.  Could you-- Before you

18     do that, could you just tell me do you know-- who

19     are-- who are these young men that we're talking

20     about?

21             MR. LODICE:  Those are --

22             THE COURT:  D.L. and S.L., who are they to you?

23             MR. LODICE:  Those are my sons.

24             THE COURT:  Your sons.  Okay.

25             MR. LODICE:  Yes.  So they're not here

26     stepbrothers, they're ger brothers.

27             THE COURT:  Okay.
```

1          MR. LODICE:  She likes to put stepbrothers on

2     there --

3          ATTY. CRETELLA:  And, your honor, --

4          MR. LODICE:  -- to negate the relationship.

5          ATTY. CRETELLA:  -- for-- for-- for context,

6     there is-- I-- I--- I-- and I'm sure this isn't a

7     problem because it's a court proceeding, but there--

8     just to let you know there is a full no contact

9     between parties.

10         THE COURT:  Oh,  Yeah, how did that come up?

11    Anybody know?  Who got arrested?

12         MR. LODICE:  I-- I-- I was, your Honor.

13         THE COURT:  What were you arrested for?

14         MR. LODICE:  Well, last time-- Remember when I

15    was in court a couple of months ago for-- she had

16    filed for-- for her fourth protective order on me,

17    which was thrown out, when Judge --

18         ATTY. CRETELLA:  Your Honor, --

19         MR. LODICE:  -- Judge Martin said --

20         ATTY. CRETELLA:  -- he should maybe be advised,

21    too, if he's going to speak about his criminal case.

22         THE COURT:  I know.  I --

23         MR. LODICE:  I-- I understand.  I understand

24    that I-- I can --

25         THE COURT:  Just-- Just tell me-- tell me what

26    you got arrested for.  Just tell me what-- what --

27         MR. LODICE:  Harassment.  Harassment second

1    degree.

2         THE COURT:  And-- And who arrested you, what

3    department?

4         MR. LODICE:  The Orange Police Department.

5         THE COURT:  Okay.  And there's a full no contact

6    protective order?

7         MR. LODICE:  Three's a full no contact order

8    with stipulations in there saying that we can contact

9    via the app, and I'm allowed to make phone calls to

10   her to-- to talk to my daughter and to set up

11   visitation in cases there's any-- like, you know, to

12   initiate contact for visitation purposes.

13        THE COURT:  Okay.  All right.  You answered  my

14   questions.

15        And I-- Sorry I did this out of order.  Why

16   don't you ask Ms. Antar any questions that you have.

17        MR. LODICE:  Okay.

18   **CROSS-EXAMINATION OF MS. ANTAR BY MR. LODICE:**

19   Q   Ms. Antar, you allege that Angelina was-- You allege

20   that there was multiple instances in February where Angelina

21   was being abused.  Was it-- When you say that did you mean

22   there was multiple instances of her showing you these

23   things, talking about the same alleged abuse that happened,

24   or multiple times, that she's being abused multiple times?

25   A   I'm sorry, could you please repeat the question?

26   Q   So when you were saying that Angelina kept showing

27   you throughout February multiple times that she was being

1  abused, are you-- are you saying that she was being abused

2  multiple times throughout February, or are you-- is she

3  referring to one that-- the alleged time that she was being

4  abused?

5  A   The child made multiple disclosure to me since

6  February about being abused.

7  Q   So the mul-- It was multiple disclosures, okay.

8  Thank you.

9      One second here.  October 20-- In October of 2022

10  when claimed that-- that D.L. was doing these things, did

11  you claim that S.L. was also doing these things, or just

12  D.L.?

13  A   I stated that the child said S.L. did-- tickled her

14  in her private area because that's what she said at the time

15  in October.

16  Q   S.L. or D.L.?

17  A   She said both.

18  Q   She said both?

19  A   Yes.

20  Q   Now was the investigation involving the-- involving

21  both children or just one child or-- as far as the-- the

22  acc-- the alleged-- I don't know how-- what term I would use

23  to-- D.L. and S.L., did they investigate both of them or did

24  they just investigate one of them?

25  A   I'm not sure.

26  Q   Okay.  And what was the result of that investigation?

27  A   What was the result of what investigation?

1    Q    The October investigation on-- to D.L. and S.L.,

2    both.

3    A    The child attended a forensic interview during which

4    she was not able to speak because she was not able to get

5    past the first question, and then investigation was then

6    closed at that time.

7    Q    Were-- Did you see the investigation?  So when they

8    do the forensics are you present for the forensic interview?

9    A    No.

10   Q    So it's the police officer and the DCF worker that's

11   present during the interview; correct?

12   A    It's a social worker.

13   Q    Okay.  And then once they did this interview they

14   found it to be unsubstantiated saying that it did not

15   happen?

16   A    That's incorrect.

17          ATTY. CRETELLA:  I'm going to object.  That's a

18          compound question, two different-- two different

19          questions.

20          MR. LODICE:  Okay.  Let me reword it then.

21   **BY MR. LODICE:**

22   Q    So what was the-- the- DCF and the police

23   department's final determination of their investigation?

24   A    There's currently two active criminal investigations

25   --

26   Q    I'm asking about the one from October.

27   A    As I stated pr-- prior, the one from October was

1  closed in October and then reopened in February 1st, and now

2  there's two open ones.

3    Q   Okay.  Now the one February 1st did they do-- for the

4  first one, did they do a forensic investigation on Angelina?

5    A   For what?

6    Q   For the-- the allegation on February 1st did they do

7  a forensic investigation on Angelina for that allegation?

8    A   There was a forensic interview that took place.

9  There was --

10   Q   Okay.  And what were the results of that forensic

11  interview?

12   A   The child made disclosures about what happened to

13  her, and it's currently still being investigated.

14   Q   What-- What was the results that DCF, Ms. Larae

15  Plummer said that the results were?

16          ATTY. CRETELLA:  Objection, --

17   A   According --

18          ATTY. CRETELLA:  -- hearsay.  Objection.

19          THE COURT:  I let-- I let her talk about this,

20       I'm certainly going to let her talk about it again

21       under his questioning.

22          You can answer it.  What did she say?

23   A   The DCF worker did not say anything.

24   Q   So the DCF worker did not say it was being

25  unsubstantiated?

26   A   She did not.

27   Q   And then was-- So was there any arrests made after

1   the-- the invest-- the initial investigation?

2      A   They're-- The invest-- Both criminal investigations

3   are currently still pending looking into both you and D.L.,

4   and so an arrest may be made; however, --

5      Q   After --

6      A   -- it's still under investigation.

7      Q   After the first forensic invest-- the actual forensic

8   investigation, was there any arrest made?

9      A   The criminal investigations are still pending, and no

10  arrests have been made --

11     Q   I'm not asking about the entirety of the criminal

12  investigation, I'm asking about the forensic investigation

13  that was take-- taken place?

14     A   I'm not sure what-- I understand what your question

15  is.

16     Q   So in the forensic investigation they have the social

17  worker come in with the DC-- and they have DCF and the

18  detective standing outside the room watching as the social

19  worker works with Angelina to find out if there was anything

20  that can be substantiated.  Upon that investigation, was

21  there any arrest made?

22     A   There's no forensic investigation, it's a forensic

23  interview.  And the child attended that interview, the

24  invest-- both investigations are now open and they're still

25  pending.

26     Q   Okay.  And then have then done the third forensic

27  investigation yet-- or forensic interview?  Excuse me.

1    A    It's pending.

2    Q    What day is that set for?

3    A    It's current-- It's currently-- It doesn't have any
4  date, but it's pending.

5    Q    It's pending.  So they're investigating, but they
6  haven't set a date up to do the interview yet?

7    A    I feel like you're asking a lot of questions about an
8  active criminal investigation that I don't feel comfortable
9  telling all the details 'cause it's actively being
10 investigated.

11            THE COURT:  Ms. Antar, you don't get to object
12        to his questions, your lawyer does.  And there's
13        nothing about that question that's inappropriate, so
14        answer the question.

15   A    May you please repeat the question.

16   Q    They-- They have yet to-- They have not scheduled a
17 forensic in-- interview with Angelina yet?

18   A    There was one scheduled and it is currently on hold
19 pending things that need to get done within the next week.

20   Q    I don't understand what that means.  Can you
21 elaborate on that, please?

22   A    Yes.  The-- Angelina will be having another forensic
23 interview.  It was scheduled for last week on Wednesday, it
24 was then subsequently placed on hold pending police
25 activity, and now it will be rescheduled, and once it's
26 rescheduled we will receive a new date.

27   Q    Do you know why it was placed on hold?

```
1     A   I do not.

2           MR. LODICE:  Your Honor,-- Let me see if there's

3           anything else before I continue.
```

**BY MR. LODICE:**

```
5     Q   So when you-- Now you-- you stated that I saw

6   Angelina the weekend of Friday, March 10th, the 11th, and

7   then the 12th when she was dropped back off to you, we won't

8   go into the specific details, but you stated I did see here

9   that weekend and she was with me and my sons; correct?

10    A   Yes, because you took her and violated the protective

11  order and stole her from her school.

12          MR. LODICE:  I-- I guess objection because none

13          of that's factual.  I didn't violate a protective

14          order, I picked up my daughter on my day.  I don't

15          understand how that's violating a protective order.

16          THE COURT:  Yeah, we'll be addressing that

17          later.

18          MR. LODICE:  Okay.
```

**BY MR. LODICE:**

```
20    Q   Now when-- when-- when I picked up my daughter what--

21  what, if anything, did you do when you found that out?

22    A   I called 911 because I immediately felt she was in

23  danger.

24    Q   Okay.  What made you feel that she was in danger?

25    A   The fact that you had said to Detective Lisa Steeves

26  on February 11th, 2023 that you agreed that it was in the

27  child's best interest --
```

```
 1              MR. LODICE:  Objection, hearsay.
 2      A    -- (Indiscernible) upon further notice.
 3              MR. LODICE:  She's saying --
 4              ATTY. CRETELLA:  It's not hearsay, your Honor.
 5              MS. ANTAR:  It's not hearsay.
 6              ATTY. CRETELLA:  Technically, it's a part
 7          opponent.
 8              THE COURT:  Well, it's not responsive, so.
 9              ATTY. CRETELLA:  All right.  That's a different
10          objection.
11              Maybe-- I-- If we-- You know, I think we're
12          starting to deteriorate a little bit in terms of --
13              MR. LODICE:  No.  No.  I-- I-- I have a basis --
14              THE COURT:  Don't interrupt.
15              MR. LODICE:  Sorry.
16              ATTY. CRETELLA:  And so maybe-- And I'm not
17          saying it-- it's your fault, Mr. Lodice, and I'm not
18          saying it's your fault, Ms. Antar, but maybe--
19          because I know you have a lot you want to get off
20          your-- that you want to say, but just answer his
21          questions and then I'll have a chance to-- myself or
22          the Judge may have a chance to ask you a couple of
23          more questions afterwards.  So just answer his
24          questions instead of trying to elaborate and getting
25          out information that you think it's time to get out,
26          all right.
27              MS. ANTAR:  Okay.
```

1    **BY MR. LODICE:**

2      Q   Okay.  That weekend where I picked up my daughter

3    from daycare, how many times did you call the police on me

4    that weekend?

5      A   What do you mean call the police on you?

6      Q   How many times did you call the police departments?

7      A   I called 911 --

8      Q   Yep.

9      A   -- on Friday, --

10     Q   Um-Hm.

11     A   -- and then I called for a wellness check from the

12   New Britain Police Department on Saturday morning, and I --

13             ATTY. CRETELLA:  Ms. Antar, maybe-- maybe just a

14         number --

15             MS. ANTAR:  Yes.

16             ATTY. CRETELLA:  -- would be good.

17     A   Three.  Three.

18             ATTY. CRETELLA:  There you go.

19   **BY MR. LODICE:**

20     Q   I was-- I was contacted by four different police

21   departments in the course of two days.

22             ATTY. CRETELLA:  Objection.  That's-- he's

23         testifying now.

24             THE COURT:  So, sir, you can ask questions now

25         but --

26             MR. LODICE:  Okay.

27             THE COURT:  -- you can't tell me things now, --

```
1              THE COURT:  -- okay.
2              MR. LODICE:  Okay.  I'll-- I'll have a chance to
3         tell you after; correct?  Okay.
4    BY MR. LODICE:
5      Q   Okay.  You claim that Dominic-- that D.L.-- Excuse
6    me.  You claim that D.L. did things-- that Angelina made
7    claims that D.L. did things without clothes on; correct?
8      A   Yes.
9      Q   Okay.  When did-- Did she allege-- allege this the
10   first time or every time or just this last time?
11             Let me reword that.  When did she allege that, that
12   things done without clothes on?
13     A   She alleged that and stated to me multiple times
14   since February-- I'm-- I'm sorry, since March, I believe,
15   4th was the first time.
16     Q   Okay.  Now in the last police report that was made
17   against D.L. you stated that Dominic was left alone with
18   Angelina all day Saturday?
19     A   That's correct.
20     Q   How do you know this?
21     A   Because a witness witnessed that you left and you
22   left her alone with Dominic.
23     Q   Who-- Who's the witness?
24     A   I don't feel comfortable telling you her name.
25             ATTY. CRETELLA:  You have to answer the
26        question, Theodora.
27     A   Okay.  Mary Elise Cofrancesco.
```

1    Q   Who is this witness and how would she know my

2  schedule?

3    A   She's a friend who happens to live minutes away from

4  you who drove by on her way to work and noticed that you

5  were not there.

6    Q   Okay.  And how did she notice I was not there; she

7  can see inside my home?

8    A   She saw that your truck, which is your only vehicle,

9  was not there.

10   Q   Okay.  And where is my truck typically parked?

11   A   Your truck is typically backed in in your driveway.

12   Q   Okay.  And you can always see every part of the back

13 driveway from where this person allegedly was?

14   A   Yes.

15   Q   Okay.  And that upon that you figured-- you-- you

16 came to the conclusion that Angelina was left alone with

17 Dominic that day?

18   A   I called the police and they--  I --

19          ATTY. CRETELLA:  Just answer the question,

20       Theodora.  Just answer the question.

21   A   Yes.  Yes.

22   Q   Okay.  And what times was-- was I gone from and what

23 time did I arrive back home?

24   A   I know for sure you-- you were gone as of 6:40 a.m.

25 and that you were back as of 5:20 p.m.

26   Q   Okay.  And you know-- And how do you know this?

27   A   Because Mary Elise was an eyewitness that testified

1  this.

2    Q   That testified to me leaving and coming back?

3    A   That you were not there at 6:40 and that you were

4  there at 5:20.

5    Q   But she did not see when I came back, all she saw

6  that-- was I left at 6:40.  Did she stay there to see if I

7  was there throughout the day?

8    A   Yes.  And she did not see you back until 5:20.

9    Q   Did she see me come back home or did she just happen

10 to see that my car was back there?

11   A   I'm not sure.

12   Q   You made a statement-- You made a statement that I--

13 I-- I said I would agree to not let Dominic be around-- or

14 excuse me, D.L. be around  Angelina.  Who-- How do you-- Who

15 told you that I made the statement?

16   A   Detective Lisa Steeves from the New Britain Police

17 Department.

18   Q   She said that I agree that I wouldn't let Dominic be

19 around Angelina alone at all?

20   A   She stated that you agreed that it was in Angelina's

21 best interest to remain with me and not to have any

22 unsupervised visitation with you until further notice

23 throughout the duration of the criminal investigation.

24   Q   Wait.  Wait.  Can you re-- Can you say that again?  I

25 didn't understand.

26   A   Yes.  Detective Lisa Steeves called you on February

27 11th, 2023 to warn you to stop harassing me and making

1  disparaging statements during the calls.  She also made it

2  clear to you to stop telling Angelina that you would see her

3  on Friday during the calls, and that she made it clear to

4  you that I already told you as early as February 3rd, 2023

5  that I would not be sending her to your mother's on Friday

6  until further notice, and I wasn't going to be getting any--

7  filing emergency orders, I would just be keeping her with me

8  until further notice due to the ongoing pending DCF and

9  criminal investigations.  I said if you have any questions,

10  please follow up with DCF or new Britain PD.  Which then she

11  followed up with you after you called her, you left her a

12  voicemail that day.  She called you back February 11th, that

13  was a Saturday, she spoke to you.

14        She called me back immediately when she was done

15  speaking to you and she stated Is poke to Matthew, Matthew

16  knows that there's a current investigation, Matthew knows

17  that him and his son are-- are considered suspects and going

18  to be interrogated and he agreed-- and she said you said you

19  know, Dominic's going to be a little nervous, but you agree

20  that you'll let him talk to her.  And she said you said I

21  agree that it's in the best interest of Angelina to stay

22  with mom until further notice for her own safety --

23  Q    I'm-- She --

24  A    -- and --

25        ATTY. CRETELLA:  Can I just-- Can I just

26        interrupt for one second.  You're going to lose my

27        video for about a minute, but I'm here and I'm

1    listening to everything, and I'll object if I need

2    to, --

3            THE COURT:  Okay.

4            ATTY. CRETELLA:  -- just losing the video.

5            MR. LODICE:  Okay.

6    **BY MR. LODICE:**

7    Q    Your-- So you're claiming-- So your claim is that DCF

8    said--  Or-- Excuse-- I'm sorry.  That Officer Steeves said

9    that it's-- that I should not be around Angelina unt--

10   pending the investigation?

11   A    No.  I claim that when you had a conversation with

12   Detective Lisa Steeves on February 11th when she called you

13   regarding your ongoing harassment during the phone calls

14   that you had with the child, she warned you that you are on

15   thin ice and you may be arrested for violating a protective

16   order if you continue to keep harassing me and continue to

17   keep saying to me and the child see you Friday, see you

18   Friday, when you're fully aware that the child will not be

19   going to grandma's on Friday.  I told you I'm keeping her

20   with me until further notice on February 3rd.

21           THE COURT:  Okay.  Okay.  Okay.  Stop.  Ms.

22           Antar, there's court orders in place and I don't

23           think it's a great idea for you to keep repeating

24           vehemently about how you decided to violate those.

25           So I'm going to-- We're going to get back to that,

26           but let's-- let's switch out questions here, okay.

27           MR. LODICE:  Move on.  Yep.  No-- No more

1      questions, your Honor.

2           THE COURT:  All right.  Attorney Cretella, do

3      you have any questions for your client?

4           ATTY. CRETELLA:  I do not.

5           THE COURT:  I-- I would just like to understand,

6      again the name of the DCF worker is Ms. Plummer; --

7           MR. LODICE:  Yes.

8           THE COURT:  -- is that right?

9           MR. LODICE:  That would be Larae, L-A-R-A-E,

10     Plummer is spelled P-L-U-M-M-E-R.

11          THE COURT:  And what department?

12          MR. LODICE:  I believe the Milford department.

13          THE COURT:  Which department, Ms. Antar?  Is

14     that right?

15          MS. ANTAR:  That's correct.

16          THE COURT:  How did this-- How did it wind up

17     with Milford?  You don't live in Milford and neither

18     does he.

19          MS. ANTAR:  I live in Orange.

20          THE COURT:  Okay.

21          ATTY. CRETELLA:  And I think it went to Derby

22     Court --

23          THE COURT:  All right.

24          ATTY. CRETELLA:  -- and Derby goes to Milford

25     Judicial District.

26          THE COURT:  And then the police-- Is it the

27     Milford Police Department also?

1       MR. LODICE:  No.

2       MS. ANTAR:  New-- New Britain.

3       THE COURT:  And that's the same department that

4   investigated the last claim, right?

5       MS. ANTAR:  Right.  The last claim we reopened

6   in February.

7       THE COURT:  What-- And who's the-- Did you tell

8   me who the police officer was that's --

9       ATTY. CRETELLA:  Detective Steeves, right.

10      MS. ANTAR:  Yep.  And also her sergeant, I can

11  give you his name, Jared --

12      THE COURT:  Steeves.  All right.

13      MS. ANTAR:  -- Jared, and the last name is

14  Barsaleau, B-A-R-S-A-L-E-A-U, I think.

15      THE COURT:  And have you talked to the-- Ms.

16  Baranowski in Family Relations, the person who's

17  doing the custody evaluation?  Annamaria.

18      MS. ANTAR:  We actually met with her on January

19  30th, and then all of these new things happened on

20  February 1st, a few days later.  So when we saw her

21  there were no open cases, no-- nothing going on, and

22  then two days, three days later Angelina made this --

23      THE COURT:  But you haven't talked to her about

24  any of these things?

25      MS. ANTAR:  Not since.  I've only spoken to my

26  attorney and --

27      THE COURT:  Okay.  Okay.  All right.  Then,

1      Attorney Cretella, anything else from your client?

2          ATTY. CRETELLA:  No, your Honor.

3          THE COURT:  All right.  So, Mr.-- Mr. Lodice,

4      let me ask you a couple questions.

5          MR. LODICE:  All right.

6          THE COURT:  Is it possible for you to have your

7      daughter with you and not have your-- your sons alone

8      with her?

9          MR. LODICE:  I mean, yes.  But, like, if I have

10     to go somewhere, like a grocery store or something, I

11     mean typically I'll just leave Dominic home with

12     Angelina and then, you know, usually when she's

13     napping I'll go, if anything.

14         THE COURT:  All right.  Well, do those boys live

15     with you full-time?

16         MR. LODICE:  No.  My ex and I-- My-- Their

17     mother and I split the time.

18         THE COURT:  So is-- Are they always with you

19     when Angelina is with you?

20         MR. LODICE:  Yes.

21         THE COURT:  Is that how the weekends work?

22         MR. LODICE:  Yep.

23         ATTY. CRETELLA:  Can we switch the weekend?

24         THE COURT:  Yeah.  Is it possible for you to

25     have Angelina with you when the boys aren't there

26     until this is done?

27         MR. LODICE:  Not really.  It's kind of the only

1      schedule that works out with my ex and myself is I

2      have Friday, Saturday, and Sunday, until Monday

3      morning, with all the children.

4           THE COURT:  Is it possible that you can-- Is--

5      Is it possible that either one the parties could

6      follow my court orders-- or Judge Griffin's court

7      orders that say that when the children are with you

8      they're not alone, and, Ms. Antar, that the-- the --

9           MR. LODICE:  I --

10          THE COURT:  -- Angelina goes to her dad's on the

11     regular schedule; is it possible that that can

12     happen?

13          MR. LODICE:  Yes, I can make sure that the

14     children are not alone with Angelina.  Absolutely.

15          THE COURT:  Well, I mean, I think you would have

16     to, sir.  Do you understand that?

17          MR. LODICE:  I-- I do.  I do.

18          THE COURT:  All right.  Have you had

19     conversations with this police-- Sorry, let me-- I'm

20     going to swear you in, Mr. Lodice, because --

21          MR. LODICE:  Okay.  Please do.

22          THE COURT:  -- I want to tell you something.

23          MR. LODICE:  Okay.

24          THE COURT:  You do not-- Ms. Lodice(sic) has

25     made criminal allegations against you, both in

26     relation to the protective orders and in relation to

27     Angelina.  There's criminal cases pending --

1       MR. LODICE:  Yep.

2       THE COURT:  -- so, number one, nobody can force

3   you to testify about things like that.  But, number

4   two, it's also a very bad idea to testify about

5   things like that.

6       So one is in relation to your Fifth Amendment

7   Privilege, you have the right not to-- to remain

8   silent in the face of questions regarding pending

9   criminal cases.  Do you understand that?

10      MR. LODICE:  Of course.

11      THE COURT:  And it's also-- I'm going to go a

12  step further to say it's just a bad idea for you to

13  talk about those things when you're under oath.  Do

14  you understand that?

15      MR. LODICE:  I understand, your Honor.

16      THE COURT:  Okay.  So I have some questions for

17  you, Attorney Cretella has some questions for you,

18  but they're not going to be about the accusations

19  that Ms. Antar made against you and they're not going

20  to be about the accusations she made about Angelina

21  and D.L.  You understand that?

22      MR. LODICE:  Okay.

23      THE COURT:  And if we're getting into hose areas

24  I don't want you to-- I don't really want you to

25  answer those questions without giving it some serious

26  thought.

27      MR. LODICE:  Okay.

1          THE COURT:  All right.  Would you swear the

2    gentleman in.

3          COURT CLERK:  Please raise your right hand.

4             **(The witness complied.)**

5          COURT CLERK:  Do you solemnly swear, or solemnly

6    and sincerely affirm as the case may be, that the

7    evidence you shall give concerning this case shall be

8    the truth, the whole truth, and nothing but the

9    truth, so help you God or upon penalty of perjury?

10   If so, please say I do.

11         MR. LODICE:  I do.

12         COURT CLERK:  Please state your  name and

13   address for the record.

14         MR. LODICE:  Matthew Lodice, 23 Lyme Street,

15   apartment number two, New Britain, Connecticut,

16   06053.

17

18

19

20

21

22

23

24

25

26

27

1          **M A T T H E W   L O D I C E**, of

2     23 Lyme Street, Apartment #2, New Britain, Connecticut,

3     06053, having been duly sworn by the Clerk, was examined on

4     his oath and testified as follows:

5              THE COURT:  All right.  Mr. Lodice, have you

6          talked to this DCF worker?

7              MR. LODICE:  I have.  Multiple times.

8              THE COURT:  Okay.  And do you feel kike you're

9          cooperating with the DCF worker?

10             MR. LODICE:  A hundred percent.  Yes.

11             THE COURT:  What has this person asked you to

12         do?

13             MR. LODICE:  This person had asked to come to my

14         house and just do an in home inspection, and then

15         this person asked that I don't leave Dominic alone

16         with Angelina during the-- during the-- before the--

17         before the forensic interview, up until the forensic

18         interview results.

19             THE COURT:  Okay.  And when-- when is-- When did

20         you have the conversation with DCF?

21             MR. LODICE:  I don't know the exact day, but I

22         would say probably the end of February.

23             THE COURT:  Did this DCF worker couldn't-- they

24         were recommending you couldn't have Angelina with

25         you?

26             MR. LODICE:  No.

27             THE COURT:  All right.  And did you abide by

1      those-- Did you do those two things they asked you to

2      do?

3           MR. LODICE:  Well, I never even saw Angelina, so

4      yes, I didn't really have the option either way.

5           THE COURT:  All right.  Did they come to your

6      house?  DCF came to your house?

7           MR. LODICE:  Yes.

8           THE COURT:  And did they talk to Dominic?

9           MR. LODICE:  Yep.  Not-- Not this last time.

10     They have not talked to Dominic yet.

11          THE COURT:  They talked to him in October?

12          MR. LODICE:  They talked to-- They talked to me.

13     They talked to-- Yes, they talked to Dominic in

14     October.

15          This time they talked to me.  We were going to

16     set up-- We set up a time for them to meet with me

17     and the kids, but then after the forensic interview

18     they decided to cancel it because they were

19     unsubstantiating it.

20          THE COURT:  That was --

21          MR. LODICE:  And so --

22          THE COURT:  That was in October?

23          MR. LODICE:  No, this was in Feb-- The-- The--

24     The second one, which was in February.

25          But then they had--before the closed it she had

26     made another claim, so they couldn't close it because

27     once she makes another claim they automatically have

1        to keep it open and start it over.

2            THE COURT:  All right.  So are you saying, let

3        me make sure I got this right, that the same thing

4        happened in October --

5            MR. LODICE:  Um-Hm.

6            THE COURT:  -- and February, which is that this

7        forensic interview was scheduled and then cancelled?

8            MR. LODICE:  No, it was not cancelled.  So the

9        forensic interview happened in October.

10           THE COURT:  Okay.

11           MR. LODICE:  The second forensic interview

12       happened in February, both times it was

13       unsubstantiated and found that there was no evidence

14       of abuse.

15           THE COURT:  Okay.  Notwithstanding that, is it

16       possible that you can make sure that Dominic and

17       Angelina aren't left alone when they're with you?

18           MR. LODICE:  For the time-- During the

19       investigation, yes.  I would have no problem with

20       that.

21           THE COURT:  And you saw-- you saw Angelina saw

22       in March?

23           MR. LODICE:  I saw Angelina for one weekend in

24       March, yes.

25           THE COURT:  And when was the last time you had

26       seen before that?

27           MR. LODICE:  About six and a half weeks prior.

1    Well, no, it would be seven weeks prior that I saw

2    her.  It was six weeks that I didn't see her.

3         THE COURT:  Okay.  And-- And when is your

4    weekend schedule with her supposed to be?

5         MR. LODICE:  Theodora-- Ms. Antar is supposed to

6    be dropping her off at my mother's house from Friday

7    morning at nine a.m. where she remains in my custody

8    until Monday morning when I drop her off at daycare.

9         THE COURT:  All right.  Is this weekend your

10   weekend coming up?

11        MR. LODICE:  I have every weekend like that.

12        THE COURT:  It's every weekend?

13        MR. LODICE:  It's every weekend.

14        THE COURT:  Okay.  Are the boys with you every

15   weekend?

16        MR. LODICE:  Yes.

17        THE COURT:  Okay.  And who is the-- Have you

18   talked to police officers in relation to this claim?

19        MR. LODICE:  Yes, I did.  I met with Detective

20   Steeves multiple times.

21        THE COURT:  What's your understanding of what's

22   going on in that investigation?

23        MR. LODICE:  From my understanding is they--

24   they-- they were going to schedule a third forensic

25   inv-- interview but they cancelled the forensic

26   interview because they don't want to do another one

27   and subject Angelina to that upon me presenting the

1          evidence that I was home all day Saturday.  I brought

2          video footage to-- to the detective's office and

3          showed that I was there, that the kids were there,

4          with timestamps.  We took multiple pictures of

5          different timestamps through the day of me being

6          there, and so I don't believe they're going to be

7          doing a third interview.  They're not sure if they

8          wanted to.  Ms. Antar keeps pushing for a third

9          interview, they're hesitant to do it because they

10         don't want to subject Angelina to it.

11              THE COURT:  Okay.  All right.  Thank you.

12         Attorney Cretella, do you have any questions?

13              ATTY. CRETELLA:  Just-- Just very few.

14    **CROSS-EXAMINATION BY ATTY. CRETELLA:**

15    Q    There-- There was a day in question when-- about the

16    time, there was one day that you had left at 6:40 and were

17    back at 5:20.  Do you remember those series of questions?

18    A    Yep.

19    Q    Is it your testimony that you were back throughout

20    day?

21    A    I was home all day, except for there was-- from 12:15

22    to 12:44-- Actually, I left at 12:07 and came back at 12:44

23    for going to Aldi's and going grocery shopping.

24    Q    All right.  So you didn't leave the house at 6:40?

25    A    Nope.

26    Q    And then, you know, I'm not talking-- I don't want to

27    ask about what happened in the past, but in-- in terms of

1  the future, while you were watching the children, say you

2  have all three, your two sons and your daughter on Saturday,

3  --

4      A    Um-Hm.

5      Q    -- who else is there besides you?

6      A    Just the three of us typically.

7      Q    The four you mean?

8      A    Or the four of us, yeah.  But lately it's been just

9  the three of us --

10     Q    Right.

11     A    -- because --

12     Q    So if-- if there comes a time when you do have to go

13  to the store, how-- how-- what-- what-- what will you do

14  then?

15     A    What will I do?  At this point I'll have to bring

16  them, or I'll have to shop before they come.

17     Q    Okay.  So it is possible if you do have to leave the

18  house to bring your daughter with you, but leave the two

19  boys behind; correct?

20     A    Yeah, I can do that.  Yeah, it's the same.

21     Q    Or take everybody together?

22     A    Or take everybody together.  Yes.

23              ATTY. CRETELLA:  Okay.  All right.  I have no

24          more questions.

25              THE COURT:  Okay.  Do you have any other

26          witnesses, Mr. Lodice?

27              MR. LODICE:  No.  Just myself, I'd like to give

1    some personal testimony before a decision is

2    rendered.

3        THE COURT:  All right.  Well, they are moving

4    party and I think I'm going to make a decision based

5    on the testimony and case that they've put on, okay.

6    So, Attorney Cretella, anything else?

7        ATTY. CRETELLA:  Your-- The-- The only thing I

8    would say, your Honor, is I think Ms. Antar  is very

9    concerned for her daughter.  I-- I think that there--

10   And the Court, I think, could distinguish between the

11   way I think Mr. Lodice put it was it was not

12   substantiated so it didn't happen.  I think there's a

13   distinction between non-substantiation and it

14   actually happening or not.

15       I would like the-- at the very minimum the--

16   especially at least until next week that the current

17   order remain in-- in effect, that-- that the-- the

18   minor daughter not be alone with the-- with the son.

19       MR. LODICE:  Your Honor, since I'm not going to

20   be able to give testimony may I-- may I-- may I ask

21   more questions then to-- to-- to the plaintiff?

22       THE COURT:  I don't think it's going to be

23   necessary, Mr. Lodice.

24       This is-- What's before the Court today is a

25   very narrow issue, which is under the ex-- emergency

26   custody statute is the parties' minor child in

27   immediate threat of physical harm or physical injury

1    or psychological harm, emotional harm, if she's left

2    in the care of her father, and-- and the evidence

3    that I've heard before me indicates that's not true.

4         The history of this case is important in making

5    this decision.  Ms. Antar has been leveling

6    accusations against Mr. Lodice that he doesn't care

7    properly for their child throughout the very lengthy

8    history of this case.  This is one of the longest

9    and-- not longest, but most active cases in this

10   district, it's got hundreds of pleadings, Ms. Antar

11   has made many, many, many accusations against Mr.

12   Lodice.

13        While there have been criminal issues, which--

14   and Mr. Lodice has been arrested-- both parties have

15   been arrested I should say, on criminal matters

16   between them, there has never been any credible

17   evidence before this court that Mr. Lodice is an in--

18   ineffective or unsafe parent.

19        The accusations that led to this latest request

20   for emergency custody are the same accusations that

21   were leveled and-- by Ms. Antar and then apparently

22   found unsubstantiated and not pursued by the police

23   department in October, so I cannot say that there is

24   a need for emergency orders.  There's simply no

25   credible evidence before me that would suggest that

26   that's the case.

27        The only evidence I have is the testimony of a--

1      let's call him a lay witness, current or former

2      romantic partner of the moving party, whose testimony

3      I'm just gonna say was not especially reliable.  I

4      have Ms. Antar's testimony which, on past occasions

5      and today, I will find is simply not reliable before-

6      - before this Court because is mot-- it's so

7      obviously motivated by her dislike and distrust of

8      Mr. Lodice.

9           And I do have some testimony the parties agree

10     on, which I will rely on, which is that these are

11     repeat allegations made by a very young child, a

12     child who goes to daycare, does see-- goes-- goes do

13     doctors, has independent eyes on her on a regular

14     basis, referrals have not made by any other source,

15     other than the sources that Ms. Antar has contacted,

16     so those referrals, from this Court's perspective,

17     are somewhat suspect.

18          However, there's pending investigations.  Both

19     partis agree that DCF and the police department are

20     looking into these investigations.  So, in light of

21     that testimony, I will enter some orders in the

22     custody case based on what I would say is simply a

23     lower evidentiary standard or a lower statutory

24     standard, but I-- I do not have enough reliable

25     evidence to sustain emergency orders under-- under

26     the emergency order statute.  It's simply not

27     appropriate.

1          So the request for emergency orders is denied.

2     There's not enough proof to meet the standard-- not

3     enough reliable proof to meet the standard set out in

4     46b-56f.

5          However, in light of these two investigations,

6     which apparently are ongoing, I will enter orders in

7     the underlying custody case that the parties' current

8     custody and access orders remain in place.

9          Ms. Antar, the child goes to her father on the

10    regular schedule.

11         However, Mr. Lodice, you are not to leave the

12    children alone with their stepbrothers until these

13    investigations are cleared.  That is for your

14    daughter's sake, and also for your sons' sake.  But

15    regardless of what your motivation is, it's a court

16    order.

17         So, Ms. Antar, I can't stress this enough, the

18    child goes to her father on regular schedule, and the

19    father is in charge of making sure that while these

20    investigations are pending, both police and DCF, that

21    the child-- the child's not left alone with her

22    brothers.  So you have no authority, ma'am, zero, to

23    withhold the child from the father on the regular

24    schedule.

25         I-- I-- We will have a hearing on April 5th,

26    which I think is next week, and address sone of these

27    oth-- regular custody concerns.

1          But I want to be clear with you, Ms. Antar, that

2     you understand that the child goes to the father on

3     the regular access schedule.  Do you understand that?

4          MS. ANTAR:  Your Honor, may I please say

5     something --

6          THE COURT:  No.  I want you to tell me that you

7     understand what I'm saying to you.

8          MS. ANTAR:  I don't understand because I'm

9     saying that-- it wasn't-- you're saying I'm-- I'm not

10    credible, but you didn't allow me to show any

11    evidence at all.  And I --

12         THE COURT:  Ms. Antar, I want you to understand-

13    - Tell me you understand that the child goes on the

14    regular access schedule and that that is going to

15    happen.

16         MS. ANTAR:  My child --

17         THE COURT:  Please tell me that.

18         MS. ANTAR:  My child is in danger and I'm going

19    to do whatever I have to do to protect my daughter.

20         THE COURT: It's --

21         MS. ANTAR:  My daughter is in danger.

22         THE COURT:  Ms. Antar, you are not the only

23    person who-- you are not the only parent, and you are

24    not the only person who gets to decide this.  I have

25    listened to your case many, many, many, many times,

26    and I am telling you now that the child goes to the

27    father on the regular schedule and the child has--

```
1        the father has to make sure that while these
2        investigations are pending the child is not left
3        alone with the stepbrothers.  And if you can't follow
4        those orders that's going to be a problem for you in
5        the relief that you're requesting from this court on
6        your custody cases.  So you need to follow the Court
7        orders, Ms. Antar.  Those are the orders.
8             MS. ANTAR:  The problem is that Mr. Lodice says
9        he's not going to leave her with Dominic, but then
10       the does.  And if I asked for a wellness check he
11       refuses to open the door for police.  So-- And what's
12       stopping him from doing what he did last time?
13            Also, the orders says I'm supposed to bring her
14       to grandma's, it doesn't say dad gets her from
15       school.  And so he went and took her from school,
16       that's not what the order says.  I haven't brought my
17       daughter to school since March 10th, I'm scared.  I'm
18       paying a hundred percent of the daycare.
19            Not-- And he doesn't pay any child support.  He
20       hasn't paid a dime of child support or childcare
21       since June, when you put him in jail to pay it.
22            Now I'm scared to bring her to school because
23       the order doesn't say Matthew picks her up on Friday
24       from school, he went and picked her up anyway.  He
25       took her that day even knowing what this
26       investigation --
27            THE COURT:  Ms. Antar, --
```

```
 1              MS. ANTAR:  (Indiscernible).
 2              THE COURT:  Ms. Antar, --
 3              MS. ANTAR:  (Indiscernible) no protection to me
 4         (Indiscernible).
 5              THE COURT:  -- listen to me.  You have no --
 6              MS. ANTAR:  (Indiscernible).
 7              THE COURT:  You have no right to deprive this
 8         child of her relationship with her father.  Zero
 9         right to do that.
10              MS. ANTAR:  Unless I prove what Dominic's done.
11              THE COURT:  And-- Listen to me, you are asking
12         this Court for custody orders, and one of the things
13         that the Court has to consider in custody orders is
14         the ability of both parents to facilitate and value
15         the relationship of the child with the other parent,
16         and this is very problematic for you when you decide
17         all on your own that you're going to withhold child
18         the child from the father.  It's not like you're
19         making other arrangements, it's not like you're
20         letting the father see the child anyplace else --
21              MS. ANTAR:  I understand.  I tried to speak to
22         DCF and that's why Mr. Lodice is lying.  Larae
23         Plummer after --
24              THE COURT:  Ms. --
25              MS. ANTAR:  -- after-- after --
26              THE COURT:  Ms. Antar, --
27              MS. ANTAR:  -- DCF --
```

```
1              THE COURT:  Ms. Antar, stop.

2              MS. ANTAR:  DCF said they were working on

3      setting up supervised visits.

4              THE COURT:  There is --

5              MS. ANTAR:  That's-- The last time I spoke to

6      her --

7              THE COURT:  Ms. Antar, --

8              MS. ANTAR:  (Indiscernible).

9              THE COURT:  Ms. Antar, I've made my orders, I

10     expect you to follow them.  So those are the court

11     orders.

12             Everybody's-- I'm telling you right now, these

13     hearings are happening in person in the future

14     because this video format is really too-- too

15     troublesome.

16             So I understand, Attorney Cretella, that this

17     hearing came up at the last minute and I appreciate

18     your working on your vacation to be present for it;

19     however, going forward we have to have these hearings

20     om person the video proceedings are too difficult.

21             So those are the court orders.  The father needs

22     to have his access time with the child, the father

23     needs to follow the court orders about not leaving

24     the child alone with the stepbrothers while these

25     investigations finish, and that's it.  I will see

26     everyone for this hearing next week,

27             I will tell you that I told Family Relations to
```

```
1        reach out to everyone to get some additional
2        information about these new allegations, so you can
3        expect to hear from Family Relations, hopefully
4        before April 5th.
5             ATTY. CRETELLA:  And-- And the pickup--
6        pickup/drop off would be in accord with the current
7        order where mom drops the child of at --
8             MR. LODICE:  My mother's.
9             ATTY. CRETELLA:  -- Mr. Lodice's mothers.
10            MR. LODICE:  Yes.
11            THE COURT:  Well, yes.  Unless the mother's not
12       doing that, in which case if the father wants to pick
13       the child up at school I guess I'm going to have to
14       allow that.  So, I don't know, Attorney Cretella,
15       what are we going to do?
16            MR. LODICE:  Your --
17            ATTY. CRETELLA:  Can I-- Let me --
18            MR. LODICE:  Your Honor, --
19            ATTY. CRETELLA:  Let me-- Let me inquire.  Ms.
20       Antar, are you going-- I mean, maybe your Honor
21       should ask this question.
22            THE COURT:  Listen, the child's supposed-- You
23       should be following court orders, the child should be
24       dropped off at the father's-- at the paternal
25       grandmother's house, so, Ms. Antar, that's your
26       responsibility, that's what you need to do.
27            MR. LODICE:  Your Honor, at this time I'd also
```

```
1       like to ask that we don't allow anymore continuances
2       for this case, that-- because we need to get in front
3       of you for this custody and what's been going on
4       because I'm really --
5            ATTY. CRETELLA:  Well, --
6            MR. LODICE:  -- I have not been seeing my
7       daughter.  All they --
8            THE COURT:  Well, I'm expecting to see everybody
9       in April.
10           MR. LODICE:  And all they keep doing-- Every
11      time we're supposed to be in front of the Judge like
12      a day or two before the-- Ms. Antar's lawyer
13      postpones it another two months, another two months,
14      and this happened --
15           ATTY. CRETELLA:  Well, the reason that's --
16           MR. LODICE:  -- three times already
17           ATTY. CRETELLA:  The reason that's happening,
18      Mr. Lodice, is because you continually not give me
19      the rest of the discovery.  You still don't have-- We
20      still don't have all the discovery.
21           MR. LODICE:  You-- You have all the financial
22      discovery.  I don't understand how the financial
23      discovery is relevant to our custody.
24           THE COURT:  Mr. Lodice, you do need to provide
25      Attorney Cretella with all the documents that he
26      asked for.
27           MR. LODICE:  It --
```

```
1           THE COURT:  And, listen, --

2           MR. LODICE:  I have.

3           ATTY. CRETELLA:  No, one more.

4           THE COURT:  And, listen, if you don't --

5           ATTY. CRETELLA:  One is missing.

6           THE COURT:  -- if you don't do that you run --

7           ATTY. CRETELLA:  Still one missing.

8           THE COURT:  -- you run the risk that the Court

9       might make an adverse inference, that is to say I'm

10      just going to assume that you didn't produce the

11      documents because what Attorney Cretella was looking

12      for is correct.  So it doesn't help you.

13          MR. LODICE:  I-- I know that, your Honor.  And I

14      absolutely provided him everything.

15          THE COURT:  I will see you April 5th.  I expect

16      everyone to follow the court orders.  I don't want

17      another situation where I'm hearing about people not

18      following court orders.  So, Attorney Cretella, --

19          ATTY. CRETELLA:  There's one-- Just --

20          THE COURT:  -- it sounds like you're going to

21      have a conversation with your client.

22          ATTY. CRETELLA:  I will.  And there's one other-

23      - There is one piece of discovery that Mr. Lodice has

24      not provided, he said there was some account that

25      began with an M, and I don't have the-- the file in

26      front of me,

27          MR. LODICE:  Mile-- Milestone.  I-- I'm having
```

1        trouble --

2             ATTY. CRETELLA:  Can you bring that to court?

3             MR. LODICE:  I've been trying to get it.  I'll--

4        I'll call again today.  It's like an overseas credit

5        card company that's been closed on me already, so

6        it's like-- I keep calling them and I keep getting

7        recordings.  They don't have, like, an actual call

8        center, they don't have an online site I can sign

9        into.  I'm, like, really trying to get all this

10       information and I have no way of getting it.

11            ATTY. CRETELLA:  If I-- So if I don't have that

12       by the end of the week, I may be filing for another

13       continuance.

14            THE COURT:  Well, --

15            MR. LODICE:  Can we subpoena the company then to

16       get those-- that information?  Can I subpoena the

17       company?  Is it possible for that.  I-- I don't

18       understand.  Like, `cause I been trying --

19            THE COURT:  I can-- Ladies and gentlemen, I can

20       tell you that I am not going to grant any

21       continuances.  We're going to get started, --

22            ATTY. CRETELLA:  Fair enough.

23            THE COURT:  -- at least on the custody case, --

24            ATTY. HALEY:  All right.  Fair enough.

25            THE COURT:  -- and-- and if we need to-- some

26       additional time to get the financial documents I'll

27       certainly give you time to do that, Attorney

```
 1        Cretella, but we gotta get started on some of this.
 2             ATTY. CRETELLA:  Fair enough.
 3             THE COURT:  And, Mr. Lodice, you better make
 4        every effort.  You can talk to Attorney Cretella when
 5        he gets back from vacation about what-- what might--
 6        what you have that might satisfy his request, that
 7        might be --
 8             MR. LODICE:  I will.
 9             THE COURT:  -- a good idea.
10             MR. LODICE:  I will.  And I can even go down his
11        office and try to do it in front of him so he can see
12        I'm actively trying to get this information.
13             ATTY. CRETELLA:  You don't need to come to the
14        office to do that.
15             THE COURT:  You two can work that out.  Okay.
16             ATTY. CRETELLA:  We can do that by phone.
17             THE COURT:  Okay.
18             ATTY. CRETELLA:  All right.
19             THE COURT:  Thank you, ladies and gentlemen.
20        I'll see you next week.
21             MR. LODICE:  Thank you, your Honor.
22             ATTY. CRETELLA:  Thank you, your Honor.
23                  (The matter concluded.)
24
25
26
27
```

```
NNH-FA19-5046828-S              :  SUPERIOR COURT

THEODORA F. ANTAR              :  JUDICIAL DISTRICT
                                  OF NEW HAVEN

v.                             :  AT NEW HAVEN, CONNECTICUT

MATTHEW J. LODICE             :  MARCH 27, 2023
```

E L E C T R O N I C

C E R T I F I C A T I O N


   I hereby certify the electronic version is a true and correct

transcription of the audio recording of the above-referenced

case, heard in Superior Court, Judicial District of New Haven,

New Haven, Connecticut, before the Honorable Jane K. Grossman,

Judge, on the 27th day of March, 2023.



        Dated this 30th day of May, 2023, in New Haven,

Connecticut.




                                   _Janis Longobardi_
                                   _____
                                   Janis Longobardi
                                   Court Recording Monitor

```
NNH-FA19-5046828-S              :  SUPERIOR COURT

THEODORA F. ANTAR              :  JUDICIAL DISTRICT
                                  OF NEW HAVEN

v.                             :  AT NEW HAVEN, CONNECTICUT

MATTHEW J. LODICE              :  MARCH 27, 2023
```

C E R T I F I C A T I O N


   I hereby certify the electronic version is a true and correct

transcription of the audio recording of the above-referenced

case, heard in Superior Court, Judicial District of New Haven,

New Haven, Connecticut, before the Honorable Jane K. Grossman,

Judge, on the 27th day of March, 2023.



      Dated this 30th day of May, 2023, in New Haven,

Connecticut.



                                   *Janis Longobardi*
                                   _____
                                   Janis Longobardi
                                   Court Recording Monitor