| | | |
|---|---|---|
| NNH-FA19-5046828-S | : | SUPERIOR COURT |
| THEODORA ANTAR | : | JUDICIAL DISTRICT<br>OF NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| MATTHEW LODICE | : | JUNE 15, 2023 |

TRANSCRIPT OF THE PROCEEDINGS

BEFORE THE HONORABLE JANE GROSSMAN, JUDGE

A P P E A R A N C E S :

    Representing the Plaintiff:

        MS. THEODORA ANTAR
        Self-Represented Party
        856 Shagbark Drive
        Orange, Connecticut 06477

    Representing the Defendant:

        MR. MATTHEW LODICE
        Self-Represented Party
        23 Lyman Street
        New Britain, Connecticut 06053

Recorded & Transcribed By:

Shannon Anderson
Court Recording Monitor
235 Church Street
New Haven, Connecticut 06510

1          THE COURT:  All right.  Then the next ready

2     matter -- ready matters are all 2 o'clock markings

3     and they are -- involve the parties of Theodora Antar

4     and Matthew Lodice.  So, if the parties are here,

5     they can come up.

6          MR. LODICE:  Good morning, your Honor -- or

7     afternoon, excuse me.

8          THE COURT:  All right.  Hello, Mr. Lodice.

9          And hello, Ms. Antar.

10          All right.  Marshal, I've got some witnesses.

11     Would you ask them to come in please.

12          All right.  You both may have a seat.  So, there

13     are five matters on the docket today; two which

14     originated in Milford and were transferred here, two

15     originated in New Britain and transferred here, one

16     that originated here.  Today's court date was

17     originally set as an additional date to -- to receive

18     some independent evidence from family relations and

19     other witnesses regarding a concern Ms. Antar raised

20     on the last court date.  And, in relation to that,

21     Ms. Antar filed a number of things, but two of them

22     were pro se requests for subpoenas.

23          Miss Antar, those requests were denied because

24     the Court subpoenaed those witnesses.  So, I'd like

25     to have those witnesses testify.

26          MS. ANTAR:  I'm sorry, your Honor.  I didn't try

27     to subpoena the same witnesses that you asked.  I

1    tried to subpoena the treatment provider that Mr.

2    Lodice refused to sign a release for that you ordered

3    him for him to sign a release --

4         THE COURT:  All right.  Miss Antar, please --

5         MS. ANTAR:  -- for, and the child's treatment

6    provider.

7         THE COURT:  -- do not interrupt me.

8         MS. ANTAR:  I was just objecting to what you

9    were saying 'cause as I was correcting you.

10        THE COURT:  Okay.  Resist the urge to correct me

11   every time.

12        MS. ANTAR:  Okay.  I will just file for a

13   hearing on it then.

14        THE COURT:  Okay.  So, two of your subpoenas

15   were denied because I felt that they related to

16   witnesses that the Court had already subpoenaed on

17   your behalf.  And those witnesses are here and I am

18   going to hear from them first because they have other

19   jobs besides working in the courthouse.  Then we will

20   hear from the other Court witness which is the family

21   relations counselor who I assigned to do some

22   additional looking into the allegations that Miss

23   Antar raised.  So that's how we're going to proceed.

24   First with the Court witnesses on the holdover issues

25   -- holdover custodial issues from the last court

26   date, then we'll talk about the four cases that were

27   ex parte -- denied ex parte cases that were

1    transferred here, and then, before you leave today,

2    there are outstanding financial motions filed by Miss

3    Antar that need to be resolved as well as the

4    financial issue between the two of you of child

5    support now that the child is living primarily with

6    the father.  So, those have to get scheduled and they

7    will get scheduled.  We'll talk about that probably

8    at the end of the day.  So that's how we're going to

9    proceed.

10          I think we should probably proceed first with

11   the detective from the New Britain Police Department

12   if I have that person present.  Okay.

13          All right.  So, Detective Steeves.  Right?

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  All right.  Come on up and just wait

16   for the clerk to swear you in.

17          THE CLERK:  Please raise your right hand.  Do

18   you solemnly swear or solemnly and sincerely affirm

19   as the case may be that the evidence you shall give

20   concerning this case shall be the truth, the whole

21   truth, and nothing but the truth, so help you God or

22   upon penalty of perjury?  If so, please say I do.

23          THE WITNESS:  I swear I do.

24          THE CLERK:  Please state your name and your

25   business address and badge number.

26          THE WITNESS:  Lisa Steeves, badge number 462,

27   business is New Britain Police Department, 10

```
1          Chestnut Street, New Britain, Connecticut, 06051.
2               THE COURT:  All right.  You may have a seat,
3          detective.
4               THE WITNESS:  Thank you, your Honor.
5               THE COURT:  First why don't you tell us how to
6          properly spell your last name.
7               THE WITNESS:  I'm sorry, what?
8               THE COURT:  How do we spell your last name?
9               THE WITNESS:  It's S-t-e-e-v, as in Victor -e-s.
10         Sorry.  I'm a little short.
11              THE COURT:  All right.  And you -- that
12         microphone does not make you any louder, it's just
13         for the sake of the monitor.
14              THE WITNESS:  Okay.
15              THE COURT:  So you are here pursuant to a
16         subpoena from the Court.  So I am gonna start my -- I
17         am going to start asking you questions.  It may be
18         that the parties will have some questions for you,
19         maybe not.  All right.
20              THE WITNESS:  Yes, your Honor.
21
22
23
24
25
26
27
```

**L I S A   S T E E V E S,**

1

2   Having been first duly sworn by the clerk of the Court, was

3   called as a witness and testified upon her oath as follows:

4   **DIRECT EXAMINATION BY THE COURT:**

5   Q   So, why don't you start by telling me what your role

6   is at the New Britain Police Department.

7   A   Currently assigned as a detective with our youth

8   bureau division.  There we investigate crimes against

9   children as well as on the ICAC task force doing Internet

10  crimes against children.  And I've been a detective for

11  almost four years now and a police officer for nine.

12  Q   Okay.  All in New Britain?

13  A   Yes, your Honor.

14  Q   So, Detective Steeves, did you testify once before in

15  this case or did you just talk to the related investigator?

16  A   No, your Honor.  I just spoke  with --

17  Q   Someone from family relations?

18  A   Yeah.  Yes, your Honor.

19  Q   Okay.  So then why don't we start at the beginning.

20  Are you familiar with the parties?

21  A   Yes, your Honor.

22  Q   All right.  Why don't you tell me how you became

23  familiar with them.

24  A   I was originally assigned to an investigation back in

25  October of 2022.  It was reported to be a suspected sexual

26  assault that Miss  -- I don't know if I'm allowed to say

27  names or.

1    Q   Yeah, you can say names in this court.

2    A   Okay.

3    Q   It's a public courtroom.

4    A   -- that Miss Antar had reported she had suspected or

5    she had observed some unusual sexualized behavior from her

6    daughter Angelina.  So I was assigned to that investigation.

7     At the time, we had her scheduled to do a forensic

8    interview at Yale, the CAC, and Angelina at that time, you

9    know, she was very young so she -- you know, she -- it was

10   hard for her to pay attention during the interview, so she

11   didn't make a disclosure of any kind of abuse.  The

12   allegations at that time were that her half-brother Dominic

13   Lodice was, I guess, sitting on her.  It was -- at that

14   point there weren't much details that we had at -- at that

15   point.

16        So on February 3rd I was assigned to another

17   investigation, the same --

18   Q   All right.  Hold -- hold on.  How did -- how

19   initiated the October 2022 investigation?

20   A   Miss Antar.

21   Q   All right.  And how did that end?

22   A   That ended -- I had to close it after the -- after

23   Angelina had her forensic interview.  I closed it no

24   disclosure.

25   Q   All right.  Was Miss Antar cooperative in that

26   investigation?

27   A   Yes.

1    Q    And was Mr. Lodice cooperative in that investigation?

2    A    In that investigation I didn't have any contact with

3    Mr. Lodice.

4    Q    Now, there was another investigation -- another

5    allegation in February of --

6    A    February 3rd of this year.

7    Q    Of '23.  Okay.  And how was that initiated?

8    A    That was initiated -- Miss Antar had contacted the

9    police department stating the same allegations.  She had

10   observed her daughter humping her stuffed animals and

11   rubbing them on her vagina and saying this is what Dom does

12   to me.  She had taken several recordings of Angelina doing

13   this, and in the recordings she's asking Angelina what is

14   that you're doing and she says this is what Dom does to me.

15   Q    These are video or audio?

16   A    Video.

17   Q    And you saw them?

18   A    Yes, your Honor.

19   Q    And the mother's -- Miss Antar is taking the

20   recording?

21   A    Yes, your Honor.

22   Q    Okay.  Go ahead.

23   A    So, I watched the videos.  We decided to do another

24   forensic interview for Angelina.  We set that up again at

25   the -- the same Children's Advocacy Center.  Angelina had

26   her interview.  You could tell it was very different this

27   time around.  She's very smart, great memory, proper self-

1  awareness of her body parts.  And, again, in this interview

2  she made not disclosure of being touched in any of her

3  intimate areas so we didn't have any disclosure at that

4  time.  I didn't close the investigation; I said that I

5  would, you know, continue investigating since this was now a

6  second complaint.  So I informed Miss Antar I would speaking

7  with Matthew -- Mr. Lodice, and attempt to do an interview

8  with Dominic Lodice as well, his son.

9     Q   All right.  And did any of that happen?

10    A   Yes, your Honor.

11    Q   Okay.  And how did that investigation end?

12    A   That investigation ended.  Again, I had to close it.

13  One, there was still no disclosure from the victim; two,

14  when I spoke with Dominic Lodice, he denied any

15  inappropriate touching. And then on top of that, when

16  Matthew came in for an interview with me, he had provided me

17  with security footage in his home from the day that the --

18  there was a specific date and timeframe that Miss Antar had

19  reported the alleged sexual assault.  So he showed me camera

20  footage from throughout his home that Dominic and Angelina

21  were never once alone together.  And to just kind of make

22  sure that those -- you never know; sometimes the camera

23  footage date and timestamps may be off or inaccurate.  He

24  was able to corroborate the accuracy of them with GPS

25  location on his phone that he provided to me.  So I didn't

26  have a crime scene, as we would call it, so I unfortunately

27  had to close that one out as well.

1    Q   Okay.  Were there any additional complaints made to

2  your department?

3    A   There -- this time around there is a new one.  This

4  came in -- Miss Antar had reported that, I guess, Angelina

5  had gone to the -- the doctor and she -- her stomach hurt.

6  She suspected it might be a urinary tract infection.  While

7  there, I guess Angelina had made disclosures, again, of

8  possible sexual abuse, so they had her do a sexual assault

9  evidence collection kit.

10    Q   The child?

11    A   Yes, your Honor.

12    Q   Where did that happen?

13    A   That happened at Connecticut Children's Medical

14  Center in Hartford.

15    Q   But the child is in the mother's care in Orange and

16  the father's case in New Britain.  Do you know how they

17  wound up in Hartford?

18    A   That, unfortunately, I don't know.

19    Q   Okay.  And --

20    A   Sorry.

21    Q   No, you finish what you were saying.

22    A   So, as of right now, that investigation is still open

23  because we haven't received the results yes from the sexual

24  assault evidence collection kit.  In the meantime, it's kind

25  of -- we're at a standstill with that.  I like to make sure

26  that, you know, everything is done and, you know, talk to

27  everyone involved and things like that before I officially

1  close an investigation.

2    Q   Is that the only thing standing in your way of

3  closing this investigation?

4    A   Yes, your Honor.

5    Q   So you've had some interactions with both parents

6  through this process.  Right?

7    A   Yes, your Honor.

8    Q   So could you characterize your interactions with the

9  father?

10    A   He's been very cooperative.  Any time I call, ask him

11  questions, he's, you know, made time to come in and meet

12  with me, answers those questions.  With juvenile law, you

13  know, Dominic he was the suspect and he was too young to

14  waive his own rights and speak to me, so Matthew and

15  Dominic's mother, they both -- you know, I had to have their

16  permission to interview him which they both agreed to and

17  that was fine.  So my interactions with Mr. Lodice have been

18  normal, that they would be with usually all of my

19  investigations.

20    Q   All right.  And what have -- what have your

21  interactions been with Ms. Antar?

22    A   I try to limit my interactions with Miss Antar

23  because it was very clear early on in the second

24  investigation that she did not -- she wasn't receptive to

25  the information I was giving her, I guess I could say.  She

26  did become very hostile towards me and wound up, you know,

27  wanting to speak to supervisors.  She sent very lengthy e-

1  mails, which I did not, unfortunately, have time to get

2  through them they were so lengthy.  Because of the fact that

3  she's started -- she's -- she copied on these e-mails the

4  captain of every division in our PD, our retired chief, our

5  chief, another lady from the Rape Crisis Center.  So, I

6  decided, you know, let my supervisors handle this.  I like

7  to limit contact 'cause anything between us has been -- I

8  don't really get a word in.  I can never really say my side

9  and so, like, one day -- I think our last conversation I was

10  forced to hang up on her 'cause she refused to let me off

11  the phone and I had to leave at 11 that day 'cause I was

12  sick.  And that's mostly -- it's -- and then I recently --

13  my captain informed me that a complaint was filed against

14  me, so I don't have any contact with her from -- from here

15  on out.

16     Q   When is that conversation that you felt you had to

17  hang up on her?  When was that?

18     A   That was on 13th -- March 13th.

19     Q   All right.  And when you say that she wasn't

20  receptive to the information that you were trying to give

21  her, what information were you trying to give her that she

22  wasn't receptive to?

23     A   I was trying to inform her why this time I have no

24  probable cause.  And I was simply saying, you know, I still

25  -- this was at that point, I still had to have an interview

26  with Matthew which his interview happened to be scheduled

27  for that following day.  And then I offered to even call her

1  back, but she wanted to talk now and refused to let me get

2  off the phone.  So it was mostly that, you know, she was

3  kind of demanding a meeting with the prosecutor or the

4  State's Attorney's Office and I was telling her, you know, I

5  can't just do that, I need -- you know, I don't have any

6  probable cause yet for an arrest.  And it was just -- I just

7  could not really get a word in.  It was to the point I

8  actually made it a point to make sure all my conversations

9  with Miss Antar were recorded on my body cam, just in the

10  event -- because there were kind of some things that were

11  now being falsified about things that I said that I didn't

12  say.  So I made sure that everything was recorded.

13     Q   So, we sometimes have this experience in family court

14  where people make criminal complaints to get some kind of

15  advantage in the family court process, and that's always a

16  concern that family court has that that could be happening.

17  Do you have any indication that that might be happening

18  here?

19     A   I don't feel comfortable saying yes or no to that

20  question.  I apologize.

21     Q   It's okay.

22     A   It's just because with -- with sexual assault

23  victims, I take my cases very seriously and I'm not in a

24  position to be, like, this did happen; this didn't happen,

25  because at the end of the day, I don't fully know.  So, the

26  way I'm trying to perceive it or handle it is that, God

27  forbid something did happen in the future or has, I don't

1   want to -- I don't want to say -- I don't know if you know

2   what I'm trying to say.  I don't want to, you know, be like,

3   oh, this is the reason why she's reporting it.  I don't know

4   Miss Antar well enough to say, you know, she's vindictive or

5   spiteful or doing this for certain reasons.  My only

6   interest was Angelina and making sure she was safe.  It does

7   appear that certain circumstances -- 'cause I go off of

8   facts and circumstances.  It does seem unusual to me,

9   certain things that have happened; the way I've been spoken

10  to, the way DCF and all the other disciplinary teams that

11  are involved.  And just a lot of -- you know what I mean.  I

12  just -- I don't like to say that this definitely is being

13  reported just out of spite or because of custody issues.

14      Q   What other investigatory teams were there?

15      A   So what we do with these investigations, we'll do --

16  because this was such a unique case, we had to -- before we

17  decided to do a third forensic interview, we have what's

18  called an MDT.  That team includes the forensic interviewer,

19  the advocacy center for the kids, the State's Attorney's

20  Office, myself, any clinicians, any doctors, anyone -- DCF

21  -- anyone that has Angelina's, you know, safety at their

22  interest.  So, when we had a meeting, that was everyone that

23  was included.

24      Q   So, is there anything else about this situation --

25  so, I have a custody dispute.  That's what's happening here.

26  Is there anything else that you want to make sure that I

27  know about, about your work with the family?

1    A    Not that I can think of off the top of my head.  I

2  can't think of anything right now.  I think -- I feel that

3  your court pretty much has a lot of, you know, the valid or

4  most important information.  As far as -- I just have not --

5  I've tried to limit my contact with Miss Antar just because

6  of her hostility.  I can't think of anything.

7    Q    Okay.

8              THE COURT:  All right.  So, I think that this is

9         information that we mostly received from family

10         relations before, but -- so, I don't have any more

11         questions for this witness and I'm gonna be mindful

12         of her time.

13              MS. ANTAR:  Your Honor, I have some questions

14         for the witness.

15              THE COURT:  All right.  Well, what are those

16         questions about, Ms. Antar?

17              MS. ANTAR:  They're about what she testified, so

18         I'd like to --

19              THE COURT:  Okay.  Can you -- can you narrow it

20         down for me?

21              MS. ANTAR:  Yes.

22  **CROSS-EXAMINATION BY MS. ANTAR:**

23    Q    Good afternoon.

24              THE COURT:  Okay.  So -- so, narrow down the

25         questions for me.

26              MS. ANTAR:  Right.  So, I'm gonna start.  Okay.

27              THE COURT:  Like, what are the subjects that you

1      wanna ask her about?

2            MS. ANTAR:  Okay.  So I just wanted to start by

3      saying --

4   Q   Why didn't you bring up the third police interview

5   that we had at the New Britain Police?  You stated that the

6   last time we spoke was on March 13th.  Is that correct?

7            THE COURT:  All right.  Ms. Antar, you're

8      talking to me for a minute.

9            MS. ANTAR:  Yes.

10           THE COURT:  So --

11           MS. ANTAR:  Would you like me to go through each

12      question one-by-one?  Or why can't I just have my

13      right -- I have the right to cross-examine this

14      witness.  I have -- I'm ready to ask her questions.

15           THE COURT:  Miss Antar --

16           MS. ANTAR:  Yes.

17           THE COURT:  -- simmer down.

18           MS. ANTAR:  Okay.  I'd just like to --

19           THE COURT:  Yes, you have --

20           MS. ANTAR:  -- ask her questions.

21           THE COURT:  My experience with you is that you

22      will keep this witness here for two hours.

23           MS. ANTAR:  Nope.  I just have a few questions.

24           THE COURT:  Okay.  What's --

25           MS. ANTAR:  It's gonna take maybe five minutes.

26      You can set a timer if you'd like.

27           THE COURT:  I'm gonna take you up on that.

```
 1          MS. ANTAR:  And it's my legal right, even if
 2     it's five -- more than five minutes.  I have the
 3     right to cross-examine the witness.  So if I ask for
 4     more time --
 5          THE COURT:  Ms. -- Ms. Antar --
 6          MS. ANTAR:  -- I should be given that ability.
 7     But I could start.  If I have five minutes, I'd like
 8     to start so.
 9          THE COURT:  Okay.  Ms. Antar --
10          MS. ANTAR:  Yes.
11          THE COURT:  -- listen to me.  Yes, you can ask
12     this witness some relevant questions --
13          MS. ANTAR:  Yes.
14          THE COURT:  -- for this proceedings.  And, yes,
15     I will certainly give you five minutes.  But if the
16     questions aren't relevant, then probably I'm going to
17     limit your right to ask her anymore questions.
18          MS. ANTAR:  They're all relevant.
19          THE COURT:  And then I'm gonna -- listen to me.
20      And then I'm gonna say what are the subject matters,
21     and I'll question her.  Okay?
22          MS. ANTAR:  Okay.
23          THE COURT:  All right.  So, we can --
24          MS. ANTAR:  Okay.  Thank you.
25          THE COURT:  -- you can start --
26          MS. ANTAR:  Okay.
27          THE COURT:  -- and we can see how it goes.
```

```
 1              MS. ANTAR:  Sure.
 2   BY MS. ANTAR:
 3     Q   Okay.  Good afternoon.  How are you?
 4     A   Good.  How are you?
 5     A   Doing well.  Thank you.
 6     Q   So, I'm sorry.  Can you please state again for the
 7   record your rank and credentials?
 8     A   Detective.
 9     Q   Okay.  And so, for the record, can you just state
10   also, do you have any credentials in mental health or
11   anything of that nature?
12     A   I've had training with mental health and especially
13   being in the youth bureau and dealing with sexual assault
14   victims, we learn a lot about trauma and things like that,
15   how they're affected.
16     Q   So can you please state the name of your medical
17   degree or any mental health certification that you have?
18              THE COURT:  Okay.  So this would be an excellent
19          example of a question that's not relevant.  She just
20          reported a bunch of facts.  Her --
21              MS. ANTAR:  Okay.  We can move on to if --
22              THE COURT:  -- lack-there-of -- lack of a
23          medical degree --
24              MS. ANTAR:  -- if -- if -- we can go to the next
25          question.
26              THE COURT:  -- is not gonna be helpful.
27              MS. ANTAR:  We can go to the next question.
```

1        That's fine.

2     Q    You know, I just was saying, you said you reported

3  that you had a concern for my mental health and stated that

4  I was unstable.  Is that correct?

5     A    No, that's not correct.

6     Q    So you did not tell Anna Maria Baranowski from family

7  relations from this court that you reported a concern for my

8  mental health?

9     A    I'm sorry, you mean today that I said that or to who?

10    Q    Ever.  Have you ever stated to family relations, and

11 specifically Anna Maria Baranowski, that you've reported a

12 concern for my menta health?  Yes or no.

13    A    I don't recall the conversation, but I have no doubt

14 that I did say that.

15    Q    So, yes, you did?

16    A    Like I said, I don't recall our exact conversation,

17 but I highly -- I'm sure I did.  I have no doubt that I did.

18    Q    Okay.  And so why did you wait 15 days to bring the

19 DNA sample to the Connecticut State Lab when the law says

20 that it must go to the lab in ten days or less?

21    A    I don't do the lab runs.

22    Q    I'm sorry?

23    A    I'm not the evidence officer.  I don't do the lab

24 runs.

25    Q    Okay.  So then --

26    A    So, our evidence officer, he has -- weekly, he has to

27 report to the lab and transfer whatever evidence that needs

| | |
|---|---|
| 1 | to be analyzed.  So the paper -- I do the paperwork, I |
| 2 | submit it to him, and then the -- it gets transferred |
| 3 | whenever his next appointment is with the lab. |
| 4 | Q   So who brought it to the lab, you or him? |
| 5 | A   The evidence officer. |
| 6 | Q   Okay.  And is that Officer Reyes? |
| 7 | A   Yes. |
| 8 | Q   Okay.  And so, per the records of the State, it says |
| 9 | on the tracking information that the person who dropped it |
| 10 | off was Lisa Steeves and it stated you dropped it off at |
| 11 | 7:20 a.m. on June 7th.  Was that just him? |
| 12 | THE COURT:  Okay.  You can't -- Miss Antar, you |
| 13 | can't testify from documents -- you can't -- you |
| 14 | can't offer facts that aren't in evidence. |
| 15 | MS. ANTAR:  I'm not offering any -- |
| 16 | THE COURT:  Stop. |
| 17 | MS. ANTAR:  I'm asking her a question. |
| 18 | THE COURT:  Stop.  Well, it's an inappropriate |
| 19 | question because none of those facts are in evidence. |
| 20 | MS. ANTAR:  Okay.  I'll just say was it -- |
| 21 | THE COURT:  And -- and -- listen.  That doesn't |
| 22 | matter to this Court or this proceeding so much as |
| 23 | the October and the February and the May |
| 24 | allegations -- |
| 25 | MS. ANTAR:  Okay. |
| 26 | THE COURT:  -- and her interactions with you. |
| 27 | MS. ANTAR:  That's fine.  Okay. |

1  Q   So, but, getting back to this.  You stated that --

2  you testified today that in the October 2022 investigation

3  you stated that I initiated that.  Is that correct?

4  A   Yes.

5  Q   And you also testified that I contacted the police in

6  order to initiate that investigation?

7  A   It was police or DCF.  Did I say police or DCF?

8  Q   If you don't remember, it's okay.

9          THE COURT:  I don't -- I don't -- I don't think

10  you did say.

11  A   I don't remember if I said police or DCF.

12  Q   Okay.  So, I had originally -- did call DCF.  Is that

13  -- to your knowledge --

14  A   Yes.

15  Q   And then they -- and is it correct that DCF then sent

16  the New Britain Police the report automatically --

17  A   Yes.

18  Q   -- as a mandated reporter?

19  A   Yes.

20  Q   And, in February 2022 you stated that I reported it

21  to the police.  Is that also incorrect?

22  A   It was either -- I'm sorry, I don't -- it was either

23  police or DCF.  I have my reports; I can review them to

24  recall.

25  Q   Okay.  Okay.  And then as far as with -- we discussed

26  about the first forensic which took place in October 2022,

27  and you were there.  Correct?

1    A    Yes.

2    Q    And did you ever speak to Angelina at all on that

3  day?

4    A    No.

5    Q    And have you ever met Angelina?

6    A    No.

7    Q    So you've never seen or met my child?

8    A    I've seen her, but I've made it a point not to be

9  introduced to her.

10    Q    Okay.  And so, during the first forensic, that took

11  place at the Yale Child Advocacy Center.  Is that correct?

12    A    Yes.

13    Q    And the woman who conducted the forensic interview,

14  her name was Priscilla Westberg, LCSW.  Is that correct, to

15  your --

16    A    I remember the first name Priscilla.

17    Q    -- to your recollection?  You said Priscilla.  Okay.

18        And so did anybody else -- I know you mentioned

19  before, you said there was a team and you mentioned the

20  person from Rape Crisis Center and the other individuals.

21  But, is it correct -- is it correct that the only person who

22  was in the room with Angelina during the interview was

23  Priscilla in October?

24    A    Yes.

25    Q    And, just to clarify for the record, is it true that

26  you as well as the DCF worker at that time observed through

27  some type of two-way glass where Angelina couldn't see you

```
 1   but you were able to both observe in real-time, however,

 2   only the interviewer and Angelina were alone in that room?

 3      A   Yes.

 4      Q   And was this interview recorded?

 5      A   Yes.

 6      Q   And, during this interview, is it true that when the

 7   woman Priscilla started it she asked Angelina if she knew

 8   why she was here?

 9      A   Yes.

10      Q   And did Angelina say no?

11      A   I don't remember.

12      Q   So, according to Priscilla, you know, she had stated

13   that Angelina said no.  And is -- and that's why --

14              MR. LODICE:  Objection, hearsay.

15              THE COURT:  Okay.  So, you can't ask --

16              MS. ANTAR:  Okay.

17              THE COURT:  -- the witness a --

18              MS. ANTAR:  I'll -- let me rephrase the

19          question.

20              THE COURT:  Listen.  Listen.  You can't ask the

21          witness a question about things that other people

22          said.

23              MS. ANTAR:  That's fine.  I'm gonna rephrase it.

24      Q   So, I know that -- okay.  After the interview, you

25   came back in the room with me and everybody else.  Correct?

26      A   Yes.

27      Q   And while it was happening, I was in a room with the
```

1    Rape Crisis Center Victim Advocate and somebody else from

2    the Yale Child Abuse Clinic, and I was not witnessing this

3    interview like you and the DCF worker were.  Correct?

4        A    Correct.

5        Q    Okay.  And then after, you guys came in to debrief me

6    and explain to me what occurred.  Right?

7        A    Yes.

8        Q    Okay.  And then so, is it your -- to the best of your

9    recollection that, per the conversation that we had in that

10   room after the interview, that you guys explained to me

11   that, you know, Angelina said she didn't know why she was

12   there and that's why they then brought out some type of

13   drawings which showed a age-appropriate figure of a human

14   body for a child?

15       A    I'm sorry.  I got lost in --

16       Q    Do you remember if they brought out drawings --

17       A    Yes.

18       Q    -- showing the body?

19       A    Yes.

20       Q    Okay.  And so did -- at that time, was Angelina asked

21   to identify random parts of the body such as an arm or a leg

22   and she answered that correctly?

23       A    No.  That was part of the reason why they had to end

24   the interview.  She -- because her attention span, we didn't

25   -- they didn't even get that far.

26       Q    So --

27       A    So it was hard to really hold her attention to

1   actually have a successful forensic, which is

2   understandable.  She was so young.

3              THE COURT:  All right.  So, let's just --

4    Q   So, you don't -- you don't --

5              THE COURT:  Hold on.

6              MS. ANTAR:  Okay.

7              THE COURT:  Let's just be clear.  Angelina was

8         born in 2019.  Right?

9              THE WITNESS:  Yes.

10             THE COURT:  So, this happened -- the interview

11        you're talking about right now happened in 2022?

12             THE WITNESS:  Yes, your Honor.

13             THE COURT:  So she was three?

14             THE WITNESS:  Yes, your Honor.

15             THE COURT:  Okay.

16   Q   And -- and, also, is it correct that in these

17   forensic interviews, that they ask the same set of questions

18   to a child between the age of 3 and 18 and that it --

19   regardless of your age, all children get asked the same set

20   of questions between the age of 3 and 18 and that they do

21   not modify these questions at all based on the child's age,

22   that they're the same across the board?

23   A   The Finding Words protocol, that's incorrect.  They

24   do modify the questions.

25   Q   But is it true that they're not allowed to ask the

26   children leading questions?

27   A   Correct.

1    Q   And is it true that the social worker that conducts

2   these interviews is trained specifically that they can't ask

3   anything leading at all?

4    A   Correct.

5    Q   And -- and if they get to a dead end where they would

6   have to ask a leading question, is it the protocol to stop

7   the interview?

8    A   Yes.

9    Q   And was Angelina asked if there's anywhere on her

10  body that no one else is allowed to touch?

11   A   They tried -- they had to -- they have to identify

12  the parts to have her be known what parts are what to her;

13  what she calls certain parts, if she's aware.  They couldn't

14  even get that far.

15   Q   So you don't remember when Priscilla stated that she

16  was able to identify this is my arm, this is a leg, and then

17  the third thing they asked her was, is there anything on

18  your body that no one else can touch and she answered no?

19  You don't remember Priscilla saying that in front of me and

20  you?

21   A   Sorry.  I'm specifying about the intimate areas.  She

22  didn't identify the intimate area.  The part about the arm

23  or her identifying the arm, that part I don't remember.

24   Q   You don't remember.  But you do remember that she was

25  unable to even identify what her intimate areas or private

26  parts were.  Correct?

27   A   Correct.

1    Q    So, was Angelina ever asked in that forensic

2    interview if anyone touched her in her private parts?

3    A    I don't think she was asked that, and I --

4    Q    Because that would have been a leading question.

5    Right?

6    A    Correct.

7    Q    Correct.  I'm sorry.  So -- so, now she -- so, was

8    she ever asked directly by anyone from New Britain Police if

9    she was sexually abused?

10   A    Police don't interview our victims.

11   Q    And is it the State law that police are not allowed

12   interview child victim?

13   A    It's not that they're not allowed, it's just not our

14   procedure.

15            THE COURT:  Okay.  We're gonna stop.  Stop.

16   Q    And so -- okay.

17            THE COURT:  Ms. Antar --

18            MS. ANTAR:  Yes.

19            THE COURT:  I let you got for ten minutes.  You

20        haven't asked this woman a single question that's

21        relevant for my --

22            MS. ANTAR:  I just have some questions about the

23        second interview as well.

24            THE COURT:  Don't -- don't -- please don't

25        interrupt me.  You haven't asked this witness a

26        single thing that's --

27            MS. ANTAR:  How is that not relevant?

1      THE COURT:  Please don't interrupt me.

2      MS. ANTAR:  She just testified that no one --

3   she never met my daughter.

4      THE COURT:  Please don't interrupt.

5      MS. ANTAR:  Okay.

6      THE COURT:  So, why don't you tell me what it is

7   broadly that you want to know about this witness --

8      MS. ANTAR:  Yeah.

9      THE COURT:  -- and I'll ask her about it.  Put

10  your questions down.  Tell me what you think it is

11  that this witness could offer this proceeding.

12     MS. ANTAR:  So, the witness failed to mention

13  the fact -- I'm sorry.  Should I be sworn in first?

14     THE COURT:  No.  You're not gonna testify.

15     MS. ANTAR:  Okay.

16     THE COURT:  I'm just trying to figure out what

17  you think this witness --

18     MS. ANTAR:  I mean --

19     THE COURT:  Listen.

20     MS. ANTAR:  -- I'd like to tell you.  Yes.

21     THE COURT:  Okay.  What this witness has by

22  information --

23     MS. ANTAR:  Mm-hmm.

24     THE COURT:  -- that would help me decide this

25  case.

26     MS. ANTAR:  Okay.

27     THE COURT:  What does she -- what do you think

1    she knows that would be helpful?

2         MS. ANTAR:  Well, I just wanted, for -- more for

3    clarification purposes for the Court and for the

4    record, for her to -- there was certain things she

5    said in her testimony that were inaccurate and maybe

6    -- maybe she didn't remember it, it's fine.  But, I

7    just wanna make it clear for the record about what

8    was said and what occurred.  For example, she

9    mentioned that that last time we spoke was on -- she

10   stated it was on a phone call on February 13 -- on

11   March 13th she stated that I hung up on her and got

12   mad and that was the last time we talked.  But,

13   that's --

14        THE COURT:  No.  She didn't -- the witness

15   didn't -- this is excellent example.

16        MS. ANTAR:  She -- okay.

17        THE COURT:  The witness didn't say that.  I

18   asked her when was the phone call that she hung up on

19   you.  That was my question.

20        MS. ANTAR:  But she said --

21        THE COURT:  I didn't ask her when the last time

22   she talked to you was.

23        MS. ANTAR:  But she said she believes that may

24   have been the last time we spoke.

25        THE COURT:  But it -- but --

26        MS. ANTAR:  I wanted to make it clear to the

27   Court --

1          THE COURT:  -- but, Miss Antar, it doesn't

2     matter.

3          MS. ANTAR:  It does matter.  It's very important

4     because, after that, we did speak.  We had a meeting

5     at the New Britain Police Department Headquarters.

6     During that meeting, it was a full recorded video

7     interview in person where she was there, Sergeant

8     Barsaleau of the New Britain Police Department was

9     there, Cindy from the Rape Crisis Center of Milford

10    was there, and Detective Lisa Steeves.  We had a very

11    productive interview.  They gave me one hour of

12    devoted time and listened to me.  They were

13    respectful.  Everybody was nice.  Lisa was very nice.

14    And they said to me at the beginning of this

15    interview that we're just letting you know this is

16    all being recorded.  And, during this interview, I

17    disclosed to her that Angelina -- there was a whole

18    other investigation that she didn't bring up.  And

19    they stated that they were going to -- that's why --

20         THE COURT:  Okay.  So, stop.

21         MS. ANTAR:  Yeah.  Okay.

22         THE COURT:  Let me ask this witness --

23         MS. ANTAR:  Okay.

24         THE COURT:  -- about any other investigations.

25         MS. ANTAR:  Okay.

26         THE COURT:  That would be helpful.  Okay?

27         MS. ANTAR:  Okay.

1          THE COURT:  But you're not gonna do it because

2     it takes too long when you do it.

3          MS. ANTAR:  Sure.

4          THE COURT:  And you're asking this woman all

5     sorts of irrelevant stuff so.

6          I go three investigations; October '22, February

7     '23, and May of '23.  Any other investigations

8     regarding this family?

9          THE WITNESS:  Four.

10          THE COURT:  Four.

11          THE WITNESS:  And that's probably why I was

12     jumping -- there's -- there's a lot.

13          THE COURT:  Okay.

14          THE WITNESS:  So that might be why --

15          THE COURT:  That's fine.

16          THE WITNESS:  -- I wasn't --

17          THE COURT:  Tell me about the fourth.

18          THE WITNESS:  The fourth one is the current one.

19     So the first one was October, the second one was

20     February 3rd, the third one came up in March during

21     -- actually, the first or the second investigation,

22     and now the one we're at now.  So there's now four.

23          THE COURT:  Okay.  So there's actually four.

24     Okay.  And were the first three closed?

25          THE WITNESS:  Yes, your Honor.

26          THE COURT:  And were they all initiated by Ms.

27     Antar?

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  Okay.  And the fourth one is the one

3     that you haven't closed because you're waiting for

4     the results from Hartford Hospital?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  Okay.  All right.  That was useful.

7          MS. ANTAR:  Okay.  And now I wanted to --

8          THE COURT:  So, other subject areas?

9          MS. ANTAR:  It's very relevant in that you

10     stated that the first -- that they were closed.  We

11     established that the first one was immediately

12     closed.  She immediately closed the investigation

13     when my daughter was unable to  identify --

14          THE COURT:  Okay.  So tell me --

15          MS. ANTAR:  -- private parts.

16          THE COURT:  Stop.

17          MS. ANTAR:  This is very relevant.

18          THE COURT:  Ms. Antar --

19          MS. ANTAR:  Yes.  She stated there was --

20          THE COURT:  don't --

21          MS. ANTAR:  She stated no disclosure.  That

22     doesn't mean that the abuse didn't happen.

23          THE COURT:  Listen, if you -- if you can't

24     follow the rules of court, I'm gonna have to put you

25     in the hallway while these people testify.

26          MS. ANTAR:  Well, I have the right to cross-

27     examine this witness.

1          THE COURT:  You don't have the right --

2          MS. ANTAR:  I do have the right to cross-

3     examine --

4          THE COURT:  Okay.

5          MS. ANTAR:  -- this witness and the other

6     witness.

7          THE COURT:  Okay.

8          MS. ANTAR:  I have the right.

9          THE COURT:  So --

10         MS. ANTAR:  And I have questions.  You're

11    refusing to allow me to ask her questions.  You said

12    you want -- you want a broad overview.

13         THE COURT:  Miss Antar --

14         MS. ANTAR:  I'd be happy to provide that to you.

15         THE COURT:  -- what other subjects do you think

16    this witness might be helpful on?

17         MS. ANTAR:  Right.  I wanted her to clarify that

18    Angelina didn't say that she wasn't abused.

19         THE COURT:  Okay.  I --

20         MS. ANTAR:  They did not investigate it, other

21    than asking -- I wanted to just clarify.

22         THE COURT:  I understand --

23         MS. ANTAR:  Okay.  But do you understand that

24    the first --

25         THE COURT:  -- why they were closed.

26         MS. ANTAR:  Do you -- okay.  So -- and I wanna

27    make it for the record.

```
 1    Q   Do you understand --

 2            THE COURT:  You -- you have -- you have made an

 3        excellent record on that point.  Don't worry.

 4    Q   Do you understand, for the record, that -- and is it

 5  on the record now that the first investigation was -- the

 6  only thing that we did to --

 7            THE COURT:  Okay.  Stop.

 8    Q   -- the only thing we did to investigate that --

 9            THE COURT:  Miss Antar --

10    Q   -- was ask my daughter one question --

11            THE COURT:  -- stop.

12    Q   -- which she answered wrong?

13            THE COURT:  Stop.

14            MS. ANTAR:  Okay.

15            THE COURT:  Any other subjects for this witness?

16        That's it.

17            MS. ANTAR:  Yes.  The second forensic.

18            THE COURT:  What is it?

19            MS. ANTAR:  The second forensic.

20            THE COURT:  No, I -- I'm not -- you're not gonna

21        ask her any more questions about that.  It's not

22        helpful.

23            MS. ANTAR:  We never asked any about the second

24        forensic yet.

25            THE COURT:  Right.  Okay.  Listen.

26            MS. ANTAR:  You're not gonna allow me to ask her

27        about the second forensic?
```

```
1            THE COURT:  No, I'm not.

2            MS. ANTAR:  She's -- there was a disclosure made

3       during that.  That's very important and relevant and

4       you're not gonna allow me --

5            THE COURT:  Miss --

6            MS. ANTAR:  -- to ask her a question about that?

7            THE COURT:  No.  I'm not.

8            MS. ANTAR:  Why is that?

9            THE COURT:  Do you have any other subject

10      areas --

11           MS. ANTAR:  Absolutely.

12           THE COURT:  -- that you think --

13           MS. ANTAR:  The fact that she state --

14           THE COURT:  Listen.

15           MS. ANTAR:  She didn't bring up the fact that at

16      Yale Child Advocacy Center they said they don't --

17      they recommend no unsupervised contact with Dominic

18      and they noted --

19           THE COURT:  Okay.  Miss Antar --

20           MS. ANTAR:  -- they noted that.  Why aren't you

21      letting me ask her about that?

22           THE COURT:  Because it's hearsay.

23           MS. ANTAR:  It's not hearsay.  It's in the

24      record.  It's on the e-filed case exhibits.

25           THE COURT:  Okay.

26           MS. ANTAR:  If you look in the e-file case

27      exhibit, I'll tell you the number.
```

1      THE COURT:  I'm -- I am -- I'm about --

2      MS. ANTAR:  It's not hearsay.

3      THE COURT:  -- to let this witness go unless you

4   tell me some subject area that we haven't covered

5   that is relevant.

6      MS. ANTAR:  We haven't covered the March 3rd

7   forensic interview yet and I'd like to ask her about

8   that.

9      THE COURT:  All right.  Well, I asked her if

10  they were all closed and she said yes.

11     MS. ANTAR:  I'm not talking about the police

12  investigation.  I'm talking about the forensic

13  interview which was scheduled by DCF that took place

14  on March 3rd, 2023 at the Yale Child Abuse Clinic --

15     THE COURT:  Okay.

16     MS. ANTAR:  -- that was conducted by Leah Smith.

17  That's what I'm talking about.

18     THE COURT:  Okay.

19     MS. ANTAR:  We -- you did not allow me to ask --

20     THE COURT:  This -- this --

21     MS. ANTAR:  -- her about that.

22     THE COURT:  Okay.  Listen.  This witness works

23  for the police department. So all she can --

24     MS. ANTAR:  She was present for this interview.

25     THE COURT:  Okay.

26     MS. ANTAR:  She observed it.

27     THE COURT:  Miss -- Miss Antar --

1          MS. ANTAR:  It's very relevant.

2          THE COURT:  Okay.

3          MS. ANTAR:  She testified about this.  She --

4     she testified incorrectly.

5          THE COURT:  Okay.

6          MS. ANTAR:  It's not funny.  It's really not

7     funny.

8          THE COURT:  Ms. Antar, this witness can only

9     tell me first-hand what  her department did and what

10     she did in her role.

11          MS. ANTAR:  She testified what she observed --

12          THE COURT:  Okay.  All right.

13          MS. ANTAR:  -- at the March 3rd --

14          THE COURT:  If you can't stop interrupting me --

15          MS. ANTAR:  Okay.  You know what.

16          THE COURT:  -- and you can't let me finish my

17     sentences, this is not gonna work.

18          MS. ANTAR:  So, just to confirm, I'm not gonna

19     be allowed to continue to cross-examine this witness?

20          THE WITNESS:  Correct.  Because you can't --

21          MS. ANTAR:  You're not allowing me -- just -- I

22     couldn't hear you.  You said, correct, you're not

23     going to --

24          THE COURT:  I said --

25          MS. ANTAR:  -- allow me to ask anymore questions

26     to this witness, despite the fact that I have some --

27     some that wrote down here that I'd like to ask her

1      about --

2              THE COURT:  Well, what's --

3              MS. ANTAR:  -- things that never got addressed

4      that will be on the record that you did not let this

5      get asked.

6              THE COURT:  What is the subject matter that you

7      want to ask the witness --

8              MS. ANTAR:  The subject is that fact she -- you

9      said that I scheduled these forensics.  DCF schooled

10     them, not me.  I wanted her to clarify that.

11             I also wanted her to clarify that there was a

12     disclosure that was made on March 3rd.

13             THE COURT:  Okay.

14             MS. ANTAR:  And it's not hearsay.  It's in the

15     records which I filed as an exhibit which were put in

16     by Angelina's MyChart.  And she stated in there that

17     Dominic sits on her, that she has her sit on him --

18             THE COURT:  Okay.  Okay.

19             MS. ANTAR:  -- and that they straddled each

20     other.  And states --

21             THE COURT:  Miss -- Miss Antar, stop.

22             MS. ANTAR:  Okay.  You don't wanna hear it

23     because you're trying to silence me again.

24             THE COURT:  No.  It's just that you --

25             MS. ANTAR:  Then why won't you let me speak?

26             THE COURT:  Are you gonna let me answer that

27     question?

1          MS. ANTAR:  Are you gonna let me cross-examine

2     the witness?

3          THE COURT:  Okay.

4          MS. ANTAR:  It's -- and you're laughing.  I love

5     how you think this is so funny,.

6          THE COURT:  Miss Antar, you -- I can't answer

7     you if you don't stop talking.

8          MS. ANTAR:  She's the wtiness.

9          THE COURT:  All right.

10         MS. ANTAR:  She testified.

11         THE COURT:  All right.

12         MS. ANTAR:  You called her in here.  I have the

13     right --

14         THE COURT:  Stop.  That's enough.

15         MS. ANTAR:  Okay.

16         THE COURT:  The witness is excused.

17         MS. ANTAR:  Yep.

18         THE COURT:  That's it.  She's released from the

19     subpoena.  There isn't a single thing you've raised

20     that this witness hasn't already told me.

21         MS. ANTAR:  That's okay.  I'll just send her a

22     deposition to answer the rest.

23         THE COURT:  All right.  Thank you, Detective

24     Steeves.

25         THE WITNESS:  Thank you, your Honor.

26         THE COURT:  I've got another Court witness from

27     the Department of Children and Families.  Okay.  Just

1    remain standing for a moment while the clerk swears

2    you in please.

3         THE CLERK:  Please raise your right hand.  Do

4    you solemnly swear or solemnly and sincerely affirm

5    as the case may be that the evidence you shall give

6    concerning this case shall be the truth, the whole

7    truth, and nothing but the truth, so help you God or

8    upon penalty of perjury?  If so, please say I do,.

9         THE WITNESS:  I do.

10         THE CLERK:  Please state your name, your

11    business address, and the spelling of your last name

12    please.

13         THE WITNESS: LaRae Plummer, last name is P-l-u-

14    m-m-e-r.  I'm a DCF social worker in the Milford

15    office, 38 Wellington Road, Milford, Connecticut.

16         THE COURT:  All right.  Thank you, Miss Plummer.

17    You can have a seat.  That microphone doesn't make

18    you any louder, it's just for the sake of the

19    monitor.  So, you're gonna --

20         THE WITNESS:  Okay.

21         THE COURT:  -- mostly talk to me.  So, you are

22    here pursuant to subpoena by the Court, and I

23    appreciate your coming.

24

25

26

27

1       **L A R A E   P L U M M E R,**

2   Having been first duly sworn by the clerk of the Court, was

3   called as witness and testified upon her oath as follows:

4   **DIRECT EXAMINATION BY THE COURT:**

5       Q   Tell me what your role is at DCF and how long you've

6   had that role.

7       A   I have been at DCF for eight years and I've been a

8   social worker for that time.  I started in the investigative

9   unit in December of

10      Q   Okay.  And you have some familiarity with this

11  family?

12      A   Yes.

13      Q   Could you tell me about that?

14      A   I was assigned the Antar case in February of 2023

15  with allegations of possible sex -- sexual abuse regarding

16  Angelina.

17      Q   All right.  So that's the allegations regarding her

18  older step brother?

19      A   Correct.

20      Q   Okay.  So could you tell me how they came to your

21  attention?  Like, how the case came to you?

22      A   Absolutely.  So, we received -- the department

23  received a referral from Miss Antar on approximately

24  February 3rd with concerns of Angelina's older step brother

25  touching her inappropriately or having some type of sexual

26  contact.  And so it was assigned to me initially.

27      Q   And what did you do in the course of your assignment?

1    A    In the course of my assignment we -- we go out and we

2    met -- well, I initially did not meet with Miss Antar

3    initially because I was out, so one of my co-workers met

4    with her for the first -- the first initial visit.  However,

5    subsequent to that, I submitted a 737, which is when a

6    client comes in with a possible sex abuse, we -- we will

7    submit that to the Yale Child Abuse Clinic, notify the

8    police department, and a forensic interview is scheduled.

9    Q    All right.  So, did you meet with anybody in the

10   family?

11   A    I did, yes.

12   Q    Who did you meet with?

13   A    I met with Miss Antar subsequent to the first

14   initial --

15   Q    Mm-hmm.

16   A    -- as well as Angelina.  And I met with Mr. Lodice.

17   Q    Okay.  And where did you meet Angelina?

18   A    I met with her at her home.

19   Q    At her mom's house?

20   A    I saw her at her home.  Yes.

21   Q    Okay.  And how was Angelina at her mom's house?

22   A    At her mom's house she was lively, playing around.  I

23   didn't have too much conversation with Angelina because we

24   try to limit the conversation regarding the case to -- so

25   that she can just meet with one person at the forensic

26   interview.

27   Q    All right.  Did Ms. Antar cooperate in your work?

1    A    Yes.

2    Q    And did Mr. Lodice cooperate in your work?

3    A    Yes.

4    Q    All right.  And did you talk to anybody else?  You

5  talked to mom, dad, and child.  Right?

6    A    Yes.

7    Q    Anybody else?

8    A    Just Detective Steeves and the other providers that

9  were involved.

10    Q    What happened with this February 3rd, 2023 referral?

11    A    It was subsequently closed due to a nondisclosure of

12  any sexual abuse and collaboration with Detective Steeves'

13  investigation as well.  And we closed the case.

14    Q    How would you characterize your interactions with

15  Miss Antar?

16    A    Miss Antar stopped communication with me mid-

17  investigation due to she didn't like the way I handled the

18  case.  And so a lot of her communication happened with my --

19  either my supervisor or my program director or a area

20  director.

21    Q    Do you know what it is that Miss Antar didn't like?

22    A    If -- to -- I believe it was the second -- it was

23  after the second referral that came in where it was alleged

24  that Mr. Lodice abducted Angelina from daycare.  And she was

25  not in agreeance with DCF not removing or not allowing Mr.

26  Lodice to see her.

27    Q    Okay.  And can you characterize for me your

1 | interactions with Mr. Lodice?

2 |   A   Very -- he communicated very well.  There was no --

3 | no issued with communication or visits with Mr. Lodice.

4 |   Q   Did you see Angelina at his house?

5 |   A   No, I did not.

6 |   Q   In the course of your work, did -- did you have any

7 | concerns about either parent?

8 |   A   It was -- there were concerns just based around the

9 | constant request for forensics for Angelina because she's so

10 | young and she has already had -- had two at one point -- at

11 | that point.  And Miss Antar was requesting another.  And

12 | there was concern around her having -- Angelina having to do

13 | repeated forensics just with the same -- they're conducted

14 | the same throughout the state so it wouldn't be anything

15 | different.

16 |   Q   So, it was Miss Antar asking for additional or

17 | repeated forensic evaluations of the child?

18 |   A   After the -- the one that I was involved, yes.

19 |   Q   Okay.  Did you know about the one in October of 2022?

20 |   A   Yes.

21 |   Q   And these forensic interviews, are they -- did any of

22 | these forensic interviews include physical examination of

23 | the child?

24 |   A   I'm not sure about the first one.  The second one, I

25 | believe Miss Antar agreed to a physical, but I -- I can't

26 | recall completely.

27 |   Q   And when you say that was a concern, what does that

1   mean?  Like, what is -- what -- what -- how does that

2   translate into a concern for the department?  How would you

3   articulate that?

4       A    The department doesn't -- the forensics are very

5   intense and, you know, the -- for a -- for an alleged

6   victim.  And so once, you know, the information is given, we

7   kind of don't -- unless there's something truly earth-

8   shattering, don't want someone to continue to be asked the

9   same questions over and over again.  And it kind of -- if

10  there's no new reasoning and you're gonna get the same

11  information, there's no -- no sense in putting a child

12  through that again.

13      Q    But, Ms. Antar was asking you to do that?

14      A    Yes.

15      Q    And this incident about the daycare --

16      A    Mm-hmm.

17      Q    -- or the alleged abduction, this is the father

18  retrieving the child from the daycare?

19      A    Yes.

20      Q    And Miss Antar made what request of your department?

21      A    she was -- she was -- she wanted Mr. Lodice not to

22  have contact with Angelina or to be able to -- be allowed to

23  pick her up.  And DCF did not have the -- the -- we couldn't

24  deny him of that.  It was his day to have him [sic] based on

25  the Court -- based on his days, and there was no Court order

26  saying that he could not have her, nor was there any

27  concern.  At that point, we had already had the forensic, so

1   there was no concern of Mr. Lodice's care.

2   Q   All right.  So, I was asking you if the department

3   had any concerns about either parent -- oh.  You all right?

4   A   Yeah.

5   Q   About either parent.  So, you said, yes, there was a

6   concern with Miss Antar about the repeated requests for

7   forensics.  Were there any other concerns about the mother?

8   A   No.

9   Q   And were there any concerns about the father?

10  A   No.

11  Q   All right.  So the -- the child did go back with the

12  father and the department did not intervene.

13  A   No.

14  Q   And are there any open cases that you know if?

15  A   No.  Not that I know of, no.

16  Q   Okay.  Is your work with the family done?

17  A   Yes.

18  Q   And is there anything else that you think I should

19  know in relation to this custody dispute about your work

20  with the family?

21  A   No.

22  Q   Okay.  All right.  Okay.

23          THE COURT:  You know what, I'll start with Mr.

24  Lodice first.  Do you have any questions for the DCF worker?

25          MR. LODICE:  No.  I'm all set.

26          THE COURT:  All right.  Ms. Antar, do you have

27  any questions for -- for Miss Plummer.

1              MS. ANTAR:  I do, and I'd like to be able to ask

2    her questions without you holding my hand and treating me

3    like a child, because I'm perfectly capable of asking her

4    the very few -- just a few questions I have for her.

5              THE COURT:  All right.  Well, how many questions

6    are there?

7              MS. ANTAR:  Am I limited when I'm cross-

8    examining a witness to how many questions I can ask?

9              THE COURT:  Possibly.

10             MS. ANTAR:  Okay.  Well, I'd like to just start,

11   like, in the sake of time, to just ask her what she was

12   saying.

13   CROSS-EXAMINATION BY MS. ANTAR:

14     Q   So, hello, Miss Plummer.  How are you are?

15     A   I'm well, and you?

16     Q   Doing well.  Thank you.

17         I just wanted to just ask, so you mentioned that I

18   was asking for constant forensic interviews.  Wasn't it DCF

19   that scheduled the first two interviews because isn't it

20   your protocol that you guys automatically schedule it?

21     A   Yes.

22     Q   Okay.  So -- and so, just to be clear, I didn't ask

23   to the schedule the first two.  DCF did both times?

24     A   Yes.

25     Q   And then were you aware of what Detective Steeves

26   testified about how there was a third police investigation

27   that was initiated after that date when I contacted you?

1  Did you -- were you listening when Detective Steeves

2  testified that earlier?

3     A   A third investigation.

4     Q   So, I know that you were not present, but were you

5  aware of the recorded in-person interview where I was with

6  Detective Steeves and her Sergeant and Cindy?

7     A   Oh.

8     Q   And were you told about, after that, that there had

9  been allegations that Angelina stated that she was sexually

10 abused by Dominic on March 11th while left alone with him?

11 Did you get told that?

12    A   I believe Detective Steeves and I had a conversation

13 about that.

14    Q   Okay.  And do you remember that they had scheduled --

15 do you remember that Lisa Steeves stated that we were going

16 to be scheduling a third forensic at Klingberg because of

17 the fact that she stated that maybe they would allow

18 Angelina to bring her stuffed animal since Yale had such a

19 strict policy about nothing being allowed to go in there and

20 that it had been scheduled for the 21st?

21              THE COURT:  All right.  Hold -- hold on.  You

22 gotta -- that's not a question.  Like, what are you asking

23 this person?  That's got like six things in it.  What are

24 you asking her?

25    Q   Did you remember that the forensic interview was

26 scheduled for March 21st after this new police investigation

27 was open?  And that Lisa Steeves scheduled that after our

1    in-person meeting?

2       A   I don't recall that.

3       Q   So was DCF contacted by Lisa Steeves or anybody from

4    the New Britain Police Department after that second week of

5    March when we met and it was -- Cindy was there?

6              THE COURT:  All right.  Why -- okay.  You gotta

7          ask -- you gotta -- she can't answer --

8       Q   Was DCF contacted after we had the meeting where

9    Cindy was present?

10      A   Yes.

11      Q   And do you remember that the forensic was scheduled

12   and booked for March 21st for Anglina at Kilngberg?

13      A   I don't remember the date, but I do remember a

14   conversation around a possible forensic being scheduled,

15   yes.

16      Q   Okay.  And did you know that -- were you aware that

17   the third investigation, it was never reported directly to

18   DCF.  Correct?

19      A   Correct.

20      Q   And that was only reported through a verbal

21   communication from myself to the detective and her sergeant

22   in-person at headquarters of -- in New Britain?

23      A   Mm-hmm.  Yes.

24      Q   And so it wasn't me who was constantly asking for

25   forensics.  It was DCF that scheduled the first two and

26   Detective Steeves who scheduled the third.  Correct?

27      Q   You did ask for another one during the second

1    interview after we debriefed in the room.

2      Q   But do you remember -- you weren't present at the

3    meeting in which I disclose that the child made a new

4    disclosure and that they were opening up a new investigation

5    after that March 11th incident and that that was why she

6    brought up security footage; that's why she said that she

7    attempted that.  You do -- you do recall?

8              THE COURT:  All right.  Miss Antar, that's not a

9         question.

10     A   Yes.  But you requested it to be at Klingberg and not

11   at the New Haven office where the other two have been.

12     Q   Okay.  And --

13             THE COURT:  Hold on.  So mom requested that it

14        happen at a particular place?

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.

17     Q   And so who told you that I requested that?

18     A   That was a conversation Detective Steeves and I had.

19     Q   A conversation with who?

20     A   Detective Steeves.

21     Q   So, your testimony is that Detective Steeves said

22   that I requested Klingberg?

23     A   Yes.

24     Q   Okay.  And then the other thing I wanted to ask you

25   is that you stated that there was no -- Matthew stated

26   previously that you -- is it true that you told Matthew

27   there was no recommendations after the second forensic?

1   A   Recommendations for who?

2   Q   In terms of for -- for our daughter.

3   A   No.  There were recommendations.

4   Q   And which recommendations did you relay to Matthew

5   that were recommended by the Child Abuse Clinic and Yale

6   after that second forensic where you were present?

7   A   To follow up with the Child Abuse Clinic, like, from

8   the -- the same thing from the first one.  She was already

9   involved with the Child Abuse Clinic so.

10   Q   I'm sorry, I couldn't hear you.

11   A   To follow up with the Child Abuse Clinic.

12   Q   So, no, I'm saying, you were present at the March 3rd

13   forensic interview at the Child Abuse Clinic.  Correct?

14   A   Yes.

15   Q   And I was also there.  Correct?

16   A   Yes.

17   Q   Obviously.  And so do you -- do you recall if the

18   individual Leah Smith who did the interview had any

19   recommendations for afterwards for Angelina as far as, for

20   example, that she put no unsupervised contact with Dominic

21   during the investigation?  Do you recall that?

22   A   I -- no, I don't recall that.

23   Q   Okay.  And do you recall that she stated that she

24   recommended that Angelina continue in Yale Child Study

25   Center for therapy?

26   A   Yes.

27   Q   And did you recommend also that DCF felt that

1   Angelina should continue with Yale Child Study Center?

2       A    Yes.

3       Q    And did you state to family relations that you had

4   major concerns for my mental health?

5       A    No.

6       Q    So, it's your testimony that you did not tell this

7   Court that you had major concerns for my mental health but

8   no concerns for the father?

9       A    Major concerns, no.

10      Q    Okay.  And so did you also state to family relations

11  that you, quote, wanted us both to engage in mental health

12  treatment services, both mom and dad engage in mental health

13  treatment?

14      A    No, that wasn't part of my recommendations.

15      Q    So did you make any recommendations relative to

16  either mine or dad's mental health or any mental health

17  other than Angelina?

18      A    In my report, yes.  For you --

19      Q    And what --

20      A    -- for you to continue with your -- with your therapy

21  with your counselor.

22      Q    And for us to both be participating in Angelina's

23  therapy at Yale Child Study?

24      A    Yes.

25      Q    Okay.  And then I also wanted to say, you stated that

26  these forensics are intense for the children.

27      A    Mm-hmm.

1    Q   Do you feel that the questions that were asked of

2  Angelina in the second interview that you observed were

3  intense or how would you describe the interview itself that

4  Angelina did?

5    A   I think the interview was thorough and appropriate.

6    Q   And did you witness that Angelina stated during that

7  interview that Dominic sits on her and has her sit on him?

8    A   Yes.

9    Q   And she stated that when they asked to demonstrate

10  what he does, she straddled the floor.  Is that correct?

11    A   Yes.

12    Q   And so she did make those disclosures as documented

13  in MyChart.  And, but you are saying you don't remember that

14  Leah Smith --

15          THE COURT:  All right.  You have to -- you have

16       to pick which question you want her to answer.

17    Q   Oh.  Okay.  So, is it your testimony that you don't

18  remember if Leah Smith had recommended no unsupervised

19  contact with Dominic?

20    A   No, I don't.

21    Q   Not to your recollection?

22    A   I don't -- I don't remember that, no.

23    Q   But you didn't -- did you ever see the MyChart or the

24  follow-up from any of that?

25    A   No.

26    Q   Okay.  And then -- let me see what else.  And, as far

27  as with you said that you guys -- so DCF decided that they

1   weren't going to do the third forensic interview because

2   why?

3       A   DCF --

4       Q   Why did DCF -- I'm sorry.  Let me rephrase that.  Why

5   did DCF choose to cancel the third interview that -- after

6   it was already scheduled?

7       A   DCF didn't cancel the third interview.

8       Q   So DCF didn't decide that they were going to put it

9   on hold and then conduct a meeting with the individuals at

10  Klingberg?

11      A   It was -- it was a result of the meeting that the

12  forensic was canceled.

13      Q   And so the reason was because you stated they thought

14  it was gonna be traumatic for Angelina or too much for her?

15      A   It's that she had two already two previous already

16  done and it was inappropriate to have a third one done given

17  her age and the allegations had already been investigated.

18      Q   Okay.  And are you aware that Angelina does have a

19  forensic that was scheduled by Connecticut Children's

20  Medical Center of Hartford due to this newest allegation?

21      A   No, I'm not part of the new allegation.

22      Q   Okay.  And do you guys have any -- ever work with the

23  Scan Clinic?

24      A   No, I haven't.

25      Q   Okay.  And then also I just wanted to say that you

26  stated that -- did you tell Matthew that it was okay for

27  Dominic to be with Angelina unsupervised after that third

1   forensic?  I mean, after the second forensic.

2      A   Did I tell Dominic that --

3      Q   Did -- did you tell Matthew that DCF thought it was

4   appropriate and acceptable for him to start letting Angelina

5   have unsupervised contact with Dominic after the second

6   forensic that you witnessed?

7      A   I did say that it was -- it was okay, however,

8   considering the constant allegations, that it would be in

9   his best interest not to.

10     Q   So, I'm sorry.  You stated that there was constant

11  allegations and that you felt that -- you felt that it was

12  okay for her to have unsupervised contact with Dominic?

13     A   Being that there was no evidence and that we had

14  closed our case, we haven't -- we can't --

15     Q   So you advised him to allow her unsupervised contact

16  -- allow unsupervised contact with Dominic despite the fact

17  that --

18             THE COURT:  All right.  That's not what the

19         witness --

20     Q   -- the investigation with the police wasn't closed?

21             THE COURT:  Stop.  All right.  Stop.  That's not

22         what the witness said, Miss Antar.  You can't

23         recharacterize her testimony.

24             MS. ANTAR:  I know exactly what was said.

25             THE COURT:  Okay.  Well.

26             MS. ANTAR:  She can answer the question.

27             THE WITNESS:  I did.

1        THE COURT:  I get to decide that actually.

2        MS. ANTAR:  Okay.  Well, I just --

3        THE COURT:  And it's not a -- it's a not a

4    question.  You're -- you're -- you're

5    mischaracterizing her testimony.  Her testimony was

6    that she told the father that the -- his children

7    could be unsupervised with Angelina, but that maybe

8    it's a bad idea because there's these constant

9    allegations coming up and that it might not be good

10    for the -- for the stepbrother.  That's what she

11    said.

12        MS. ANTAR:  Okay.

13    Q    So, Miss Plummer, do you remember what you said that

14    when I tried to reach out to you about the situation out of

15    concern for Angelina, do you remember -- I'm sorry.  Hold on

16    a second.

17        So, I mean, you mentioned before -- you stated that

18    DCF said that they had concerns for my mental health?

19    A    No.

20    Q    Okay.  So why is -- why did Judge Grossman say in the

21    order that DCF stated they had major concerns for the

22    mother's mental health and no concerns for the father's

23    mental health?

24        THE COURT:  All right.  This -- this witness

25    can't answer that question.

26        MS. ANTAR:  According to you, you stated that

27    DCF said that to family relations.  She's saying

1      that's a lie.  So does that mean you're lying?

2           THE COURT:  Okay.  This -- we're all done with

3      this witness.

4           MS. ANTAR:  We're all done.  Okay.

5           THE COURT:  Yeah.  Okay.  Thank you.

6           MS. ANTAR:  Don't worry.  She'll get a

7      deposition hearing too.

8           THE COURT:  All right.  Thank you, Miss Plummer,

9      very much for your testimony.

10          The next Court witness is going to be a witness

11     from family relations.  We're gonna take a recess

12     until 3:30 and then I'll need that witness here.

13          (Whereupon court recessed.)

14          THE COURT:  Good afternoon, ladies and

15     gentlemen.  All right.  Everyone can have a seat.

16     We're back on the record on the Antar and Lodice

17     matters.  And the next witness -- well, the next

18     person we're gonna hear from is the family relations

19     counselor assigned to do some general case management

20     on behalf of the Court.  So, I think we're ready for

21     that witness or that person.

22          So she doesn't need to be sworn in 'cause she's

23     just reading a report.  So we'll just take your name

24     for the record.

25          MS. BARANOWSKI:  Anna Maria Baranowski.

26          THE COURT:  All right.  Miss Baranowski, you can

27     have a seat.  You work for family relations and I

1   asked family relations  to do some general case

2   management based on disclosure that the mother made

3   at the end of our last hearing.  So why don't you

4   tell us for the record what that was and then you

5   could read us your report.

6        MS. BARANOWSKI:  What my tasks were, your Honor?

7        THE COURT:  Yep.

8        MS. BARANOWSKI:  Okay.  So I have on May 31st,

9   2023, the Court ordered a general case management as

10  follows:  Family relations will report to the Court

11  regarding the mother's statement that additional

12  complaints of sexual abuse were initiated by her in

13  May of 2023.  Family relations will attempt to speak

14  with any person or provider familiar with this new

15  complaint to include DCF, any police department, and

16  any medical providers, including Hartford Hospital.

17  Therefore, each parent signed releases for the

18  following:  Bright Horizons, Preferred Pediatrics,

19  Yale Child Study Center, Griffin Hospital,

20  Connecticut Children's Medical Center, and the

21  Department of Children and Families.  A release of

22  information was not needed for the New Britain Police

23  Department.

24       THE COURT:  All right.  So, to be clear, you've

25  provided general case management on this case before,

26  but all you're reciting for the Court today is May

27  2023 to now?

1        MS. BARANWOSKI:  Correct.

2        THE COURT:  Okay.  Go ahead.

3        MS. BARANOWSKI:  A release of info and record

4    request was mailed to Bright Horizons on June 8th,

5    2023.  On June 8th, 2023, family services left a

6    voicemail message for director Paula Boyles.  At the

7    writing of this report, family services has not

8    received information from Bright Horizons.

9        A release of information and record request was

10   mailed and faxed and faxed to Preferred Pediatrics on

11   June 8th, 2023.  Family services spoke with Nurse

12   Kelly Daley of Preferred Pediatrics on June 9th,

13   2023.  On June 2nd, 2023 at 11 a.m. Miss Antar made

14   an appointment for Angelina for June 9th, 2023 at

15   4:30 p.m.  The appointment was scheduled as a

16   standard sick visit to discuss things going on with

17   Angelina.  On June 9th, 2023, the pediatric office

18   was contacted by Miss Antar via telephone whom

19   indicated that Mr. Lodice is refusing to take

20   Angelina to her scheduled appointment later that day.

21   Shortly thereafter, Mr. Lodice contacted the

22   pediatric office via telephone indicating that

23   custody changed; he has sole custody; and indicated

24   that he would not be bringing Angelina to her

25   scheduled appointment later that day.  The pediatric

26   office requested that Mr. Lodice provide them with

27   written documentation  of the custody change for

1    their records.  As their records stand, the parents

2    share custody.  Angelina was last at the pediatric

3    office for a recheck visit on October 25th, 2022

4    following a visit at Yale.  Prior to that, Angelina's

5    last physical was August 2nd, 2022.

6         Records were received from Preferred Pediatrics

7    via fax on June 8th, 2023.  According to Angelina's

8    chart notes, Miss Antar contact Preferred Pediatrics

9    on May 23rd, 2023.  It was noted that Miss Antar

10   believed that Angelina was being sexually assaulted

11   by her half-brother.  She explained the history of

12   Angelina reporting pain down there, and again

13   reported that same pain on that date.  It is noted

14   that lawyers advised Miss Antar to make an

15   appointment with the pediatrician.  It was told to

16   Miss Antar that at the appointment, providers can

17   discuss what is going on, however Angelina cannot be

18   in the room.  Thus, a family or friend member has to

19   come with her.  Miss Antar stated she will call for a

20   same-day sick visit to start documenting.  It is

21   noted that Miss Antar was planning to go to the

22   emergency room that day.

23        A release of information and record request was

24   mailed to Yale Child Study Center and e-mailed to

25   Jessica Mayo on June 8th, 2023.  Family services

26   spoke with Jessica Mayo from Yale Child Study Center

27   via telephone on June 8th, 2023.  She reports that

1     Angelina was referred by Miss Antar in the spring of

2     2022.  Miss Antar disclosed concerns that Angelina

3     expressed signs of anxiety.  At that time, Angelina

4     was placed on an outpatient waitlist.  In November of

5     2022 --

6          THE COURT:  All right.  Hold on.  I missed a

7     date there.

8          MS. BARANOWSKI:  Sure.

9          THE COURT:  Back up.  When is it that the

10    initial call --

11         MS. BARANOWSKI:  Spring of 2022.

12         THE COURT:  Thank you.

13         MS. BARANOWSKI:  At that time, Angelina was

14    placed on an outpatient waitlist.

15         In November of 2022, a separate referral came in

16    for Angelina from a Yale-New Haven Health social

17    worker following an evaluation at the Yale-New Haven

18    Health Child Abuse Clinic because Angelina was being

19    evaluated for possible sexual abuse.  During the

20    forensic interview, Angelina did not make any

21    disclosures of sexual abuse, however, the evaluators

22    noted a concern for Angelina regarding separation

23    anxiety and the stress of joint custody.  Thus,

24    Angelina was referred to Yale Child Study Center.

25    Coincidentally, Angelina was just about to be coming

26    off the waitlist from the spring of 2022.

27         Miss Antar took part in Angelina's initial

1    evaluation on January 23rd, 2023.  A separate intake

2    was conducted with Mr. Lodice on February 13th, 2023.

3    The intent of meeting with Mr. Lodice was to get

4    informed consent for Angelina's participation in

5    treatment, and to get Mr. Lodice's perspective on how

6    things were going.  At that time, Mr. Lodice was

7    unsure about his consent.  A follow-up call was made

8    to Mr. Lodice, and a subsequent e-mail was sent on

9    February 21st, 2023 to Mr. Lodice from Miss Mayo with

10   no response.  Miss Mayo's e-mail indicated that Mr.

11   Lodice should reply if he does not consent to

12   Angelina participating in services.  Ultimately, due

13   to Mr. Lodice's lack of response, Miss Mayo continued

14   providing services for Angelina.

15        Angelina has participated in the following

16   individual sessions:  March 17th, 2023, April 20th,

17   2023, April 27th, 2023, May 1st, 2023, and May 19th,

18   2023.  An appointment was scheduled for Angelina on

19   June 1st, 2023, however, it was subsequently canceled

20   by Mr. Lodice due to transportation issues.  Mr.

21   Lodice has expressed an openness to continue Angelina

22   in treatment, however, there was no appointment

23   scheduled for her at that time.

24        Miss Mayo reports that she became aware of the

25   most recent sexual assault allegation on May 24th,

26   2024 [sic].  She was contacted and notified by --

27   notified of the allegation by Miss Antar via e-mail.

1    Miss Mayo followed up with a phone call, however,

2    she was not able to connect with miss Antar before

3    Miss Mayo was out of the office as previously

4    scheduled.  Upon returning to work, Miss Mayo was

5    advised that custody of Angelina was changed.  During

6    her sessions with Angelina, Miss Mayo notes that

7    Angelina has not made any disclosures of sexual

8    abuse.  Any information Miss Mayo knows regarding

9    sexual abuse allegations have been brought to her

10   attention by Miss Antar.  Miss Mayo describes Miss

11   Antar's relationship with Angelina to be warm.  Miss

12   Mayo explains that her interactions with Mr. Lodice

13   have been minimal, thus making it difficult to

14   describe Mr. Lodice's relationship with Angelina.

15   Miss Mayo notes that, given Angelina's age, a sense

16   of Angelina not seeing Miss Antar would be hard for

17   Angelina.  Miss Mayo hoped to work with both parents

18   in efforts to think of a way Angelina can expect to

19   see her mom routinely by agreement of the parents.

20       Angelina carries a diagnosis of adjustment

21   disorder.  Different than struggling with --

22   different than struggling from a specific event, it

23   appears Angelina is struggling to adjust to ongoing

24   parental discord, which Miss Mayo describes to be

25   notable and clinically relevant.  Miss Mayo contact

26   family services on June 14th, 2023 via telephone.

27   She reports that on June 8th, 2023, Mr. Lodice

1    reported to her that he is not interested in pursuing

2    treatment at Yale Child Study for Angelina.  Miss

3    Mayo reports that she provided Mr. Lodice with her

4    clinical judgment that Angelina should continue in

5    treatment given the recent separation from Miss

6    Antar.  Miss Mayo recommends that a third party be

7    available to speak to Angelina's needs.  She reports

8    a concern about Angelina's voice getting lost.

9         A release of information and record request was

10   mailed to Griffin Hospital records division on June

11   8th, 2023.  At the writing of this report, family

12   services has not received information from Griffin

13   Hospital.

14        A release of information and record request was

15   mailed to the Connecticut Children's medical center

16   records division on June 8th, 2023.  Family services

17   received medical records via fax on June 14th, 2023.

18   Angelina visited the hospital on May 23rd, 2023.

19   Angelina's diagnosis is noted as parental concern

20   about possible sexual abuse.  The emergency

21   department's discharge notes state Angelina Lodice

22   discharged to home, slash, self-care.  It is noted in

23   the history that Angelina has had a forensic

24   interview through Yale-New Haven for previous sexual

25   assault disclosures.  The history notes that there

26   has been concern relative to sexual assault behavior

27   in October of 2022 and February of 2023.  It is noted

1    that when interviewed alone, Angelina was unaware as

2    to why she was brought to the Connecticut Children's

3    Medical Center.

4        When asked where her private -- when asked where

5    her private parts are, she responded, Dominic does it

6    to me and mommy told me you wouldn't be mad if I told

7    you.  According to the medical decision-making of the

8    records, it is noted that Angelina is unable to make

9    true disclosure, secondary to age.  Angelina denied

10   any current abdominal pain or vaginal pain.  It is

11   noted that the hospital will discuss their matter

12   with SCAN, which is the Suspected Child Abuse and

13   Neglect program.  It is noted that Miss Antar is

14   requesting an FEC and is deferring bloodwork.  The

15   FEC was performed with Ashlynn Cahill, RN.  An

16   anogenital exam was performed with Dr. Kelly, and no

17   bleeding or bruising was noted.  A DCF report was

18   filed and the New Britain Police Department was

19   advised.  The FEC kit was given to the New Britain --

20   given to a New Britain Police Department officer.  It

21   was recommended that Angelina follow-up with SCAN and

22   her primary care.

23       A release of information and record request was

24   mailed to the Department of Children and Families

25   records division, and emailed to LaRae Plummer on

26   June 8th, 2023.  Family services spoke with DCF

27   worker LaRae Plummer on June 8th, 2023 via phone.

1    She reports that, at this time, her case with this

2    family is closed and she no longer has the file.  She

3    reports that she will -- was subpoenaed on June 7th,

4    2023 regarding this matter for a court date of June

5    15th, 2023.  She indicates that once she has her

6    file, she will reach back out to family services.  At

7    the writing of this report, family services has not

8    received information from the Department of Children

9    and Families.

10        Family services spoke with Detective Lisa

11   Steeves of the New Britain Police Department on June

12   7th, 2023.  She reports that on May 24th, 2023, the

13   Connecticut Children's Medical Center contacted the

14   New Britain Police Department as a result of a sexual

15   assault report and a completed sexual assault kit.

16   The responding officer is Charmaine Podgursky.  Miss

17   Antar showed the officer a video that she took of

18   Angelina that day in the hospital.  This video was

19   entered into evidence along with a written statement

20   from Miss Antar.  Officer Podgursky notes in her

21   report that she had the opportunity to speak with a

22   nurse, Michaela Lavoie, of whom indicated that it

23   appeared Miss Antar was egging Angelina on to say

24   certain things in the video.  It is common policy for

25   the responding officer not to interview the minor

26   child at the hospital.  Thus, Angelina was not

27   interviewed by Officer Podgursky on May 24th, 2023.

1        That same day, May 24th, 2023, the matter was

2    assigned to Detective Steeves.  According to

3    Detective Steeves, Miss Antar's statement included

4    the following information:  On May 19th, 2023, Miss

5    Antar dropped Angelina off to her grandmother's

6    residence, Karen Bauer, in Waterbury.  Later that

7    day, Mr. Lodice picked up Angelina from Miss Bauer's

8    residence to go to his residence in New Britain.  On

9    May 20th, 2023, Mr. Lodice's sons were left home

10   alone with Angelina when Mr. Lodice went to work.

11   Angelina told Miss Antar that Mr. Lodice's younger

12   son was in the bedroom playing when she was in the

13   bedroom with Mr. Lodice's oldest son.  Mr. Lodice's

14   older son brought Angelina behind the couch.

15   Angelina stated that he pulled down his pants and her

16   pants.  When asked what Mr. Lodice's older son did,

17   Angelina reported that he does what Dom does.

18   Angelina then stated that Mr. Lodice's older son put

19   his penis on her back, vagina, and butt.  He made he

20   lie on her stomach and he lied on top of her.  This

21   is how his body parts touched her.  Mr. Lodice's

22   older son then got off of Angelina and told her not

23   to tell anybody.  He threatened that if she did, he

24   will put her to sleep.

25        Miss Antar picked up Angelina from Mr. Lodice's

26   residence on May 21st, 2023.  On May 23rd, 2023 on her

27   way to school, Angelina stated that her stomach hurt.

1    At this time, Miss Antar thought Angelina may have

2    UTI.  It is noted that Angelina's pediatrician

3    recommended Miss Antar take Angelina to the emergency

4    room.  Thus, Miss Antar took Angelina to Griffin

5    Hospital.  Griffin Hospital referred Angelina to the

6    Connecticut Children's Medical Center in Hartford to

7    have a sexual assault kit completed.  Detective

8    Steeves reports that her contact with Miss Antar is

9    limited.  If any interaction is needed with Miss

10   Antar, Detective Steeves' supervisor typically

11   handles it.

12       On June 3rd, 2023, around 10:30 a.m., Mr. Lodice

13   participated in an interview with Detective Steeves.

14   At that time, Mr. Lodice contacted his son's mother

15   who confirmed that their oldest son was a -- was at a

16   friend's sleepover in Southington during the time of

17   the alleged sexual assault.  Mr. Lodice provided text

18   messages to Detective Steeves related to that claim.

19   Detective Steeves reports that, at this time, there

20   is no probably cause for an arrest.

21       Upon conversations with the multi-disciplinary

22   team, Angelina will not be scheduled for a third

23   forensic interview at this time unless the sexual

24   assault kit comes back with concerning results.

25   According to Detective Steeves, the kit could take up

26   to 60 days to be returned.  Typically, she gets them

27   back from the lab within one month and a half.

1    Sexual assault kits are submitted to the lab once per

2    week.  Angelina's kit was brought to the lab on June

3    6th, 2023.

4         And that concludes my report.

5         THE COURT:  Okay.  Well, thank you for your

6    report.  You're excused.

7         MS. BARANOWSKI:  Thank you.

8         THE COURT:  Okay.  We have four -- five things

9    on the docket today.  So, one was -- is the wrapping

10   up of the custody motions.  That was the three

11   witnesses we just heard from based on the disclosure

12   that Miss Antar made at the last minute of our last

13   hearing.  The other four are restraining orders and

14   emergency orders that Miss Antar filed in other JD's

15   that were transferred here.  Then we also have these

16   financial motions that have not yet really even

17   started, plus the related issue of what's happening

18   with child support moving forward.  So --

19        MS. ANTAR:  What about the emergency ex parte

20   that's scheduled for today?  You never mentioned

21   that.

22        THE COURT:  I think that's one of the four

23   motions that -- oh, no.  You're right.  There was one

24   filed here.  Well, because that emergency ex parte

25   was a subject of all these other motions, I'm gonna

26   treat them all sort of similarly.

27        MS. ANTAR:  It's not.  They're separate.  And,

1        also, you stated last time that since it's a IV-D

2        case that support enforcement services needs to

3        handle everything in magistrate.  So are they here?

4            THE COURT:  Okay.  No.  What I said is that when

5        we schedule -- my orders say that when we schedule

6        the financial motions, that we would need family

7        relations here.  So here's my question.  We have all

8        these --

9            MS. ANTAR:  No, you said support enforcement

10       services, not family relations.  Are they here for

11       that today?

12           THE COURT:  My question for the two of you is

13       how would you like to prioritize the hour that we

14       have left? We have the child support motions.  We

15       have -- the old ones. We have the new issue about

16       child support between the two of you going forward.

17       And then we have these four denied ex parte motions.

18           So, I think, Ms. Antar, you're the moving party

19       on most of those so, which of these would you like to

20       try and address in the next hour?

21           MS. ANTAR:  I'd like to first start with the

22       first one I filed which is the emergency ex parte

23       motion.

24           THE COURT:  Okay.  And, sir, which of these do

25       you think we should be taking up first?

26           MR. LODICE:  Well, it doesn't have to be first,

27       but I'd like to touch base on the child support

1    moving forward part at some point before we leave

2    today.

3         THE COURT:  Okay.  Well, I think we can probably

4    tackle both of those in the next hour.  And then I am

5    going to pick a date with the two of you for the

6    remaining financial motions.  So, let's take a look

7    at the emergency ex parte motion that Ms. Antar filed

8    most recently.  Let's see.  Is that May 26th?

9         That's -- is that something you filed May 26th,

10   Ms. Antar?

11        MS. ANTAR:  Yes.  And I'd like to speak about

12   this motion.

13        THE COURT:  Okay.  Well, hold on.  Let me take a

14   look at that motion.

15        THE COURT:  All right.  So, Ms. Antar, this

16   motion is the same allegation that I have been

17   listening to throughout this case.  So I am    not

18   inclined to treat it any differently than anything

19   else I've already heard.  This allegation doesn't

20   raise anything new.

21        MS. ANTAR:  I'm sorry, but this motion is nine

22   pages long.  I'm not sure how you read the whole

23   thing in the two seconds you just took to look at it,

24   but my major concern is --

25        THE COURT:  All right.  Miss --

26        MS. ANTAR:  -- that you're not allowing me due

27   process.  My major concern is you keep trying to step

1    on my federal and state and constitutional rights.

2    Now, I filed this motion; I'm the moving party.  And

3    I'd like to address it.  I'd like to be heard.

4         THE COURT:  Okay.  So --

5         MS. ANTAR:  I'd like to start by saying that I'd

6    like to be sworn in because you keep referencing

7    things that are said when I'm not sworn in, so I

8    wanna be clear that if I'm gonna be addressing this

9    motion properly, I'd like to be able to be heard.

10   And I'm highly concerned because there's new things.

11   The fact that Mr. Lodice just got evicted from his

12   apartment.  He doesn't even have a stable place to

13   live and he has no vehicle.

14        THE COURT:  Okay.  So, Ms. Antar, you filed this

15   motion on May 26th.

16        MS. ANTAR:  Yes.

17        THE COURT:  So, what -- you're right.  It is

18   nine pages.  And I've had plenty of time since May

19   26th to read it.  Now, when I say that it does not

20   raise anything new, I am saying that the same things

21   that are in this -- that you allege in this document

22   are the same things that I've been listening to

23   throughout -- throughout --

24        MS. ANTAR:  That's incorrect.  I'm gonna object

25   to that because the things in this motion have never

26   before been heard in any courtroom proceeding before,

27   and I have every transcript to show that.  And none

```
1        of these things have ever been addressed in this
2        courtroom and I would like to address them today. I'm
3        not going to continue to let my rights be violated.
4        I'm looking out for the best interest of the child.
5        The best interest of the child.  We heard family
6        relations state how concerned her provider is.  In my
7        motion I also bring up how Miss Westberg, who did the
8        last forensic, states she recommends Angelina
9        continue --
10            THE COURT:  All right.  Miss --
11            MS. ANTAR:  -- in Yale Child Study Center.
12            THE COURT:  Miss Antar --
13            MS. ANTAR:  Mr. Lodice took her from school.  He
14       took her out --
15            THE COURT:  Miss --
16            MS. ANTAR:  -- he is -- I've only seen my
17       daughter --
18            THE COURT:  Miss Antar --
19            MS. ANTAR:  -- for ten hours in the last three
20       weeks because Mr. Lodice is isolating her.  And
21       instead of letting me speak about that, do you think
22       that's in the best interest?  You just heard her
23       psychiatrist, who has a PhD --
24            THE COURT:  Okay.  Miss -- Miss Antar --
25            MS. ANTAR:  I don't think you are a
26       psychologist, are you?
27            THE COURT:  All right.  Miss Antar --
```

1          MS. ANTAR:  Having a -- having a Bachelor's in

2     Psychology doesn't make you a mental health provider.

3          THE COURT:   Okay.  Miss Antar, you are going to

4     have to be a little more respectful in this court

5     process of the people that are in it.

6          MS. ANTAR:  You are also, under the Code of

7     Judicial Conduct, supposed to be respectful to

8     litigants and respect the fact that you shouldn't be

9     scheduling ten different motions for the same

10    hearing.  I know you laughing 'cause you think it's

11    so funny.  I know it's so funny to you because

12    watching the fact that you're taking my daughter

13    away, putting her with somebody who moved into his

14    mom's basement.  In the last three weeks, let's talk

15    about best interest of the child.  They should have a

16    stable home.  I've had the same single-family

17    residence for seven years.

18         THE COURT:  Miss -- Miss -- Miss Antar --

19         MS. ANTAR:  He just moved back into --

20         THE COURT:  -- stop.

21         MS. ANTAR:  -- mom's basement.

22         THE COURT:  Stop.

23         MS. ANTAR:  Okay.

24         THE COURT:  Stop.

25         MS. ANTAR:  That doesn't -- that doesn't concern

26    you that he has no -- no stable home?  She's living

27    in a basement with a recovering alcoholic.

1          THE COURT:  All right.

2          MS. ANTAR:  And Mr. Lodice got evicted between

3     the last three weeks.

4          THE COURT:  Miss -- Miss Antar --

5          MS. ANTAR:  And Angelina has been crying --

6          THE COURT:  Okay.

7          MS. ANTAR:  -- begging to go to therapy; begging

8     to see me.

9          THE COURT:  If you -- if you --

10          MS. ANTAR:  This is not in the best interest of

11     the child.  It's not.

12          THE COURT:  Miss Antar, if you can't stop

13     interrupting --

14          MS. ANTAR:  I want to know when I'll be able to

15     speak.  When will I be allowed my due process?  Let

16     me know when I can speak.

17          THE COURT:  Well, you've done a lot of talking.

18          MS. ANTAR:  Let me know when it's my turn to

19     speak.

20          THE COURT:  Okay.  I will let you know when it's

21     your turn.  I think in light of the fact that this

22     motion number 262, which I've had plenty of time to

23     review, addresses the same allegations --

24          MS. ANTAR:  So you're not gonna let me address

25     my motion?  You scheduled this for a hearing.  You

26     put it here that there's a hearing for today at 2

27     o'clock.  I'm here at 2 o'clock to speak about it.

1        Are you denying me the right to argue this motion?

2              THE COURT:  All right.  I --

3              MS. ANTAR:  Are you going to deny me the right

4        to argue this motion?

5              THE COURT:  I think we're gonna move on to --

6              MS. ANTAR:  So you're denying -- I'm just making

7        it clear for the record.  I'm making it clear for the

8        record.  I showed up here at 2 o'clock like it says

9        right here.  It says we will -- this application will

10       have a hearing.  I'm here to speak about it and you

11       are not even letting me say anything.  You're not

12       gonna swear me in and you're just gonna tell me that

13       you read it and that you're gonna deny it without a

14       hearing.  Is that what you're saying?

15             THE COURT:  Okay.

16             MS. ANTAR:  Because I'm ready to speak about it,

17       and none of these things have been represented in

18       prior hearings.  None of them.

19             THE COURT:  Okay.

20             MS. ANTAR:  And what you're doing is actually

21       criminal what you're doing.

22             THE COURT:  All right.  I think we're gonna move

23       on since you can't really --

24             MS. ANTAR:  Why?

25             THE COURT:  -- focus on this motion to --

26             MS. ANTAR:  Because you don't wanna hear -- you

27       won't let me argue this motion.

1    THE COURT:  All right.  Two, the financial

2    issues.  So, do --

3    MS. ANTAR:  I'm not arguing anything -- this is

4    a IV-D case and should -- without child support

5    enforcement, I'm not talking about finances.  My

6    daughter is in danger.

7    THE COURT:  Do either --

8    MS. ANTAR:  These emergency orders need to come

9    up.  And, you know what?  Mr. Lodice is unfit.

10   THE COURT:  All right.  Miss Antar --

11   MS. ANTAR:  He refused to comply with your

12   orders to sign releases for his mental health

13   providers.

14   THE COURT:  Miss Antar --

15   MS. ANTAR:  Why did you not hold him in

16   contempt?

17   COURT MARSHAL:  Be quiet and let her talk.

18   THE COURT:  -- if you can't stop interrupting --

19   MS. ANTAR:  Because she's denying me due

20   process.

21   COURT MARSHAL:  Be quiet and let her talk.

22   THE COURT:  All right.  Well, we have an hour

23   together.  Now we have less than that.  If you can't

24   stop interrupting, we're not gonna get a lot done.

25   Do either one of you have financial affidavits with

26   you?

27   MR. LODICE:  I do, your Honor.

1        THE COURT:  Okay.  Miss Antar, do you have a

2    financial affidavit with you?

3        MS. ANTAR:  No, I don't.

4        THE COURT:  Okay.  Well, you're gonna need to

5    file one.  How much time do you think it's gonna take

6    you to do that?

7        MS. ANTAR:  Why do I need to file one if this is

8    magistrate matter?  We have a contempt hearing for

9    magistrate on August 2nd.  I was told by support

10    enforcement this morning that anything to do with

11    support enforcement and child support must be in

12    magistrate court, must be 'cause it's a IV-D case.

13    And in each of our prior hearings with you, you

14    verified this, including the last one.  You've said,

15    quote, I need support enforcement here because it's a

16    IV-D case.  And, again, support enforcement is

17    already gave us a court date and they stated that on

18    that day everything -- anything to do with financial,

19    which is on a separate docket from this, will be

20    handled.  So I don't understand why you're trying to

21    force these things to be heard here when the -- the

22    jurisdiction is magistrate.  The jurisdiction also --

23    the State law says it has to be --

24        THE COURT:  Miss Antar --

25        MS. ANTAR:  -- in the jurisdiction.

26        THE COURT:  -- you -- stop it.  You filed these

27    motions.  You filed --

1    MS. ANTAR:  What motions?  Which motions did I
2    file?
3         THE COURT:  Ms. Antar, if you cannot stop
4    interrupting me --
5         MS. ANTAR:  I filed this motion.  I'd like to --
6         THE COURT:  Oh, my goodness.
7         MS. ANTAR:  -- I'd like to argue it.  You say I
8    didn't prove it, but you're not giving me a chance.
9         THE COURT:  Listen to me.  You -- with Attorney
10   Cretella and before Attorney Cretella, you filed a
11   bunch of financial motions.
12        MS. ANTAR:  Which ones?  Can you list them for
13   me?
14        THE COURT:  Listen.  Just stop talking --
15        MS. ANTAR:  Okay.
16        THE COURT:  -- and listen for a second.  You
17   filed a number of financial motions.
18        MS. ANTAR:  That's incorrect.
19        THE COURT:  We didn't get the opportunity to
20   hear them because we were trying to take care of the
21   custody matters.  So I told you that we would try and
22   hear those today.  And I did tell you that we were
23   gonna need support enforcement here because they need
24   to tell us what --
25        MS. ANTAR:  You said today you would say if I
26   could see my daughter back.  Are you gonna let me see
27   my daughter?

```
 1          COURT MARSHAL:  You gotta let her talk.  Let her
 2     finish.
 3          THE COURT:  All right.  Marshal -- marshal, no.
 4          COURT MARSHAL:  No?
 5          THE COURT:  I'll handle it.  I'll let you know
 6     if I need help.
 7          Ms. Antar, listen to me.  They're your motions.
 8     You told me you wanted a hearing.  And I --
 9          MS. ANTAR:  I'm sorry.  I'm having a hard time
10     understanding you, and I'd like it if you could
11     please be respectful enough to clarify which motions
12     you're referring to.
13          THE COURT:  Do you have my Court orders?
14          MS. ANTAR:  Which motions are you referring to?
15          THE COURT:  I issued a lengthy decision that
16     said that the only financial motions that were left
17     were listed at the end of that motion and we would
18     try and do them with support enforcement only
19     because --
20          MS. ANTAR:  So are we --
21          THE COURT:  Stop.  Stop.
22          MS. ANTAR:  Oh, my God.
23          THE COURT:  -- only because support enforcement
24     knows what the arrearage is and we need them for that
25     purpose.  So, if you don't want to have those motions
26     heard here, you can withdraw them.
27          MS. ANTAR:  There's no motions that I -- I'm
```

1    aware of.  So, unless you can list the numbers of

2    them, then I'm gonna just assume that you're making

3    this up.  You also stated today we would hear this

4    motion and the emergency motions and -- and modify

5    custody and visitation.  He's withholding my

6    daughter.  He doesn't even have a stable place to

7    live.  How is that in the best interest of the child?

8    He moved to Waterbury with his mother and now he's

9    back at his mom's house telling people he can't

10   handle having full custody and he doesn't know what

11   to do; his car is on three wheels.

12        You just heard the family relations say that

13   they are highly concerned that my daughter is not in

14   therapy.  He withdrew her from the doctor.  He

15   withdrew her from therapy.  He withdrew her from

16   everything.  My daughter is being isolated.  This is

17   abuse.  Public Act Number 21-78, Jennifer's Law,

18   named after Jennifer Dulos because her husband killed

19   her.  Because it was the same situation.  Go look how

20   many filings they have, over 700.  You wanna say mine

21   was the highest one?  Go look at this one.  They

22   changed the law because of her.  Why aren't you

23   complying with it?  You forced me to come here today.

24   You denied my request for remote testimony four times

25   in a row and forced me to come in person to face the

26   person, even though I'm protected.  And you stated to

27   the clerk's office that no one's allowed to sign that

1    even though the law states that they are. You deny me

2    due process.  You deny me the -- the adequate hearing

3    time.  You stated and confirmed last time on May 25th

4    that anything financial must be heard in the

5    jurisdiction with magistrate and support enforcement

6    'cause it's a IV-D case with cash assistance.  And I

7    have zero income.  He's not getting child support

8    from me.

9         THE COURT:  Okay.

10        MS. ANTAR:  He owes me over --

11        THE COURT:  Why don't -- stop -- stop --

12        MS. ANTAR:  -- $14,000.

13        THE COURT:  -- talking.  Why don't you take a

14   look at my last order at page seven.

15        MS. ANTAR:  Can you provide me a copy of it?

16        THE COURT:  No.

17        MS. ANTAR:  Okay.  Well, I can't look at it

18   then.

19        THE COURT:  Okay.

20        MS. ANTAR:  Unless you wanna let me go on my

21   laptop.

22        THE COURT:  Absolutely not.

23        MS. ANTAR:  Okay.  So you're telling me to look

24   at something and you're not giving it to me and

25   you're denying me the opportunity to look at it.

26        THE COURT:  Here.  Let me tell you what the

27   motions are.  The motions requiring additional

1      evidence are related to financial issues.  They're on

2      page seven.

3           MS. ANTAR:  These are motions scheduled for

4      today?  'Cause the clerk's office said that the only

5      thing scheduled today was the ex parte and the -- and

6      these TRO's that you forcibly made Judges from other

7      jurisdictions bring here.  What's your -- what right

8      do you have to hear TRO's for people outside of your

9      jurisdiction?  I don't live in New Haven.  He lives

10     in Waterbury.  I live in Orange.  So either Waterbury

11     or -- or Milford must hear this.  There's -- there's

12     jurisdictions.  You have no subject matter

13     jurisdiction to even be doing this.

14          THE COURT:  Miss -- Miss Antar, if --

15          MS. ANTAR:  There's also an appeal filed.

16          THE COURT:  -- if -- if you --

17          MS. ANTAR:  And I filed for recusal.  Why won't

18     you recuse yourself?  You've shown so much clear

19     bias.  And it's standard where a Judge should recuse

20     themselves.  You're refusing.

21          THE COURT:  All right.

22          MS. ANTAR:  Why is that?

23          THE COURT:  If -- if you would like to have your

24     motion for recusal heard, I will certainly

25     schedule --

26          MS. ANTAR:  I want my emergency motions heard

27     right now.  They are emergency motions.

1          THE COURT:  Okay.

2          MS. ANTAR:  I want those heard immediately.

3          THE COURT:  Well, I can't do both of those at

4    the same time so.

5          MS. ANTAR:  What both?  I want one.  This one in

6    my hand that I asked you repeatedly to let me speak

7    about and you refused.

8          THE COURT:  Okay.  Why don't you swear Miss

9    Antar in.

10         THE CLERK:  Please raise your right hand.  Do

11   you solemnly swear or solemnly and sincerely affirm

12   as the case may be that the evidence you shall give

13   concerning this case shall be the truth, the whole

14   truth, and nothing but the truth, so help you God or

15   upon penalty of perjury?  If so, please say I do.

16         MS. ANTAR:  I do.

17         THE CLERK:  Please state your name and address

18   for the record.

19         MS. ANTAR:  Theodora Antar, 856 Shagbark Drive,

20   Orange, Connecticut, 06477.

21         THE COURT:  All right.  So, Ms. Antar, you have

22   filed, since May, a number of motions.  But the one

23   that you want to be heard on right now is this May

24   emergency motion for custody.  Now, I think that I

25   have already -- that's motion number -- think it's

26   262.  I think I've already heard testimony about all

27   of the things in this motion.  So, if you have that

1     affidavit in front of you, I want you to take a look

2     at it.  And if there's things that you want to tell

3     me that aren't in the affidavit and aren't related to

4     things I've -- are not things I've already heard

5     evidence on, I'll hear you out.  But it's gotta be

6     those two things.  I'm not gonna listen to everything

7     all over again.  So, take a look at your affidavit.

8     Things that aren't in the affidavit and things I

9     haven't heard before, I'm gonna listen to you about

10    it now.

11         MS. ANTAR:  So, I'm sorry.  Just to clarify,

12    you're stating that I'm not allowed to reference any

13    of the things in my affidavit in this -- so we're

14    here to have a hearing about this motion I filed, but

15    you're telling me I cannot reference any of the

16    things I address in my affidavit?

17         THE COURT:  No.  What I'm saying is that you

18    don't need to repeat things that you wrote in your

19    affidavit because I've read your motion and your

20    affidavit.

21         MS. ANTAR:  I don't think you read it and that's

22    why we're having a hearing.  So I have due process.

23    It's a legal right.  And you can't just tell me that

24    you are gonna make this decision without a hearing

25    because that's not how things work.

26         THE COURT:  Okay.  You wanted to be -- offer

27    some testimony about this motion.

1      MS. ANTAR:  Yes.  I just wanna start by asking

2      why wasn't this scheduled within two weeks?  It

3      states that, in accordance here, when it's scheduled

4      -- the order, you checked off this box and it says

5      that it should be hearing pursuant to General Statute

6      46b-56f(c) which states it must be scheduled within

7      two weeks.  Why was it not scheduled within two weeks

8      as an emergency motion?

9          THE COURT:  Is there anything you want to tell

10     me about this application?

11         MS. ANTAR:  Yeah, absolutely.

12         THE COURT:  Okay.

13         MS. ANTAR:  I'd like to say that I'm extremely

14     concerned for my daughter.  The State of Connecticut

15     has the best interest of the child standard and this

16     is the thing that Connecticut will look at in

17     determining custody, access, visitation.  I've done

18     nothing but be an excellent mother to my child.  I've

19     given her a stable home for her entire life.  I  am

20     participating in her therapy.  Her therapist stated

21     and everyone heard for the record that she says we

22     have a warm relationship.  She says that she's very

23     concerned that the fact that Mr. Lodice was --

24     immediately withdrew Angelina from therapy.  She

25     stated that my daughter has special needs, adjustment

26     disorder; that my daughter's been struggling now

27     being separated from me.

1        In the last 21 days I've only been able to see

2    my daughter for ten hours.  This is in -- and just

3    to --

4        THE COURT:  All right.  Miss -- Miss Antar, you

5    filed this motion in May.  So I'm not gonna listen

6    to --

7        MS. ANTAR:  You just said if there's anything

8    that wasn't in the affidavit --

9        THE COURT:  All right.  Listen.  LiSten.

10        MS. ANTAR:  -- that I wanna bring up.  And now

11    you're telling me --

12        THE COURT:  Related --

13        MS. ANTAR:  -- I can't bring up --

14        THE COURT:  Listen to me.

15        MS. ANTAR:  -- stuff not on the affidavit?

16        THE COURT:  Related to things that happened

17    prior to when you filed it.  I don't -- if you're

18    trying to testify about things that happened after

19    you filed it, they're not relevant to this emergency

20    motion.

21        MS. ANTAR:  I'm sorry, but you're letting him

22    testify about things from 2019 and 2020.

23        THE COURT:  You -- he hasn't --

24        MS. ANTAR:  So why is that he gets special

25    treatment?

26        THE COURT:  -- he hasn't said a word the entire

27    day.

1      MS. ANTAR:  No, I'm talking about the last

2   hearing when you -- when you listened to him bring up

3   only -- only incidents from 2020.

4      THE COURT:  Okay.  All right.  Listen.  You

5   filed an emergency motion for custody saying that

6   there was an immediate risk of physical harm and

7   physical injury to your child.  And you --

8      MS. ANTAR:  See.  The fact that you said that

9   shows you don't understand the law.  It says physical

10   or emotional harm and the law changed in 2021 based

11   on Public Act 21-78 which you ignore and you

12   consistently ignore.  The fact that you even said

13   it's only physical.  It says it right here on here.

14   There's a risk of physical or emotional harm.  And

15   there is a huge risk of emotional harm to my daughter

16   because she has no access to therapy.  She's been

17   completely isolated from myself, other members of my

18   family.  She has been recommended by -- again,

19   talking about what I reference in my affidavit.

20   Priscilla Westberg who I'm gonna be getting a

21   deposition.  She conducted the last forensic.  She

22   stated she recommends Yale Child Study Outpatient

23   services.  She recommends that no unsupervised

24   contact with Dominic.  We talk about, again,

25   Preferred Pediatrics sent in a letter to the court.

26   Angelina's struggling with the separation of her

27   parents.  It's in her best interest to see a

1    therapist to properly process the feelings.  Mental

2    health is important to maintain to maintain optical

3    wellness.  Angelina must continue going to see a

4    therapist.

5        Not only did Matthew try to stop her from going

6    to therapy and block the therapy, but he also then

7    withdrew her from therapy.  The minute he got custody

8    he withdrew her from school.  He said she'll never he

9    allowed to go to church again.  He stopped allowing

10   her to go to therapy and he's been denying her access

11   to medical care.  She was told by Hartford Children's

12   Hospital to have a follow-up appointment on May 31st.

13   He did not bring her.  He said to me tell me what her

14   appointment is and I will bring her.  As soon as I

15   told him, he immediately called the doctor and said

16   she won't be going there anymore.

17       In your order you said the child's gonna be

18   registered in New Britain Public Schools.  Since that

19   order was issued, Mr. Lodice left his apartment after

20   being evicted from his apartment in New Britain and

21   moved back in his mother's basement at 48 Quarry Hill

22   Road, Waterbury, Connecticut.  He said to John

23   Cassanova Jr., who I'm also going to get a deposition

24   on --

25       MR. LODICE:  Objection, hearsay.

26       MS. ANTAR:  -- that he stated --

27       THE COURT:  Okay.  So.

1        MS. ANTAR:  -- that he is struggling with taking

2    care of Angelina.

3        THE COURT:  All right.  Miss --

4        MS. ANTAR:  Angelina has not been given --

5        THE COURT:  All right.  Miss Antar --  Miss

6    Antar --

7        MS. ANTAR:  -- medical or mental health

8    services.  We asked for a GAL repeatedly.

9        THE COURT:  Miss Antar --

10        MS. ANTAR:  My motion for the GAL is still

11    pending.  I would like it to be ordered.

12        THE COURT:  All right.  Miss --

13        MS. ANTAR:  Why can't you allow it?  Jessica

14    Mayo, Ph.D, said the same thing.

15        THE COURT:  Miss Antar, listen to me.  If you

16    want to offer testimony on your emergency motion for

17    custody --

18        MS. ANTAR:  This is.

19        THE COURT:  No, it's not.

20        MS. ANTAR:  This is an emergency. My daughter is

21    in great risk of mental and emotional risk.  She's

22    being -- she won't even be allowed to see me.  She --

23    you're making it so he can keep her away.  You think

24    that it's in the best interest of me to only see

25    Angelina for ten hours in a three-week period when

26    she used to live with me?  My daughter Juliana hasn't

27    been allowed to see her sister.  You think it's okay

1      for me to have supervised visits with Angelina, but

2      it's -- but I can have sole legal and sole physical

3      custody of Juliana?  For the record, my daughter

4      Juliana Viglione in the Antar Viglione case, I have

5      sole legal and sole physical custody of her since

6      2016.  I've never not had sole legal and physical.

7      But you're telling me that that's okay for Juliana to

8      live with me as her sole --

9           THE COURT:  Okay.  Stop.

10          MS. ANTAR:  -- custodial guardian and -- and --

11          THE COURT:  Since -- since you cannot focus on

12     the motion that you filed, let me --

13          MS. ANTAR:  What do you mean?

14          THE COURT:  -- let me ask --

15          MS. ANTAR:  You're telling me that you don't

16     think --

17          THE COURT:  Stop.

18          MS. ANTAR:  this is concerning.

19          THE COURT:  I -- stop.

20          MS. ANTAR:  You're not concerned about my

21     daughter.  The 60 days that we have to wait for the

22     rape kit to come back, she can just keep being

23     babysat by Dominic.  That's fine?

24          THE COURT:  Stop.

25          MS. ANTAR:  That's not a concern?  That's not a

26     reason to have a GAL?

27          THE COURT:  Miss Antar --

1        MS. ANTAR:  Why aren't you concerned for the

2     best interest?

3        THE COURT:  Miss Antar, if you can't follow

4     court instructions, I'm gonna have to --

5        MS. ANTAR:  What instructions are those?  For

6     you to just deny me my --

7        THE COURT:  To stop --

8        MS. ANTAR:  -- due process?

9        THE COURT:  To stop talking.

10        MS. ANTAR:  Stop talking, why?  Because you

11     don't wanna hear what I'm telling 'cause --

12        THE COURT:  Because I have --

13        MS. ANTAR:  -- I'm telling the truth?

14        THE COURT:  -- I have some questions for the

15     father since you can't answer my questions.

16        MS. ANTAR:  So, you're gonna stop me from

17     arguing my motion as the moving party?  You let him

18     sit there --

19        THE COURT:  One --

20        MS. ANTAR:  -- the whole time last time.

21        THE COURT:  -- one more opportunity to stop

22     talking.

23        MS. ANTAR:  It's ridiculous.

24        THE COURT:  All right.  Mr. Lodice --

25        MR. LODICE:  Yes, your Honor.

26        THE COURT:  -- what is going on with Angelina

27     seeing her mother?

1          MR. LODICE:  So, I've been trying to do

2     supervised visits.  Nobody -- so, in the agreement

3     that you sent or -- not the agreement -- the order

4     that you sent, I have to provide the third party,

5     except everyone I know, nobody wants to be around

6     Theo.  I can't find anyone willing to sit there

7     'cause they don't trust what Theo's gonna say about

8     them or do so I can't find anyone to supervise the

9     visits.  So what I've been asking Theo to do is just,

10    you know, I'll let you pick who supervises, just let

11    me know.  And she had her mother do it a few times

12    and she had her sister do it, and I'm perfectly

13    okay --

14          MS. ANTAR:  Objection.

15          THE COURT:  All right.  Please don't interrupt.

16          Your -- are those two people okay?

17          MR. LODICE:  Those two people are absolutely

18    okay.  I trust her with Theodora's mother.

19    Theodora's mother is very nice and takes very good

20    care of Angelina.

21          THE COURT:  Okay.

22          MR. LODICE:  And I also trust her sister Irene

23    because her sister is the same way.  She's very

24    level-headed, very calm, and will follow the -- the

25    parameters of -- you know, that we set as far as

26    visitation.

27          THE COURT:  Okay.  So how often has that

1          happened since --
2               MR. LODICE:  It's happened since three times in
3          the past three weeks.
4               THE COURT:  Okay.  And is that because you're
5          not available, they're not available, mom's not
6          available?
7               MR. LODICE:  A little bit of both.
8               MS. ANTAR:  Objection.  I've asked every day
9          repeatedly to see my daughter --
10              THE COURT:  Okay.  Please -- please -- please
11         let me --
12              MS. ANTAR:  -- and he denies it.
13              THE COURT:  -- let me --
14              MS. ANTAR:  When will I have a chance to speak?
15              THE COURT:  Miss Antar, you've been talking non-
16         stop for hours.
17              MS. ANTAR:  So he can just lie?  You're -- this
18         is my motion.
19              THE COURT:  Stop.
20              MS. ANTAR:  Okay.  So are you gonna ask me about
21         this --
22              THE COURT:  I would like --
23              MS. ANTAR:  -- or are you only gonna take his
24         word for it --
25              THE COURT:  Miss -- okay.
26              MS. ANTAR:  -- like you always do?
27              THE COURT:  Last time.  If you interrupt, I have

1    to hear from him about what's going on.  If you can't

2    stop interrupting, you're gonna be in the hallway.

3    Do not interrupt.  I will tell you when I'm ready to

4    hear from you.

5         All right.  So why has it been such a short

6    period -- such a small number of times?

7         MR. LODICE:  She has asked, and every time she

8    asks I'll say, okay, who do you have available and

9    what time do you wanna pick her up.  She never gives

10   me an answer.  And when she does respond, it's either

11   really, really late at night -- like, even just the

12   other day I let Angelina go out at 9 o'clock at night

13   because I wanted her to see her mom and she didn't

14   respond to me till after 8 o'clock saying my mother

15   and I are coming to get her.  So I let her go out at

16   -- at 9 o'clock and she had her back by, I think, it

17   was, like, 10:30, almost 11 by the time she came back

18   which is very late for her.  But, I mean, obviously I

19   want her to see her mom.

20        The other times is, every time that, like, Theo

21   says I wanna see here, I'll say okay; who do you have

22   available and when do you wanna see her, what times.

23   And she never responds.

24        THE COURT:  Okay.

25        MR. LODICE:  And then she'll do the same thing

26   the next day and she'll never respond.

27        THE COURT:  All right.  Do you think it would be

1    possible to make a regular schedule with the

2    grandmother or the aunt so that it's a little more

3    predictable for Angelina?

4        MR. LODICE:  What do you mean possible?  Like,

5    would I find it -- I'm okay with it, yeah, a hundred

6    percent.

7        THE COURT:  All right.  So, could you make

8    arrangements with the grandmother or with the aunt

9    directly for a regular schedule so that Angelina

10   knows when she'll see her mom?

11       MR. LODICE:  I could try, but Theo tells them

12   not to talk to me a lot of times.  So, like, I'll try

13   to -- I'll message her mom and her mom will be, like,

14   oh, I'm not allowed to talk to you according to Theo.

15       THE COURT:  Okay.

16       MR. LODICE:  So, as long as I can communicate

17   with them and set up the times, absolutely.

18       THE COURT:  All right.  Well, that may be a good

19   idea.  Would you please tell me how Angelina is

20   doing?

21       MR. LODICE:  She's doing very well.

22       THE COURT:  All right.  And --

23       MR. LODICE:  She seems to be -- at first, it was

24   a little bit of an adjustment.  I explained to her

25   what was happening.  I said, you know, now you're

26   gonna be living with daddy and you're gonna see mommy

27   sometimes; you're still gonna see mommy, it's just

```
 1        not gonna be as much.  You're just gonna have a lot
 2        more time staying at daddy's house.  And she
 3        understood and she gets it.  And she repeats it to
 4        her and, you know, Theo doesn't say -- I wish Theo
 5        would just be, like, yeah it's just gonna be for a
 6        little while like that, but instead she's like, oh,
 7        no, daddy's trying to keep you from me.  He's not
 8        letting me see you and stuff like that.  Which, I'm
 9        not doing.
10             THE COURT:  Okay.  So, I would like you try and
11        make a regular schedule.  I think that would be more
12        appropriate but --
13             MR. LODICE:  Okay.  Absolutely.
14             THE COURT:  -- that is all I'm gonna say about
15        that.  All right.  You -- your brought a financial
16        affidavit with you today?
17             MR. LODICE:  I did.
18             THE COURT:  Okay.  Marshal, could I have that
19        please.
20             MS. ANTAR:  I just wanted to say, regarding to
21        what he just said, if it's okay --
22             THE COURT:  Okay.  No.  Let me just ask you a
23        question.
24             MS. ANTAR:  Yes.
25             THE COURT:  Before you go off on something else,
26        let me just ask you a question.
27             MS. ANTAR:  Yes.
```

1          THE COURT:  Would it be possible to set up a

2     regular -- for him to set up a regular schedule

3     between your mom and your sister for you and

4     Angelina?  Would that be possible?

5          MS. ANTAR:  Probably not because you're --

6     you're requiring supervised visitation and so, if

7     there wasn't the aspect of being supervised, it would

8     be very easy to make a schedule.  But the problem is

9     that he says I don't answer.  That's not true.  He's

10    the one who doesn't answer.  And I -- for example, he

11    will say that I have to drive all the way to New

12    Britain -- now he moved to Waterbury.  But before he

13    was saying you have to get your supervisor, drive all

14    the way to my house in New Britain, come pick her up,

15    and then you can have her for one hour or two hours

16    and then you've gotta come all the way back and bring

17    her back to me to New Britain.  He offers to do none

18    of the driving.  He states I have to pick the

19    supervisor.  I have to then -- he has to approve of

20    the supervisor, so he'll say I don't approve of this

21    person.  And I'll say, okay, well, why don't we meet

22    at a neutral place like the police parking lot so at

23    least I can see her, and then he just doesn't

24    respond.  I've asked -- I've begged to see her

25    repeatedly.  Even, I said today can you bring her to

26    my mother's house; there's court.  My other daughter

27    is at my mom's all day.  She -- she's crying every

1        day missing her sister.  My mom is crying every day,

2        misses her granddaughter.

3               THE COURT:  Okay.  How about --

4               MS. ANTAR:  She saw her once.

5               THE COURT:  -- you propose a schedule?

6               MS. ANTAR:  I propose a schedule which is that

7        there's -- having supervised visitation is -- is --

8        makes no sense.  Why do I need supervised visits?

9               THE COURT:  Okay.  Well --

10              MS. ANTAR:  We never had -- why do I need

11       supervised visits?

12              THE COURT:  -- that's -- that's not my question.

13              MS. ANTAR:  No, I'm asking you.  Why do I need

14       supervised visits?

15              THE COURT:  I've --

16              MS. ANTAR:  What in this -- what in this could

17       ever --

18              THE COURT:  I --

19              MS. ANTAR:  Why would it be in -- so you think

20       it's in the best interest of my daughter for her to

21       not see me?  Because he uses that as a reason to keep

22       her away.  You give him -- he controls who the

23       supervisor is.

24              THE COURT:  Okay.  Miss Antar, I've issued --

25              MS. ANTAR:  So then why don't you appoint it?

26       Then why can't you -- you appoint it then.

27              THE COURT:  I issued my orders about that.

1          MS. ANTAR:  So -- okay.  So you think that
2     giving it to him is --
3          THE COURT:  And -- and now you've told me that
4     you would prefer a schedule.  So I am saying, while
5     you're here, if you propose one, I'll try and work it
6     out.
7          MS. ANTAR:  Okay.  So then my mother asked for
8     remote testimony and you denied her that.  She could
9     talk about being a supervisor.  You're asking me to
10    commit to a --
11         THE COURT:  Okay.  Miss Antar --
12         MS. ANTAR:  -- schedule that will involve other
13    people.
14         THE COURT:  Yes.
15         MS. ANTAR:  I can't -- my sister's an eye
16    doctor.  She's very busy.  She doesn't have time to
17    take away from her career to go supervise visits for
18    somebody who has sole custody of another child.  And
19    my mother has a disability with her knees.
20         THE COURT:  Okay.
21         MS. ANTAR:  And she explained to Mr. Lodice,
22    listen, please can you bring the child to me at
23    church; can you bring the child to my house; I can't
24    drive to New Britain.  Mr. Lodice says he has no
25    vehicle.
26         THE COURT:  Okay.  If --
27         MS. ANTAR:  So how can we arrange these with --

```
1        you won't appoint a supervisor.  There's no details.
2            THE COURT:  All right.
3            MS. ANTAR:  How can we do it if --
4            THE COURT:  I am asking you about a schedule.
5        If you don't want to propose one, that's fine.  I'm
6        gonna leave it up to Mr. Lodice.
7            MS. ANTAR:  I would propose the schedule to be
8        that Angelina could be with me from Monday through
9        Friday like she was.
10           THE COURT:  That's not --
11           MS. ANTAR:  Then she can --
12           THE COURT:  I -- that is not what I'm asking
13       you.
14           MS. ANTAR:  You just asked me to propose a
15       schedule and I just did.
16           THE COURT:  Because I am -- I am not changing my
17       prior Court orders about --
18           MS. ANTAR:  You just asked me to propose a
19       schedule and I did.
20           THE COURT:  -- about the need for your
21       supervision.
22           MS. ANTAR:  So, let me ask you, have my parental
23       rights been permanently terminated?  Yes or no.
24           THE COURT:  All right.  I guess --
25           MS. ANTAR:  Have my parental rights been
26       terminated?  Yes or no.
27           THE COURT:  That's not how this works, Miss
```

1    Antar.

2         MS. ANTAR:  I'm asking you a question.  Have my

3    parental rights for Angelina Lodice been terminated?

4     Yes or no.

5         THE COURT:  Mr. Lodice, you're going to have to

6    work out the schedule with the supervisors which

7    sound like the maternal grandmother and the maternal

8    aunt.  You're gonna have to do that on your own.

9         MR. LODICE:  Okay.

10        THE COURT:  Ms. Antar, how long is it gonna take

11   you to file a financial affidavit with the court?

12        MS. ANTAR:  I'm gonna need to have counsel in

13   order to do that.

14        THE COURT:  Okay.  Well, the last time we were

15   here you told me that you thought you'd be hiring

16   someone.  So, what's going on with that?

17        MS. ANTAR:  And I haven't.  So I'd like my file

18   to be released to me because I have not been able to

19   get counsel.  I've spoken to maybe 40 different

20   lawyers and I could be happy to tell you the names of

21   all the ones that I tried so far, and I've not been

22   able to.

23        THE COURT:  Okay.  So, how soon do you think you

24   can file a financial affidavit?  'Cause these

25   financial motions are yours.  You wanted them heard.

26   I'm trying to get them scheduled.

27        MS. ANTAR:  There's no financial motions I want

1  heard.  I only want the custody motions heard in

2  family court.

3        THE COURT:  All right.  You have a number of

4  motions related to claims --

5        MS. ANTAR:  If you could list them for me, I'd

6  be happy to look at that.

7        THE COURT:  Listen, remember you filed all these

8  motions saying that he owes you money?

9        MS. ANTAR:  I don't remember.

10       THE COURT:  You don't remember that?

11       MS. ANTAR:  Are you able to tell me in the file

12  in front of you which motions they are that you're

13  referring to because --

14       THE COURT:  They are --

15       MS. ANTAR:  -- I thought you said last time that

16  all financial stuff has to be in front of magistrate

17  court because this a IV-D case under the IV-D of the

18  Social Security Act.

19       THE COURT:  Okay.  I am going to schedule a

20  hearing for those motions.  They're listed in the

21  decision.  They're your motions.  If you don't want

22  to have them heard, that's fine.  They'll be denied

23  on that date.  I'll give you one more chance to take

24  a look at the decision and look at the motions.  I'm

25  gonna schedule them for a hearing and if you don't --

26       MS. ANTAR:  And is that gonna be in this court

27  or magistrate?

1    THE COURT:  -- and if you don't want to pursue

2    them on that date, then they'll be denied.

3    MS. ANTAR:  So will those be in magistrate or in

4    family court?

5    THE COURT:  They will be here because that's

6    where you filed them.

7    MS. ANTAR:  I didn't file those here.  So will

8    support enforcement services be there, or is that

9    something that we would have to --

10   THE COURT:  Support enforcement will be present

11   because I need their arrearage numbers.

12   MS. ANTAR:  And are they present today?

13   THE COURT:  I don't think so.

14   MS. ANTAR:  So, okay.  And then -- so, you said

15   today we would talk about modifying parental access.

16   My daughter's been -- she's been alienated from me.

17   THE COURT:  Well, that's what I was trying to

18   talk to you about and trying to make a schedule.

19   MS. ANTAR:  Okay.  So then why do I need

20   supervised visits then?  Why can't you answer that?

21   THE COURT:  I issued my orders about why that is

22   necessary.

23   MS. ANTAR:  I understand you issued biased

24   harassing orders against me, but I'd like you to say

25   on the record one reason why I should have supervised

26   visits.  If you can't give me on reason why I deserve

27   to have supervised visits -- and it's so hilarious

1        because how can you say that there's no DCF

2        involvement?  And I have sole legal and physical

3        custody of another kid.  And he already lost his

4        apartment.  He's not even living in New Britain

5        anymore.  He says I told her you're gonna be at

6        daddy's house.  Now she's at Mema's house in Mema's

7        basement, so -- with the alcoholic stepdad Roy

8        Bauers.  That's not concerning to you?  'Cause in

9        your order you said she lives along in New Britain;

10       she's gonna go to New Britain schools.  How's she

11       gonna do that when now she lives in Waterbury?  How's

12       she gonna do that when she -- he doesn't even have a

13       stable place to live or a car.

14            THE COURT:  Okay.  Ms. Antar --

15            MS. ANTAR:  That's not concerning to you?

16            THE COURT:  -- if you can't --

17            MS. ANTAR:  Okay.  Of course it's not concerning

18       to you --

19            THE COURT:  -- contain yourself --

20            MS. ANTAR:  -- because you just wanna just

21       ignore that it's not in the best interest of the

22       child.

23            THE COURT:  Okay.

24            MS. ANTAR:  He does -- he moved to Waterbury.

25            THE COURT:  All right.  Enough.  You've said it

26       four times.

27            MS. ANTAR:  And that doesn't mean anything to

1     you?  He can't have a stable home for her.

2          THE COURT:  I have issued my orders about legal

3     and physical custody.  I said I would try today to

4     make a regular schedule for you to see the --

5          MS. ANTAR:  You said modifying access today.

6          THE COURT:  Yes.  Well --

7          MS. ANTAR:  So why can't we modify it where it's

8     not supervised?  You can't give me one reason why it

9     should be supervised.

10         THE COURT:  Okay.  So, now that we have

11    established that you don't want to address a

12    schedule --

13         MS. ANTAR:  I do want to address a schedule.  I

14    said I want her Monday through Friday.  That's my

15    proposed scheduled.  I also submitted, with Attorney

16    Cretella, a proposed parenting plan, and Mr. Lodice

17    gave a proposed parenting plan as well which included

18    me having overnights.  So if Mr. Lodice said that I

19    should have overnights and he said he's okay with me

20    continuing to make religious decisions, why are you

21    going against what even the defendant's asking for?

22    Because, again, there's no reason -- there's not one

23    reason why I need supervised visitation. I don't have

24    any untreated mental health.  I never abused or

25    neglected my child.

26         Excuse me?  What was that?

27         THE COURT:  All right, Miss Antar.

1     MS. ANTAR:  Are you insulting me in open court

2     on the record?

3          THE COURT:  Oh, my goodness.  No, I'm just a

4     little exhausted with you.

5          MS. ANTAR:  If you're exhausted with me, why

6     don't you recuse yourself from this case?  Because

7     clearly you shouldn't be sitting at this bench right

8     now.

9          THE COURT:  I am -- I am going to schedule a

10     hearing on the remaining financial motions.

11          MS. ANTAR:  So we're not gonna talk about

12     custody, visitation, access, or the fact that he's

13     denying my child medical access?

14          THE COURT:  And I am --

15          MS. ANTAR:  Okay.

16          THE COURT:  -- going to remind you both that

17     there are some upcoming hearings.  So, there's

18     motions to intervene.  If they're properly --

19          MS. ANTAR:  I also filed a contempt that you

20     ignored, but you let him talk about stuff from three

21     years ago and make up lies.

22          THE COURT:  Okay.  You know what, we're all

23     done.  This hearing's adjourned, ladies and

24     gentlemen.  I'll schedule the remaining motions for a

25     hearing.  You folks are excused.

26

27

NNH-FA19-5046828-S            :  SUPERIOR COURT

THEODORA ANTAR               :  JUDICIAL DISTRICT
                                OF NEW HAVEN

v.                           :  AT NEW HAVEN, CONNECTICUT

MATTHEW LODICE               :  JUNE 15, 2023


C E R T I F I C A T I O N


          I hereby certify the foregoing pages are a true and

correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, Judicial District of

New Haven, Connecticut, before the Honorable Jane Grossman,

Judge, on the 15th day of June, 2023.


          Dated this 20th day of June, 2023 in New Haven,

Connecticut.


                              _____
                              Shannon Anderson
                              Court Recording Monitor

```
NNH-FA19-5046828-S            :   SUPERIOR COURT

THEODORA ANTAR               :   JUDICIAL DISTRICT
                                 OF NEW HAVEN

v.                           :   AT NEW HAVEN, CONNECTICUT

MATTHEW LODICE               :   JUNE 15, 2023
```

E L E C T R O N I C    C E R T I F I C A T I O N

        I hereby certify the electronic version is a true and
correct transcription of the audio recording of the above-
referenced case, heard in Superior Court, Judicial District of
New Haven, Connecticut, before the Honorable Jane Grossman,
Judge, on the 15th day of June, 2023.

        Dated this 20th day of June, 2023 in New Haven,
Connecticut.

                                 _____
                                 Shannon Anderson
                                 Court Recording Monitor