```
NO. NNHFA20-5049515S          :   SUPERIOR COURT

ANTAR, THEODORA               :   JUDICIAL DISTRICT
                                   OF NEW HAVEN
VS.
                              :   AT NEW HAVEN, CONNECTICUT

LODICE, MATTHEW               :   DECEMBER 29, 2020
```

BEFORE THE HONORABLE MARGARET MURPHY, JUDGE

A P P E A R A N C E S :

Representing the

    SELP REP
    856 SHAGBARK DRIVE
    ORANGE CT. 06477

Representing the Defendant

    SELF REP
    48 COREY HILL ROAD
    WATERBURY, CT. 06706

Recorded By:
Kim Korwek

Transcribed By:
Lisa Raccio
Court Recording Monitor
235 Church Street
New Haven, CT. 06510

1      THE COURT:  Good morning, Marshal.  Good

2   morning, everyone.  I understand that we have

3   Ms. Antar on the phone, is that correct?

4      CLERK:  Yes, your Honor.

5      THE COURT:  All right.  So, this is the case

6   of Antar v. Lodice, or Lodice.  And Ms. – Madam

7   Clerk, can you please sear the parties in?

8      CLERK: Yes, your Honor.  Will both parties

9   please raise their right hands?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1  **T H E O D O R A   A N T A R,** 856 Shagbark Drive,

2  Orange, Connecticut, 06477, called as a witness, having

3  been first duly sworn, was examined and testified as

4  follows:

5          CLERK:  Thank you.  Sir?

6  **M A T H E W   L O D I C E,** 48 Corey Hill Road,

7  Waterbury, Connecticut, 06706, called as a witness

8  having been first duly sworn, was examined and testified

9  as follows:

10          CLERK:  Thank you.

11          THE COURT:  All right. So, Mr. Lodice –

12          everybody can take a seat.  So, for the record,

13          this case was called yesterday and the Court

14          did not call Ms. Antar.  And I understand we

15          had her phone number, so, the case was dismissed,

16          but I vacated that dismissal, so that we could

17          have a telephonic hearing today.

18          And, so, this is – Ms. Antar, I'm Judge

19          Margaret Murphy.  I have your application for a

20          restraining order.  It was granted temporarily

21          by Judge Price-Boreland.  Today is the hearing

22          to see if that restraining order should be

23          continued.

24          And, so, right now, it says that it's a

25          residential stay away, meaning Mr. Lodice cannot

26          go to your home, it also protects your two

27          children, Angelina, date of birth May 21, 2019

1    and Julianna Viglione, date of birth September

2    23, 2014.

3         So, I'm going to hear from you first, then,

4    I'm going to hear from Mr. Lodice.  So, for me

5    to issue a restraining order, I need to find

6    that you are under a continuous and present

7    threat of physical pain, physical injury,

8    threatening, or stalking as defined by the law.

9    So, I'll hear from you first, Ma'am?

10        MS. ANTAR:  Okay.  So, you know, I've been

11   dealing with a lot of, you know, emotional abuse

12   by him and he has threatened me several times.

13   He has said to me that he has guns and he said

14   that he doesn't – he thinks that even if I call

15   the police, even if I put cameras or alarms on

16   my house, he says he'll still find a way in.

17        A few weeks ago, he actually broke in

18   through a window in the middle of the night.

19   And he has threatened, several times, saying

20   he'd have me killed, saying that he would, you

21   know, have many of his female friends beat me

22   up.

23        Just as recently as this morning, I received

24   another message from one of his female friends

25   threatening to - to beat me up and – and, you

26   know, several other threatens, mentioning Mathew

27   as well.  And I – And, you know, I'm just – I'm

1    really afraid, I'm – I'm fearing for my life

2    and the life of my children, because he has said

3    several times that he was going to kill me, he

4    was going to have me beat up, he was going to

5    have me jumped.

6        And he's also mentioned many times that –

7    he said he's not afraid because he's not on

8    probation anymore.  And he said that, you know,

9    even though they took his guns away in the past,

10   that he still has guns that they don't know

11   about.  And he said that there's nothing that

12   the cops can do, there's nothing I can do.  He

13   says he'll – If he wants to get in, he'll find

14   a way in.

15       He's showed up to my house several times

16   without me asking him to.  I have it on video

17   several times.  And he has a history of domestic

18   violence.  He's been to jail for domestic

19   violence.  And I – I'm just extremely afraid of

20   him. I want him – I'm asking that the Court will

21   consider my original request, which was that you

22   make the restraining order so that he also can

23   have no contact with me, as well as stay away

24   from my job, and stay within a hundred yards of

25   me as well.

26       THE COURT:  All right.  And so – So, tell

27   me, you said that he broke into your home a

```
1          couple of weeks ago, when – tell me more about
2          that and when was it, approximately?
3              MS. ANTAR:  So, this was when he – when he
4          arrived, it was at 3:30 in the morning, and it
5          was on – early in the morning on December 13th.
6          And, you know, he – he rang my doorbell for
7          over an hour, trying going through several
8          windows, banged on the door over and over,
9          repeatedly, for over an hour, until finally
10         entering in through a window, extremely
11         intoxicated.  He woke my child up.
12             And, you know, he – then, he continued to
13         be extremely aggressive with me, continued
14         threatening me, you know, telling me that
15         there was nothing I can do.  I went to the
16         police a few days later and I reported this.
17         And they suggested that I get a restraining
18         order in order to make it so he has no contact
19         and stay away from me.
20             I, also, at that time, the police called
21         him and said to him do not contact me again or
22         he may be arrested, and he not come to my house
23         again, or he may be arrested.  And this was prior
24         to the restraining order being – being issued.
25             And, so, that – you know, I just – it was
26         extremely unsettling, and I felt violated by the
27         fact that he thinks its okay to enter through a
```

1    window in my home, you know, at four in the

2    morning in the middle of the night.  It's

3    extremely unsettling.  And if he can do that –

4    I – I said, how did you get in, he said, don't

5    worry about it, I'll get in if I want to.  I

6    can do whatever I want.  If I want to come here,

7    I will.

8        THE COURT:  So – So, did you – did you call

9    the police at four in the morning?

10       MS. ANTAR:  No, because he threatened me.

11   He said to me that if I did, that he – he would

12   hurt me and things like that.  So, I – You know,

13   I didn't – I didn't want to, because I didn't

14   feel safe doing that.  And I – He kept trying

15   to stay around and I told him I had to leave,

16   I – you know, I had – I made up a – a lie, I

17   told him I had to meet somebody for lunch when

18   I didn't.  He kept begging to just spend the

19   day together, I – I said, no.

20       I blocked him.  He, then, you know, was –

21   was upset about the fact that I blocked him.

22   And, you know, many times when I blocked him

23   and told him to leave me alone, he proceeded

24   to – to show up at my house, sometimes he would

25   bring his children and show up at the house and

26   try to, you know, use that as an excuse to say,

27   oh, the children want to play together, and – and

1    things like that.  And, you know, just the

2    threats have not stopped.  And now several of

3    his female friends are directly threatening me as

4    well.  And -

5         THE COURT:  How do you know - How do you know

6    that they're his female friends?

7         MS. ANTAR:  Because they - they mentioned

8    him.  They said, you know, - They said - They

9    said, oh, Matt - Mathew's name, and they brought

10   him up in the messages.

11        THE COURT:  All right.  So, I'm going to

12   hear from Mr. Lodice now and I will come back

13   to you as - as I need, all right?

14        MS. ANTAR:  Okay.

15        THE COURT:  All right.  So, Mr. Lodice you

16   heard the - the testimony from Ms. Antar, you

17   know, what do you want the Court to know?

18        MR. LODICE:  I - I did hear, your Honor.

19   All of this is retaliation -

20        THE COURT:  Did you say I did it?

21        MR. LODICE:  No, no, no, I did hear.

22        THE COURT:  Okay.

23        MR. LODICE:  I did hear.  All of this is in

24   retaliation.  That Saturday night I went over

25   her house, she asked me to come over after I was

26   done hanging out with my friends, and I did come

27   over.  We spent the night together.  We, excuse

1    my language, but we did have sex multiple times

2    that night and the next day.  And, then, later

3    that next morning, I said, you know, this

4    probably isn't a good idea, because she – I

5    don't really want to date her and we were still

6    kind of hooking up.  And I said this is probably

7    not a good idea if we do this anymore, you know,

8    I don't think we should see each other anymore.

9        And then, I ended up leaving later that

10   afternoon. I never made any threats towards her.

11   I've nev – I don't have any guns that she's

12   claiming.  I don't have any friends who are going

13   to beat her up.  I've never said anything of the

14   sort.

15       She found out was fooling around with someone

16   at the – one of the teachers at the daycare since

17   then.  She ended up, Tuesday, asking me to come

18   over, I have copies of our text messages.  I

19   printed one for you, one for myself, and one

20   for her, I thought she would be here.  It goes

21   over our whole conversation.  It's her asking

22   me to come over and help her with something,

23   me telling her I can't help her.  And then, as

24   I'm telling her this, she's like, well, it's

25   because you're sleeping with some whore, blah,

26   blah, blah.

27       And then, she says, well, we'll see how

1    you feel when I have you arrested, when I get

2    a restraining order, blah, blah, blah.  You'll

3    see what happens when it's like when we're

4    enemies, when you can't even see your kids

5    anymore.  She's making – She's basically just

6    trying to do this to get back at me.

7         The whole reason she wants this restraining

8    order, because we work for the same company.  And

9    if she gets a restraining order where I can't go

10   see her, be around her, or go to where she works,

11   then I can't work my job.  And this is my career,

12   and I was working there before she even started

13   there.

14        THE COURT:  Where do you – Where do you work?

15        MR. LODICE:  Casanova Remodeling.

16        THE COURT:  Okay.  What – what do you do

17   there?

18        MR. LODICE:  I'm a salesman, I do like sales

19   for roofing, siding, and windows.  She's our

20   office manager.

21        THE COURT:  Okay.  All right.  What about

22   the – What -

23        MR. LODICE:  Not only did she do this, she

24   also – when she also went to the daycare, yelled

25   at the daycare, made a scene at the daycare

26   about the daycare worker who they've are – who's

27   already like left the daycare.  So, they were

1    like we can't do anything because if he did

2    sleep somebody from daycare, outside of daycare,

3    that's not our responsibility.  So, what she

4    did next was call the cop – Woodbridge Police

5    Department on the daycare, filed a false abuse

6    report, and also called DCF on the daycare to

7    try to retaliate against them too.

8         When she called the cops that day, she

9    didn't call until Tuesday, until we had this

10   conversation.  And that's when she decided to

11   call.  And after she called them, I explained

12   to the cop, I showed them all my messages and

13   everything, that's why they didn't arrest me,

14   because they knew I did not break in, they knew

15   it was just her retaliating.  She's just trying

16   to get back at me.

17        I – I don't want to go to her house.  I

18   don't want to see her.  I don't want to be with

19   her, but we have a one-and-a-half-year-old

20   daughter together, we cannot not communicate.

21   I – I can't spend the next year trying to raise

22   my one-and-a-half-year-old daughter with her,

23   co-parent, do drop offs and pick ups and not be

24   able to communicate at all, that's next to

25   impossible.

26        I've nev – I've done nothing wrong to her,

27   other than not want to be with her.  I've never

1       threatened her.  I'm not going to threaten her.

2       I'm not going to hurt her.  I'm not going to do

3       any of those things.  I mean we can do all our

4       speaking through a parenting app, which I made

5       it already, I blocked her since then, because

6       she's still calling me and texting me from

7       like – like fake numbers, you know how they have

8       those apps you can use like fake numbers.  I'm

9       still getting texts from her.

10          So, it's like, I don't know what to do –

11      There's nothing I can do here.  I haven't done

12      anything wrong.  And I feel like because of my

13      past, and I know what my past looks like on

14      paper, and because of that, she's doing this to

15      try to retaliate.  And I don't know – I didn't

16      do anything wrong.  And I feel like this is wrong.

17      And I feel like there's got another way we could

18      do this.  I don't have no problem staying away

19      from her house.  I'm not going to go near her

20      house.

21          Obviously, we're going to have to find a

22      way to drop off our daughter and pick up,

23      especially now that we're losing our daycare,

24      because now our daycare's removing her, because

25      she made a scene at the daycare.  So, now, we

26      don't have the daycare for our daughter anymore.

27          THE COURT:  Okay.  Marshal, can you please

1    get the – the text, the copy of the text, we'll

2    mark those as an exhibit.

3         CLERK:  Yes, your Honor.

4         THE COURT:  Thank you.  So, does either

5    party object if the Court looks at the Family

6    Relations report regarding Mr. Lodice and the

7    arrests?

8         MR. LODICE:  No.

9         THE CORT:  Do you object, Mr. Lodice?

10        MR. LODICE:  No objection.

11        THE COURT:  Okay.  So, does this – Do these

12   arrests involve Ms. Antar?

13        MR. LODICE:  No, this was with my ex-wife

14   years ago.

15        THE COURT:  Okay.  So, it looks like, were

16   they 2012, 2013, 2017?

17        MR. LODICE:  Yes, the 2012, 2013 were the –

18   were the breach of peaces and the violation of

19   conditional release regarding her and her – her

20   boyfriend at the time.

21        THE COURT:  Her being?

22        MR. LODICE:  Her, my ex, Monica, her name is.

23        THE COURT:  Okay.  All right.

24        MR. LODICE:  And then, the reckless

25   endangerment was, I left the – my – my – my

26   oldest to baby sit my youngest, and she called

27   the cops, and, then I took a plea deal to avoid

1 Court.

2   THE COURT:  Okay.  And, then, there are a

3 bunch of restraining orders, are those dealing

4 with Ms. Antar?

5   MR. LODICE:  No, nothing is with Theo.

6   THE COURT:  All right.  So, when the clerk –

7 Thank you.  So, Ms. Antar, there's a – there are

8 some texts that I'm looking at.

9   MS. ANTAR:  Yes, and would I be able to

10 respond to some of the things – some of the

11 things that he said?

12   THE COURT:  Yes, I'll – I'll hear from you

13 now.

14   MS. ANTAR:  I'm sorry, what was that?

15   THE COURT:  I'll hear from you now.

16   MS. ANTAR:  Okay.  So, I'd just like to say,

17 first of all, that everything that Mathew has

18 said is absolutely false.  He has threatened me

19 several times and threatened me with weapons

20 several times.  And I did not tell him to come

21 there on Saturday on that night.  Notice how

22 he has no text messages, or phone records, or

23 anything, indicating that I told him to come,

24 because I never did.

25   We actually spent – And as far as the – the

26 work goes, – And Mathew was terminated from his

27 position at Casanova Remodeling and my – the

1    owner, I have text messages from the owner

2    stating that Matt does not work there anymore.

3    And the owner also stated that he would make

4    sure that Matt does not come to the office ever

5    again.  He said Matt's not allowed at the property

6    and he's been terminated since early in October.

7    He said he does not work for us, period.  So,

8    that's another lie.

9         There's no reason why Matt should be able to

10   come within a hundred yards of me or my place of

11   employment, considering the fact that he lost his

12   job there.  He – He purchased a truck and his –

13   his only job that he has now is snow removal and

14   landscaping, which he did as a result of losing

15   his job.  And I have several – several messages

16   from the owner attesting to that.

17        Second of all, the night where he broke

18   into my house, I did not once ask him to come

19   there.  I never messaged him, called him, texted,

20   anything telling him to come there.  We spent –

21   We've already gone to Court for, you know, the

22   child – the custody for our child.  And we had

23   a very lenient, not very specific schedule which

24   stated we would just one a week-by-week basis,

25   figure out the days for which – which days he

26   would see the baby.

27        And, so, prior to, you know, prior to the

1        beginning of October, we were just kind of just

2        doing it like that, where we would just doing

3        on a week-by-week basis.  Then, things started

4        to get a little bit, really volatile with us,

5        so, we decided to sit down with, actually, the

6        help of my boss, who had us sit down and make

7        a calendar, which we created a schedule for when

8        the baby would be with him, when the baby would

9        be with me.  And we printed it out, we both signed

10       it.  And, you know, the Court advised us to, you

11       know, file a modification and submit that to the

12       Court, which we- we plan to do that as well, and

13       make it a formal, official schedule for our child.

14            So, you know, we've been living separately.

15       I never told him to come to my house.  That night,

16       I actually have witnesses, because I was with

17       one of my very good friends until about eleven

18       o'clock at night. And I went home, you know, I –

19       I locked all my doors and everything.  And I

20       was woken up to him drunk standing in my house

21       at 4:15 in the morning banging on my bedroom door,

22       my daughter's screaming because he woke her up.

23            And I have all the – all the video footage

24       of him spending an hour and fifteen minutes trying

25       desperately to get into the house, ringing the

26       doorbell over, and over, and over, and over,

27       and over until I finally entering through the

1    window.  I - I submitted videos of that to the

2    police.

3         And Mathew is trying to manipulate the

4    Court, manipulate the police.  He has a very,

5    very history of domestic violence.  He was both

6    physically and mentally abusive, and emotionally

7    abusive to his ex-wife.  He still constantly

8    threatens the ex- the ex-wife's new fiancé, who

9    he went to jail for hitting.  He - He hit his

10   ex-wife.  He left his child - his children alone

11   when they were six and - and ten, and left them

12   alone just to go with some girlfriend he had.

13        Also, as - as far the daycare goes, I can't

14   comment too much, because there's an ongoing

15   lawsuit.  And the reason why my daughter is being

16   dismissed from the daycare is because Matt had

17   sexual relations with one of the teachers, which

18   was going against their policy.  And they said,

19   due to his misconduct, that's the reason my

20   daughter is getting her daycare -

21        THE COURT:  Okay.  I'm going to interrupt

22   you, because this doesn't really have anything

23   to do with the two of you.  I am looking at these

24   text messages and they start on December 15th,

25   which is a few days after you said that he broke

26   in.  The text messages reference, you know, him

27   breaking in, but you don't seem too upset about

1      it in the – the text message.  I will note that

2      the phone number is the same one that you're

3      calling – that – that we called you on today.

4          MS. ANTAR:  Yes.  And Mathew actually

5      deleted several of the messages before taking a

6      screenshot and printing it.  So, you know, the

7      messages I have are completely different from

8      what he has –

9          THE COURT:  Well, in these, you're – you're

10      asking him to come over and help you with plowing

11      and moving stuff, and, you know –

12          MS. ANTAR:  Yes, like I said, he has –

13          THE COURT:  You seem pretty – You seem pretty

14      upset in these messages about him being with other

15      woman.

16          MS. ANTAR:  Right.  And like he deleted a

17      lot of those messages, so you can't see the full

18      context of the conversation, which is what he's

19      trying to do, because he just so desperately

20      trying to make it so, you know, these – this

21      restraining order gets dropped.  I – I – I

22      don't feel safe.  I really don't feel safe.

23      If somebody is constantly, constantly showing

24      up all the time, telling me that they're going

25      to kill me, telling me they're going to have

26      me clipped, telling me they're going to have

27      me jumped, saying to me that the Albanian woman

1      that live across the street from him at his

2      mother's house are ready, and that – that, oh,

3      I can have you jumped at any second –

4          THE COURT: All right.  All right.  All

5      right.  All right.  I don't find either of you

6      very credible.

7          MR. LODICE:  Your Honor, I can –

8          THE COURT:  Excuse me.

9          MR. LODICE:  Okay.  I'm sorry.

10          THE COURT: I'm – I'm – I'm ruling.  So, I –

11      I've listened to both of you, I've seen the –

12      the text messages, you both kind of tell the

13      same story, but neither of you are completely

14      credible.  But, I don't find, Ma'am, Ms. Antar,

15      that you've met your burden of proof to show

16      that you are subject to a continuous threat of

17      physical pain, physical injury, threatening or

18      stat – under the statute.  So, I'm going to

19      dismiss the application.  Sir, I agree, you

20      should stay away.

21          MR. LODICE:  I will.

22          THE COURT:  I'm not – There's no order, but

23      stay away.  You two are going to – You have a

24      custody matter in this Court, there were orders

25      in that custody matter.  I don't find that you

26      are a threat to your children.  I haven't heard

27      anything that you're a threat to them, or to –

1          to her, the daughter that you guys have together.

2          If you need additional orders for pick ups and

3          drop offs, then you can file a motion, you can

4          reach an agreement.  But the application for the

5          TRO is dismissed.  Okay.  Court stands in recess.

6

7

8                    **WHEREUPON THE COURT WAS RECESSED**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
NO. NNHFA20-5049515S          :  SUPERIOR COURT

ANTAR, THEODORA               :  JUDICIAL DISTRICT
                                  OF NEW HAVEN
VS.
                              :  AT NEW HAVEN, CONNECTICUT

LODICE, MATTHEW               :  DECEMBER 29, 2020
```

C E R T I F I C A T I O N

     I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of New Haven, Connecticut, before the Honorable Margaret Murphy, Judge on the 29th day of December, 2020.

     Dated this 2nd day of June, 2023 in New Haven, Connecticut.

*Lisa Raccio*
_____
Lisa Raccio
Court Recording Monitor

21

```
NO. NNHFA20-5049515S          :  SUPERIOR COURT

ANTAR, THEODORA               :  JUDICIAL DISTRICT
                                   OF NEW HAVEN
VS.
                              :  AT NEW HAVEN, CONNECTICUT

LODICE, MATTHEW               :  DECEMBER 29, 2020
```

C E R T I F I C A T I O N

       I hereby certify the electronic version is a true
and correct transcription of the audio recording of the above-
referenced case, heard in Superior Court, Judicial District
of New Haven, Connecticut, before the Honorable Margaret Murphy,
Judge on the 29th day of December, 2020.

       Dated this 26th day of June, 2023 in New Haven,
Connecticut.

*Lisa Raccio*
_____
Lisa Raccio
Court Recording Monitor